# 25-3047

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

MARISOL ARROYO-CASTRO,

*Appellant*,

*v.*

ANTHONY GASPER, ET AL.,

*Appellees*.

On Appeal from U.S. District Court for the District of Connecticut,
No. 3:25-cv-00153-SFR

## BRIEF AND SPECIAL APPENDIX FOR APPELLANT

JEFFREY C. MATEER
DAVID J. HACKER
JEREMIAH G. DYS
HOLLY M. RANDALL
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075
(972) 941-4444

REBECCA R. DUMMERMUTH
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave, NW, Suite 1410
Washington, DC 20037
(202) 921-4105

MATTHEW T. MARTENS
KEVIN M. GALLAGHER
DONNA M. FARAG
JONATHAN W. ELLISON
ANDREW NELL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
(202) 663-6921

ROBERT KINGSLEY SMITH
JAYNE HOLLOWAY MORRIS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State St.
Boston, MA 02109
(617) 526-6759

March 18, 2026

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ....................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 4

STATEMENT OF THE ISSUES.................................................................. 4

STATEMENT OF THE CASE...................................................................... 5

      A.     Factual Background.................................................................. 5

      B.     Procedural History................................................................ 11

STANDARD OF REVIEW ........................................................................ 14

SUMMARY OF ARGUMENT .................................................................. 15

ARGUMENT ............................................................................................. 17

I.     MS. CASTRO IS LIKELY TO SUCCEED ON THE MERITS OF HER
     CONSTITUTIONAL CLAIMS ................................................................ 18

      A.     Ms. Castro Is Likely To Succeed On Her Free Exercise
            Claim ................................................................................... 18

            1.     Defendants burdened Ms. Castro's sincere
                  religious practice in a manner that is neither
                  neutral nor generally applicable, triggering strict
                  scrutiny ................................................................... 19

                  a.     Ms. Castro's religious practice is attributable
                        to her, not the school..................................... 19

                      i.     Ms. Castro's sincere religious
                             exercise includes personal prayer and
                              meditation, aided by viewing a
                              crucifix................................................. 19

ii.    That religious exercise is not attributable to the state ..........................21

b.    Defendants have burdened Ms. Castro's religious exercise ........................................30

c.    Defendants' singling out of Ms. Castro's religious exercise is subject to strict scrutiny.................31

2.    Defendants' discriminatory treatment of Ms. Castro's personal religious exercise cannot satisfy strict scrutiny....................................................................35

a.    The school district lacks a compelling interest in burdening Ms. Castro's religious exercise ......................................................35

i.    Ms. Castro's personal religious expression is consistent with a history of religious displays that do not violate the Establishment Clause .........................36

ii.    Ms. Castro's visible personal religious exercise was not government coercion ...............39

b.    The leeway doctrine cannot supply a compelling interest .........................................42

c.    Defendants' policy is not narrowly tailored to serve any compelling interest ....................................46

B.    Ms. Castro Is Likely To Succeed On Her Free Speech Claim ...........................................................................47

1.    Ms. Castro's display of her religious identity was expression on a matter of public concern ...............................49

2.    Ms. Castro's display of her religious identity was private expression in her personal capacity .............................49

3.    Defendants have not offered a valid justification for restricting Ms. Castro's personal expression ......................54

II.     MS. CASTRO HAS SUFFERED IRREPARABLE HARM AS A RESULT OF DEFENDANTS' CONSTITUTIONAL VIOLATIONS ..............................................58

III.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF A PRELIMINARY INJUNCTION ..............................................................................................60

CONCLUSION......................................................................................................61

CERTIFICATE OF COMPLIANCE

SPECIAL APPENDIX

## TABLE OF AUTHORITIES

### CASES

Page(s)

*360 Virtual Drone Services LLC v. Ritter*, 102 F.4th 263 (4th Cir. 2024) .................................................................................................15

*A.H. ex rel. Hester v. French*, 985 F.3d 165 (2d Cir. 2021) ....................................60

*Agudath Israel of America v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) ...........32, 58, 60

*Barber v. Rounds*, No. 25-20125, ---F.4th---, 2026 WL 657874 (5th Cir. Mar. 9, 2026).......................................................................46, 47. 54

*Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir. 1998) .......................................................................................50, 51

*Bronx Household of Faith v. Board of Education City of New York*, 750 F.3d 184 (2d Cir. 2014) ...................................................................14, 44

*Cambridge Christian School, Inc. v. Florida High School Athletic Association*, 115 F.4th 1266 (11th Cir. 2024) ...............................................28

*Carson v. Makin*, 596 U.S. 767 (2022) ....................................................................43

*Central Rabbinical Congress of United States & Canada v. New York City Department of Health & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014)....................................................................................32, 33

*Chalifoux v. New York Caney Independent School District*, 976 F. Supp. 659 (S.D. Tex. 1997)..............................................................25

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)................................................................................18, 31, 46

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................49

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351 (2d Cir. 2024) ........................................................................17

*Draper v. Logan County Public Library*, 403 F. Supp. 2d 608 (W.D. Ky. 2005) .................................................................................................25

*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................................................................59

*Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 877 (1990) ...................................................................18, 31

*Engel v. Vitale*, 370 U.S. 421 (1962) ...................................................................39, 41

*Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 428 F.3d 223 (6th Cir. 2005)..............................................53

*Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, 624 F.3d 332 (6th Cir. 2010)..............................................50

*Firewalker-Fields v. Lee*, 58 F.4th 104 (4th Cir. 2023) .........................................36

*Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) .................................35

*Freedom from Religion Foundation, Inc. v. Mack*, 4 F.4th 306 (5th Cir. 2021)..................................................................................38

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)..............................................33

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)............................... 17, 23, 48, 50, 52, 54

*Gardner-Alfred v. Federal Reserve Bank of New York*, 143 F.4th 51 (2d Cir. 2025)................................................................................ 20-21

*GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) ..................................................................................26, 28

*Good News Club v. Milford Central School*, 533 U.S. 98 (2001) ...............41, 56, 58

*Heil v. Santoro*, 147 F.3d 103 (2d Cir. 1998) ........................................................56

*Hernandez v. Commissioner*, 490 U.S. 680 (1989) ................................................20

*Hills v. Scottsdale Unified School District*, 329 F.3d 1044 (9th Cir. 2003) ................................................................................................41

*Hilsenrath ex rel. C.H. v. School District of Chathams*, 136 F.4th 484 (3d Cir. 2025)...................................................................................36

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) ................................................15, 49

*James v. Board of Education Central District No. 1 Towns of Addison*,
461 F.2d 566 (2d Cir. 1972) ........................................................57

*Johnson v. Poway United School District*, 658 F.3d 954 (9th Cir.
2011) ..............................................................28, 29, 49, 52

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022)..........................*passim*

*Knight v. Connecticut Department of Public Health*, 275 F.3d 156
(2d Cir. 2001)...............................................13, 33, 34, 44, 45

*Lane v. Franks*, 573 U.S. 228 (2014)...................................................49

*Lee v. Weisman*, 505 U.S. 577 (1992) ..................................37, 40, 41, 46

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .................................................36

*Lindke v. Freed*, 601 U.S. 187 (2024) .............................................24, 25

*Lugar v. Edmondson Oil Company*, 457 U.S. 922 (1982).......................................25

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ...................................................38

*Marchi v. Board of Cooperative Educational Services of Albany*,
173 F.3d 469 (2d Cir. 1999) .......................................35, 42, 43, 44

*Matal v. Tam*, 582 U.S. 218 (2017) .....................................................26

*Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015)................24, 50, 51, 53

*Mid Vermont Christian School v. Saunders*, 151 F.4th 86 (2d Cir.
2025) ...................................................14, 17, 58, 59, 60

*Montero v. City of Yonkers*, 890 F.3d 386 (2d Cir. 2018) ...............................50, 53

*New Yorkers for Religious Liberty, Inc. v. City of New York*, 125 F.4th
319 (2d Cir. 2025).......................................................59

*Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536 (W.D. Pa.
2003) .....................................................................25

*Paulson v. County of Nassau*, 925 F.2d 65 (2d Cir. 1991) .....................................59

*Pickering v. Board of Education Township High School*, 391 U.S. 563 (1968) ..................................................................................... 16-17, 48

*Polk v. Montgomery County Public School*, 166 F.4th 400 (4th Cir. 2026) ...............................................................................................30, 51

*Rankin v. McPherson*, 483 U.S. 378 (1987) ......................................................49, 57

*Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025).................................................28

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ....................58

*Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000)...........30, 40, 41

*School District of Abington Township v. Schempp*, 374 U.S. 203 (1963) ..................................................................................... 39-40

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ...................... 25, 26, 27, 37, 38, 58

*Skoros v. City of New York*, 437 F.3d 1 (2d Cir. 2006) ...........................................45

*Stone v. Graham*, 449 U.S. 39 (1980).................................................................40, 41

*Sullivan v. American Airlines, Inc.*, 424 F.3d 267 (2d Cir. 2005) ...........................43

*Tandon v. Newsom*, 593 U.S. 61 (2021) ...............................................................32

*Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707 (1981)..............................................................................31

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969)..............................................................................3, 53, 56

*Town of Greece v. Galloway*, 572 U.S. 565 (2014).........................................37, 38

*Tucker v. State of California Department of Education*, 97 F.3d 1204 (9th Cir. 1994) ...........................................................................26, 57, 58

*United States v. Virginia*, 518 U.S. 515 (1996) .......................................................56

*Weintraub v. Board of Education City School District of New York*, 593 F.3d 196 (2d Cir. 2010) ...............................................................22, 49, 50, 54

*Wood v. Florida Department of Education*, 142 F.4th 1286 (11th Cir. 2025) ...............................................................................50, 54

*Ziparo v. CSX Transportation, Inc.*, 160 F.4th 314 (2d Cir. 2025) .........................43

*Zorach v. Clauson*, 343 U.S. 306 (1952) ................................................................38

## STATUTES

28 U.S.C.
§ 1292 .................................................................................................4
§ 1331 .................................................................................................4

42 U.S.C. § 1983 ................................................................................................11

Conn. Gen. Stat. § 52-571b................................................................................11

## LEGISLATIVE MATERIALS

1 Annals of Cong. 757-760 (J. Gales ed., 1789)........................................................37

1 Annals of Cong. 949-950 (J. Gales ed., 1789)........................................................38

## SACRED SCRIPTURE

*Holy Bible* (New American Bible, Revised ed.)
Matthew 5:15 .......................................................................2, 9, 20
Matthew 22:21 ...................................................................................9

## OTHER AUTHORITIES

Brockhaus, Hannah, *Pope Francis: The Crucifix is for Prayer, not Decoration*, EWTN News (Mar. 18, 2018), https://perma.cc/CJL2-8EJ5 ........................................................................24

*Catechism of the Catholic Church* (2d ed. 1997) .................................................24

McConnell, Michael W., *Coercion: The Lost Element of Establishment*, 27 Wm. & Mary L. Rev. 933 (1986) ...................................37

McConnell, Michael W., *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003)........................................37

## INTRODUCTION

Plaintiff Marisol Arroyo-Castro, a veteran public-school teacher, is a devout Roman Catholic who wants to pray silently to herself during work breaks and draw spiritual inspiration throughout the workday by looking to a crucifix. According to her conscience, this requires placing the crucifix in a visible location where she can glance at it as needed. Defendants, administrators of the public school at which Ms. Castro worked, refuse to let her do so.

In the fall 2024, Defendants asked Ms. Castro to teach an unruly seventh-grade class at DiLoreto Elementary & Middle School, and, as had been her practice for a decade, she placed a crucifix at waist height on the wall next to her desk in her new classroom. This was consistent with the school's practice of allowing teachers to place personal items—including family photos, mugs with inspirational quotes, pop culture figurines, and professional sports memorabilia—around their desks in the classroom. Ms. Castro made no reference to the crucifix as any part of her instructional duties. Rather, she looked to the crucifix to pray during breaks and for inspiration during stressful moments throughout the day.

In December 2024, Defendants abruptly directed Ms. Castro to remove the crucifix from the wall to avoid a purported establishment of religion and suggested that she instead put the crucifix in the kneehole or a drawer of her desk. One Defendant even criticized Ms. Castro's use of the crucifix as violating the biblical

command against "idol" worship.  Ms. Castro viewed the kneehole and drawer suggestions as disrespectful of the crucifix, contrary to the demands of her faith, and feared that removing the crucifix would violate Christ's instruction not to hide her "light … under a bushel."  Matthew 5:15 (New Am. Bible, Rev. ed.).  So she refused to remove the crucifix, invoking her First Amendment freedoms.  In retaliation, Defendants suspended her without pay, placed her on leave, and then reassigned her to an administrative position away from the classroom.  By singling out Ms. Castro's personal religious exercise and expression for sanction, Defendants violated her First Amendment rights.

*First*, Ms. Castro placed the crucifix next to her desk to aid *her* in silent prayer and to provide *her* with spiritual inspiration, both aspects of her personal religious exercise.  Under the Free Exercise Clause, a government cannot burden such religious exercise through a rule that is not neutral and generally applicable unless that rule satisfies strict scrutiny.  Below, "Defendants d[id] not argue that they acted pursuant to a neutral or generally applicable policy or that they did not burden Ms. Castro's free exercise of religion."  SPA29.  Rather, Defendants admitted that "teachers generally have been permitted to display some personal items in their classrooms or work areas."  JA122(¶14).  And Defendants have targeted Ms. Castro's personal religious exercise—ridiculing her for "idol" worship, demanding that she conceal the crucifix, and punishing her when she refused—with no

- 2 -

compelling reason for doing so.  Defendants' misplaced concerns about a phantom Establishment Clause violation provide no justification for their discrimination against Ms. Castro's religious exercise.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 542-543 (2022).

***Second***, the Free Speech Clause protects personal expression by teachers, who do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The district court erroneously concluded that because Defendants allow teachers to decorate their classrooms, Ms. Castro's placement of a crucifix next to her desk was government speech that the school district could control.  But Ms. Castro's crucifix—like other teachers' family photos, inspirational quote mugs, pop culture figurines, and sports memorabilia—is *her* personal expression, merely identifying *herself* as a Catholic.  There is no evidence that anyone understood the crucifix to be the school district's speech or its endorsement of the Roman Catholic faith.  The mere fact that Ms. Castro's expression occurred in a classroom during the school day does not render it government speech.  Ms. Castro's rights to her own expression are not outweighed by the government's misplaced Establishment Clause concerns or its unsubstantiated and uncommunicated disruption rationale.  *See Kennedy*, 597 U.S. at 532-542.

For these reasons, Ms. Castro is likely to succeed on the merits of her constitutional claims. Infringement of her First Amendment rights while this litigation is pending is an irreparable harm, and the balance of interests weighs in favor of enjoining Defendants from continuing that harm. Accordingly, the district court erred in denying Ms. Castro's motion for a preliminary injunction. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331. Ms. Castro timely appealed from the district court's order denying her motion for a preliminary injunction. JA319. This Court has jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether Ms. Castro is likely to succeed on the merits of her First Amendment free exercise claim.

   a. Whether Ms. Castro's prayer with the aid of a crucifix is her personal religious exercise.

   b. Whether Defendants' admitted targeting of Ms. Castro's crucifix-aided prayer because it was religious is subject to strict scrutiny, rather than *Pickering-Garcetti* balancing and/or the leeway test.

    c. Whether Defendants satisfy strict scrutiny where Defendants' only asserted interest is a phantom Establishment Clause violation.

2. Whether Ms. Castro is likely to succeed on the merits of her First Amendment free speech claim.

    a. Whether Ms. Castro's expression of her Catholic identity was government speech or her personal expression.

    b. Whether Defendants' punishment of Ms. Castro's personal expression is justified under the *Pickering-Garcetti* balancing test, where Defendants' only asserted interest is a phantom Establishment Clause violation.

3. Whether Ms. Castro is suffering irreparable harm from Defendants' violations of her constitutional rights.

4. Whether the public interest favors issuing a preliminary injunction.

## STATEMENT OF THE CASE

**A.     Factual Background**

For more than three decades, Marisol Arroyo-Castro has been a public-school teacher at DiLoreto Elementary & Middle School ("DiLoreto") in New Britain, Connecticut.  JA56(¶¶3-4,7).  She holds a master's degree in elementary education and has earned credits toward a doctorate in counseling psychology.  JA56(¶5).  Ms.

- 5 -

Castro is also certified to mentor beginning teachers and has done so for the last ten years. JA56(¶6).

From 2004 through 2024, Ms. Castro mostly taught 3rd and 4th grade but has also taught 6th and 7th grade. JA56(¶7). She regularly received "proficient" or "exemplary" evaluations. JA57(¶8). Teaching at DiLoreto is challenging because many students have significant educational and behavioral issues. JA57(¶9). Ms. Castro, however, is known as an effective disciplinarian who prioritizes adherence to classroom rules to foster a safe and well-organized environment for children. *Id.*

For ten years, Ms. Castro hung a crucifix near her desk in her classroom. JA58(¶16). Also, she displayed a Yankees pennant, family pictures, a church calendar, and (around the holidays) a Christmas tree. JA58(¶17). Ms. Castro also wore a crucifix necklace while she taught. JA58(¶19). The crucifix is important to Ms. Castro's personal identity as a Roman Catholic, and she has a crucifix in several rooms of her home, believing it protects her. *Id.*

In the fall 2024, DiLoreto's principal, Dario Soto, reassigned Ms. Castro to teach 7th grade, JA57-58(¶¶13,15), because he believed Ms. Castro's "strong" teaching abilities equipped her to address behavioral problems in the middle school, which lacked qualified teachers. JA58(¶15). Due to the move, Ms. Castro changed classrooms and began reporting to DiLoreto vice principal Andrew Mazzei. JA57-

58(¶¶14-15).  As she had in the past, Ms. Castro hung her crucifix on the wall by her desk, at waist height below the level of a nearby computer monitor.  JA59(¶23).



JA67.  Most other teachers likewise display on or near their desks personal items like inspirational quotes, pop culture icons, family photos, and college and professional sports pennants.  JA58-60(¶¶16,25-26).  As Defendants admit, "teachers generally have been permitted to display some *personal* items in their classrooms or work areas."  JA122(¶14) (emphasis added).

On December 3, 2024, Mr. Mazzei emailed Ms. Castro asking to discuss a "concern" about her crucifix.  JA60(¶27).  At their meeting, Mr. Mazzei said the First Amendment prohibits "the permanent display of a religious symbol" in a public

school, which "may not erect any type of religious display on school property," and ordered Ms. Castro to take down her crucifix. JA61(¶28). He advised Ms. Castro that if she failed to remove her crucifix it would be "insubordination" exposing her to "disciplinary measures." *Id.* But as a matter of religious conviction, Ms. Castro could not bring herself to remove the crucifix. JA61(¶29).

On December 10, 2024, Mr. Mazzei, Mr. Soto, and Maryellen Manning (the school district's chief of staff) met with Ms. Castro and her union representative to discuss the crucifix. JA57(¶12), JA61(¶30). Ms. Manning advised Ms. Castro that, as a public-school employee, she was required to avoid the "perception of promoting a particular religion." JA61(¶30). Ms. Manning ordered Ms. Castro to remove the crucifix and suggested that she instead keep it in a drawer where she could access it as needed. *Id.* Ms. Castro pointed out that other teachers display personal items on or around their desks, but Ms. Manning would not relent. *Id.* Mr. Soto offered his view that Christians should not worship "idols" and questioned whether Ms. Castro wanted to remain "true" to that as a Christian. *Id.*

As a compromise, Ms. Castro agreed to hang the crucifix on her desk in a place less visible to students, but Ms. Manning insisted that Ms. Castro place the crucifix in her desk's kneehole. JA61-62(¶¶31-32). Ms. Castro objected, viewing this as disrespectful of the crucifix. JA62(¶32). Although she did as Ms. Manning demanded, she immediately "felt sick to [her] stomach," "almost collapsed," and

"broke down and began sobbing." JA62(¶33). The next morning, true to her religious conviction, Ms. Castro returned the crucifix to the wall beside her desk. JA62(¶35). Concealing the crucifix under her desk would, in Ms. Castro's view, be hiding her light "under a bushel," contrary to Jesus's instruction. JA62(¶33), JA64(¶46); *see* Matthew 5:15. The placement of the crucifix was important to Ms. Castro not only because it expressed her identity as a Catholic but also because it helped her pray silently during lunch breaks and seek peace and strength as she faced the challenges of teaching. JA59(¶¶20-21).

Because Ms. Castro refused to remove the crucifix, Ms. Manning issued her a Letter of Reprimand for insubordination. JA62(¶36). According to Ms. Manning, Ms. Castro's hanging of her crucifix in her classroom was, "in effect, saying that 'the New Britain Board of Education endorses religion.'" *Id,* Ms. Manning directed that the Letter of Reprimand be included in Ms. Castro's disciplinary file. JA63(¶37).

Later that day, Mr. Soto came to Ms. Castro's classroom at Ms. Manning's direction to assist Ms. Castro in removing the crucifix. JA63(¶40). Mr. Soto advised Ms. Castro that she needed to remove the crucifix to properly "live out [her] faith." JA63(¶39). He spoke about "giv[ing] Caesar what is Caesar's" (a reference to Matthew 22:21) and again compared the crucifix to an "idol[]." *Id.* Ms. Castro refused to remove her crucifix. JA63(¶40).

On December 12, 2024, Ms. Castro arrived in her classroom to find her crucifix had been removed. JA63(¶41). Ms. Castro went to meet with Ms. Manning, Mr. Soto, and Mr. Mazzei. *Id.* At that meeting, Ms. Manning suspended Ms. Castro for two days without pay and sent her home with her crucifix, telling her that a few days of suspension without pay would help her "reflect" on whether it was in her "best interest" to continue hanging the crucifix on the wall. JA63(¶¶41-42). The written Notice of Suspension stated that "putting [a] religious artifact on the wall of the school building is not legally permissible" because it "send[s] the message that the school district … is promoting that religion." JA63(¶43). The Notice further stated that Ms. Castro could return to work on December 16 only if she agreed to keep the crucifix off the wall. JA64(¶44). Ms. Castro was advised that the Notice would also be included in her disciplinary file. *Id.* When Ms. Castro responded that she could not in good conscience remove the crucifix, she was placed on indefinite paid leave. JA64(¶¶46,48).

On January 24, 2025, Ms. Castro attended a video conference with Ms. Manning and Anthony Gasper, the school district's superintendent. JA57(¶11), JA64(¶50). Seven times during that meeting, Mr. Gasper asked Ms. Castro if she would move the crucifix from the wall to a concealed location. *Id.* Each time, Ms. Castro advised that she would not do so as long as other teachers were permitted to display personal items in their desk areas in their classrooms. *Id.* Ms. Castro's

position was consistent with guidance issued to elementary and secondary schools by the U.S. Department of Education during the Biden Administration, which provides that, "where a school permits teachers, coaches, and other employees to engage in personal speech, … it may not prohibit those employees from engaging in prayer merely because it is religious or because some observers, including students, might misperceive the school as endorsing that expression." JA106 (citing *Kennedy*, 597 U.S. at 531-536). Nevertheless, because of Ms. Castro's refusal to remove and conceal her crucifix, Mr. Gasper confirmed during that January 24 meeting that Ms. Castro would remain on administrative leave. JA64-65(¶50); JA130(¶45).

## B. Procedural History

On January 30, 2025, Ms. Castro sued Gasper, Manning, Soto, and Mazzei (collectively, "Defendants") under 42 U.S.C. § 1983, alleging violations of her First Amendment free exercise and free speech rights. JA13-55. Ms. Castro also alleged a violation of her rights under Connecticut's Act Concerning Religious Freedom, Conn. Gen. Stat. § 52-571b. JA13-55. In February, someone from the school district released Ms. Castro's teacher evaluation and performance information to the media. JA65(¶52). Then, on March 6, Defendants met with Ms. Castro to inform her that she was being involuntarily reassigned to a non-teaching role because of "concerns about [her] instructional pedagogy and [her] personal beliefs that [Defendants] need to look into." JA65(¶54).

Given this escalating retaliation, Ms. Castro moved for a preliminary injunction on March 14. One month later, Defendants answered Ms. Castro's complaint, "admit[ting] that teachers generally have been permitted to display some personal items in their classrooms or work areas." JA122(¶14). Defendants further admitted that they "confirmed the imposition of administrative leave" on Ms. Castro because of her refusal to remove the crucifix. JA130(¶45). The district court held oral argument on Ms. Castro's preliminary injunction motion in May.

Almost six months later, the district court denied the motion. On Ms. Castro's free speech claim, the district court focused on "whether Ms. Castro displayed the crucifix on the classroom wall pursuant to her official duties as a teacher or as a private citizen." SPA18. If Ms. Castro was acting pursuant to her official duties, the court explained, the Free Speech Clause would not "shield" her from the school's "'control and discipline because [such] speech is—for constitutional purposes at least—the government's own speech.'" SPA2. The court reasoned that because "Ms. Castro's job duties specifically included decorating the classroom walls," it followed that she "acted pursuant to her official duties when she posted items on the classroom wall that students would see during instructional time." *Id*. Accordingly, the court held, Ms. Castro's expressive act of displaying the crucifix on the wall was unprotected by the Free Speech Clause. SPA27.

The district court also deemed Ms. Castro's free exercise claim unlikely to succeed. Primarily, the district court concluded the crucifix was government speech unprotected by the Free Exercise Clause, determining that "Ms. Castro's free exercise claim rests on exercise that necessarily involves communication of a religious message" and repeating its free speech holding that Ms. Castro's "crucifix display on the classroom wall" was speech attributed to the school district. SPA34.

Even if the crucifix were attributed to Ms. Castro, the district court opined that Ms. Castro's free exercise claim would still likely fail. SPA38. Defendants conceded that they did not act neutrally or pursuant to a generally applicable policy, SPA29, but the court declined to apply strict scrutiny in the government employee context, holding that the school district needed only to show that its interests in efficient operation of the school outweighed Ms. Castro's interest in religious exercise, SPA35-37 (citing *Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 160 (2d Cir. 2001)). But the district court then declined to balance those interests. SPA38(n.21). Instead, it gave the school district "some leeway" given its alleged Establishment Clause concerns. SPA37-40. Applying this "leeway" test, the court concluded that Ms. Castro was "unlikely to show that Defendants did anything other than make 'a reasonable, good faith judgment' that permitting Ms. Castro to hang the crucifix on the classroom wall during instructional time 'runs a substantial risk of incurring a violation of the Establishment Clause.'" SPA42

- 13 -

(quoting *Bronx Household of Faith v. Board of Educ. City of N.Y.*, 750 F.3d 184, 198 (2d Cir. 2014)). Thus, the district court determined that Ms. Castro was unlikely to prevail on the merits of her free exercise claim.

Accordingly, the district court denied the preliminary injunction as to Ms. Castro's free exercise and free speech claims. Given those rulings, the court also determined it was unlikely to exercise supplemental jurisdiction over Ms. Castro's remaining claim under Connecticut's religious freedom statute and declined to grant a preliminary injunction based on that claim. SPA52-53.[1] Without a preliminary injunction, Defendants continue to prohibit Ms. Castro from teaching if she abides by her religious conviction. Ms. Castro timely appealed from the district court's order on December 3, 2025. JA319.

## STANDARD OF REVIEW

This Court "review[s] a district court's denial of a preliminary injunction for abuse of discretion, but must assess *de novo* whether the court proceeded on the basis of an erroneous view of the applicable law." *Mid Vt. Christian Sch. v. Saunders*, 151 F.4th 86, 92 (2d Cir. 2025). For First Amendment claims, whether a government employee's speech or conduct was in the employee's capacity as an employee or as a citizen is "a question of law for the court," and subject to *de novo* review.

---

[1] Ms. Castro does not appeal, at this stage, the court's decision to deny her a preliminary injunction based on her state law claim.

*Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011). So are the questions of what level of scrutiny applies and whether it is satisfied. *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 270 (4th Cir. 2024), *petition filed*, No. 24-279 (U.S.).

### SUMMARY OF ARGUMENT

For a decade, Ms. Castro placed a crucifix next to her desk to aid *her* personal prayer during breaks and to derive spiritual inspiration to face the stresses of the workday. The district court's ruling that Ms. Castro had no constitutional right to place a crucifix next to her desk to aid in her personal religious exercise hinged on the court's legal conclusion that the crucifix would reasonably be understood as speech attributable to the government.

This photo alone refutes that conclusion:



- 15 -

So too does the uncontroverted evidence that DiLoreto teachers regularly display personal items on and about their desks. JA69. As Defendants have admitted, Ms. Castro never invoked the crucifix as part of curricular instruction. *See* D.Ct. 50 at 1, 4-5, 17, 22, 24. And there is no evidence that anyone understood—much less *reasonably* understood—the crucifix to represent the school district's position on some religious question. The district court's legal conclusion that the crucifix nonetheless constituted governmental religious exercise and expression unprotected by the First Amendment cannot be squared with the Supreme Court's decision in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022).

Since the district court erred in concluding as a matter of law that Ms. Castro's display of her crucifix was government speech and not private religious exercise, the court's order denying preliminary injunctive relief must be reversed. Defendants concede that when they punished Ms. Castro for hanging her crucifix to channel her prayers, they did not act pursuant to any "neutral" or "generally applicable" policy. SPA29. But Defendants cannot single out for punishment a teacher's personal religious exercise unless they satisfy strict scrutiny. Defendants have identified no compelling interest justifying their suppression of Ms. Castro's personal religious exercise, much less shown that their response to her crucifix was narrowly tailored to such an interest. And even under the balancing test that applies to government-employee free speech claims under *Pickering v. Board of Education Township High*

- 16 -

*School*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the government has not identified any legitimate interest that outweighs Ms. Castro's free speech rights. Accordingly, Ms. Castro is likely to prevail on her constitutional claims and injunctive relief should have been granted.

## ARGUMENT

A plaintiff seeking a preliminary injunction against the government must show (1) "a likelihood of success on the merits," (2) "irreparable harm absent injunctive relief," and (3) "public interest weighing in favor of granting the injunction." *Mid Vt. Christian Sch.*, 151 F.4th at 92.[2] The district court denied Ms. Castro's motion for a preliminary injunction based only on the first element, concluding that she is not likely to succeed on either of her constitutional claims. But Ms. Castro is likely to succeed on those claims. Those ongoing constitutional violations inflict irreparable harm, and enjoining constitutional harms would serve the public interest, warranting relief.

---

[2] Ms. Castro seeks to enjoin Defendants from continuing to adversely limit Ms. Castro's employment due to the crucifix. JA256; D.Ct. 60 at 1 n.1. Such an injunction would, as Defendants concede, JA256, be prohibitory as it would return her employment status to "the last, actual, peaceable[,] uncontestable status which preceded the pending controversy," *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024).

## I. MS. CASTRO IS LIKELY TO SUCCEED ON THE MERITS OF HER CONSTITUTIONAL CLAIMS

Ms. Castro brought claims against Defendants for violating her First Amendment rights to free exercise of religion and free speech. She is likely to prevail on both claims.

### A. Ms. Castro Is Likely To Succeed On Her Free Exercise Claim

To make out a free exercise claim, a plaintiff must "show[] that a government entity has burdened h[er] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525 (quoting *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 877, 879-881 (1990)). Once the plaintiff makes that showing, the burden shifts to the government to "satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

Under this framework, Ms. Castro is likely to prevail on her free exercise claim. She placed her crucifix on the wall next to her desk so that it was visible to her to aid her personal, silent prayer and meditation. Defendants burdened that religious exercise by demanding that Ms. Castro conceal the crucifix and punishing her when she refused. At the same time, Defendants admit that the school district permits other teachers to "display some personal items in their classrooms or work areas," JA122(¶14), and further admit that they singled out the crucifix *because* it is

- 18 -

religious, JA64-65(¶50); JA81-86; D.Ct. 50 at 5-8. Thus, Defendants' discriminatory treatment of Ms. Castro's crucifix is neither neutral nor generally applicable, triggering strict scrutiny, which Defendants cannot satisfy.

### 1. Defendants burdened Ms. Castro's sincere religious practice in a manner that is neither neutral nor generally applicable, triggering strict scrutiny

#### a. *Ms. Castro's religious practice is attributable to her, not the school*

Ms. Castro's sincere religious exercise includes personal prayer and meditation, aided by viewing a crucifix. As Defendants acknowledge, Ms. Castro never used the crucifix for curricular instruction. D.Ct. 50 at 4, 6, 17, 22, 24. Nor is there evidence that anyone reasonably understood the crucifix to represent DiLoreto's stance on a religious question. Ms. Castro was not praying with the crucifix's aid "pursuant to government policy"; she "was not seeking to convey a government-created message"; and she "was not instructing" students with reference to the crucifix. *Kennedy*, 597 U.S. at 529. Ms. Castro's crucifix-aided prayers are thus her religious exercise, not the state's.

##### i. Ms. Castro's sincere religious exercise includes personal prayer and meditation, aided by viewing a crucifix

Prayer and meditation are regular parts of Ms. Castro's religious practice as a Roman Catholic. Even when personal and silent, though, prayer often is visible. Some people close their eyes, bow their heads, or kneel to pray—devotional acts that

are observable to others. Consistent with her Catholic faith, Ms. Castro prays by focusing her sight on her crucifix. JA59(¶¶20-21). The crucifix channels Ms. Castro's prayers and provides her with spiritual inspiration during stressful moments throughout the school day. JA58-59(¶¶16,19-20). Accordingly, she placed the crucifix in a location in the classroom where she could glance at it as needed. JA59(¶¶21-23), JA61(¶31). And for Ms. Castro, it is a matter of conscience that she not conceal the crucifix, as if out of shame. JA62(¶35). She believes she must heed Christ's teaching not to "put [her light] under a bushel." Matthew 5:15. Although Ms. Castro does not expect others to join in her personal religious acts, she does not accept that she must conceal the acts from others.

Defendants do not question the sincerity of Ms. Castro's religious exercise— at least not now. But in the moment, principal Soto debased the crucifix as "idol" worship, and chief of staff Manning suggested that its availability in a desk drawer was sufficient for Ms. Castro's religious purposes. JA61(¶30). It makes no difference, however, whether Defendants believe Ms. Castro can carry out her faith without a crucifix readily visible to her while teaching. It is Ms. Castro, not public-school administrators, who defines the dictates of her religion. *See, e.g.*, *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *Gardner-Alfred v. Federal*

*Rsrv. Bank of N.Y.*, 143 F.4th 51, 66 (2d Cir. 2025) ("[T]he district court's error" was "impos[ing] its own view[s]" about what plaintiff's faith required).

### ii.     That religious exercise is not attributable to the state

The district court nonetheless rejected Ms. Castro's free exercise claim by attributing the crucifix to the school district. SPA34. According to the district court, Ms. Castro kept the crucifix in her line of sight "pursuant to [her] official duties," making it "the government's own speech." *Id.* Neither the Supreme Court nor this Court have specified what legal test delineates government from private religious conduct in the free exercise setting. But no matter the test applied, Ms. Castro's crucifix-aided prayers are attributable solely to her.

The district court used the first step of the Supreme Court's *Pickering-Garcetti* test, which applies in the free *speech* context and distinguishes between government employees' private speech and speech made "pursuant to their official duties." SPA34; *see Kennedy*, 597 U.S. at 527 (discussing the first step). The district court should not have applied *Pickering-Garcetti* in the free exercise context, as neither the Supreme Court nor this Court has held that *Pickering-Garcetti* extends to Free Exercise Clause claims.[3] *See Kennedy*, 597 U.S. at 531 n.2. Even assuming it does,

---

[3] Ms. Castro does not concede that step one of the *Pickering-Garcetti* analysis applies to free exercise claims, and she reserves the right to argue at later stages of this litigation that it does not. In any event, as discussed below, Ms. Castro *does* contend in this appeal that step two of the *Pickering-Garcetti* analysis is inapplicable to free exercise claims. *See infra* I.A.1.c.

the district court erred in attributing Ms. Castro's religious exercise to the government. Ms. Castro did not pray with the aid of a crucifix pursuant to her official duties.

Ms. Castro's crucifix-aided prayer was not "a 'means to fulfill,' and 'undertaken in the course of performing,' [her] primary employment responsibility of teaching." *Weintraub v. Board of Educ. City Sch. Dist. of N.Y.*, 593 F.3d 196, 203 (2d Cir. 2010) (citations omitted). Ms. Castro did not lead her students in prayer or use the crucifix to instruct students. She never directed the students' attention to the crucifix. As Defendants have themselves reiterated, the crucifix does not relate to any instructional topic, and Ms. Castro did not invoke the crucifix as part of any "curricular" instruction. *See* D.Ct. 50 at 4, 6, 17, 22, 24. Ms. Castro merely placed the crucifix—about the size of a standard sheet of printer paper, JA163(¶10)—at the bottom of a whiteboard adjacent to her desk, where it was hidden from some students' view but visible to her for prayer. JA59(¶22), JA61(¶31). She did so for her benefit, not for that of her students.

Ms. Castro's religious exercise does not become government expression merely because it occurred within the school environment during the school day. *See Kennedy*, 597 U.S. at 529-531; *see also* JA105 (2023 U.S. Department of Education guidance explaining that "not all religious speech that takes place in public schools or at school-sponsored events is governmental speech"). In *Kennedy*,

- 22 -

the Supreme Court held that a high-school football coach's religious exercise of praying was his own and not on behalf of the school district when he did so at midfield immediately after school football games. 597 U.S. at 529-530. It was not dispositive that the coach prayed "'within the office' environment," that is, on the football field, nor was it dispositive that the coach "remained on duty after games." *Id.* at 530. The coach prayed at a time when "coaches were free to attend briefly to personal matters," *id.*, just as teachers here were free to adorn their desks with personal items. The coach's prayers did not take place "within the scope of his duties as a coach" because "[h]e was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id.* at 529-530. In other words, he was not "speak[ing] pursuant to [a] government policy," or "seeking to convey a government-created message." *Id.* at 529. Here, too, Ms. Castro's silent crucifix-aided prayers and meditations did not "owe their existence" to her "responsibilities as a public employee." *Id.* at 530 (quoting *Garcetti*, 547 U.S. at 421).

*Kennedy* warns against "positing an 'excessively broad job description' by treating everything teachers and coaches say in the workplace as government speech." 597 U.S. at 530-531. Yet the district court here did just that. It concluded that Ms. Castro's placement of the crucifix next to her desk was pursuant to "one of her core duties as a teacher—creating a physical classroom conducive to learning."

SPA20. The court then transformed that duty into a further duty to "[d]ecorat[e] the walls of the classroom," which the court deemed to include Ms. Castro's placement of the crucifix. *Id.* But the school district policy the court invoked simply directs that "physical aspects of a classroom … should be carefully considered" and offers a checklist "as a tool." JA195. The policy does not require teachers to decorate their classrooms at all, much less in any particular manner. And even if it did, Ms. Castro did not keep the crucifix by her desk for decoration. As Pope Francis explained, "the crucifix … is not an ornamental object."[4] Rather, Ms. Castro kept the crucifix beside her desk to aid her prayer during her "personal time" and her spiritual meditation throughout the day. JA59(¶¶20-21). Doing so was "neither part of [her] job description nor part of the practical reality of [her] everyday work." *Matthews v. City of N.Y.*, 779 F.3d 167, 174 (2d Cir. 2015).

Even more broadly, the district court suggested that "Ms. Castro fulfilled her core duties and acted in her capacity as a teacher" whenever "she was with students in the classroom for class." SPA22. But although public employees "may look like they are always on the clock, making it tempting to characterize every encounter as part of the job," such conception is too "broad-brush." *Lindke v. Freed*, 601 U.S.

---

[4] Brockhaus, *Pope Francis: The Crucifix is for Prayer, not Decoration*, EWTN News (Mar. 18, 2018), https://perma.cc/CJL2-8EJ5; *see also Catechism of the Catholic Church* ¶ 2132 (2d ed. 1997).

187, 196 (2024). The state-action doctrine and its relatives require that the at-issue conduct be "'fairly attributable to the State.'" *Id.* at 196, 198 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (emphasis omitted)); *cf. Kennedy*, 597 U.S. at 528 (asking under *Pickering-Garcetti* whether Coach Kennedy's prayers "amount to government speech attributable to the District").

Standing in front of a class does not divest teachers of their religious rights. Even the district court seemed to acknowledge that Ms. Castro was not speaking for the government by wearing a crucifix necklace while teaching. *See* SPA23(n.16). After all, courts across the country have confirmed that "there is little doubt that … the visible wearing of a cross or star of David is symbolic or expressive speech *by the wearer*." *Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536, 557 (W.D. Pa. 2003) (emphasis added); *see also Draper v. Logan Cnty. Pub. Library*, 403 F. Supp. 2d 608, 613, 617 (W.D. Ky. 2005) (cross necklace); *Chalifoux v. New York Caney Indep. Sch. Dist.*, 976 F. Supp. 659, 665-666 (S.D. Tex. 1997) (rosary beads).

To distinguish Ms. Castro's crucifix from a crucifix necklace, the district court relied on the crucifix's placement on the wall. SPA23(n.16). But the Supreme Court has held that conduct is not attributable to the government just because it is hosted on government property. *See Shurtleff v. City of Bos.*, 596 U.S. 243, 248 (2022) (flying a flag on a "flagpole outside Boston City Hall"). Rather than applying a brightline rule, the Supreme Court has relied on a "holistic inquiry designed to

- 25 -

determine whether the government intends to speak for itself." *Id.* at 252. The relevant indicia include: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* All these indicia confirm Ms. Castro's crucifix is not government speech.

**First**, the history of the expression at issue suggests it is not the government's. Ms. Castro had placed the crucifix next to her desk in her prior classrooms for a decade, and *it moved with her* to each new classroom. There is no sense in which the crucifix was a "permanent" display, as Mr. Mazzei claimed. JA60-61(¶28). Further, there is no evidence of a history of DiLoreto using teachers' personal items more generally for the school's own communication. Rather, Defendants acknowledge that teachers at DiLoreto have historically "been permitted to place personal items in their work areas." JA122(¶14). Indeed, the nature of the varied personal items only shows that the state is not advancing its own message, for doing so would mean that "the State 'is babbling prodigiously and incoherently.'" *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017)).

**Second**, the public is unlikely to regard the crucifix as representing the school district's position regarding Christianity. *See Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1215 (9th Cir. 1994) ("Reasonable persons are not likely to consider

- 26 -

all of the information posted on … walls in government buildings to be government-sponsored or endorsed."). There is no evidence that DiLoreto classrooms are routinely adorned with crucifixes. Rather, like other teachers' displays of family photos, pop culture icons, inspirational quotes, and sports memorabilia, the natural understanding is that these items reflect teachers' *personal* affections.

*Third*, the school district played no role in actively shaping or controlling the expression at issue. While Defendants permitted teachers to display personal items in the classroom, nothing in the record suggests Defendants exercised any meaningful control over these displays. Defendants must demonstrate that something, whether "written policies or clear internal guidance," governs what items teachers can display and what those items communicate. *Shurtleff*, 596 U.S. at 257. Yet the district's policy here enables *teachers* to control the "physical aspects of a classroom." JA195. And in reality, just as Boston's "practice was to approve flag raisings, without exception," *Shurtleff*, 596 U.S. at 257, Defendants' practice was to permit teachers to display "personal items" near their desks—including Ms. Castro's crucifix, which remained by her desk for a decade without issue. JA58(¶16). Critically, "Defendants admit that teachers generally have been permitted to display some *personal* items in their classrooms or work areas." JA122(¶14) (emphasis added).

- 27 -

Instead of considering the *Shurtleff* factors, the district court dismissed them in a footnote, noting that *Shurtleff* involved a forum analysis rather than public-employee speech. SPA25(n.18). But as other circuits recognize, the indicia of government speech reiterated in *Shurtleff* are relevant when assessing whether speech is attributable to the government even in the public-education context. *See, e.g.*, *Reges v. Cauce*, 162 F.4th 979, 996 (9th Cir. 2025); *GLBT Youth*, 114 F.4th at 667; *Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n*, 115 F.4th 1266, 1288 (11th Cir. 2024), *cert. denied*, No. 24-126 (U.S.). Consistent with those precedents, Ms. Castro argued below that the notion that "everything within the classroom's physical layout [is] non-personal speech cannot stand in light of *Shurtleff*," D.Ct. 60 at 3 (citation omitted), and the district court wrongly disregarded this argument.

To be sure, not all classroom wall displays are personal. For example, *Johnson v. Poway United School District*, 658 F.3d 954 (9th Cir. 2011), relied on by the district court (SPA23), involved multiple large (7 feet x 2 feet) banners with large block text intended to communicate to students the teacher's views on God's role at our nation's founding. 658 F.3d at 958-959. What's more, the teacher hung these banners "'pursuant to a long-standing Poway Unified School District policy, practice, and custom' of permitting teachers to decorate their classrooms *subject to specific limitations* and the satisfaction of the principal or a District administrator."

*Id.* at 967 (emphasis added) (citation omitted). In light of those considerations, the Ninth Circuit concluded that this message directed to students in the classroom was government speech. *See id.* at 959-960.

New Britain's policy and Ms. Castro's crucifix are different. Unlike the school district in *Johnson*, New Britain imposes no "specific limitations" on classroom decorations, generally permitting teachers to display "personal items in their classrooms or work areas." JA122(¶14). Moreover, the *Johnson* administrators distinguished as permissible "smaller expressions of [the teacher's] personal beliefs around his desk area," 658 F.3d at 959, that is, displays like Ms. Castro's. And unlike the banners in *Johnson*, Ms. Castro's crucifix was not intended to "preach [her] own views on the role of God" to her students. *See id.* Rather, Ms. Castro put the crucifix where *she* could see it for her silent prayer and meditation. JA59(¶20). Both the size of the crucifix and its location confirm as much—as does the fact that, unlike the teacher in *Johnson*, Ms. Castro brings a free exercise challenge.

In sum, Ms. Castro kept the crucifix beside her desk, not as a classroom decoration, but to aid her silent prayers and spiritual inspiration. The prayer and crucifix "'ow[e their] existence'" to Ms. Castro's religious practice, not her official duties, making them personal religious exercise, not governmental speech. *Kennedy*, 597 U.S. at 509. Since the crucifix was visible to some students, the district court concluded otherwise. That overbroad notion of government speech invites schools

- 29 -

to trample the religious rights of their workers; indeed, it would constitutionally mandate as much on the theory that "[s]chool sponsorship of a religious message is impermissible." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310 (2000). But the Constitution neither requires nor tolerates that result. Rather, it requires school districts to respect personal religious exercise even when visible to students: like "a Muslim teacher … wearing a headscarf in the classroom," *Kennedy*, 597 U.S. at 531, like "a Christian aide [who] pray[s] quietly over her lunch in the cafeteria," *id.*, like a Jewish librarian who "wear[s] a yarmulke to school," *id.* at 540, and like a coach who prays on the field after games, *id.* at 542-543. "[I]f the presence of a student or location [in the classroom] alone could remove all protection from a teacher's speech, the constant refrain that public employees retain their First Amendment rights would ring hollow." *Polk v. Montgomery Cnty. Pub. Sch.*, 166 F.4th 400, 426 (4th Cir. 2026) (Wilkinson, J., dissenting). This Court should not bless the district court's decision to bypass the remaining constitutional analysis required under the Free Exercise Clause by wrongly categorizing Ms. Castro's crucifix-aided silent prayer as government speech.

### b. *Defendants have burdened Ms. Castro's religious exercise*

As the district court noted, "Defendants do not argue … that they did not burden Ms. Castro's free exercise of religion." SPA29. Nor could they. A cognizable burden exists when an "employee was put to a choice between fidelity to

religious belief or cessation of work." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-718 (1981).

Since December 2024, Defendants have put Ms. Castro to that choice: remove the crucifix or face discipline. When Ms. Castro chose her faith, Defendants engaged in a series of escalating disciplinary actions: initially suspending Ms. Castro without pay for two days so that she could "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the wall, JA63(¶42); then placing Ms. Castro on a months-long administrative leave, JA64(¶48); and ultimately "involuntarily" reassigning Ms. Castro in response to this lawsuit because of "concerns about ... [her] personal beliefs," JA65(¶54). Defendants have reaffirmed each action was motivated by her refusal to remove the crucifix. JA60-65; *see also* JA81-86. Disciplining an employee for "praying quietly" and refusing to remove a prayer aid, as Defendants have done here, is an adverse employment action that imposes a quintessential burden on religious exercise. *Kennedy*, 597 U.S. at 525-526.

### c. *Defendants' singling out of Ms. Castro's religious exercise is subject to strict scrutiny*

If a government entity burdens religious exercise "pursuant to a policy that is not 'neutral' or 'generally applicable,'" it "normally must satisfy at least 'strict scrutiny.'" *Kennedy*, 597 U.S. at 532 (first quoting *Smith*, 494 U.S. at 879-881, then citing *Lukumi*, 508 U.S. at 533). As the district court observed, "Defendants do not

argue that they acted pursuant to a neutral or generally applicable policy." SPA29. And with good reason, since the record demonstrates that Defendants have "expressly singl[ed] out" Ms. Castro's placement of a personal item on the wall around her desk "for less favorable treatment" precisely because of the crucifix's religious nature. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 632 (2d Cir. 2020); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) ("[G]overnment regulations are not neutral and generally applicable … whenever they treat any comparable secular activity more favorably than religious exercise.").

To the extent the school district had a policy, it was to permit, not forbid, teachers' displays of personal items in their classrooms or work areas. JA122(¶14). Ms. Castro introduced evidence confirming that other teachers display personal items in their classrooms. JA69. Defendants have repeatedly stressed that they singled out Ms. Castro's crucifix because they wanted to avoid appearing to endorse religion. JA60-65; *see also* JA81-86; D.Ct. 50 at 5-8. Punishing school staff to avoid "appearing to a reasonable observer to endorse" religious conduct is "'not neutral' toward religion." *Kennedy*, 597 U.S. at 526; *see also Central Rabbinical Cong. of U.S. & Can. v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (explaining that actions "'specifically directed at [a] religious practice'" are not neutral).

Nor was the targeting of Ms. Castro's religious exercise undertaken pursuant to a generally applicable school policy. A policy "is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton v. City of Phila.*, 593 U.S. 522, 533-534 (2021). Generally, the district's policy was to *permit* teachers to keep personal items near their workspaces. JA122(¶14); JA69. The government cannot then selectively "'impos[e] burdens only on conduct motivated by religious belief.'" *Central Rabbinical Cong.*, 763 F.3d at 196. Defendants have not approached these displays in "an evenhanded, across-the-board way," so strict scrutiny applies. *Kennedy*, 597 U.S. at 526-527.

Despite the district court's contrary suggestion (SPA35-36), this Court's decision in *Knight v. Connecticut Department of Public Health*, 275 F.3d 156 (2d Cir. 2001), did not excise public employees' free exercise claims from the Supreme Court's well-established strict scrutiny framework. By the time *Knight* reached this Court, two district courts had already found on summary judgment that the plaintiffs had not demonstrated a burden on their religious exercise pursuant to a non-neutral or non-generally-applicable policy. *See id.* at 161 ("Knight did not show she was treated differently than other similarly situated employees, or that the state intentionally discriminated against her."); *id.* at 163 ("Quental has failed to adduce evidence showing that the defendants selectively treated her in enforcing the

- 33 -

Commission's policies or that their enforcement of the policies was motivated by a discriminatory purpose."). So instead of pursuing a freestanding free exercise challenge under *Smith*, the public employees sought to leverage their free exercise interests to ratchet up the level of scrutiny applicable to their free speech claim, which was subject to *Pickering* balancing. *Id.* at 166. Since neither a free speech nor a free exercise claim in *Knight* independently triggered strict scrutiny, neither could do so when hybridized. *See id.* at 167.

But this Court has never, in *Knight* or otherwise, endorsed the proposition that in the public-employment context, courts may water down the constitutional strict scrutiny that claims would otherwise receive.[5] Under well-established Supreme Court precedent, from *Smith* through *Kennedy*, strict scrutiny—not the *Pickering-Garcetti* step two balancing that governs free speech claims—applies to Defendants' burdening of Ms. Castro's religious exercise, which burdening they concede was neither neutral nor generally applicable.

---

[5] Here, the district court did not even apply *Pickering-Garcetti* balancing, instead giving Defendants "some leeway" to infringe Ms. Castro's free exercise rights due to their misguided Establishment Clause concerns. *See* SPA38(n.21). But as explained in Part I.A.2.b, the leeway test cannot justify Defendants' infringement of Ms. Castro's free exercise rights. And even if this Court were instead to apply *Pickering-Garcetti* balancing, the balance favors Ms. Castro. *See infra* Part II.B.3.

## 2. Defendants' discriminatory treatment of Ms. Castro's personal religious exercise cannot satisfy strict scrutiny

Defendants cannot satisfy strict scrutiny, which is "the most demanding test known to constitutional law." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484-485 (2025). Defendants' asserted interest—a fear of violating the Establishment Clause—has no basis. And their policy is not narrowly tailored to their purported interest.

### a. The school district lacks a compelling interest in burdening Ms. Castro's religious exercise

Although Defendants have a compelling interest in preventing a *genuine* Establishment Clause violation, they do not have an interest in avoiding a *phantom* Establishment Clause violation. *See Kennedy*, 597 U.S. at 543. To the extent this Court's decisions in *Knight* and *Marchi v. Board of Cooperative Educational Services of Albany*, 173 F.3d 469 (2d Cir. 1999), suggest that Defendants have "some leeway" to impinge Ms. Castro's free exercise rights to address misguided Establishment Clause concerns, that suggestion has been overruled by the Supreme Court. "[I]n no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights." *Kennedy*, 597 U.S. at 543.

It is notable that the district court here never found an actual Establishment Clause violation created by Ms. Castro's crucifix placement. SPA42. And

- 35 -

Defendants' articulated Establishment Clause concern—that Ms. Castro's crucifix would be seen as the school district's "endorsement" of her faith, SPA49-50—is neither the correct Establishment Clause test nor supported by any evidence in the record. *See Kennedy*, 597 U.S. at 534-535 (overruling the endorsement test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). An actual Establishment Clause violation requires proof of conduct that "resembles one of [the] hallmarks of religious establishment," *Hilsenrath v. School District of Chathams*, 136 F.4th 484, 491 & n.54 (3d Cir. 2025), *cert. denied*, No. 25-256 (U.S.), which are largely rooted in compulsion or coercion, *see Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023). Permitting Ms. Castro to practice her faith bears no resemblance to such hallmarks, and Defendants cannot sacrifice Ms. Castro's free exercise rights to assuage their misguided concerns about the Establishment Clause.

> **i.  Ms. Castro's personal religious expression is consistent with a history of religious displays that do not violate the Establishment Clause**

The Establishment Clause must be interpreted "by reference to historical practices and understandings" to "faithfully reflect the understanding of the Founding Fathers." *Kennedy*, 597 U.S. at 535-536 (cleaned up). The Clause's pre-ratification history elucidates its original public meaning and why Defendants' establishment concerns are unfounded. At the founding, the Church of England and state-established religions bore certain "hallmarks" that "the framers sought to

prohibit when they adopted the First Amendment." *Id.* at 537. These hallmarks of religious establishment involve government control or coopting of the church, compelled religious exercise, punishment of religious dissenters, preferential financial support for a denomination, religious tests for office, and use of the church for civic functions. *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring) (citing McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131-2181 (2003)); *see also Kennedy*, 597 U.S. at 537 n.5.

Each hallmark points to a common theme: coercion to support a particular religion or religions and to restrain others. *See* McConnell, *Coercion: The Lost Element of Establishment*, 27 Wm. & Mary L. Rev. 933, 939 (1986); *see also* 1 Annals of Cong. 757-760 (J. Gales ed., 1789) (James Madison opining "that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience"). But coercion does not refer to abstract social pressure; at the Founding, coercion was "by force of law and threat of penalty." *Lee v. Weisman*, 505 U.S. 577, 640 (1992) (Scalia, J., dissenting) (emphasis omitted); *see also Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014) ("Offense, however, does not equate to coercion.").

Public officials' expressions of faith—even in government functions or offices and even when observable by others—do not run afoul of the Establishment

Clause. On the contrary, public displays of religiosity have long been part of the national zeitgeist protected by the Free Exercise Clause. Our nation's history is replete with examples of public officials openly displaying their faith, including "[p]rayers in our legislative halls; … appeals to the Almighty in the messages of the Chief Executive; …'so help me God' in our courtroom oaths … [and] other references to the Almighty that run through our laws, our public rituals, [and] our ceremonies." *Zorach v. Clauson*, 343 U.S. 306, 312-313 (1952).

Indeed, George Washington, acting at the direction of Congress, declared "a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God." *Lynch v. Donnelly*, 465 U.S. 668, 675 n.2 (1984); *see* 1 Annals of Cong. 949-950 (J. Gales ed., 1789). Chief Justice John Jay, along with several associate justices, invited clergy to open court sessions with prayer. *See Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 314 (5th Cir. 2021). And the same Congress that adopted the Establishment Clause simultaneously appointed legislative chaplains, which the Framers viewed as "a benign acknowledgment of religion's role in society." *Town of Greece*, 572 U.S. at 576. "'[N]o one at the time of the founding … argu[ed] that the use of religious symbols in public contexts was a form of religious establishment.'" *Shurtleff*, 596 U.S. at 287 (Gorsuch, J., concurring). Nor did the public view the Establishment Clause as precluding government officials (or employees) from religious expression.

### ii. Ms. Castro's visible personal religious exercise was not government coercion

Despite this robust historical tradition, the district court held that Defendants raised credible establishment concerns because students were a "captive audience" to Ms. Castro's religious exercise. SPA44, SPA50. But students were only an audience, if at all, to the fact that Ms. Castro personally practiced her faith. There was no suggestion that Ms. Castro's faith was the school district's, nor was any student obliged to pay any mind or respect to Ms. Castro's silent prayer. No student was compelled to "'make a religious observance'" or "force[d] … to engage in 'a formal religious exercise,'" as actual coercion would require. *Kennedy*, 597 U.S. at 537.

The district court mistakenly believed the school context produced a different result because children may be subtly pressured to conform their beliefs to that of their teacher. SPA45. But the district court misapplied Establishment Clause caselaw about "'formal religious exercise'" in schools, *Kennedy*, 597 U.S. at 537, which has no bearing on an individual teacher's personal religious exercise. For example, in *Engel v. Vitale*, the Supreme Court held that a school board violated the Establishment Clause by requiring teachers and students to recite a prayer to "Almighty God." 370 U.S. 421, 422-423, 429-430 (1962). In *School District of Abington Township v. Schempp*, the Court similarly concluded that states could not require students to begin each day with a recitation of Bible verses and the Lord's

- 39 -

Prayer. 374 U.S. 203, 223 (1963). In *Stone v. Graham*, the Court invalidated a state statute requiring the Ten Commandments to be displayed prominently in every classroom in the state. 449 U.S. 39, 42 (1980) (per curiam).[6] In *Santa Fe*, the Court held that a school could not broadcast a prayer over the public address system before sporting events when attendance was mandatory. 530 U.S. at 294, 311. Finally, in *Weisman*, the Court concluded that a high school violated the Establishment Clause by functionally "compell[ing] attendance and participation in an explicit religious exercise." 505 U.S. at 598.

The throughline is that a religious practice violates the Establishment Clause in schools when the practice is imposed by the government and where the Court has found students were compelled to unwillingly participate. *See Kennedy*, 597 U.S. at 536-537 ("[T]his Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'"). Neither element is present here. As explained above, Ms. Castro's crucifix and silent prayer can only be "characterized as 'private [expression].'" *Santa Fe*, 530 U.S. at 310. Defendants did not control, direct, or in

---

[6] Besides having no bearing on an *individual*'s display of religion, the district court's reliance on *Stone* is particularly egregious, given that its holding turns entirely on the now-disavowed *Lemon* test. 449 U.S. at 41-43. *Stone* does not (and cannot) stand for Defendants' position, seemingly adopted by the district court, that any "religious artifact in the[] classroom" or "religious displays and exercises in public schools" violates the Establishment Clause. SPA50-51.

any way participate in Ms. Castro's display of her crucifix, nor did Ms. Castro ever try to force students to participate in or engage with her prayer or crucifix. *Cf. id.*; *Engel*, 370 U.S. at 422-423; *Weisman*, 505 U.S. at 580; *Stone*, 449 U.S. at 39-40. On the contrary, "not a single … student joined [her] quiet prayers." *Kennedy*, 597 U.S. at 539.

Unwanted, and even unavoidable, exposure to another's religion in school is not coercion within the Establishment Clause's original public meaning. *Kennedy* makes this clear. Ms. Castro's students may "have seen h[er] religious exercise," but mere visibility "is 'part of learning how to live in a pluralistic society'"—not a constitutional affront. *Kennedy*, 597 U.S. at 538. Indeed, the Supreme Court has underscored that schools cannot operate "under the assumption that any risk that small children would perceive endorsement … counsel[s] in favor of excluding … religious activity," lest the Constitution be converted into "a modified heckler's veto, in which … religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001); *accord Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1055 (9th Cir. 2003) (per curiam) (The proper "approach is not for schools to throw up their hands because of possible misconceptions about endorsement of religion" but "'to educate the audience rather than squelch the speaker.'"). The

- 41 -

district court deviated from Supreme Court precedent and created the very same carveout for religious exercise in schools that *Kennedy* unequivocally rejected.

**b.      *The leeway doctrine cannot supply a compelling interest***

Because Defendants have not demonstrated an actual interest in preventing an Establishment Clause violation, they cannot satisfy strict scrutiny.  To reach its contrary result, the district court misread this Court's leeway doctrine to hold that an actual establishment is not required for a school district to suppress a teacher's religious exercise.  SPA50-51.  The leeway doctrine is irreconcilable with *Kennedy* and no longer good law.  But even if this Court disagrees, Ms. Castro remains entitled to relief.  Leeway is a doctrine of limited deference to the government in certain edge cases, not a tool for judicial abdication.

The genesis of the leeway doctrine was this Court's decision in *Marchi*. Applying the now discredited *Lemon* test, *Marchi* explained that "state policies or action must not foster excessive government entanglement with religion."  173 F.3d at 475.  Recognizing the difficulty of applying that amorphous (and since overruled) standard, *Marchi* concluded it was not feasible to expect "governmental agencies … to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause."  *Id.* at 476.  Therefore, this Court would afford the government "some leeway" when it raised Establishment Clause concerns, "even though the conduct it forbids might not inevitably be determined to violate the

Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause." *Id.*

The leeway doctrine is no longer good law, and this Court should say so. *Marchi*'s holding is inextricably intertwined with *Lemon*, which the Supreme Court "long ago abandoned" because it "created a 'minefield' for [governments]," *Kennedy*, 597 U.S. at 534—precisely the issue animating the purported need for leeway. *Marchi* wrongly deferred to the government's asserted interest in avoiding a *possible* establishment violation at the expense of *actual* individual free exercise rights. In no uncertain terms, *Kennedy* rejected that rationale. *See Kennedy*, 597 U.S. at 543; *see also Carson v. Makin*, 596 U.S. 767, 781 (2022) (an "interest in separating church and state more fiercely than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise" (cleaned up)).

A panel of this Court can "reconsider a prior panel's holding … 'where,'" as here, "there has been an intervening Supreme Court decision that casts doubt on … [the] precedent." *Sullivan v. American Airlines, Inc.*, 424 F.3d 267, 275 (2d Cir. 2005). This is so even where the Supreme Court's decision does "'not address the precise issue decided by the panel'" but poses "a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision." *Ziparo v. CSX Transp., Inc.*, 160 F.4th 314, 334-335 (2d Cir. 2025). This

- 43 -

Court can and should recognize that the leeway doctrine of *Marchi* and its progeny cannot survive *Kennedy*.

Even if this Court declines to revisit *Marchi*, Ms. Castro is still entitled to relief because the district court gave Defendants free rein, not some leeway. Under the leeway doctrine, the government must exercise "a reasonable, good faith judgment that it runs a *substantial* risk of incurring a violation of the Establishment Clause." *Bronx Household of Faith*, 750 F.3d at 198 (emphasis added). As *Kennedy* makes plain, a school does not run a substantial risk of violating the Establishment Clause because it permits a teacher's private religious expression. *See* 597 U.S. at 531, 538.

The leeway doctrine is, at best and if it survives, a narrow rule for borderline establishment violations. That is, the government gets some leeway to preemptively prevent its employees, when state actors, from crossing the constitutional line. But the district court relied on *Marchi* and *Knight* to give Defendants carte blanche to discriminate against personal religious conduct. Those cases only underscore how far afield this case is from reasonable leeway. For example, in *Marchi*, a public-school teacher infused religious topics into "the delivery of his instructional program" to students and in his communications with those students' parents. *Marchi*, 173 F.3d at 472, 475. Similarly, in *Knight*, a nurse consultant and a sign language interpreter sought "to proselytize while working with clients." 275 F.3d at

- 44 -

160.  This entailed telling a same-sex couple that God did not condone their lifestyle and distributing religious literature to a mental health patient who displayed visible signs of agitation and discomfort.  *Id.* at 161-162.  Finally, in *Skoros v. City of New York*, this Court afforded the government "some leeway" in choosing which holiday displays to include or omit in a forum that was unambiguously the government's. 437 F.3d 1, 3, 35 (2d Cir. 2006).[7]

"Leeway" is not some talisman that enables states to shrink constitutional rights.  Nor does it permit courts to abdicate their role in balancing individual rights against the state's interests—particularly when the state's interests are purely conjectural.  Yet that is precisely what occurred here, with the district court abdicating its role to protect Ms. Castro's free exercise rights, not by finding an actual establishment violation, but simply because the court believed that Defendants were not "unreasonable" in fearing that they "risked liability" for an Establishment Clause violation.  SPA51.  This is not how the Religion Clauses work together.

---

[7] The origin of the leeway doctrine and these foundational cases predated the Supreme Court's seminal public-employee speech case, *Garcetti*, and therefore do not engage with the contemporary framework for differentiating between speech in a private or official capacity.  In each leeway case, however, this Court suggested that the speech at issue was pursuant to the employee's official duties.

### c. Defendants' policy is not narrowly tailored to serve any compelling interest

Even if Defendants could demonstrate a compelling interest in avoiding the mere appearance of an Establishment Clause violation, they cannot show their conduct is narrowly tailored to advancing such an interest. If Defendants were concerned about appearing to endorse religion, as they have claimed, JA65(¶55); *see also* JA81-86, they had far less religiously restrictive means at their disposal. For instance, Defendants could have explained to students that personal displays on the school wall do not represent the school's message or that the school does not endorse Ms. Castro's faith or any other. Or they could have explained that "learning how to tolerate … prayer of all kinds is 'part of learning how to live in a pluralistic society.'" *Kennedy*, 597 U.S. at 538 (quoting *Weisman*, 505 U.S. at 590). But what Defendants could not do was remove Ms. Castro from the classroom for visibly exercising her religious convictions. "*Kennedy* clearly established that school officials may not impose categorical, visibility-based restrictions on an employee's private religious expression." *Barber v. Rounds*, No. 25-20125, ---F.4th---, 2026 WL 657874, at *5 (5th Cir. Mar. 9, 2026). Where the state's "interests could be achieved by narrower [polices] that burden[] religion to a far lesser degree," the state cannot satisfy strict scrutiny. *Lukumi*, 508 U.S. at 546.

\* \* \*

- 46 -

Following her faith, Ms. Castro prayed silently with the aid of a visible crucifix. Defendants admit they targeted Ms. Castro's practice precisely because it was religious, so the district court should have applied strict scrutiny. And because one teacher's personal use of a religious icon poses no Establishment Clause concern, Defendants cannot satisfy strict scrutiny. But even if *Pickering-Garcetti* balancing were to apply, Defendants still would not prevail because any interest is purely conjectural. *See infra* Part I.B.3. Ms. Castro is therefore likely to succeed on her free exercise claim.

## B. Ms. Castro Is Likely To Succeed On Her Free Speech Claim

Ms. Castro's prayer with the aid of her crucifix admittedly includes a communicative element. Specifically, the visibility of her crucifix communicates her personal identity as a devout Roman Catholic. JA59(¶21). This communicative dimension to Ms. Castro's religious exercise is protected by the First Amendment's Free Speech Clause. *See Barber*, 2026 WL 657874, at *4 (holding that, under *Kennedy*, "visibility-based restriction of religious exercise implicates both the Free Speech Clause and the Free Exercise Clause"). Ms. Castro's benign expression of her Catholic identity is indistinguishable from the Muslim teacher whose headscarf communicates her religious identity, or the Jewish teacher whose yarmulke communicates his. *See Kennedy*, 597 U.S. at 530-531. Under the First Amendment, this communication is protected private speech. *See id.* at 527-531.

*Pickering-Garcetti*'s two-part framework controls public-employee speech claims. *See Kennedy*, 597 U.S. at 527-528. Under that framework, courts first determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. If the answer is yes, then the expression is protected. *Id.* Only when an employee speaks "pursuant to their official duties" is their speech the government's own. *Id.* at 421. If the employee speaks privately on a matter of public concern, *Pickering-Garcetti*'s second step requires courts to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Just as Ms. Castro's religious exercise cannot be attributed to the school district, *see supra* Part I.A.1.a.ii, her expression of her Christian identity is private speech. It is implausible to suggest that her crucifix, placed at waist height next to her desk, was government speech. This is particularly so given the uncontroverted evidence that Defendants permitted teachers to display various personal expressive items around their desks without incident. JA122(¶14). Moreover, Defendants cannot justify restricting Ms. Castro's expression; their mistaken Establishment Clause concern cannot outweigh Ms. Castro's speech interests, and they have not

shown that the crucifix would disrupt the classroom's efficient operations. *See Kennedy*, 597 U.S. at 542-543; *Rankin v. McPherson*, 483 U.S. 378, 388-389 (1987).

### 1. Ms. Castro's display of her religious identity was expression on a matter of public concern

Defendants do not dispute that Ms. Castro's religious expression constitutes speech on a matter of public concern. D.Ct. 50 at 18 n.8; SPA15, 18, 33. Nor could they. Speech touches on a matter of public concern when it is "'fairly considered as relating to any matter of political, social, or other concern to the community,'" *Jackler*, 658 F.3d at 236 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)), and "speech concerning religion is unquestionably of inherent public concern," *Johnson*, 658 F.3d at 966.

### 2. Ms. Castro's display of her religious identity was private expression in her personal capacity

As the district court recognized, Ms. Castro's speech claim turns on whether her expression occurred in her private capacity or pursuant to her official duties. SPA33. *Pickering-Garcetti*'s official-duties inquiry is straightforward: whether "the speech at issue is itself ordinarily within the scope of the employee's duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014).

For example, schoolteachers' speech may be made pursuant to their official duties where it is "part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties[] as a public school teacher." *Weintraub*, 593 F.3d at 203

(quotation marks and citations omitted). On the other hand, public employees speak as private citizens when their "actual, functional job responsibilities" do not encompass the speech at issue. *Matthews*, 779 F.3d at 174; *see also Montero v. City of Yonkers*, 890 F.3d 386, 398 (2d Cir. 2018) (public employee speaks as a private citizen when speaking in "a role which he was not required to serve").

Thus, the question is whether the speech "was a means to fulfill, and undertaken in the course of performing [the teacher's] primary employment responsibility of teaching." *Weintraub*, 593 F.3d at 203 (quotation marks and citations omitted). This inquiry must be conducted "'practical[ly],' not with a blinkered focus on the terms of some formal and capacious written job description." *Kennedy*, 597 U.S. at 529. Otherwise, public employers could evade constitutional protections by exploiting "excessively broad job descriptions." *Id.* (quoting *Garcetti*, 547 U.S. at 424).

Ms. Castro's primary responsibilities at DiLoreto include teaching her students. The First Amendment generally does not protect "in-class curricular speech." *Evans-Marshall v. Board of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010). But there is an "elementary difference" between curricular speech and non-curricular speech. *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 373 (4th Cir. 1998) (Luttig, J., concurring); *Wood v. Florida Dep't of Educ.*, 142 F.4th 1286, 1300 (11th Cir. 2025) (Jordan, J., dissenting);

*Polk*, 166 F.4th at 427 (Wilkinson, J., dissenting). "In the … context of … in-class noncurricular speech, the teacher assuredly enjoys some First Amendment protection." *Boring*, 136 F.3d at 373 (Luttig, J., concurring). Ms. Castro never sought to involve her students with the crucifix or her prayer; her crucifix merely expressed *her* Catholic identity and aided in *her* private prayer. JA59(¶¶20-21). Defendants concede that Ms. Castro never used the crucifix in curricular instruction. D.Ct. 50 at 1, 4-5, 17, 22, 24. That Ms. Castro's expression was non-curricular means that she is "assuredly" afforded First Amendment protection. *Boring*, 136 F.3d at 373 (Luttig, J., concurring).

The district court reached the opposite conclusion by placing virtually dispositive weight on its view that the school district's policy encouraged teachers to "[d]ecorat[e] the walls of the classroom," and that Ms. Castro placed the crucifix next to her desk pursuant to "one of her core duties as a teacher—creating a physical classroom conducive to learning." SPA2, 20, 34. As explained above (at 24-25), those conclusions are erroneous because the policy included no such directive and because it runs afoul of *Kennedy*'s instruction against excessively broad job descriptions. There is no sense in which the placement of the crucifix next to Ms. Castro's desk was part of her "actual, functional job responsibilities." *Matthews*, 779 F.3d at 174.

The district court further erred in reasoning that Ms. Castro acted "in her role as a teacher" because the crucifix was "on a classroom wall during instructional time." SPA21; *see supra* Part I.A.1.a.ii. That the expression happens in a classroom is relevant to whether the speech is governmental, but it is not "dispositive." *Kennedy*, 597 U.S. at 530 ("Nor is it dispositive that Mr. Kennedy's prayers took place 'within the office' environment."). The public-employee-speech doctrine exists precisely because location alone is insufficient to render the expression governmental. *See Garcetti*, 547 U.S. at 420-421. After all, Ms. Castro's Yankees pennant was likewise in the classroom during instructional time, and there is no serious argument that the pennant represents the school district's official position about preferred MLB teams. That Ms. Castro's expression occurred in the classroom, even during instructional time, does not transform her speech into the government's.

Finally, the district court's reliance on *Johnson* (SPA23-25) is misplaced because, in addition to the reasons explained above, *Kennedy* significantly limits *Johnson*'s import. With respect to the government-versus-personal speech question, *Johnson* found significant that "[a]n ordinary citizen could not have walked into Johnson's classroom and decorated the walls." 658 F.3d at 968. That reasoning proves too much. For example, a member of the public presumably could not wander into a school cafeteria for lunch. But that does not mean that "a Christian

- 52 -

aide [who] pray[s] quietly over her lunch in the cafeteria" engages in government speech because her job grants her access to the lunchroom. *Kennedy*, 597 U.S. at 531. If a teacher's unique access to school property renders her speech governmental, then a teacher could never engage in personal speech while on the schoolhouse side of the gates. That is not the law. *See Tinker*, 393 U.S. at 506. Teachers no more shed their speech rights at the classroom door than at the schoolhouse gate. *See Evans-Marshall v. Board of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 229 (6th Cir. 2005) ("The assumption that the Court would draw a distinction between the schoolhouse gate and the doors of the classroom is counterintuitive.").[8]

Ms. Castro's religious expression occurred in her private capacity. She placed her crucifix near her desk at a low height to aid in her prayer—which, like kneeling or bowing one's head during a prayer or wearing religious garb or jewelry, communicated her religious identity. JA58-59(¶¶18, 21). But Ms. Castro's prayers

---

[8] Relatedly, this Court views the lack of a relevant analogue to ordinary citizen speech as relevant, but not critical, in analyzing public-employee speech claims. *Montero*, 890 F.3d at 397-398; SPA18. Defendants did not argue that Ms. Castro's expression lacks a relevant analogue. In any event, ordinary citizens place personal religious items in various personal spaces including one's home, vehicle, workspace, or on one's person. The fact that laypeople cannot engage in this kind of expression in Ms. Castro's classroom is immaterial for the reasons explained above and because it matters not whether a public employee has "better access" to engage in the precise speech at issue. *Matthews*, 779 F.3d at 176. Rather, "what matters is whether the same *or a similar channel* exists for an ordinary citizen." *Id.* (emphasis added).

and expressions of her Catholic identity do not "owe their existence" to her public employment. *Kennedy*, 597 U.S. at 530 (quoting *Garcetti*, 547 U.S. at 421). Rather, they owe their existence to Ms. Castro's personal religious practice, regardless of her public employment. *See Wood*, 142 F.4th at 1297 (Jordan, J., dissenting) ("[S]ignificant markers of *individual* identity … exist outside of, and do not depend on, the school or the government for their [own] existence."). The crucifix was neither "a means to fulfill" nor "undertaken in the course of performing" Ms. Castro's teaching responsibilities. *Weintraub*, 593 F.3d at 203 (quotation marks omitted). As Defendants concede, the crucifix does not relate to any instructional topic, and Ms. Castro never invoked it during instruction. *See* D.Ct. 50 at 1, 4-5, 17, 22, 24. Rather, the communicative aspects of Ms. Castro's prayer, including her crucifix, passively express her Catholic identity. JA59(¶21). That is protected private speech. *See Kennedy*, 597 U.S. at 530-531; *Barber*, 2026 WL 657874, at *4.

### 3. Defendants have not offered a valid justification for restricting Ms. Castro's personal expression

Under *Pickering-Garcetti*'s second step, Defendants cannot restrict Ms. Castro's private expression unless their interests as an employer outweigh her speech interests. *See Garcetti*, 547 U.S. at 418. This requires "a delicate balancing of the competing interests surrounding the speech and its consequences." *Id.* at 423. Defendants bear the burden of providing "an adequate justification for treating [Ms. Castro] differently from any other member of the public." *Id.* at 418. They have

- 54 -

failed to do so, regardless of whether their alleged interest is avoiding an Establishment Clause violation or, as described below, a forfeited interest in preventing disruption.

The district court purported to apply *Pickering-Garcetti* but instead treated the "leeway" doctrine as dispositive and declined to "resolve whether Defendants satisfied step two *Pickering* balancing by showing that the crucifix was disruptive or potentially disruptive, and whether the government's interest in avoiding this disruption outweighs Ms. Castro's interest." SPA38(n.21). As explained above, the court's reliance on "leeway" is flawed. *See supra* Part I.A.2.b. So too is its conclusion that Defendants' establishment concern was reason enough to restrict Ms. Castro's expression. *See supra* Part I.A.2.a.

Moreover, Defendants are too late to assert their interest in preventing disruption. In the district court, Defendants claimed for the first time that the crucifix would be disruptive, citing student complaints. D.Ct. 50 at 19-20. No such concerns were communicated to Ms. Castro as a reason for discipline. *See* JA81-88; JA211(¶¶6-7). Rather, at every juncture, Defendants cited their "endorsement" concern as the basis for her discipline. JA65(¶55); JA211(¶¶6-7). Defendants simply "invented [this concern] *post hoc* in response to litigation.'" *Kennedy*,

- 55 -

597 U.S. at 543 n.8 (quoting *United States v. Virginia*, 518 U.S. 515, 516 (1996)). This Court should reject their eleventh-hour arguments.[9]

Even if Defendants did not forgo their purported disruption interest, they do not have one. Under *Pickering*, employers must show that they "reasonably believed that the speech would potentially interfere with or disrupt the government's activities." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (citations omitted). The government's "prediction must be reasonable" based on the evidence. *Id.* Indeed, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508.

In their litigation papers, Defendants first noted "two students" who complained of Ms. Castro's expression. D.Ct. 50 at 4. But student complaints alone cannot tip the balance of interests in Defendants' favor. Under our Constitution, protected speech does not "readily give way to a 'heckler's veto.'" *Kennedy*, 597 U.S. at 543 n.8 (quoting *Good News Club*, 533 U.S. at 119). Instead, Defendants must show that Ms. Castro's expression "threatened to disrupt classroom activities

---

[9] Defendants also referenced a message that Ms. Castro sent to her students and their parents *after* being disciplined to apprise them of her absence, claiming that the message "created a spectacle" and interfered with DiLoreto's operations. D.Ct. 50 at 19-20. But Defendants similarly never claimed that this message was the reason for Ms. Castro's discipline. Nor could they, given that it was her after-the-fact reaction to the disciplinary action. In any event, the state cannot provoke citizens by violating their rights and then assert that the resulting controversy is disruptive. *See Kennedy*, 597 U.S. at 543 n.8.

or created … disruption in the school." *James v. Board of Educ. Cent. Dist. No. 1 Towns of Addison*, 461 F.2d 566, 572 (2d Cir. 1972). But before Defendants ordered Ms. Castro to conceal the crucifix, there is no evidence that it interfered with her teaching, impaired co-worker harmony, or disrupted DiLoreto's operations. *Cf. Rankin*, 483 U.S. at 388. On the contrary, Ms. Castro placed her crucifix in various classrooms where she taught countless students for a decade. JA58(¶16). And even with the crucifix present throughout those years, Ms. Castro received exemplary evaluations for her teaching performance and developed a reputation for maintaining an orderly classroom environment. JA57(¶¶8-9). Defendants lack any evidence that Ms. Castro's crucifix is anything other than "a benign symbolic expression of [her] personal views." *James*, 461 F.2d at 574.

Rather than suppressing Ms. Castro's expression because it impedes public functions, Defendants censored her speech *solely because of its religious nature*, evidenced by the fact that Defendants targeted only the crucifix while permitting all other forms of similarly displayed expressive items. JA122(¶14); JA65(¶55). But this cannot outweigh Ms. Castro's speech interests. In *Tucker*, the Ninth Circuit recognized that an employer lacked sufficient justification to ban employees from using religious symbols and engaging in religious speech in the workplace. 97 F.3d at 1214-1215. Applying *Pickering*, the court recognized that "it is not reasonable to allow employees to post materials around the office on all sorts of subjects, and

forbid only the posting of religious information and materials." *Id.* at 1215. Not only did the employer lack justification for its religious speech ban, but "[t]he prohibition [was] unreasonable … because its sole target is religious speech." *Id.* Defendants likewise fail *Pickering*'s balancing test—they have not articulated a sufficient justification, and their sole target was Ms. Castro's religious expression. JA65(¶55).

At bottom, Defendants singled out Ms. Castro's religious expression for disfavored treatment. But the Supreme Court has been clear: "When [the] government does not speak for itself, it may not exclude speech based on 'religious viewpoint.'" *Shurtleff*, 596 U.S. at 258 (quoting *Good News Club*, 533 U.S. at 112). Thus, the district court erred by concluding that Ms. Castro is not likely to succeed on the merits of her First Amendment free speech claim.

## II. MS. CASTRO HAS SUFFERED IRREPARABLE HARM AS A RESULT OF DEFENDANTS' CONSTITUTIONAL VIOLATIONS

Ms. Castro seeks to stop Defendants' ongoing violations of her First Amendment rights. It is well established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mid Vt. Christian Sch.*, 151 F.4th at 96 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)). Thus, "[r]eligious adherents are not required to establish irreparable harm independent of showing a Free Exercise violation." *Agudath Israel*, 983 F.3d at 636. Nor are those claiming

a violation of their free speech rights. *See Paulson v. County of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). Ms. Castro has demonstrated a likelihood of success on her free exercise and free speech claims. Either of those constitutional deprivations alone establishes her irreparable harm.

But there is more. Defendants' disciplinary actions also have been irreparably harming Ms. Castro. Some adverse employment actions, even just "the threat of permanent discharge," "can cause irreparable harm in the First Amendment context." *New Yorkers for Religious Liberty, Inc. v. City of N.Y.*, 125 F.4th 319, 328 (2d Cir. 2025) (per curiam), as amended; *see also Elrod*, 427 U.S. at 373-374 (plurality op.). Defendants have more than just *threatened* to remove Ms. Castro from her tenured teaching position or pressured her to resign. JA63-65(¶¶40,49,55). They have *actually* removed her from that position, first by suspending her without pay, imposing a leave lasting several months, and then by involuntarily reassigning her through the present. JA63-65(¶¶42,48,54). If the lost opportunity "'to participate in [state-sponsored] sports and to pursue athletic scholarships" constitutes irreparable harm to a religious school, *Mid Vt. Christian Sch.*, 151 F.4th at 96, so does Ms. Castro's lost opportunity to continue her teaching career.

### III. THE PUBLIC INTEREST WEIGHS IN FAVOR OF A PRELIMINARY INJUNCTION

It also is well established that "the public interest is well served by the correction of … constitutional harm." *Mid Vt. Christian Sch.*, 151 F.4th at 96 (quoting *A.H. ex rel. Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021)). While allowing other teachers to display personal items around their workspaces, Defendants have punished Ms. Castro for putting a crucifix near her desk to channel her prayers and meditation, and they have done so specifically because of the crucifix's religious significance. Defendants' actions "specially and disproportionately burden religious exercise, and thus 'strike at the very heart of the First Amendment's guarantee of religious liberty.'" *Agudath Israel*, 983 F.3d at 637. "Such a direct and severe constitutional violation weighs heavily in favor of granting injunctive relief." *Id.*

While such a clear constitutional violation is sufficient to support preliminary injunctive relief, the public interest would also be served by keeping Ms. Castro in the classroom. Just as there is "a strong public interest in ensuring that students and schools do not lose out on valuable athletic opportunities by virtue of the government's hostility to religion," *Mid Vt. Christian Sch.*, 151 F.4th at 96, there is likewise a strong public interest in ensuring that students do not lose out on valuable educational opportunities by virtue of that same hostility. Ms. Castro has provided such opportunities to students over her 30-plus years as a public-school educator.

JA56-57(¶¶3-9). Ending this ongoing First Amendment violation and returning Ms. Castro to the classroom would serve the public interest.

## CONCLUSION

For the foregoing reasons, Ms. Castro respectfully requests that the Court reverse the decision below denying her motion for a preliminary injunction and remand to the district court for the entry of such an injunction.

Dated: March 18, 2026

JEFFREY C. MATEER
DAVID J. HACKER
JEREMIAH G. DYS
HOLLY M. RANDALL
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075
(972) 941-4444

REBECCA R. DUMMERMUTH
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave, NW, Suite 1410
Washington, DC 20037
(202) 921-4105

Respectfully submitted,

*/s/ Matthew T. Martens*

MATTHEW T. MARTENS
KEVIN M. GALLAGHER
DONNA M. FARAG
JONATHAN W. ELLISON
ANDREW NELL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
(202) 663-6921

ROBERT KINGSLEY SMITH
JAYNE HOLLOWAY MORRIS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State St
Boston, MA 02109
(617) 526-6759

*Counsel for Marisol Arroyo-Castro*

- 61 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as modified by Local Rule 32.1(a)(4)(A).

1.      Excluding the items exempted by Fed. R. App. P. 32(f), the brief contains 13,984 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font and complies with the requirements of Fed. R. App. P. 32(a)(5)-(6).  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  March 18, 2026                              */s/ Matthew T. Martens*
                                                    MATTHEW T. MARTENS

# SPECIAL APPENDIX

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

Page

Memorandum and Order Denying Plaintiff's Motion for Preliminary
Injunction, Dkt. 88 (Nov. 3, 2025) ........................................................... SPA1

Constitution of the United States, First Amendment ...................................... SPA59

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------------- x

MARISOL ARROYO-CASTRO,                              :
                                                    :
                    Plaintiff,                      :
                                                    :
        v.                                          :        3:25-CV-00153 (SFR)
                                                    :
ANTHONY GASPER, ET AL.,                             :
                                                    :
                    Defendants.                     :
--------------------------------------------------------------- x

**MEMORANDUM & ORDER**

Marisol Arroyo-Castro, a teacher employed by the Consolidated School District of New

Britain (the "District"), has brought this action against Anthony Gasper, Maryellen Manning,

Dario Soto, and Andrew Mazzei (collectively "Defendants") in their individual and official

capacities as employees and administrators of the District. The complaint asserts claims against

Defendants pursuant to 42 U.S.C. § 1983 for violating Ms. Castro's[1] rights under the Free

Speech and Free Exercise Clauses of the First Amendment to the U.S. Constitution. The

complaint, which seeks injunctive and equitable relief, also raises a claim under Connecticut's

Act Concerning Religious Freedom, Conn. Gen. Stat. § 52-571b.

The dispute centers around whether Ms. Castro has the right to affix an approximately

foot-high crucifix to the wall near the teacher's desk in a classroom of a public middle school.

Ms. Castro has moved for a preliminary injunction seeking an order from this Court prohibiting

Defendants from removing Ms. Castro from the classroom or otherwise disciplining her for

having the crucifix displayed in a classroom in a manner similar to how it was displayed in the

---

[1] Plaintiff's papers refer to Plaintiff as "Ms. Castro."

classroom where she taught on December 3, 2024, preceding the pending controversy.[2] Defendants have opposed the request for a preliminary injunction.

The parties do not dispute that the crucifix display on the classroom wall is "speech" within the meaning of the First Amendment. At issue is whether the crucifix display is protected speech. When "a public employee speaks 'pursuant to [his or her] official duties,' . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Here, Ms. Castro's job duties specifically included decorating the classroom walls to make the physical classroom environment conducive to student learning. Under these circumstances, based on the existing evidentiary record, I conclude that Ms. Castro acted pursuant to her official duties when she posted items on the classroom wall that students would see during instructional time. The classroom wall decorations are thus speech pursuant to Ms. Castro's official duties and subject to the District's control. For these reasons, I conclude that Ms. Castro is unlikely to prevail on the merits of her free speech and free exercise claims and is not entitled to the extraordinary remedy of a preliminary injunction. Ms. Castro's motion for a preliminary injunction is denied.

---

[2] Ms. Castro's motion for a preliminary injunction seeks an injunction returning Ms. Castro to the "status quo ante as it stood on December 3rd, 2024." ECF No. 38. At oral argument, Ms. Castro's counsel acknowledged the impossibility of returning to the exact status quo as of that date, given that teaching assignments adjust with the needs of the school. Counsel clarified that Ms. Castro seeks a preliminary injunction "to enjoin the defendants from continuing to adversely [a]ffect Ms. Castro's employment but-for the crucifix in her personal space." Tr. 3, ECF No. 72. *See also id.* at 6-7 (acknowledging that "it would not be a requirement," if the injunction were granted, "that [Ms. Castro] be based back in that particular classroom teaching seventh grade students social studies and so forth in that particular room").

## I.     BACKGROUND

### A.     Factual Background[3]

The parties ask the court to consider the facts set forth in the exhibits and declarations attached to the motion for preliminary injunction, ECF No. 38, and Defendants' memorandum in opposition, ECF No. 50. The parties declined the opportunity to have an evidentiary hearing on the motion. ECF No. 52.

Ms. Castro is a tenured teacher employed by the Consolidated School District of New Britain. Castro Decl. ¶ 4, ECF No. 38-2. Defendants are administrators of the District: Anthony Gasper is Superintendent and CEO of the District, Maryellen Manning is Chief of Staff for Relationships and Accountability for the District, Dario Soto is principal of DiLoreto Elementary & Middle School ("DiLoreto"), and Andrew Mazzei is the vice principal of the middle school program at DiLoreto. *Id.* ¶¶ 10-14.

Ms. Castro has taught in the District since 2003 and at DiLoreto since 2008. Manning Decl. ¶¶ 3, 5, ECF No. 50-1. For much of the past decade, Ms. Castro has taught third and fourth graders. *Id.* ¶ 10; Castro Decl. ¶ 7. For the 2024-2025 school year, Ms. Castro was assigned to teach seventh grade social studies at DiLoreto. *Id.* ¶ 15. At this time, Ms. Castro moved classrooms and began reporting to Mazzei. *Id.*

In the fall 2024 semester, Ms. Castro had a homeroom class, taught four sections of social studies, and taught an advisory class of students needing reading and math support. Mazzei Decl. ¶ 4. Each section had at least 25 students and all class sessions were 48 minutes long. *Id.* In the fall 2024 semester, Ms. Castro was DiLoreto's only seventh grade social studies

---

[3] Citations to declarations are by paragraph number. With respect to other documents, page citations are to the page number generated by the ECF system.

teacher. ECF No. 50-2, at 12. In addition to a 30-minute daily lunch break, Ms. Castro had three-and-a-half hours total each week for planning when she was required to be on school grounds but was free from other responsibilities. Manning Decl. ¶ 12.

Connecticut law requires that "each parent or other person having control of a child five years of age and over and under eighteen years of age shall cause such child to attend a public school regularly during the hours and terms the public school in the district in which such child resides is in session, unless such child is a high school graduate or the parent or person having control of such child is able to show that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools." Conn. Gen. Stat. § 10-184. Students enrolled in the District are required to attend school regularly per District policy. ECF No. 50-4, at 4.

A District policy statement recognizes that the "classroom environment has a powerful influence on student performance and behavior." ECF No. 50-4, at 9. The policy states that the "physical aspects of a classroom include, but are not limited to, room arrangement, seating, bulletin boards, and artifacts relating to instructional areas" and "[e]ach of these should be carefully considered with both individual students' needs and instructional goals in mind." *Id.* The policy provides a "checklist" as a "tool to ensure that the physical arrangement of the classroom is student-centered and task-focused." *Id.* The checklist asks teachers to ensure that the classroom: "[a]ddresses academic and social needs of our students," "[r]eflects the diverse cultural and linguistic characteristics of our students," "[e]nsures clean, and attractive settings that stimulate learning and help build a classroom community," and "[e]stablishes emotionally, socially, and physically safe environments for learning and encourages students' growth and development." *Id.*

4
**SPA4**

Ms. Castro decorated the classroom walls when she moved to the new classroom in fall 2024. Castro Decl. ¶¶ 15-16. Near the teacher's desk, Ms. Castro displayed a poster for a social studies textbook, instructions relating to operating Chrome Book computers, a printout entitled "Student Daily Schedule," a painting containing a Puerto Rican flag, and various drawings of scenes and animals that appear to have been made by children. ECF No. 38-3.[4] On the same wall, near the desk, Ms. Castro affixed a crucifix. *Id.*; Castro Decl. ¶¶ 16-17, 21. A crucifix is a representation of the figure of Jesus Christ crucified on the cross. The crucifix Ms. Castro affixed to the classroom wall is approximately a foot tall and half a foot wide. Mazzei Decl. ¶ 10. The crucifix was hung on the wall "at about waist height." Castro Decl. ¶ 22. The crucifix was not part of the seventh grade social studies curriculum, and the school did not approve of the crucifix as a learning aid. *See id*. ¶¶ 16, 20; Mazzei Decl. ¶ 5.

In addition to the crucifix, which Ms. Castro calls a "personal expressive item," Castro Decl. ¶ 16, Ms. Castro displayed on the classroom wall other "personal expressive items" including a New York Yankees team pennant and her church calendar. Ms. Castro also had a small Christmas tree in the classroom around the holidays. *Id.* ¶ 17. Near the Christmas tree was an angel figurine, a small cross, and a Merry Christmas sign in the shape of a Santa hat. ECF No. 38-3, at 2. Ms. Castro states that based on her experience, displaying "[p]ersonal expressive items" such as these "make the classroom environment more conducive to learning." *Id.* ¶ 18. Ms. Castro says that the experience of remote learning during the pandemic showed her the importance of "students interacting with their teachers as human beings" and

---

[4] ECF No. 38-3 appears as Appendix 1 to this opinion.

"[p]ersonal expressive items promote this goal by humanizing teachers to their students." *Id.* ¶ 19.

Ms. Castro states that she has hung that same crucifix "in a similar location" for the past 10 years, Castro Decl. ¶ 16, 23, but provides no further details about the location of the crucifix in the other classrooms or the size or layout of those classrooms. This specific crucifix has personal significance to Ms. Castro because it belonged to a friend whose family gave it to Ms. Castro after the friend's death. *Id.* ¶ 20. Ms. Castro's grandmother taught her how important it is to treat a crucifix with respect and "never to put anything on top of the crucifix." *Id.* ¶ 19. Ms. Castro states: "During the school day, looking at the crucifix provided me with peace and strength, especially when the task of teaching young students proved particularly challenging." *Id.* ¶ 20. In addition, during lunch breaks, rather than going to the teachers' lounge, Ms. Castro "would remain at [the] desk, look at the crucifix, and pray." *Id.* Ms. Castro says: "I hang the crucifix on the wall in the personal space next to my desk for multiple reasons. It reminds me of my grandmother, helps me pray silently in my personal time, and express[es] my identity as a Christian." *Id.* ¶ 21.

Multiple student desks in the classroom had direct lines of sight to the crucifix. *See* ECF No. 50-2, at 24;[5] *see* Mazzei Decl. ¶ 22 (noting that ECF No. 50-2 portrays the classroom as it appeared when Ms. Castro was teaching, but for the crucifix). It appears that materials for students were placed on top of a small file cabinet next to the desk. ECF No. 38-3; ECF No. 50-2; Mazzei Decl. ¶ 22. Papers appear on a small table sitting immediately to the right of the crucifix and to the left of the door. *Id*. Ms. Castro does not dispute that students could see the

---

[5] ECF No. 50-2, at 24 appears as Appendix 2 to this opinion.

crucifix while in the classroom during instructional time but asserts that the crucifix was "blocked from most students' view by a computer monitor and other items." Castro Decl. ¶ 31.

Ms. Castro has supplied photos showing items she says other teachers have displayed at DiLoreto including athletic team pennants, inspirational phrases, college decals, family and pet photos, action figures of Wonder Woman, a picture of the Mona Lisa, and a desk mat with images of Baby Yoda. *Id.* ¶ 25; ECF No. 38-4. In addition, Ms. Castro points to items she says have "religious origins or connotations" including a picture of Santa Claus, a coffee mug,[6] a Christmas tree, and a small photograph of a statue of the Virgin Mary. *Id.* The placement of the items varies, with some items displayed on or near desks, ECF No. 38-4, at 2-4, 6-7, 9, near doors, *id.* at 5, or near windows, *id.* at 8, 10. Ms. Castro does not assert that all the photos are from classrooms and some photos show spaces that may instead be offices. *See id.* at 2, 4.

During the fall 2024 semester, in a conversation with a seventh-grade science teacher, two students complained that Ms. Castro was exposing students to religion in the classroom. The students mentioned the crucifix and also said that Ms. Castro was making religious comments to students in the classroom. Duve Decl. ¶¶ 6, 7.[7] The science teacher expressed her

---

[6] Defendants' memorandum says the mug has "Teacher" printed on it along with a citation to Proverbs 31:26 ("She opens her mouth in wisdom; kindly instruction is on her tongue.") Defs.' Mem. 12 n.3. The reference to the Proverbs is not visible in the photo.

[7] Ms. Duve's declaration details complaints from students who alleged that Ms. Castro made religion-based comments to students in the classroom. Duve Decl. ¶¶ 6-7, ECF No. 50-3. Mr. Mazzei then heard complaints directly from students. Mazzei Decl. ¶ 11. Ms. Castro denies directing religious comments to students. Castro Supp. Decl. ¶¶ 3-5, ECF No. 60-1. At oral argument, Defendants' counsel made clear that Defendants were not relying on the alleged comments for purposes of opposing Ms. Castro's preliminary injunction motion, noting that the matter was still under investigation. Tr. 60-61.

concern to Mr. Mazzei, who notified Ms. Manning. *Id.* ¶ 8; Manning Decl. ¶ 13. Mr. Mazzei and Ms. Manning decided to convene an "informational meeting" with Ms. Castro. Manning Decl. ¶¶ 13, 14.

On December 3, 2024, Mr. Mazzei emailed Ms. Castro asking to discuss a "concern" that had been brought to his attention "regarding a cross displayed in your classroom." Castro Decl. ¶ 27. Mr. Mazzei added: "Please know that this meeting is non-disciplinary in nature and is intended to review district polices to ensure clarity and consistency." *Id.* At the meeting, Mr. Mazzei instructed Ms. Castro to remove the crucifix. *Id.* ¶ 28. Thereafter, Mr. Mazzei sent Ms. Castro an email recounting the "nondisciplinary meeting involving the permanent display of a religious symbol." *Id.* Mr. Mazzei stated that "any permanent displays of religious symbols are prohibited from public schools, based on the First Amendment of the United States Constitution" and instructed that Ms. Castro's crucifix must be removed by December 9. *Id.* Mr. Mazzei stated that noncompliance would "lead to insubordination and disciplinary measures." *Id.*

Ms. Castro did not remove the crucifix by the deadline. On December 10, 2024, Ms. Castro met with Mr. Mazzei, Mr. Soto, and Ms. Manning. *Id.* ¶¶ 29-30. At the meeting, Ms. Manning directed Castro to remove the crucifix. *Id.* ¶ 30. According to Ms. Castro, Ms. Manning explained that a religious item could not be hung on the walls of public-school buildings and that as a public-school employee, Ms. Castro was required to avoid the "perception of promoting a particular religion." *Id.* Ms. Castro says that Ms. Manning suggested that Ms. Castro put the crucifix in a desk drawer, to be pulled out only when she

wished to "ground" herself. *Id.* According to Ms. Castro, during the meeting, Mr. Soto stated his own religious views in an effort to pressure her to take down the crucifix. *Id.*[8]

At the meeting, which Ms. Castro attended with her union representative, Ms. Castro says she agreed to re-hang the crucifix on the desk where it would be less visible to students but where she could still see it. *Id.* ¶ 31. Mr. Mazzei says at the meeting the union representative suggested hanging the crucifix on the desk drawers, an idea that Ms. Castro entertained. Mazzei Decl. ¶ 16. Ms. Manning asserts that the union representative also proposed hanging the crucifix underneath the desktop, next to the drawers—a proposal that Ms. Manning seconded. Manning Decl. ¶ 16. Ms. Castro says that the group walked to the classroom after meeting and Ms. Castro was "surprised and offended" when Ms. Manning told her to "attach the crucifix to the side of the kneehole of [her] desk, by [her] legs." Castro Decl. ¶ 32. Ms. Castro says that as she put her hand on the crucifix to move it, she "felt sick to [her] stomach" and "broke down and began sobbing." *Id.* ¶ 33. She nevertheless moved the crucifix in the kneehole of the desk and left it in that location overnight while she prayed about what to do. *Id.* ¶ 35. When Ms. Castro returned to the classroom the next morning, she returned the crucifix to the wall next to the desk. She says she did so out of "sincere religious conviction" and informed Defendants of her decision. *Id.* ¶ 35. That same day, on December 11, 2024, Ms. Manning issued a Letter of Reprimand to Castro stating that her actions were "insubordinate" and that Mr. Soto would come to "assist" her with removing the crucifix from the classroom at the end of that day. *Id.* ¶¶ 36-37. The letter summarized the meeting held the day before:

---

[8] Ms. Manning asserts that any comments at the meeting "referencing [Ms. Castro's] pedagogy or personal beliefs simply reiterated the nature of complaints from students and staff" that had prompted the school to investigate. Manning Decl. ¶ 20.

At this pre-disciplinary meeting we discussed the Establishment Clause of the First Amendment that says that the government cannot establish a religion.

Prior to yesterday's pre-disciplinary meeting your building administration met with you and informed you the following:

- Per legal statutes, schools should remain neutral when speaking of religion, so as to not have a perception of endorsing a particular religion.
- The placement of religious artifacts is not permitted in the workplace unless the artifact is being used within a BOE approved curriculum.
- This same principle holds true when speaking to students about a particular religion.
- You need to take the cross down.
- Further insubordination may lead to disciplinary consequences.

Because public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion.

The following was discussed with you at yesterday's pre-disciplinary meeting pertaining to you as a CSDNB employee and the Establishment Clause of the First Amendment:

- The Establishment Clause includes employees of the public schools, including administrators *and teachers*.
- When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.
- You have told the administration that you are hanging this cross permanently.
- You have also told the administration that this cross is not tied to a specific curricular unit.
- This means that there is no pedagogical justification for hanging this cross.
- The Board of Education owns and controls the classroom walls.
  - So, by hanging this on the classroom wall, you are, in effect, saying that "the New Britain Board of Education endorses this religion."
  - That violates the Establishment Clause.

10

**SPA10**

> At yesterday's meeting we discussed your personal religious beliefs and strategies to support you in the classroom. . . .

ECF No. 38-6, at 2-3.

When Mr. Soto came to the classroom, Ms. Castro said she would not remove the crucifix. Castro Decl. ¶ 39. Mr. Soto instructed Ms. Castro to report to his office the next morning if she did not remove the crucifix and informed her that she may face suspension and eventual termination for being insubordinate. *Id.* ¶ 40.[9] When Ms. Castro left school that evening, she left the crucifix affixed to the classroom wall. *Id.*

The next day, December 12, 2024, Ms. Castro saw that the crucifix had been removed from the classroom wall. *Id.* ¶ 41. Ms. Castro then attended a meeting in the principal's office with Ms. Manning, Mr. Soto, and Ms. Mazzei. *Id.* According to Ms. Castro, she was informed at the meeting she would be suspended without pay for two days and could "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the wall." *Id.* ¶ 42. Ms. Castro was sent home with her crucifix in a box. *Id.* Ms. Manning issued Ms. Castro a Notice of Suspension, which stated in part:

> When a public-school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.

*Id.* ¶ 43. The Notice stated that Ms. Castro could return to work on December 16, 2024 if she agreed to remove the crucifix from its location on the wall next to the desk. *Id.* ¶ 44.

On December 16, 2024, Ms. Castro emailed Defendants stating that she could not in good conscience conceal the crucifix. She said:

---

[9] Ms. Castro says that Mr. Soto again pressured her to remove the crucifix by referencing his religious views and told her to "give Caesar what is Caesar's." Castro Decl. ¶ 40.

> For me to take my crucifix down and put it under my desk made me feel like, instead of letting my light shine as Jesus told me to do, I was putting it under a bushel (Matthew 5:15). I had to put it back up.

*Id.* ¶ 46. She also cited to *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), and 2023 Guidance from the Department of Education. *Id.* ¶ 47.[10] Ms. Castro was placed on paid administrative leave the same day. *Id.* ¶ 48.

On December 20, 2024, Ms. Castro sent a text message via the student communication portal that said: "I have been placed on Administrative Leave for refusing to remove a Crucifix from my desk area. The lesson to learn here is that doing what is right is not always easy." ECF No. 50-2, at 22. A student shared the message with a teacher, who notified administrators of the posting. Mazzei Decl. ¶ 21. A parent later told Mr. Mazzei that the parent thought the text message was an inappropriate thing to send to families. *Id.*

On January 24, 2025, Ms. Castro attended a videoconference with Dr. Gasper and Ms. Manning. Ms. Castro was represented by counsel at the meeting. Castro Decl. ¶ 50. During this meeting, Dr. Gasper proposed that Ms. Castro could place the crucifix in a desk drawer, under the desk (attached with a magnet), in her pocket, or behind a screen (that would obscure the crucifix from nearby students' views). Manning Decl. ¶ 18. At the meeting, Ms. Castro confirmed through counsel that she would not agree to remove or relocate her crucifix in the classroom so long as other teachers were permitted to keep personal expressive items in similar locations. Castro Decl. ¶ 50. On March 6, 2025, Defendants informed Ms. Castro that she was reassigned to a non-teaching role focused on curriculum. *Id.* ¶ 54. Ms. Castro has been allowed

---

[10] Ms. Castro has supplied a copy of the Guidance. *See* U.S. Department of Education, *Guidance on Constitutionally Protected Prayer and Religious Expression in Public Elementary and Secondary Schools* (2023). ECF No. 38-11.

to display the crucifix in her new work location. Manning Decl. ¶ 21. During a status conference on September 18, 2025, Ms. Castro's counsel confirmed that Ms. Castro remains in the non-teaching role working out of District headquarters.

**B.   Procedural History**

This action was initiated with a complaint filed on January 30, 2025. Compl., ECF No. 1. On March 14, 2025, Castro moved for a preliminary injunction, ECF No. 38, and filed a supporting memorandum, ECF No. 38-1 ("Pl.'s Mem."). I held a status conference on March 25, 2025, ECF No. 47, and entered a briefing schedule based on dates proposed by the parties at that conference. ECF No. 48. On April 14, 2025, Defendants filed a memorandum in opposition to the preliminary injunction motion. ECF No. 50 ("Defs.' Mem."). On April 18, 2025, the parties filed a joint notice informing me that they did not request an evidentiary hearing or seek discovery on the pending motion for a preliminary injunction. ECF No. 52. On May 2, 2025, Castro filed a reply in further support of her motion. ECF No. 60 ("Pl.'s Reply").

I held oral argument on May 13, 2025, the earliest date proposed by the parties. During a status conference on May 28, 2025, the parties requested referral to a Magistrate Judge for purposes of conducting settlement discussions. ECF No. 66. Judge Richardson conducted a pre-settlement conference on June 10, 2025 and a settlement conference on July 30, 2025. ECF Nos. 71, 77. At a status conference on September 18, 2025, following additional settlement discussions, counsel for the parties informed me that they were at an impasse and requested a decision on the motion for preliminary injunction. ECF No. 85. At that time, counsel for the parties confirmed that they did not seek to provide any further evidence at an evidentiary hearing or otherwise relating to the pending motion. The parties have filed and responded to

various notices of supplemental authority following oral argument. *See* ECF Nos. 75, 76, 80, 81, 82, 83, 86, 87.

## II.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). A preliminary injunction is an "extraordinary and drastic" remedy, which "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotation marks omitted). To obtain a preliminary injunction, a movant must make a clear showing that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in her favor, and (4) an injunction is in the public interest. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citing *Winter*, 555 U.S. at 20, 22).[11]

## III.   DISCUSSION

### A.   Federal Claims: Likelihood of Success on the Merits

Ms. Castro asserts that Defendants violated and continue to violate her rights under both the Free Speech and the Free Exercise Clauses of the First Amendment. "These Clauses work in tandem. Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). Under Supreme Court precedent, "a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses." *Id.* "If the plaintiff carries these

---

[11] At oral argument, counsel for Defendants stated that the relief sought by Ms. Castro, as narrowed at oral argument, *see supra* n.2, would not be a mandatory injunction. Tr. 42.

burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of [Supreme Court] case law." *Id.*

### 1.    Free Speech Claim

The Free Speech Clause, applicable to state actors by the Fourteenth Amendment, states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Ms. Castro argues that the display of the crucifix on the classroom wall was "speech" under the First Amendment as (1) she "intended to convey a particularized message because displaying a crucifix expressed, among other things, her identify as a devout Catholic" and (2) her "intended message was very likely to be understood because the crucifix is one of the most ubiquitous symbols in Western society, identifying the owner of a display as likely to be expressing Christian faith." Pl.'s Mem. 29. Defendants do not dispute that the crucifix display constitutes "speech" within the meaning of the First Amendment's Free Speech Clause. Defendants argue, however, that the display was not protected speech. Defs.' Mem. 20.

It is well established that teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the speech rights of public school employees are not "so boundless that they may deliver any message to anyone anytime they wish." *Kennedy*, 597 U.S. at 524. "In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.*; *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they

15

**SPA15**

speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.") (citation omitted); *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 251 (2022) ("The First Amendment's Free Speech Clause does not prevent the government from declining to express a view. When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work.") (citations omitted).

In considering free speech claims brought by government employees, courts proceed in two steps pursuant to the *Pickering-Garcetti* framework. *See Pickering v. Board of Ed. of Township High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968); *Garcetti*, 547 U.S. at 418. The parties agree this framework applies to Ms. Castro's free speech claim. Pl.'s Mem. 28-29; Defs.' Mem. 19-21.[12]

At the first step, courts consider whether an employee is speaking pursuant to his or her official duties or as a citizen on a matter of public concern. Where "a public employee speaks 'pursuant to [his or her] official duties,' . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy*, 597 U.S. at 527 (quoting *Garcetti*, 547 U.S. at 421). "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421-22. Instead "[i]t simply reflects

---

[12] Ms. Castro does not argue that the classroom walls were a "public forum" or "limited public forum" under the First Amendment. Tr. 12 ("We're not saying that this is a limited public forum."); Defs.' Mem. 19 n.9 (noting that Ms. Castro is not arguing that the classroom walls were a public forum).

the exercise of employer control over what the employer itself has commissioned or created." *Id.* However, "[w]hen an employee 'speaks as a citizen addressing a matter of public concern,'" then "the First Amendment may be implicated and courts should proceed to a second step." *Kennedy*, 597 U.S. at 528 (quoting *Garcetti*, 547 U.S. at 423). Courts must ask, therefore, whether a government employee spoke in his or her capacity as a private citizen or whether the expression amounted to speech attributable to the government. *See Kennedy*, 597 U.S. at 528 (stating that the question at step one of the *Pickering-Garcetti* framework is: "Did Mr. Kennedy offer his prayers in his capacity as a private citizen, or did they amount to government speech attributable to the District?").

At the second step of the *Pickering-Garcetti* framework, "courts should attempt to engage in a delicate balancing of the competing interests surrounding the speech and its consequences," including considering "whether an employee's speech interests are outweighed by the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (internal quotation marks omitted).

Although *Garcetti* noted that "expression related to academic scholarship or classroom instruction" could implicate "additional constitutional interests" not implicated with respect to the speech of public employees in other settings, *Garcetti*, 547 U.S. at 425, Ms. Castro does not argue that the crucifix display has additional protection as academic scholarship or classroom instruction.[13]

---

[13] Pl.'s Mem. 30 (stating that "the crucifix was not used as part of Ms. Castro's curricular instruction"). *See Lee-Walker v. New York City Dep't of Educ.*, 712 F. App'x 43, 45 (2d Cir. 2017) (stating that it "is an open question in this Circuit whether *Garcetti* applies to classroom instruction" or if such instruction is instead governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988)) (internal quotation marks omitted)

With respect to the first step of the *Pickering-Garcetti* framework, the parties do not dispute that the display of the crucifix related to a matter of public concern. Pl.'s Mem. 28; Defs.' Mem. 25 n.8. Accordingly, for purposes of step one of the *Pickering–Garcetti* framework, the only disputed issue is whether Ms. Castro displayed the crucifix on the classroom wall pursuant to her official duties as a teacher or as a private citizen.

The Second Circuit has "identified two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue exist[s]." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 397 (2d Cir. 2018) (internal quotation marks omitted). However, a lack of a civilian analogue is "not critical to a decision as to whether [an employee] spoke as a private citizen." *Id.* at 398. The relevant question is whether the speech was *pursuant* to the employee's official job duties not whether it *related* to the duties. *Id.*; *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) (stating that the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties").

Ms. Castro argues that in displaying her crucifix, "she was speaking for herself, not the government." Pl.'s Mem. 30. She says the crucifix display was not part of curricular instruction, did not "owe its existence" to her role as a public school teacher, and was not furthering a "core" job duty. *Id.*; Pl.'s Reply 5. Instead, Ms. Castro says the display is like the personal family photos or inspirational quotes that other teachers placed near their desks and is similar to a person wearing a cross necklace. Pl.'s Mem. 30; Pl.'s Reply 5. Defendants, in contrast, argue that decorating the seventh grade classroom was "part and parcel of [Ms. Castro's] teaching duties." Defs.' Mem. 21. Defendants assert that the classroom was not Ms.

Castro's classroom only; rather, it belonged to the students, the teacher, the District, and the taxpayers. Defendants maintain that they controlled what was placed on classroom walls, and what is posted on the walls impacts student performance. According to Defendants, "[s]upervisors had the discretion to instruct a teacher to relocate a visible crucifix, to have the classroom in their view better achieve the District's educational mission—just as supervisors could order a teacher to relocate a New England Patriots pennant or a Baby Yoda figurine, for example, out of an aversion to branded merchandise." Defs.' Mem. 22-23.

In *Kennedy*, the Supreme Court concluded that when a football coach prayed on the field following a game he "was not engaged in speech 'ordinarily within the scope' of his duties as a coach." *Kennedy*, 597 U.S. at 509 (quoting *Lane*, 573 U.S. at 240). The Court observed that while offering the prayers, the coach "was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech the District paid him to produce as a coach." *Id.* The Court reasoned:

> The timing and circumstances of Mr. Kennedy's prayers confirm the point. During the postgame period when these prayers occurred, coaches were free to attend briefly to personal matters—everything from checking sports scores on their phones to greeting friends and family in the stands. We find it unlikely that Mr. Kennedy was fulfilling a responsibility imposed by his employment by praying during a period in which the District has acknowledged that its coaching staff was free to engage in all manner of private speech. That Mr. Kennedy offered his prayers when students were engaged in other activities like singing the school fight song further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen. Nor is it dispositive that Mr. Kennedy's prayers took place "within the office" environment—here, on the field of play. Instead, what matters is whether Mr. Kennedy offered his prayers while acting within the scope of his duties as a coach. And taken together, both the substance of Mr. Kennedy's speech and the circumstances surrounding it point to the conclusion that he did not.

*Kennedy*, 597 U.S. at 530 (citations omitted).

In contrast, the Second Circuit concluded a teacher spoke pursuant to his official job duties in *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010). There, the Second Circuit reasoned that a teacher's speech in the form of a union grievance challenging the school administration's decision not to discipline a student for throwing a book at him in class was pursuant to official duties as "it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties,' as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203 (citations omitted). The Second Circuit concluded that the teacher's "speech challenging the school administration's decision to not discipline a student in his class was a means to fulfill, and undertaken in the course of performing, his primary employment responsibility of teaching." *Id.* (citations and internal quotation marks omitted); *see also id.* at 198 (concluding that "filing of the grievance was in furtherance of one of [plaintiff's] core duties as a public school teacher, maintaining class discipline").[14]

Here, based on the present factual record, I conclude Ms. Castro displayed items on the walls of the classroom in the course of performing one of her core duties as a teacher—creating a physical classroom conducive to learning. Decorating the walls of the classroom is part of the "actual, functional job responsibilities" of a teacher at DiLoreto. *See Matthews v. City of New York*, 779 F.3d 167, 184 (2d Cir. 2015). Indeed, District policy specifically instructs

---

[14] In contrast, in *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015), the Second Circuit concluded that a police officer engaged in protected speech when he spoke to his commanding officers about an arrest quota policy at his precinct of the New York City Police Department. The court observed that "[s]uch policy-oriented speech was neither part of [the plaintiff's] job description nor part of the practical reality of his everyday work." *Id.* at 174. Accordingly, the court concluded the plaintiff's speech was as a citizen and not as an employee because his "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders." *Id.*

teachers to consider the "physical aspects of [the] classroom" with "both individual students' needs and instructional goals in mind"—given the impact that the physical classroom environment has on learning. ECF No. 50-4, at 9. The District policy provides a "checklist" of considerations for teachers as a "tool to ensure that the physical arrangement of the classroom is student-centered and task-focused." *Id*. Pursuant to her duty to create a physical classroom conducive to learning, Ms. Castro hung various items on the classroom wall including inspirational quotes, student artwork, a social studies poster, a daily schedule, and reminders about computer commands. Ms. Castro says she also hung "personal expressive items" in the classroom, including the crucifix, and explains that she believes displaying such "personal expressive items" makes "the classroom environment more conducive to learning" because these personal items humanize teachers to their students. Castro Decl. ¶¶ 16, 18.

Thus, as a general matter, Ms. Castro acted pursuant to her job duties as a teacher when she decorated the walls of her classroom with items the students would see during instructional time. The question is whether Ms. Castro was doing otherwise when she hung items she calls "personal expressive items" on the wall, including the crucifix. Ms. Castro specifically states that posting such items makes the classroom environment more conducive to learning because the items humanize the teacher to their students. In that way, therefore, Ms. Castro was acting pursuant to her official duties as a teacher by displaying the items. Ms. Castro says she wanted to convey an aspect of her personal identity by displaying the crucifix—her "identity as a devout Catholic." Pl.'s Mem. 29. But regardless of the connection of the expression to Ms. Castro's personal identity, the expression occurred in Ms. Castro's role as a teacher—as Ms. Castro communicated the message to students on a classroom wall during instructional time.

21

**SPA21**

The circumstances in the present case differ from the "timing and circumstances" of the prayer at issue in *Kennedy*. 597 U.S. at 530. In *Kennedy*, the coach's religious expression occurred during the "postgame period" when "coaches were free to attend briefly to personal matters—everything from checking sports scores on their phones to greeting friends and family in the stands." *Id.* In addition, the Court concluded that the fact that the coach "offered his prayers when students were engaged in other activities like singing the school fight song further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen." *Id.* Here, in contrast, Ms. Castro's expression occurred when students were in the classroom for instructional time. While she was with students in the classroom for class, Ms. Castro fulfilled her core duties and acted in her capacity as a teacher. Unlike the students in *Kennedy*, who were engaged in other activities while the coach prayed, Ms. Castro's students received the religious message when they were required to be present in the classroom receiving instruction from Ms. Castro.[15]

Ms. Castro cites to several cases concluding that teachers engaged in protected speech when they wore cross necklaces. *See Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536, 541 (W.D. Pa. 2003); *Draper v. Logan Cnty. Pub. Libr.*, 403 F. Supp. 2d 608, 611 (W.D. Ky. 2005). However, *Nichol* and *Draper* focus on whether the cross necklaces constituted speech on a matter of public concern and apply *Pickering* balancing. The cases, decided before

---

[15] At oral argument in *Kennedy*, counsel for Mr. Kennedy acknowledged that a teacher offering a prayer in the classroom "during instructional time" would be speaking pursuant to his or her official duties. Transcript of Oral Argument at *8-9, *Kennedy v. Bremerton Sch. Dist.*, 2022 WL 1214751 (2022) (No. 21-418).

*Garcetti*, do not discuss whether the expression was made pursuant to the official duties of the teachers.[16]

The circumstances of the present case are similar to *Johnson v. Poway United School District*, 658 F.3d 954 (9th Cir. 2011), where the Ninth Circuit concluded that a high school math teacher spoke as an "employee, not as a citizen" when he posted large banners in the classroom stating, among other things, "GOD SHED HIS GRACE ON THEE" and "All men are created equal, they are endowed by their CREATOR." *Id.* at 958, 966. In determining that the teacher's speech was in his role as a teacher rather than a citizen, the Ninth Circuit observed:

> Johnson did not make his speech while performing a function not squarely within the scope of his position. He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. "Rather, Johnson hung his banners pursuant to a long-standing Poway Unified School District policy, practice, and custom," of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

*Id.* at 967 (footnote and citation omitted). The Ninth Circuit concluded "*as a practical matter*, we think it beyond possibility for fairminded dispute that the 'scope and content of [Johnson's] job responsibilities' did not include speaking to his class in his classroom during class hours."

---

[16] In any event, a teacher wearing a necklace on her body differs from a teacher posting an image on a classroom wall, where the teacher's job duties specifically require her to ensure the physical aspects of the classroom further student learning. As Defendants observe, "the necklace would come and go with the teacher" whereas "the classroom walls represented an immutable feature of the educational environment—a uniquely governmental medium of expression." Defs.' Mem. 23-24. Ms. Castro also relies on *James v. Bd. of Ed. of Cent. Dist. No. 1 of Towns of Addison et al.*, 461 F.2d 566, 574-75 (2d Cir. 1972), where the Second Circuit held that a school board violated the First Amendment rights of a teacher for discharging him for wearing a black armband in class in symbolic protest against the Vietnam War. *James*, decided before *Garcetti*, did not consider whether the teacher wore the arm band pursuant to his official duties or as a private citizen. Rather, the case focused on whether the school had demonstrated that disruption resulted from the teacher's actions.

*Id.* (emphasis in original). Moreover, in considering whether the teacher's speech "owes its existence to his position, or whether he spoke just as any non-employee citizen could have," *id.*, the court concluded the teacher acted as an employee, reasoning: "[A]n ordinary citizen could not have walked into Johnson's classroom and decorated the walls as he or she saw fit, anymore than an ordinary citizen could demand that students remain in their seats and listen" to whatever perspective he wanted to share, *id.* at 968. The court concluded that it "need not reach a different conclusion simply because [the school district] allows its teachers some freedom in decorating their classrooms." *Id.* Instead, the school district could "take legitimate and appropriate steps to ensure that its message [wa]s neither garbled nor distorted by its individual messengers." *Id.* at 969 (internal quotation marks omitted). The Ninth Circuit thus held that "[b]ecause the speech at issue owes its existence to Johnson's position as a teacher, [the school district] acted well within constitutional limits in ordering Johnson not to speak in a manner it did not desire." *Id.* at 970.[17]

Ms. Castro attempts to distinguish *Johnson* on the ground that the banners at issue in that classroom were much larger—seven feet long and two feet high—than the foot-high crucifix at issue in this case. Pl.'s Reply 6. However, regardless of this difference, *Johnson*'s

---

[17] *Johnson* cites *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007), where the Fourth Circuit affirmed the district court's grant of summary judgment to a school district that removed items posted by a teacher on a classroom bulletin board that included news articles describing missionary work, discussing prayer at the White House, and outlining political candidates' religious views. *Id.* at 690. The Fourth Circuit observed that "[c]ourts have generally recognized that the public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and that a school board's ability in this regard exceeds the permissible regulation of speech in other governmental workplaces or forums." *Id.* at 695. Although concluding that the teacher's speech was unprotected, the Fourth Circuit applied a different analysis than *Johnson*, concluding that the posted items were "curricular in nature, and thus not a matter of public concern" under the *Pickering* framework. *Id.* at 697.

analysis is instructive. In *Johnson*, as here, the school district had a policy governing the decoration of classroom walls and also allowed teachers some freedom with respect to postings on the walls. In *Johnson*, as here, the teacher sought to communicate his message on the walls of the classroom during instructional time.[18]

At oral argument, Ms. Castro argued that DiLoreto has created a "zone of personal expression by and around the teachers' desks." Tr. 10; *see also* Tr. 33 (stating "it is very clear to any observer looking at the desks which speech, which area[s] belong for lack of a better word, belong to the teacher and their personal items"). However, a clear demarcation of such a "zone" is not apparent from the spaces shown in the photos provided by Ms. Castro. *See* ECF Nos. 38-3; 38-4. Ms. Castro asserts that teachers keep "personal expressive items" on or near their desks but does not define the term "personal expressive item." Castro Decl. ¶¶ 16, 18, 25, 50. Although some items Ms. Castro labels "personal expressive items" are near teacher desks, some do not appear to be near teacher desks. In addition, some items are difficult to categorize as "personal" or "non-personal," particularly without a definition of the term.

---

[18] Citing *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243 (2022), Castro argues that the government must actively control and shape a message for speech to be "government speech" rather that private speech. Pl.'s Reply 6. But *Shurtleff* was analyzing whether Boston's program allowing private groups to use one of its flag poles at a plaza to hang flags during events sponsored by the groups created a public forum or whether the flags hung by the private groups instead constituted government speech. *See* 596 U.S. at 252 ("The boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program. In those situations, when does government-public engagement transmit the government's own message? And when does it instead create a forum for the expression of private speakers' views?"). Here, in contrast, Castro has not raised a public forum argument. Tr. 12 ("We're not saying that this is a limited public forum."). Instead, the case law governing public employee speech governs here. The relevant inquiry is whether Castro spoke pursuant to her official duties— which the District has defined to include decorating classroom walls.

The wall next to the teacher's desk in the classroom where Ms. Castro taught contains items she calls "personal" such as the crucifix and her church calendar. However, on the same wall as the crucifix—and also close to the desk—is a "Student Daily Schedule," a list of computer "shortcuts," and instructions for "hard start[ing]" a Chrome Book. ECF No. 38-4. Immediately above the crucifix are children's drawings. It is unclear what personal significance these drawings may have. A painting on the same wall contains a Puerto Rican flag, which may or may not be a "personal expressive item." *Id.* Although the crucifix is placed on the wall near the desk, it is similarly close to a small table that is pushed against the wall and has papers on top of it. ECF No. 38-3; ECF No. 50-2; Mazzei Decl. ¶ 22. The crucifix is also quite close to the door of the classroom. ECF No. 38-3. It is not apparent, therefore, what physical area of this classroom would fall within a "zone of personal expression."

Ms. Castro points to "personal expressive items" in other classrooms—but in some instances the items do not appear to be by teacher desks. Castro Decl. ¶ 25. For example, in one classroom, hanging on the wall right by the door is an American flag, a New England Patriots pennant, and a Central Connecticut State University pennant. ECF No. 38-4, at 5. Posted on the door itself is a decal from the District containing a motivational quote. *Id.* Inspirational quotes appear on many of the classroom walls in the photos—both near and further away from teacher desks. *See* ECF Nos. 38-3, 38-4 at 6, 9. Although Ms. Castro calls inspirational quotes appearing on classroom walls "personal expressive items," it is not clear why these quotes are necessarily "personal" as opposed to messages teachers are utilizing to motivate students in their learning.

In sum, in examining the photos, it is difficult to discern where the "zone of personal expression" is located or how to divide certain items on the walls into "personal" or "non-personal" categories.

Accepting Ms. Castro's argument that teachers have a First Amendment free speech right to post "personal expressive items" related to matters of public concern on classroom walls—where they are visible to students during instructional time—would mean the District could not control the messages conveyed to students while the students are required to be present in the classroom for learning. Instead, with respect to each such item a teacher posted on the classroom wall, the District would need to engage in a *Pickering* balancing analysis and could prohibit only those items that are sufficiently disruptive.

Under these circumstances, based on the existing factual record, I conclude that Ms. Castro is unlikely to prevail on her claim that her display of the crucifix on the wall of the classroom constitutes speech as a private citizen rather than pursuant to her job duties as a teacher. Therefore, I conclude she is not likely to prevail on her free speech claim.

### 2.    Free Exercise Claim

In addition to her free speech claim, Ms. Castro argues that Defendants violated her rights under the Free Exercise Clause by requiring her to remove the crucifix from the classroom wall and by punishing her for refusing to do so. Pl.'s Mem. 21. The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. "The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy*, 597 U.S. at 524 (internal

27

**SPA27**

quotation marks omitted). The Free Exercise Clause is applicable to the States under the Fourteenth Amendment. *Id.*

Ms. Castro says that she "sincerely believes that her religion compels her to display her crucifix, not hide it under her desktop" and "[s]tifling her religious expression through concealment of the crucifix 'would be an affront to [her] faith.'" Pl.'s Mem. 22. Ms. Castro asserts that she "engages in religious exercise with her display, including non-communicative exercise such as praying with it during lunch breaks and viewing it periodically when the task of teaching proves particularly stressful." Pl.'s Reply 12; *see also* Castro Decl. ¶ 21 ("I hang the crucifix on the wall in the personal space next to my desk for multiple reasons. It reminds me of my grandmother, helps me pray silently in my personal time, and express[es] my identity as a Christian.").

### a.    Plaintiff's Burden

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525. At least outside the public employment context, if a plaintiff shows a policy is not "neutral" or "generally applicable," a court "will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citations omitted).

"A government policy will not qualify as neutral if it is 'specifically directed at . . . religious practice.'" *Id.* at 526 (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 878 (1990)). "A policy can fail this test if it 'discriminate[s] on its face,' or if a religious exercise is otherwise its 'object.'" *Id.* (quoting *Church of Lukumi Babalu*

*Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Id.* (quoting *Fulton v. City of Phila., Pa.*, 593 U.S. 522, 534 (2021)). "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Id.*

As the Supreme Court explained in *Kennedy*, "[a] plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [the Court has] 'set aside' such policies without further inquiry." *Id.* at 525 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 639 (2018)).

In her opening memorandum in support of the motion for preliminary injunction, Ms. Castro asserts that Defendants did not act neutrally because they "singled out Ms. Castro's expressive display of a personal item (i.e., the crucifix) expressly *because of* the religious nature of the crucifix." Pl.'s Mem. 23. In addition, Ms. Castro argues that Defendants did not act pursuant to a generally applicable policy because they exercised "unbound discretion with regard to teachers' personal expressive displays in their workspaces." *Id.* at 24. Ms. Castro argues that Defendants' actions therefore triggered strict scrutiny. *Id.*

In response to Plaintiff's memorandum, Defendants do not argue that they acted pursuant to a neutral or generally applicable policy or that they did not burden Ms. Castro's free exercise of religion within the meaning of the First Amendment. Instead, Defendants argue that the *Pickering-Garcetti* framework applies rather than strict scrutiny, Defs.' Mem. 20, but that they survive strict scrutiny if the standard does apply, *id.* at 28. In her reply brief, Ms.

Castro responds to Defendants' *Pickering-Garcetti* argument, asserting again that strict scrutiny applies. Pl.'s Reply 12.

On October 9, 2025, Ms. Castro filed a notice of supplemental authority that cites *Mid Vermont Christian School v. Saunders*, 151 F.4th 86 (2d Cir. 2025), and argues that I should simply "set aside" Defendants' actions under the Free Exercise Clause "without further inquiry" because Defendants have displayed "hostility" to Ms. Castro's religious beliefs. ECF No. 86 at 1. *Mid Vermont* applies the rule that a plaintiff may "prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise." *Kennedy*, 597 U.S. at 525 n.1 (2022) (quoting *Masterpiece Cakeshop,* 584 U.S. at 639); *see Mid Vt. Christian Sch*., 151 F.4th at 93. Under such circumstances, *Masterpiece Cakeshop* says that a defendant's actions may be "set aside" without further inquiry regarding the defendant's justification. However, in her memorandum and reply in support of the motion for preliminary injunction, Ms. Castro nowhere discusses this doctrine from *Masterpiece Cakeshop* or argues that Defendants engaged in "official expressions of hostility" to her religious beliefs. *See* Pl.'s Mem. 21-27; Pl.'s Reply 12. Ms. Castro also did not assert such an argument at oral argument. Indeed, at oral argument, Defendants underscored that Ms. Castro had not made this argument. Tr. 76 ("There is no claim of viewpoint hostility."). Under these circumstances, Ms. Castro may not use a notice of supplemental authority to raise an argument not raised in her briefing on her preliminary injunction motion. *Mid Vermont* simply applies the doctrine set forth in *Masterpiece Cakeshop*, which was repeated in *Kennedy* and available to Ms. Castro when she filed her motion. Ms. Castro did not present this argument to the court in her briefing or give Defendants an opportunity to respond to it in their opposition brief. Accordingly, this argument is forfeited

for purposes of the preliminary injunction motion. *See, e.g.*, *Parlato v. Town of E. Haven*, No. 3:22-CV-1094 (SVN), 2023 WL 5206873, at *19 n.9 (D. Conn. 2023) (declining to consider theory not included in motion briefing); *Worth v. Picard*, No. 3:21-cv-432 (CSH), 2021 WL 5447121, at *2 n.3 (D. Conn. 2021) (declining to consider argument not raised in opening brief). Ms. Castro may raise this argument in support of a request for a permanent injunction.

<b>b.       Application of <i>Pickering-Garcetti</i> to Free Exercise Claims</b>

The parties dispute whether the *Pickering-Garcetti* framework applies to Ms. Castro's free exercise claim.

Ms. Castro's free exercise claim is based on her assertion that Defendants burdened her sincere religious practices by preventing her from displaying the crucifix on the classroom wall. Defendants argue that because Ms. Castro's motion characterizes the crucifix display as "symbolic religious expression" and "devotional religious speech," Ms. Castro's free speech and free exercise claims are both governed by the *Pickering-Garcetti* framework. Defs.' Mem. 21. According to Defendants, because Ms. Castro decorated the walls in furtherance of her teaching duties, she cannot maintain either a free speech *or* a free exercise claim based on the District's requirement that she remove the crucifix from the walls. *Id.* In other words, given this case involves religious expression, Defendants assert that step one of the *Pickering-Garcetti* framework applies not only to Ms. Castro's free speech claim but also her free exercise claim. *Id.* Ms. Castro disagrees. Pl.'s Reply 12.

In making their *Pickering-Garcetti* argument, Defendants cite to the Second Circuit's decision in *Knight v. Connecticut Department of Public Health*, 275 F.3d 156, 160 (2d Cir. 2001). Defs.' Mem. 21. But *Knight* rested on the *second* step of *Pickering-Garcetti*—applying the second-step's balancing test to both the free exercise and free speech claims in the case.

31

*Knight*, 275 F.3d at 164. *Knight*, decided before *Garcetti*, did not address whether courts should analyze whether expression was pursuant to job duties under the first step of the *Pickering-Garcetti* framework when a plaintiff asserts a state actor has burdened religious expression under the Free Exercise Clause.[19]

*Kennedy* does not address the issue directly but implies step one of the *Pickering-Garcetti* framework applies at least in some form to free exercise claims, stating: "Because our analysis and the parties' concessions lead to the conclusion that Mr. Kennedy's prayer constituted private speech on a matter of public concern, we do not decide whether the Free Exercise Clause may sometimes demand a different analysis at the first step of the *Pickering-Garcetti* framework." *Kennedy*, 597 U.S. at 531 n.2. Justice Thomas's concurrence in *Kennedy* observes that the "Court refrains from deciding whether or how public employees' rights under the Free Exercise Clause may or may not be different from those enjoyed by the general public." *Kennedy*, 597 U.S. at 544 (Thomas, J., concurring). Justice Thomas stated: "In the free-speech context, for example, that inquiry has prompted us to distinguish between different kinds of speech; we have held that 'the First Amendment protects public employee speech only when it falls within the core of First Amendment protection—speech on matters of public concern.' It remains an open question, however, if a similar analysis can or should apply to free-exercise claims in light of the 'history' and 'tradition' of the Free Exercise Clause." *Id.*[20]

---

[19] In *Knight*, the Second Circuit assumed arguendo that the employees' comments touched on a matter of public concern. *Knight*, 275 F.3d at 164.

[20] The parties' briefs in *Kennedy* did not address the application of step one of the *Pickering-Garcetti* framework to Mr. Kennedy's free exercise claim as distinct from his free speech claim. Brief for Petitioner, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) (No. 21-418); Brief for Respondent, *Kennedy*, 597 U.S. 507 (No. 21-418); Reply Brief, *Kennedy*, 597 U.S. 507 (No. 21-

At issue in the present case is not whether Ms. Castro needs to establish her religious expression relates to a matter of public concern, as Defendants concede that it does. Rather, the issue is whether categorizing the display as expression pursuant to official duties at step one of the *Pickering-Garcetti* framework precludes Ms. Castro's free exercise claim.

Ms. Castro's free exercise and free speech claims fully overlap in the sense that the religious exercise that Ms. Castro says is infringed is necessarily communicative. Ms. Castro acknowledges that the crucifix display intended to convey a "particularized message." Pl.'s Mem. 29. She also states that she "sincerely believes that her religion compels her to display her crucifix, not hide it under her desktop" and "[s]tifling her religious expression through concealment of the crucifix 'would be an affront to [her] faith.'" *Id.* at 22.

In asserting that her free speech and free exercise claims are not "hybrid," Ms. Castro says she engages in religious exercise with her display that includes "non-communicative exercise such as praying with it during lunch breaks and viewing it periodically when the task of teaching proves particularly stressful." Pl.'s Reply 12; *see also id.* (stating that "the Free Speech and Free Exercise clauses dually and separately protect her right to display the crucifix in her personal space because some of her conduct is symbolic speech, some is non-communicative prayer, and some is both"). But Defendants have not prohibited Ms. Castro from displaying the crucifix during noninstructional time such as lunch breaks. Instead,

---

418). At oral argument, counsel for Mr. Kennedy stated: "[I]f the statement really is the government's own speech, then I don't think you'd have the basis for either a free speech or a free exercise claim. It may be, though, that in deciding whether or not the coach's speech is his own speech or the government's speech, you might apply a slightly different test in the free exercise context than you would in the free speech case.'" Transcript of Oral Argument at *6-7, *Kennedy v. Bremerton Sch. Dist.*, 2022 WL 1214751 (2022) (No. 21-418). Counsel argued, however, that regardless "we are comfortably on the private side of the *Garcetti* inquiry." *Id.* at *7.

Defendants' restriction specifically seeks to prevent the display's communication of a message to students in the classroom. Although Ms. Castro's act of *viewing* the crucifix is itself noncommunicative, Ms. Castro asserts the right to put the crucifix on the wall during instructional time when the students can view it too. Ms. Castro's practice of hanging the crucifix on the classroom wall necessarily communicates a message to the students in the classroom who are also viewing the crucifix. Ms. Castro has not pointed to any religious practices that Defendants suppressed that do not involve displaying the crucifix on the classroom wall while she is teaching students in the classroom. And Ms. Castro's free exercise and free speech claims demand the same relief—preventing Defendants from disciplining her for displaying the crucifix during instructional time.

Given that Ms. Castro's free exercise claim rests on exercise that necessarily involves communication of a religious message, I conclude that the analysis utilized under *Pickering-Garcetti* step one for Ms. Castro's free speech claim applies to her free exercise claim. I have already concluded that the crucifix display on the classroom wall was pursuant to Ms. Castro's official duties and is therefore speech attributed to the District. The speech is thus, for constitutional purposes, the government's own speech. *See Kennedy*, 597 U.S. at 527 ("If a public employee speaks 'pursuant to [his or her] official duties,' this Court has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech."). Under these circumstances, the Free Exercise Clause does not compel the District to communicate a religious message. Rather, the District can control the messages broadcast to students on the classroom walls during instructional time.

Accordingly, based on the existing record, I conclude that Ms. Castro is unlikely to prevail on her free exercise claim.

### c.    Government Justification

Even if categorizing the crucifix display as expression pursuant to official duties at step one of the *Pickering-Garcetti* framework does not preclude Ms. Castro's free exercise claim, I conclude that Ms. Castro is unlikely to prevail on her free exercise claim.

Here, the parties do not dispute that the second step of the *Pickering-Garcetti* test would govern consideration of Defendants' burden with respect to Ms. Castro's free speech claim if that claim survived step one of the *Pickering-Garcetti* test. However, Ms. Castro argues *Pickering-Garcetti* step two balancing does not apply at all to her free exercise claim. Rather, Ms. Castro maintains that Defendants must show that the restrictions on her rights serve a compelling interest and are narrowly tailored to that end. The Supreme Court left unresolved in *Kennedy* what standard applies in assessing a state official's burden where a government employee establishes free exercise has been burdened. *See Kennedy*, 597 U.S. at 532 ("Under the Free Exercise Clause, a government entity normally must satisfy at least 'strict scrutiny,' showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end. A similar standard generally obtains under the Free Speech Clause. The District, however, asks us to apply to Mr. Kennedy's claims the more lenient second-step *Pickering-Garcetti* test, or alternatively intermediate scrutiny. Ultimately, however, it does not matter which standard we apply. The District cannot sustain its burden under any of them.") (citations omitted).

The Second Circuit, however, has defined the government's burden when a government employee shows infringement of free exercise rights. In *Knight*, a nurse and interpreter

employed by state agencies brought free exercise and free speech claims against their employers after they were reprimanded for discussing their religious beliefs with clients while performing their duties. *See Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 160 (2d Cir. 2001). The employees argued that "theirs are hybrid claims, implicating both free speech and free exercise rights, and requiring a strict scrutiny analysis rather than analysis under *Pickering*." *Id.* at 166. The Second Circuit rejected that argument, reasoning:

> In this Circuit, we have not yet addressed generally whether hybrid claims require a greater governmental justification than each component of the hybrid claim taken separately and we need not do so here because appellants' comments are limited to the public employee context. As discussed above, it is well settled that appellants' right to free speech as public employees is entitled to some First Amendment protection. However, due to the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state, appellants' free speech claims are subject to the *Pickering* balancing test. The allegation that a state action that regulates public conduct infringes more than one of a public employee's constitutional rights does not warrant more heightened scrutiny than each claim would warrant when viewed separately. In both situations, the employer's interest remains the same and is entitled to the same weight in the constitutional balance.

*Knight*, 275 F.3d at 167 (citation omitted); *see also Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648-49 (9th Cir. 2006) (applying *Pickering* balancing and rejecting government employee's argument that court "should apply a stricter test instead of a balancing test because the Department's restrictions on his religious speech to clients violate his rights under both the Free Exercise and the Free Speech Clauses of the First Amendment"); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) (concluding that *Pickering* balancing should apply to freedom of association and free exercise claims as well as free speech claims of government employee); *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 658 (8th Cir. 1995) (applying *Pickering* balancing to free exercise claim by government employee, stating that *Pickering* "dealt with free speech rather than the free exercise of religion, but because the

analogy is such a close one, and because we see no essential relevant differences between those rights, we shall endeavor to apply the principles of *Pickering* to the case at hand"); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986) (applying *Pickering* balancing to free exercise claim involving government employee).

Although Ms. Castro argues she is not bringing "hybrid claims" like those in *Knight*, Pl.'s Reply 12, I have concluded that the religious exercise Ms. Castro says has been infringed is necessarily communicative as it requires the display of the crucifix. Thus, *Knight*'s holding that step two of *Pickering-Garcetti* applies to free exercise claims that overlap with free speech claims controls here.

Defendants argue that they prevail at step two of *Pickering-Garcetti* because they reasonably concluded that the crucifix display is likely to be disruptive to learning. Defs.' Mem. 25-28. In addition, Defendants state that their "desire to avoid an Establishment Clause violation independently tilts the *Pickering* balance for the District." *Id.* at 28. Defendants also maintain that even if strict scrutiny applies, strict scrutiny is satisfied because the District has a compelling interest in avoiding an Establishment Clause violation. *Id.* at 28-29. Finally, Defendants assert that "an objectively substantial risk" of an Establishment Clause violation precludes injunctive relief under Second Circuit case law, which requires that government entities be "accorded some leeway" in balancing the free exercise rights of government employees and potential Establishment Clause liability. *Id.* at 40-41.

### i.    Leeway When Balancing the Free Exercise and Establishment Clauses

I agree with Defendants that Second Circuit case law requires courts to provide government entities with some leeway when balancing the free exercise rights of government

employees with the risk of Establishment Clause liability. As described below, I conclude that Ms. Castro is unlikely to prevail on her free exercise claim even if step one of *Pickering-Garcetti* does not preclude her claim.[21]

As noted, the Second Circuit in *Knight* rejected free exercise and free speech challenges by a nurse and interpreter, employed by the state, who wished to share their religious beliefs with clients. In applying step two of *Pickering-Garcetti*, and balancing the employees' rights with the employer's interest in "effective and efficient public services," the court concluded that "the state showed permitting religious speech when working with clients was and would continue to be disruptive." *Knight*, 275 F.3d at 164. In addition, the court concluded that "the state raised valid Establishment Clause concerns in limiting the use of religious speech with clients." *Id.* at 165. Quoting its previous decision in *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469 (2d Cir. 1999), the Second Circuit observed that "[w]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway" and concluded: "Here, both Knight and Quental promoted religious messages while working with clients on state business, raising a legitimate Establishment Clause concern. This permits the state to place a slight burden on appellants' speech: Knight and Quental may not share their religious beliefs with clients while conducting state business." *Knight*, 275 F.3d at 165-66.

In *Marchi*, a public school teacher brought free speech and free exercise challenges to a school district's directive requiring him to cease using religious references in "the delivery

---

[21] Because I reach this conclusion, I need not resolve whether Defendants have satisfied step two *Pickering* balancing by showing that the crucifix was disruptive or potentially disruptive, and whether the government's interest in avoiding this disruption outweighs Ms. Castro's interest.

of his instructional program." *Marchi*, 173 F.3d at 472. The teacher asserted that the directive

was unconstitutional as applied to a letter with religious references that he sent to a student's

parent. *Id.* at 475. The Second Circuit rejected the challenge, reasoning that the school district's

concern that the teacher's conduct could expose it to liability for an Establishment Clause

violation justified the restriction—even if the conduct did not, in fact, constitute an

Establishment Clause violation. The court said:

> [W]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government.
>
> . . . .
>
> The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause. When government is both the initiator of some religiously related actions, through the conduct of its employees, and the regulator of the extent of such actions, through the conduct of its supervising employees, it need not determine, at the peril of legal liability, precisely where the line would be drawn if its employees were not involved. Though school boards, like all instrumentalities of government, must observe the basic free exercise rights of its employees, the scope of the employees' rights must sometimes yield to the legitimate interest of the governmental employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation. In discharging its public functions, the governmental employer must be accorded some breathing space to regulate in this difficult context. For his part, the employee must accept that he does not retain the full extent of free exercise rights that he would enjoy as a private citizen.

*Marchi*, 173 F.3d at 476.

Following *Marchi* and *Knight*, the Second Circuit again stressed the need to give government actors some "leeway" when balancing free exercise and Establishment Clause concerns in *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 750 F.3d 184, 199 (2d Cir. 2014). At issue in *Bronx Household* was whether the New York City Board of Education could refuse to permit the holding of religious services in school facilities that were made available to other outside users after school hours. Citing *Marchi*, the Second Circuit rejected the district court's holding that "unless the excluded practice would in fact constitute a violation of the Establishment Clause, steering clear of conduct that might be reasonably suspect under the Establishment Clause does not furnish adequate reason for declining to offer the school facilities for the conduct of religious worship services." *Id.* at 197. The Second Circuit concluded: "In our view, the better rule allows the Board, if it makes a reasonable, good faith judgment that it runs a substantial risk of incurring a violation of the Establishment Clause by hosting and subsidizing the conduct of religious worship services, to decline to do so." *Id.* at 198; *see also Silver v. Cheektowaga Cent. Sch. Dist.*, 670 F. App'x 21, 22 (2d Cir. 2016) (affirming district court's dismissal of free speech claim brought by teacher directed to remove religiously-themed postings in classroom and stating that "when government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway" and school restrictions "fell within the scope of the 'leeway' referenced in *Marchi*"); *Skoros v. City of New York*, 437 F.3d 1, 34-35 (2d Cir. 2006) (stating that "we afford the government some leeway in policing itself to avoid Establishment Clause issues, even if it thereby imposes limits that go beyond those required by the Constitution").

District courts in this Circuit have applied this "leeway" concept in cases where school districts have tried to balance employee rights with concerns about Establishment Clause violations. *See, e.g.*, *Downing v. W. Haven Bd. of Ed.*, 162 F. Supp. 2d 19, 28 (D. Conn. 2001) (holding in case involving a teacher wearing a shirt containing a religious message that "even if Downing's shirt would not have violated the Establishment Clause, the defendants' proscriptive conduct may still pass constitutional muster" and "whatever First Amendment rights were implicated by Downing wearing her tee shirt must give way to the defendants' legitimate concerns about a potential Establishment Clause violation in a public school").

At oral argument, counsel for Ms. Castro was unable to point to any Second Circuit cases that overruled or narrowed the Second Circuit's holdings in *Marchi* and *Knight* that state officials must be given some "leeway" and "breathing space" when balancing free exercise rights of employees with a government entity's potential liability for an Establishment Clause violation. However, counsel asserted that the "leeway" aspect of these cases was "not good law" after *Kennedy*, because "*Kennedy* said the tie does not go to the runner when there's only a phantom constitutional violation." Tr. 36.

In *Kennedy*, the Supreme Court concluded that that there was only a "mere shadow" of an Establishment Clause violation as "Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." 597 U.S. at 537. Under these circumstances, the Court held that "in no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights." *Id.* at 543. I do not read *Kennedy* as overruling the Second Circuit's decisions in *Marchi*, *Knight*, and *Bronx Household*. These Second Circuit cases remain binding on me. I thus agree with Defendants

41

that Second Circuit case law provides that the District has some "leeway" and "breathing space" as it undertakes the difficult task of balancing the Establishment and Free Exercise Clauses.

### ii.    Establishment Clause Concerns

Ms. Castro argues that Defendants improperly relied on the "endorsement" test of *Lemon v. Kurtzman*, 403 U. S. 602 (1971),[22] which *Kennedy* made clear had been abandoned. Ms. Castro says that like the District in *Kennedy*, the District here may not rely on a mistaken view of the Establishment Clause as justification for burdening Ms. Castro's religious practices. Pl.'s Mem. 36-38; Pl.'s Reply 7-8. Defendants argue that allowing the crucifix to remain on the classroom wall would constitute a violation of the Establishment Clause or, at the very least, expose the District to a risk of liability for such a violation. Defs.' Mem. 28-42. Based on the existing record, I conclude that Ms. Castro is unlikely to show that Defendants did anything other than make "a reasonable, good faith judgment" that permitting Ms. Castro to hang the crucifix on the classroom wall during instructional time "runs a substantial risk of incurring a violation of the Establishment Clause." *Bronx Household*, 750 F.3d at 198. I agree with Defendants, therefore, that a preliminary injunction should not issue.

---

[22] Under *Lemon*, courts assessed Establishment Clause claims by examining a law's purposes, effects, and potential for entanglement with religion. *Lemon*, 403 U.S. at 612-13. "In time, the approach also came to involve estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion." *Kennedy*, 597 U.S. at 534 (quoting *Cnty. of Allegheny v. Am. C.L. Union Greater Pittsburgh Chapter*, 492 U.S. 573, 594 (1989)).

The Supreme Court has addressed issues relating to religious expression in public schools multiple times over the past six decades. In *Engel v. Vitale*, 370 U.S. 421 (1962), the Supreme Court held that a New York law requiring students in public schools to pray aloud with their teachers each morning violated the Establishment Clause—even though the children could choose to remain silent or leave the room. The Court observed that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Id.* at 431; *see also Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 205-06, 224-25 (1963) (holding unconstitutional the recitation of Bible verses by high school students each morning, which was broadcast over the school's intercom system).

In *Stone v. Graham*, 449 U.S. 39 (1980), the Court struck down a Kentucky statute that mandated that public school classrooms display posters of the Ten Commandments. The Court observed that "[p]osting of religious texts on the wall serves no such educational function" and this was "not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42. Instead, the Court reasoned, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* The Court concluded it was insignificant "that the Bible verses involved in this case are merely posted on the wall, rather than read aloud . . . for 'it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment.'" *Id.*

In a series of cases that followed, the Court held unconstitutional various religious practices in public schools. *See Wallace v. Jaffree*, 472 U.S. 38, 48-49 (1985) (holding that an Alabama statute authorizing a daily period of silence in public schools for prayer violated the Establishment Clause); *Lee v. Weisman*, 505 U.S. 577, 599 (1992) (holding unconstitutional a school district's practice of including clergy-led prayers during an official public school graduation ceremony); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (holding unconstitutional a public school's practice of allowing students to lead pre-football-game prayers broadcast over the school's intercom system, stating: "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community") (internal quotation marks omitted).

Supreme Court cases have noted several particular concerns about religious practices in public elementary and secondary schools. First, children are compelled by law to be at school and thus "captive audiences." *See Schempp*, 374 U.S. at 223 (noting that students were "required by law to attend school" and were "held in the school buildings under the supervision and with the participation of teachers employed in those schools"); *Lee*, 505 U.S. at 598 (stating that "the State . . . in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student" and left no real possibility for objecting students to opt out); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (noting that the "State exerts great authority and coercive power through mandatory attendance requirements"); *Santa Fe*, 530 U.S. at 311 (noting attendance at football games

**SPA44**

where students led prayers over school broadcast system was required for "cheerleaders, members of the band, and, of course, the team members themselves").

Second, school-age children are particularly susceptible to subtle pressure to conform their beliefs to those of their teachers or peers. *See Lee*, 505 U.S. at 592 ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools . . . . What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy."); *see also id.* at 593 (observing that "pressure, though subtle and indirect, can be as real as any overt compulsion"); *Edwards*, 482 U.S. at 584 ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. . . . The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure."); *Santa Fe*, 530 U.S. at 312 (noting that "adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention") (internal quotation marks omitted); *cf. Mahmoud v. Taylor*, 145 S. Ct. 2332, 2355 (2025) (stating that young children are "often impressionable and implicitly trus[t] their teachers") (internal quotation marks omitted).[23]

---

[23] *Mahmoud* relies on *Lee* and *Edwards*. *See Mahmoud*, 145 S. Ct. at 2355 ("'The State exerts great authority and coercive power through' public schools 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'") (quoting *Edwards*,

In *Kennedy*, the Supreme Court stated that it had "long ago abandoned *Lemon* and its endorsement test offshoot" and "[i]n place of *Lemon* and the endorsement test, this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy*, 597 U.S. at 534-35 (internal quotation marks omitted). The Court observed that it had "long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, make a religious observance compulsory," "coerce anyone to attend church," nor "force citizens to engage in a formal religious exercise." *Id.* at 537 (citations and internal quotation marks omitted). "No doubt, too, coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* However, the Court concluded that "Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id.* The Court observed that the coach did not "direct any prayers to students or require anyone else to participate" and his "plan was to wait to pray until athletes were occupied." *Id.* at 538. The Court reasoned that accepting the school district's view would mean "[n]ot only could schools fire teachers for praying quietly over their lunch, for wearing a yarmulke to school, or for offering a midday prayer during a break before practice" but a "school would be *required* to do so." *Id.* at 540. Such a rule, in the Court's view, "would defy this Court's traditional understanding that permitting private speech is not the same thing as

---

482 U.S. at 584); *see also id.* ("'[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.'") (quoting *Lee*, 505 U.S. at 592).

coercing others to participate in it." *Id.* 540-41. The Court in *Kennedy* distinguished prior

cases, reasoning:

> [T]his case looks very different from those in which this Court has found prayer involving public school students to be problematically coercive. In *Lee*, this Court held that school officials violated the Establishment Clause by "including [a] clerical membe[r]" who publicly recited prayers "as part of [an] official school graduation ceremony" because the school had "in every practical sense compelled attendance and participation in" a "religious exercise." In *Santa Fe Independent School Dist. v. Doe*, the Court held that a school district violated the Establishment Clause by broadcasting a prayer "over the public address system" before each football game. The Court observed that, while students generally were not required to attend games, attendance *was* required for "cheerleaders, members of the band, and, of course, the team members themselves." None of that is true here. The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience. Students were not required or expected to participate. And, in fact, none of Mr. Kennedy's students did participate in any of the three October 2015 prayers that resulted in Mr. Kennedy's discipline.

*Id.* at 541-42 (citations omitted).

Following *Kennedy*, several lower courts have concluded that *Stone v. Graham*, 449

U.S. 39 (1980), remains binding law and have held that statutes mandating the display of the

Ten Commandments in public school classrooms likely violate the Establishment Clause.

After a panel of the Fifth Circuit affirmed the district court decision preliminarily enjoining

the enforcement of a Texas statute, the Fifth Circuit vacated the decision and is considering

the issue *en banc*. *Roake v. Brumley,* 141 F.4th 614 (5th Cir.)*, reh'g en banc granted, opinion

vacated*, 154 F.4th 329 (5th Cir. 2025).[24]

---

[24] The Fifth Circuit is also considering *en banc* an appeal from *Nathan v. Alamo Heights Indep.*, No. SA-25-CV-00756-FB, 2025 WL 2417589, at *24 (W.D. Tex. Aug. 20, 2025), which held the Texas statute unconstitutional. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-50695, 2025 WL 3018244 (5th Cir. Oct. 28, 2025), *hearing en banc ordered sub nom.*

In *Stinson v. Fayetteville Sch. Dist. No. 1*, No. 5:25-CV-5127, 2025 WL 2231053, at *11 (W.D. Ark. Aug. 4, 2025), *appeal filed*, Case No. 25-2713 (8th Cir. Aug. 22, 2025), the district court held that an Arkansas statute requiring the display of the Ten Commandments in public school classrooms likely violated the Establishment Clause.

*Stinson* reasoned that although *Kennedy* declared the *Lemon* test abandoned, "there is no cause to believe that all Supreme Court precedent that relied on the *Lemon* test has been— or will be—overruled." *Stinson*, 2025 WL 2231053, at *7. *Stinson* observed that "*Kennedy* cited two public-school Establishment Clause cases, *Lee v. Weisman* and *Santa Fe Independent School District v. Doe*—both of which applied the *Lemon* test—and treated them as still-binding precedent." *Id. Stinson* continued: "In fact, Justice Gorsuch made a point of distinguishing *Lee* and *Santa Fe* from the 'very different' facts in *Kennedy*, *Lee* and *Santa Fe* involved 'problematically coercive' religious practices that had been imposed upon students and 'compelled [their] attendance and participation.'" *Id.* (citations omitted).

*Stinson* also concluded that regardless of whether *Stone* controlled, the display of the Ten Commandments would still violate the Establishment Clause under *Kennedy*'s historical practices and understanding test given the display is impermissibly coercive. In reaching this conclusion, *Stinson* observed that students were required to be present in the classroom where the religious message was displayed. *See id.*, at *11, *14 ("[T]he Ten Commandments are not passive because students in public schools are forced to engage with them and cannot look away . . . . Once students are at school, staff control their movements and often their expression. Students may not move around freely to avoid official religious indoctrination or to contest it beyond certain limits. This is especially true in the classroom context.").

In concluding that the display of the Ten Commandments is impermissibly coercive, *Stinson* also referenced the impressionability of youth and their susceptibility to influence in the school setting. *See Stinson*, 2025 WL 2231053, at \*14 ("Coercion is rife in such an environment 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'") (quoting *Edwards*, 482 U.S. at 584).

Ms. Castro argues that Defendants—like the school officials in *Kennedy*—explicitly relied on the now-abandoned endorsement test from *Lemon* when they insisted that she remove the crucifix from the classroom wall. Ms. Castro is correct Defendants stated in their communications with her that school could not be seen as "endorsing" particular religious beliefs. *See, e.g.*, ECF No. 38-6, at 3 ("So, by hanging this on the classroom wall, you are, in effect, saying that 'the New Britain Board of Education endorses this religion.'"). However, in the same letter from Ms. Manning, the District also articulated the more general principle that "[b]ecause public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion." *Id.* at 2.[25]

The letter from Ms. Manning also more specifically justified the District's actions with reasons that it continues to rely upon including that "[t]he Board of Education owns and

---

[25] The 2023 U.S. Department of Education's *Guidance on Constitutionally Protected Prayer and Religious Expression in Public Elementary and Secondary Schools*, issued post-*Kennedy* and relied upon by Castro in this case, *see* ECF No. 38-11, states: "Although a government may not promote or favor religion or coerce the consciences of students, schools also may not discriminate against private religious expression by students, teachers, or other employees. Schools must also maintain neutrality among faiths rather than preferring one or more religions over others." *Id.* at 4-5; *see also id.* at 7 ("When teachers, coaches, and other public school officials speak in their official capacities, they may not engage in prayer or promote religious views.").

controls the classroom walls." *Id.* at 3. The letter noted that Ms. Castro "told the administration that this cross is not tied to a specific curricular unit" and thus there was "no pedagogical justification for hanging this cross." *Id.* After observing that Ms. Castro told "the administration that [she was] hanging this cross permanently," the letter stated (in language that echoes *Stone*): "When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible." *Id.*

I have already concluded that Ms. Castro is unlikely to prevail on her argument that the crucifix display was speech as a private citizen rather than pursuant to her official duties as an employee. To the extent that a holding at step one of the *Pickering-Garcetti* framework that the crucifix display is expression pursuant to official duties does not preclude Ms. Castro from reaching step two of the framework on her free exercise claim, I conclude that Ms. Castro is unlikely to prevail at step two. As noted, under binding Second Circuit cases, the District must be afforded some leeway in balancing the free exercise rights of its employees and the risk of an Establishment Clause violation. *See Marchi*, 173 F.3d at 476; *Knight*, 275 F.3d at 165-66; *Bronx Household of Faith*, 750 F.3d at 199. Unlike the coach's prayer in *Kennedy*, the crucifix display is a religious message on the classroom wall broadcast to a "captive audience" of students required to be in the classroom. *See Kennedy*, 597 U.S. at 534 ("The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience."). In light of the Supreme Court's cases relating to religious displays and exercises in public schools, *see, e.g.*, *Lee*, 505 U.S. at 592; *Stone*, 449 U.S. at 42; *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309-10, I conclude based on the factual record currently before me that Ms. Castro is

unlikely to prevail in showing it was unreasonable for the District to conclude that it risked

liability for an Establishment Clause violation had it permitted Ms. Castro to hang the crucifix

on the classroom wall during instructional time.[26]

Therefore, for purposes of the motion for a preliminary injunction, I conclude that Ms.

Castro is not likely to prevail on her Free Exercise Clause claim.

## B.     State Law Claims

Ms. Castro also brings a state law claim under Connecticut's Act Concerning Religious

Freedom ("Act"), Conn. Gen. Stat. § 52-571b. Ms. Castro asserts that she has shown her rights

were burdened within the meaning of the Act and Defendants cannot satisfy strict scrutiny as

required by the Act. Pl.'s Mem. 27-28. Defendants argue that the Act requires a plaintiff to

show a "substantial burden" on religious practices. According to Defendants, Ms. Castro fails

to meet this burden and they, in any event, satisfy the strict scrutiny standard. Defs.' Mem. 42-

44.

---

[26] The reasonableness of the judgment is reinforced by the holdings of lower courts in multiple cases relating to religious images and messages on public school classroom walls. *See, e.g.*, *Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 683-84 (6th Cir. 1994) (affirming district court's order requiring school to remove a portrait of Jesus from the public school hallway stating "[a]s in *Stone*, the portrait of Jesus is not integrated into any course of study," "like *Lee*, the school controls the picture," and the portrait could be viewed as a "as a governmental statement favoring one religious group and downplaying others"); *Joki v. Bd. of Educ. of the Schuylerville Cent. Sch. Dist.*, 745 F. Supp. 823, 825 (N.D.N.Y. 1990) (concluding that a painting in a public high school auditorium depicting the Crucifixion of Jesus Christ violated the Establishment Clause and needed to be removed); *Ahlquist v. City of Cranston ex rel. Strom*, 840 F. Supp. 2d 507, 511, 525-26 (D.R.I. 2012) (concluding that *Stone* controlled and the prayer mural that referenced "our heavenly father" on the wall of a public high school auditorium violated the Establishment Clause); *Helland v. S. Bend Cmty. Sch. Corp.*, 93 F.3d 327, 331 (7th Cir. 1996) ("A school can direct a teacher to 'refrain from expressions of religious viewpoints in the classroom and like settings.'") (quoting *Bishop v. Aronov*, 926 F.2d 1066, 1077 (11th Cir. 1991)). Although these cases rely on *Lemon*'s endorsement test, the cases also rest on the general principle that public schools must not promote a particular religion.

The Act provides that the "state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability." Conn. Gen. Stat. § 52-571b(a). To justify the burden, the state must demonstrate "that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 52-571b(b); *see also Gawlik v. Semple*, 197 Conn. App. 83, 123-24 (2020) (discussing statute).

Connecticut courts do not appear to have addressed cases where government employers assert that Establishment Clause concerns justify burdening employee free exercise rights under the Act. Thus, it is unclear whether Connecticut courts would provide the leeway that the Second Circuit requires in balancing Establishment Clause concerns with free speech rights under the Free Exercise Clause. It is also not clear if Connecticut courts would conclude that employees' free exercise rights are burdened within the meaning of the Act when their expression amounts to government speech under step one of the *Pickering-Garcetti* framework. In addition, as noted, the parties dispute whether a plaintiff must show her free exercise rights were not just "burdened" but "substantially burdened." *See* Defs.' Mem. 42-43; Pl.'s Mem. 27; Pl.'s Reply 12.

A district court may decline to exercise supplemental jurisdiction over a state law claim if, *inter alia*, "the claim raises a novel or complex issue of State law" or "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. Because Castro is not likely to succeed on the merits of any federal claim, and her state law claim raises novel issues of Connecticut law, I am likely to decline supplemental jurisdiction of the claim under the Act. Given these circumstances, Ms. Castro's state law claim will not serve as the basis for

a preliminary injunction at this time. *See, e.g.*, *RHC Operating LLC v. City of New York*, No. 21-CV-9322 (JPO), 2022 WL 951168, at *15 (S.D.N.Y. Mar. 30, 2022) ("Because Plaintiff is not likely to succeed on the merits of any federal claim, it is not likely that the Court will retain supplemental jurisdiction over the remaining state law claims. In the 'early stages of litigation,' 'judicial economy, convenience, fairness, and comity' are likely to counsel in favor of dismissing those claims without prejudice to refiling in state court. Accordingly, Plaintiff's state-law claims cannot serve as a basis to issue a preliminary injunction at this time.") (citations omitted); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 788 (W.D.N.Y. 2020) ("Plaintiffs' state-law claims require interpretation of state law alone, and are thus more appropriately determined in state court in the interests of comity and efficiency, particularly because they involve important state constitutional questions. Accordingly, this Court would decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, and, in the absence of a likelihood of success on any federal claims, declines to entertain the state-law claims in the context of Plaintiffs' request for [preliminary] injunctive relief."); *Quental v. Conn. Comm'n on Deaf & Hearing Impaired*, 122 F. Supp. 2d 133, 143 (D. Conn. 2000) (declining to exercise supplemental jurisdiction over claim under Conn. Gen. Stat. § 52-571b where judgment entered against plaintiff on federal constitutional claims), *aff'd sub nom. Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156 (2d Cir. 2001).

## IV.    CONCLUSION

For the reasons stated above, Ms. Castro's motion for a preliminary injunction, ECF No. 38, is **DENIED**.

**SO ORDERED.**

New Haven, Connecticut
November 3, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

**SPA54**

# Appendix 1



Declaration Exhibit A

# Appendix 2



**Constitution of the United States, First Amendment**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.