# 25-3047

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

MARISOL ARROYO-CASTRO,

*Appellant*,

*v.*

ANTHONY GASPER, ET AL.,

*Appellees*.

---

On Appeal from U.S. District Court for the District of Connecticut,
No. 3:25-cv-00153-SFR

---

### JOINT APPENDIX
### VOLUME 2 OF 3 (JA56 THROUGH JA186)

---

JEFFREY C. MATEER
DAVID J. HACKER
JEREMIAH G. DYS
HOLLY M. RANDALL
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075
(972) 941-4444

REBECCA R. DUMMERMUTH
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave, NW, Suite 1410
Washington, DC 20037
(202) 921-4105

MATTHEW T. MARTENS
KEVIN M. GALLAGHER
DONNA M. FARAG
JONATHAN W. ELLISON
ANDREW NELL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
(202) 663-6921

ROBERT KINGSLEY SMITH
JAYNE HOLLOWAY MORRIS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State St.
Boston, MA 02109
(617) 526-6759

March 18, 2026

# APPENDIX

# TABLE OF CONTENTS

Page

**VOLUME 1**

Docket Report, No. 25-cv-00153.................................................................JA1

Complaint, Dkt. 1 (Jan. 30, 2025).............................................................JA13

**VOLUME 2**

Declaration of Marisol Arroyo-Castro in Support of Motion for
    Preliminary Injunction, Dkt. 38-2 (Mar. 14, 2025)...................................JA56

    Exhibit A to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-3
        (Mar. 14, 2025).....................................................................JA67

    Exhibit B to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-4
        (Mar. 14, 2025).....................................................................JA69

    Exhibit C to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-5
        (Mar. 14, 2025).....................................................................JA79

    Exhibit D to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-6
        (Mar. 14, 2025).....................................................................JA81

    Exhibit E to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-7
        (Mar. 14, 2025).....................................................................JA84

Declaration of Matthew T. Martens in Support of Motion for
    Preliminary Injunction, Dkt. 38-8 (Mar. 14, 2025)..................................JA87

i

Exhibit A to Declaration of Matthew T. Martens in Support of
Motion for Preliminary Injunction, Dkt. 38-9
(Mar. 14, 2025).................................................................................JA89

Exhibit B to Declaration of Matthew T. Martens in Support of
Motion for Preliminary Injunction, Dkt. 38-10
(Mar. 14, 2025).................................................................................JA98

Exhibit C to Declaration of Matthew T. Martens in Support of
Motion for Preliminary Injunction, Dkt. 38-11
(Mar. 14, 2025)...............................................................................JA100

Answer and Affirmative Defenses, Dkt. 51 (Apr. 14, 2025)............................JA119

Declaration of Maryellen Manning in Support of Opposition to
Motion for Preliminary Injunction, Dkt. 50-1 (Apr. 14, 2025)..............JA140

Exhibit A to Declaration of Maryellen Manning in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-1 (Apr. 14, 2025)................................................................JA145

Exhibit B to Declaration of Maryellen Manning in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-1 (Apr. 14, 2025)................................................................JA153

Declaration of Andrew Mazzei in Support of Opposition to Motion for
Preliminary Injunction, Dkt. 50-2 (Apr. 14, 2025) ...............................JA161

Exhibit A to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................................JA166

Exhibit B to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................................JA176

Exhibit C to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................................JA181

Exhibit D to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)...............................................................JA183

Declaration of Ayla Duve in Support of Opposition to Motion for
Preliminary Injunction, Dkt. 50-3 (Apr. 14, 2025) ...............................JA185

**VOLUME 3**

Declaration of Eric Del Pozo in Support of Opposition to Motion for
Preliminary Injunction, Dkt. 50-4 (Apr. 14, 2025) ...............................JA187

Exhibit A to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA189

Exhibit B to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA191

Exhibit C to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA194

Exhibit D to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA196

Corrected Exhibit D to Declaration of Eric Del Pozo in Support
of Opposition to Motion for Preliminary Injunction,
Dkt. 64 (May 13, 2025)...................................................................JA199

Supplemental Declaration of Marisol Arroyo-Castro in Support of
Reply to Opposition to Motion for Preliminary Injunction, Dkt.
60-1 (May 2, 2025)........................................................................JA210

Transcript of Oral Argument on Motion for Preliminary Injunction,
Dkt. 72 (May 13, 2025) ..................................................................JA215

Defendants' Third Notice of Supplemental Authority, Dkt. 82 (Aug.
27, 2025)......................................................................................JA311

iii

iv

Plaintiff's Response to Defendants' Third Notice of Supplemental
    Authority, Dkt. 83 (Aug. 28, 2025) ........................................................ JA314

Plaintiff's Notice of Appeal, Dkt. 89 (Dec. 3, 2025) ...................................... JA319

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO<br>                         Plaintiff,<br><br>       vs.<br><br>ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br>                         Defendants. | Civil Action No.  3:25-cv-00153<br><br><br>**DECLARATION OF MARISOL ARROYO-CASTRO** |

Pursuant to 28 U.S.C. § 1746, I, Marisol Arroyo-Castro, declare as follows:

1.      I am over the age of eighteen and competent to testify in this proceeding.

2.      I am the sole plaintiff in this action.

3.      I am a grandmother of five, a devout Catholic, and a public-school educator with nearly 33 years experience.

4.      I am a tenured teacher employed by the Consolidated School District of New Britain (the "District").

5.      I hold a Master's Degree in Elementary Education from Central Connecticut State University, with thirty hours of additional credits towards a Ph.D. in Counseling Psychology from Walden University.

6.      I am also a certified Master Teacher, which means that I am trained under the TEAM (Teacher Education and Mentoring) program.  For over ten years, I have mentored student teachers from universities in the area.

7.      As part of my employment with the District, I have taught various ages and grades at DiLoreto Elementary & Middle School ("DiLoreto"), including 6th and 7th grades.  Since 2004 I have mostly taught 3rd and 4th grade.

DECLARATION OF MARISOL ARROYO-CASTRO

**JA56**

8.      According to my June 2024 evaluation, I am a "proficient" teacher who "holds [my class] to high expectations" and whose students "showed growth."  I have regularly received "proficient" or "exemplary" evaluations.

9.      My reputation is that I am an effective disciplinarian in the classroom.  In my opinion, based on my experience, maintaining discipline is particularly necessary at DiLoreto because many students there exhibit significant behavioral and academic challenges.  These challenges stem from the District serving an economically disadvantaged population as well as from the lingering impact of COVID-19-related school closures on students' learning and socialization.  I prioritize students following rules in my classroom because I love my students and want to see them succeed.  In my experience, students cannot learn to their best potential unless their classes are safe and well-organized.

10.      Defendants are all officials of the Consolidated School District of New Britain with authority over my employment and assignments.

11.      Defendant Anthony Gasper is Superintendent and CEO of the District, has unilateral authority over District personnel assignments and suspensions, and can commence termination proceedings against tenured teachers.

12.      Defendant Maryellen Manning is Chief of Staff for Relationships and Accountability for the District and is Mr. Gasper's chief subordinate in personnel matters.

13.      Defendant Dario Soto is principal of DiLoreto Elementary & Middle School. The 2024-2025 school year was his third year at DiLoreto and my third year working under him.

14.      Defendant Andrew Mazzei is the newly installed vice principal of the middle school program at DiLoreto.  He is my immediate supervisor.

15.     In the summer of 2024, Defendant Soto reassigned me to teach 7th grade social studies after many years of teaching 3rd and 4th grade classes.  Despite my preference to continue teaching at the elementary level, Mr. Soto told me my abilities as a "strong" educator were needed because of a behaviorally challenged middle school population and a shortage of qualified seventh grade teachers.  Accordingly, I began reporting to Mr. Mazzei and moved classrooms.

16.     Moving classrooms also meant moving my personal items.  Most teachers at DiLoreto display personal expressive items on or near their desks, and I do the same.  Among my personal items is a small crucifix I have hung near my desk for the past ten years.

17.     Besides my crucifix, in my room I also displayed a New York Yankees team pennant, my church calendar, and (around the holidays) a Christmas tree. In previous years, I have displayed pictures of my family.

18.     In my opinion, based on my experience, personal expressive items—like university or sports pennants, family photos, inspirational quotes, or art—make the classroom environment more conducive to learning.  The experience of remote learning during the COVID-19 pandemic showed me the importance of students interacting with their teachers as human beings.  Personal expressive items promote this goal by humanizing teachers to their students.

19.     Crucifixes have long been a part of my religious and personal identity.  My grandmother impressed upon me the importance of the crucifix. She had a crucifix in nearly every room of the house, and she taught me how important it was to treat the crucifix with respect. She taught me to never put anything on top of the crucifix, and I have taught my children and grandchildren the same. In my house, I have a crucifix in the entrance of the house, in the kitchen, and beside my bed. Also, I always wear a cross necklace. I believe that once a crucifix has been blessed, it protects me.

20.    This specific crucifix has personal significance as well. The crucifix belonged to a late friend whose family gave it to me because, as a practicing Catholic, I was particularly likely to treasure it. During the school day, looking at the crucifix provided me with peace and strength, especially when the task of teaching young students proved particularly challenging. During my lunch breaks, rather than going to the teachers' lounge, I would remain at my desk, look at the crucifix, and pray.

21.    I hang the crucifix on the wall in the personal space next to my desk for multiple reasons. It reminds me of my grandmother, helps me pray silently in my personal time, and express my identity as a Christian.

22.    In August 2024, I hung the crucifix to the side of my desk at about waist height, at the very bottom of an adjacent whiteboard. The crucifix was below the level of a nearby computer monitor.

23.    The crucifix was placed in a location vis-à-vis my desk that is similar to where other teachers display their personal items. Additionally, the crucifix was hung in a similar location to where I placed it in prior years in other classrooms.

24.    A true and correct copy of a photograph that I took with my cellphone camera is attached to this Declaration as Exhibit A. Exhibit A accurately portrays the size and location of the crucifix as it was displayed prior to the events of this case.

25.    The vast majority of teachers at DiLoreto keep personal expressive items on or near their desks. Some items include:

- photos of family and pets;[1]
- inspirational phrases, such as "Yes you can!," "You are loved," "Keep calm and call Wonder Woman," and "Every Day Matters!";[2]

---

[1]  *See* Exs. B.1, B.5, B.6, B.7.
[2]  *See* Exs. B.1, B.2, B.5, B.8.

DECLARATION OF MARISOL ARROYO-CASTRO
4

**JA59**

- a miniature picture of the Mona Lisa;[3]
- a Connecticut State University decal;[4]
- a New England Patriots football team pennant;[5]
- action figures and images of Wonder Woman;[6]
- a desk mat with images of Baby Yoda;[7] and
- items with religious origins or connotations, such as a picture of Santa Claus,[8] a coffee mug with a citation to chapter 31 of the biblical book of Proverbs,[9] a photograph of a statue of the Virgin Mary,[10] and a Christmas tree.[11]

26.     Copies of photographs that I took with my cellphone camera are attached to this Declaration as Exhibit B.  Exhibit B accurately portrays personally expressive items of other teachers as they were displayed prior to the events of this case.  These exhibits are true and correct copies other than redactions to protect personally identifying information of third parties.

27.     On December 3, 2024, Mr. Mazzei emailed me asking to have a discussion because of a "concern" regarding the crucifix.  The email said:

> I wanted to reach out to discuss a concern that has been brought to my attention regarding a cross displayed in your classroom. Please know that this meeting is non-disciplinary in nature and is intended to review district policies to ensure clarity and consistency.

28.     We met on Friday, December 6.  Mr. Mazzei told me that the First Amendment prohibited "any displays of religious symbols" from public school.  He ordered me to take down the crucifix by the next Monday.  Mr. Mazzei confirmed this order with a follow-up email and warned that not taking down the crucifix "would lead to insubordination and disciplinary measures."  The email said:

---

[3] *See* Ex. B.3.
[4] *See* Ex.B.4.
[5] *See id.*
[6] *See* Ex. B.1.
[7] *See* Ex. B.2.
[8] *See* Ex. B.5.
[9] *See* Ex. B.7.
[10] *See* Ex. B.6.
[11] *See* Ex. B.9.

DECLARATION OF MARISOL ARROYO-CASTRO
5

**JA60**

Thank you for taking the time to meet with me today from 2:18 - 2:35, in a nondisciplinary meeting involving the permanent display of a religious symbol. During the meeting,… I shared that any permanent displays of religious symbols are prohibited from public schools, based on the First Amendment of the United States Constitution. I shared the cross you have displayed in your classroom behind your desk must be taken down by Monday. You inquired if you could "think about it or pray on it," which I replied that you could, however, it would not change the outcome of the meeting. Your next question was, "what if I don't take it down?" I replied that it would lead to insubordination and disciplinary measures. I understand that the conversation and situation is difficult and I thank you in advance for complying with the expectation to remove the permanent religious display as public schools may not erect any type of religious display on school property. I will stop by your room on Monday at 8:00 am to observe if the cross is still displayed.

29. I did not take down the cross. Although I did not want to be considered insubordinate, I could not bring myself to take it down.

30. On Tuesday, December 10, I met with Mr. Mazzei, Mr. Soto, Ms. Manning, and a union representative. Ms. Manning told me that, as a public-school employee, I was required to avoid the "perception of promoting a particular religion." She ordered me to remove the crucifix from the wall beside my desk, saying that a religious item could not be hung on the walls of public school buildings. I pointed out that other teachers kept their personal items in similar places, but Ms. Manning refused to change her order. Ms. Manning went on to suggest that I put the crucifix in a desk drawer, only to be pulled out when I wished to "ground" myself. Mr. Soto pressured me to remove the crucifix from the wall by stating his own religious opinion that Christians are to worship no "idols." He then asked if I wanted to stay "true" to that as a Christian.

31. I agreed to a compromise to accommodate my colleagues' wishes and avoid getting in more trouble. Despite the crucifix already being blocked from most students' view by a computer monitor and other items, I would re-hang the crucifix on my desk where it would be less visible to students, but where I could still see it. All the meeting attendees then walked to my

DECLARATION OF MARISOL ARROYO-CASTRO
6

**JA61**

classroom, where I expected the others to propose a reasonable alternative location on my desk to attach the crucifix.

32.     But I was surprised and offended when Ms. Manning told me to attach the crucifix to the side of the kneehole of my desk, by my legs.  I was offended because no other teacher was required to move something so personally significant below their desk and by their feet just to keep it out of view.  I felt that the kneehole of the desk would be demeaning for a family photo, let alone the crucifix.

33.     My feelings were hurt, but I tried to do as I was told by Ms. Manning.  As soon as I put my hand on the crucifix to move it, however, I felt sick to my stomach.  I felt so bad that I almost collapsed.  Although I try not to cry in front of others, I broke down and began sobbing. The other attendees left me crying only minutes before a scheduled parent-teacher conference.

34.     A true and correct copy of a photograph that I took with my cellphone camera is attached to this Declaration as Exhibit C.  Exhibit C accurately portrays the location of the crucifix where Ms. Manning ordered me to place it.

35.     I left the crucifix under the desk that night and prayed about what to do.  The next morning, Wednesday, December 11, I returned the crucifix to its place on the wall next to my desk. I did so out of personal conscience and sincere religious conviction that to do otherwise would be an affront to my faith and religious identity.  I told Defendants of my decision.

36.     That same day, Ms. Manning issued me a Letter of Reprimand stating that my actions were "insubordinate."  The letter stated:

> Per legal statutes, schools should remain neutral when speaking of religion, so as to not have a perception of endorsing a particular religion….  Because public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion….  So, by hanging this on the classroom wall, you are, in effect, saying that "the New Britain Board of Education endorses this religion."

**JA62**

37.     The letter also told me that Mr. Soto would come into my class at the end of the day to "assist [me] with removing the cross from [my] classroom." Ms. Manning cc'd Mr. Gasper, Mr. Soto, and Mr. Mazzei, among others. Ms. Manning designated the letter to be included in my disciplinary file.

38.     A true and correct copy of the Letter of Reprimand is attached to this Declaration as Exhibit D.

39.     When Mr. Soto came into my class, I told him that I would not remove the cross. Mr. Soto again used his religious opinion to tell me that I had to remove the cross to properly "live out [my] faith." He also told me to "give Caesar what is Caesar's." He also talked again about not worshiping an idol.

40.     Mr. Soto then instructed me that if I did not take down the crucifix, the next morning I should come directly to his office. He added that I could face suspension and eventually termination for being insubordinate. The crucifix remained on the wall when I left my classroom that evening.

41.     On Thursday, December 12, I stopped in my classroom to pick up some personal items. I noticed the crucifix had been removed. I then attended another meeting in the principal's office with Ms. Manning, Mr. Soto, Mr. Mazzei, and a union representative.

42.     At that meeting, Ms. Manning told me that a few days without pay would help me better "reflect" on whether it was in my "best interest" to keep hanging the crucifix on the wall. I was suspended without pay for two days and sent home with my crucifix in a box.

43.     That same day, Ms. Manning issued me a written Notice of Suspension. The Notice said again that my actions were "insubordinate" and further said that:

> When a public-school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is

**JA63**

promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.

44.    The Notice said I could return to work on Monday, December 16, 2024, only if I agreed to remove the crucifix from its location on the wall next to my desk.  Ms. Manning cc'd Mr. Gasper, Mr. Soto, and Mr. Mazzei, among others.  Ms. Manning designated the Notice to be included in my disciplinary file.

45.    A true and correct copy of the Notice of Suspension is attached to this Declaration as Exhibit E.

46.    On Monday, December 16, I emailed Defendants that I could not in good conscience conceal the crucifix:

> For me to take my crucifix down and put it under my desk made me feel like, instead of letting my light shine as Jesus told me to do, I was putting it under a bushel (Matthew 5:15).  I had to put it back up.

47.    I also defended my actions by citing a recent Supreme Court decision, *Kennedy v. Bremerton School District*, that rejected the "endorsement" test that the District relied on in disciplining me, Connecticut's Act Concerning Religious Freedom, and 2023 guidance from the U.S. Department of Education.

48.    That same day, I was placed indefinitely on paid administrative leave.

49.    On or before December 20th, unknown employees of the District communicated, through my union representative, that one of my "options" was to resign (or retire early) and sign an agreement not to sue the District.

50.    On January 24, 2025, I attended a videoconference with Mr. Gasper and Ms. Manning.  Seven times, Mr. Gasper asked me whether I would continue refusing to remove or relocate the crucifix to a hidden place in my classroom—for example, in a drawer or in my pocket. I confirmed through counsel that I would not agree to removing or relocating the crucifix within

the classroom so long as other teachers were permitted to keep personal expressive items in similar locations as where I had the crucifix before. Expressly based on my responses, Mr. Gasper confirmed the imposition of administrative leave. At no point in my discussions with Defendants about my suspension or placement on administrative leave did they ever mention a motivation for these decisions other than the crucifix hanging by my desk.

51. I filed this lawsuit on January 30, 2025.

52. In response, an unknown individual with the District improperly released 21 pages of my confidential teacher evaluation and performance information to the media.

53. As of January 30, my school email address was de-activated.

54. On March 6, 2025, Defendants met with me and told me that I was "involuntarily" reassigned as of March 10 to a "curriculum information" non-teaching role because of "concerns about [my] instructional pedagogy and [my] personal beliefs that [Defendants] need to look into."

55. Mr. Mazzei, Mr. Soto, Ms. Manning, and Mr. Gasper each threatened, participated in, or authorized disciplinary action against me unless I agreed to remove the crucifix. In some instances, Defendants explicitly warned me that my refusal to remove the crucifix could lead to suspension or even termination for insubordination. At each instance (until March 6), they exclusively justified their conduct against me by citing the "endorsement" test. To my knowledge, Defendants have not similarly disciplined, threatened, or retaliated against other DiLoreto teachers for their expression or displays in their personal workspace.

56. Because of the ongoing discipline, threats of termination, deactivation of my email, release of my confidential files, involuntary reassignment, and pressure to resign or retire, Defendants have made my choices clear: I can keep my job at a teacher, or I can display my crucifix in my personal space, but I cannot do both.

**I declare under penalty of perjury that the foregoing is true and correct.**

March 14, 2025

By: _____
Marisol Arroyo-Castro

Prepared by:

Matthew Martens (*pro hac vice*)
    *Of counsel for Plaintiff Marisol Arroyo-Castro*
Alyssa DaCunha (*pro hac vice*)
Jonathan Ellison (*pro hac vice*)
Paul Piazza (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6921
matthew.martens@wilmerhale.com
alyssa.dacunha@wilmerhale.com

A. William Caporizzo, Bar No. 207995
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: 617-526-6411
Facsimile: 617-526-5000
william.caporizzo@wilmerhale.com

Jeremiah G. Dys (*pro hac vice*)
Keisha T. Russell (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Telephone: 972-941-4444
krussell@firstliberty.org

Rebecca R. Dummermuth (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue NW, Suite 1410
Washington, DC 20004
Telephone: 202-921-4105

**JA66**

# Declaration of Marisol Arroyo-Castro Exhibit A



Declaration Exhibit A

# Declaration of Marisol Arroyo-Castro Exhibit B



Declaration Exhibit B.1

1. Inspirational Quote: "Be Kind"
2. Inspirational Quote: "Be Brave"
3. Inspirational Quote: "Make Everyday Count"
4. Wonder Woman Sticker
5. Wonder Woman Sticker
6. Wonder Woman Doll
7. Image of Wonder Woman and Batman
8. Wonder Woman Sticker
9. Inspirational Quote: "Keep Calm and Call Wonder Woman"
10. Family Photos [redacted]



Declaration Exhibit B.2

1. Baby Yoda Sticker
2. Baby Yoda Desk Pad
3. Inspirational Quote: "La felicidad no es una meta, sino una actitud, se feliz [Happiness is not a goal, it is your attitude/actions, Be Happy]!"



Declaration Exhibit B.3

1. Image of Mona Lisa



Declaration Exhibit B.4

1. Central Connecticut State University Flag
2. NFL New England Patriots Flag



Declaration Exhibit B.5

1. Family Photos [redacted]
2. Santa Claus
3. Inspirational Quote: "Every Day Matters…"



Declaration Exhibit B.6

1. Image of Virgin Mary
2. Family Photos [redacted]

Declaration Exhibit B.7

1. Pet Photo
2. Coffee Mug with Biblical Citation



Declaration Exhibit B.8

1. Inspirational Quote: "Yes You Can!"
2. Inspirational Quote: "You Are Loved"
3. Inspirational Quote: "Best Teacher Ever"
4. Inspirational Quote: "Bless you"

Case 3:25-cv-00153-SFR    Document 38-4    Filed 03/14/25    Page 10 of 10



Declaration Exhibit B.9

1. Christmas Tree

JA78

# Declaration of Marisol Arroyo-Castro
# Exhibit C



# Declaration of Marisol Arroyo-Castro Exhibit D



**CHIEF OF STAFF | RELATIONSHIPS & ACCOUNTABILITY**

December 11, 2024

**Via E-Mail**

Subject: *Letter of Reprimand (Teacher/DiLoreto)*

Dear Ms. Marisol Arroyo-Castro,

Yesterday you met with DiLoreto Principal, Dario Soto, Assistant Principal, Andrew Mazzei, AFT Union Representative Ed Leavy and me.  At this pre-disciplinary meeting we discussed the Establishment Clause of the First Amendment that says that the government cannot establish a religion.

Prior to yesterday's pre-disciplinary meeting your building administration met with you and informed you the following:

- Per legal statutes, schools should remain neutral when speaking of religion, so as to not have a perception of endorsing a particular religion.
- The placement of religious artifacts is not permitted in the workplace unless the artifact is being used within a BOE approved curriculum.
- This same principle holds true when speaking to students about a particular religion.
- You need to take the cross down.
- Further insubordination may lead to disciplinary consequences.

Because public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion.

The following was discussed with you at yesterday's pre-disciplinary meeting pertaining to you as a CSDNB employee and the Establishment Clause of the First Amendment:

272 Main Street • P.O. Box 1960  •  New Britain, CT 06050-1960  •  P (860) 827-2280
**WWW.CSDNB.ORG**

**JA82**

- The Establishment Clause includes *employees* of the public schools, including administrators *and teachers*.
- When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.
- You have told the administration that you are hanging this cross permanently.
- You have also told the administration that this cross is not tied to a specific curricular unit.
- This means that there is no pedagogical justification for hanging this cross.
- The Board of Education owns and controls the classroom walls.
  - So, by hanging this on the classroom wall, you are, in effect, saying that "the New Britain Board of Education endorses this religion."
  - That violates the Establishment Clause.

At yesterday's meeting we discussed your personal religious beliefs and strategies to support you in the classroom. Upon the conclusion of the meeting you were observed taking the cross off of your wall in the classroom and agreed to use it privately so it doesn't look like the school is endorsing or advancing that religion. This morning you communicated to the administration, stating you returned the cross to its original place (classroom wall).

Mr. Soto will meet you in your classroom at the end of the day and assist you with removing the cross from your classroom wall.

**<u>Outcome:</u>**
The district finds your actions to be insubordinate.  This letter is to serve as a documented reminder, specific to your employee obligations, so as to not violate the Establishment Clause. We expect all of our employees to follow our Service Excellence Standards: Integrity, Respect, Professionalism, Communication, Teamwork, and Accountability.  Future insubordination that does not adhere to above, will result in further disciplinary action up to and including termination.

Sincerely,

*Maryellen Manning*
Maryellen Manning
Chief of Staff|Relationships & Accountability

Cc:

Dr. Tony Gasper, Superintendent
Evelise Velazquez, Deputy Superintendent
Dario Soto, Principal
Tyrone Richardson, Academics & Accountability Officer, 6-12
Sue Saluru, Local 871 Union President
Talent

Personnel File

**JA83**

# Declaration of Marisol Arroyo-Castro Exhibit E

**CHIEF OF STAFF | RELATIONSHIPS & ACCOUNTABILITY**

CONSOLIDATED
SCHOOL DISTRICT
—OF—
**NEW BRITAIN**

December 12, 2024

**Via E-Mail**

Subject: *2-Day Suspension Notice (Teacher/DiLoreto)*

Dear Ms. Marisol Arroyo-Castro,

Today you met with DiLoreto Principal, Dario Soto, Assistant Principal, Andrew Mazzei, AFT Union Representative Ed Leavy and me. This morning Mr. Soto removed your religious artifact from the wall of your classroom since you did not follow yesterday's request, as well as previous requests from your employer to do so. When asked if you would comply with this, you stated you cannot.

You also stated in the meeting that your employer would not allow you to keep the cross in your classroom in a private space, to which we reminded you that we did indeed agree to that, and all members present in the meeting observed you placing it in a private area, only to have you communicate to us in writing you then returned it to your classroom wall.

At this meeting we again discussed the Establishment Clause of the First Amendment that says that the government cannot establish a religion because public schools are run by the government, this means that public schools are not allowed, legally, to take any actions that would be seen as establishing or promoting a religion. When a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion, so putting that religious artifact on the wall of the school building is not legally permissible.

**Outcome:**
*The district finds your actions to be insubordinate. You are suspended without pay on December 12th and December 13th.*

*You may return to work on Monday December 16th if you comply with the request from your employer.* If you are unwilling to do so, your actions will be deemed insubordinate and will result in further disciplinary action up to and including termination.

272 Main Street • P.O. Box 1960 • New Britain, CT 06050-1960 • P (860) 827-2280
**WWW.CSDNB.ORG**

**JA85**

This letter is to serve as a documented reminder, specific to your employee obligations, so as to not violate the Establishment Clause. We expect all of our employees to follow our Service Excellence Standards: Integrity, Respect, Professionalism, Communication, Teamwork, and Accountability.

Sincerely,

*Maryellen Manning*

Maryellen Manning
Chief of Staff|Relationships & Accountability

Cc:

Dr. Tony Gasper, Superintendent
Evelise Velazquez, Deputy Superintendent
Dario Soto, Principal
Tyrone Richardson, Academics & Accountability Officer, 6-12
Sue Saluru, Local 871 Union President
Talent

Personnel File

**JA86**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO<br>　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br>　　　　　　　　　Defendants. | Civil Action No.  3:25-cv-00153<br><br><br>**DECLARATION OF MATTHEW T. MARTENS** |

Pursuant to 28 U.S.C. § 1746, I, Matthew T. Martens, declare as follows:

1.　　　　I am over the age of eighteen and competent to testify in this proceeding.

2.　　　　I am of counsel representing plaintiff in this action.

3.　　　　Attached to this Declaration as Exhibit A is a true and correct copy of school district profile statistics promulgated by the Connecticut State Department of Education.  It was accessed via the Department's website on March 12, 2025.

4.　　　　Attached to this Declaration as Exhibit B is a true and correct copy of Consolidated School District of New Britain Board Policy Statement 2120.00.  It was accessed via the Board's website on March 12, 2025.

5.　　　　Attached to this Declaration as Exhibit C is a true and correct copy of the United States Department of Education's website, accessed on March 12, 2025.  It states administrative guidance promulgated by the Department in 2023.

**I declare under penalty of perjury that the foregoing is true and correct.**

March 14, 2025

By:   /s/Matthew Martens
Matthew T. Martens

DECLARATION OF MATTHEW T. MARTENS

**JA87**

Prepared by:

Matthew Martens (*pro hac vice*)
   *Of counsel for Plaintiff Marisol Arroyo-Castro*
Alyssa DaCunha (*pro hac vice*)
Jonathan Ellison (*pro hac vice*)
Paul Piazza (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6921
matthew.martens@wilmerhale.com
alyssa.dacunha@wilmerhale.com

A. William Caporizzo, Bar No. 207995
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: 617-526-6411
Facsimile: 617-526-5000
william.caporizzo@wilmerhale.com

Jeremiah G. Dys (*pro hac vice*)
Keisha T. Russell (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Telephone: 972-941-4444
krussell@firstliberty.org

Rebecca R. Dummermuth (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue NW, Suite 1410
Washington, D.C. 20004
Telephone: 202-921-4105

**JA88**

# Declaration of Matthew T. Martens Exhibit A

## Connecticut State Department of Education

# DISTRICT PROFILE AND PERFORMANCE REPORT FOR SCHOOL YEAR 2022-23



CONNECTICUT STATE
DEPARTMENT OF EDUCATION

## New Britain School District

Dr. Anthony Gasper, Superintendent • 860-827-2200 • http://www.csdnb.org

### District Information

| | |
|---|---|
| Grade Range | PK-12 |
| Number of Schools/Programs | 29 |
| Enrollment | 9,717 |
| Per Pupil Expenditures[1] | $18,125 |
| Total Expenditures[1] | $204,684,179 |

[1] Expenditure data reflect the 2021-22 school year.



### Community Information

AdvanceCT Town Profiles provide summary demographic and economic information for Connecticut's municipalities at https://www.advancect.org/site-selection/town-profiles

### Contents

Students............................................................. 1
Educators.......................................................... 2
Instruction and Resources............................. 2
Performance and Accountability................... 4
Narratives......................................................... 7

### Notes

Unless otherwise noted, all data are for 2022-23 and include all grades offered by the district.

In most tables, data are displayed only for the three major race/ethnicity categories. For additional race/ethnicity categories, please visit https://edsight.ct.gov

State totals are not displayed as they are not comparable to district totals.

Special Education tables reflect only students for whom the district is fiscally responsible.

* When an asterisk is displayed, data have been suppressed to safeguard student confidentiality. Complete data suppression guidelines are available at https://tinyurl.com/SuppressionPolicy

N/A is displayed when a category is not applicable for a district or school.

# Students

### October 1, 2022 Enrollment[2]

| | District | | State |
|---|---|---|---|
| | Count | Percent of Total (%) | Percent of Total (%) |
| Female | * | * | 48.4 |
| Male | 5,029 | 51.8 | 51.5 |
| Non-Binary | * | * | 0.1 |
| American Indian or Alaska Native | 7 | 0.1 | 0.3 |
| Asian | 197 | 2.0 | 5.2 |
| Black or African American | 1,074 | 11.1 | 12.5 |
| Hispanic or Latino of any race | 6,582 | 67.7 | 30.0 |
| Native Hawaiian or Other Pacific Islander | 6 | 0.1 | 0.1 |
| Two or More Races | 462 | 4.8 | 4.5 |
| White | 1,389 | 14.3 | 47.5 |
| English Learners/Multilingual Learners | 1,766 | 18.2 | 9.7 |
| Eligible for Free or Reduced-Price Meals | 7,395 | 76.1 | 42.4 |
| Students with Disabilities[3] | 2,198 | 22.6 | 17.1 |

[2] This table represents students in grades PK-12 reported by the district in the Public School Information System (i.e., PSIS Reporting District).

[3] Students in this category are students with an individualized education program (IEP) only. This category does not include students with Section 504 plans or services plans.

### Chronic Absenteeism and Suspension/Expulsion

| | Chronic Absenteeism[4] | | Suspension/Expulsion[5] | |
|---|---|---|---|---|
| | Count | Rate (%) | Count | Rate (%) |
| Female | * | * | 556 | 11.0 |
| Male | 1,863 | 38.6 | 865 | 15.7 |
| Non-Binary | * | * | 0 | * |
| Black or African American | 359 | 34.3 | 195 | 16.5 |
| Hispanic or Latino of any race | 2,611 | 41.2 | 988 | 13.8 |
| White | 386 | 28.6 | 174 | 11.5 |
| English Learners/Multilingual Learners | 686 | 37.2 | 257 | 12.8 |
| Eligible for Free or Reduced-Price Meals | 3,047 | 41.7 | 1,176 | 14.2 |
| Students with Disabilities | 1,013 | 47.7 | 389 | 14.6 |
| District | 3,542 | 37.8 | 1,421 | 13.4 |
| State | | 20.0 | | 7 |

**Number of students qualified as truant under state statute: 4,545**

**Number of school-based arrests: 58**

[4] A student is chronically absent if they miss ten percent or greater of the total number of days enrolled in the school year for any reason. Pre-Kindergarten students are excluded from this calculation.

[5] This column displays the count and percentage of students who receive at least one in-school suspension, out-of-school suspension or expulsion.

JA90

# District Profile and Performance Report for School Year 2022-23
## New Britain School District

## Educators

### Full-Time Equivalent (FTE)[1] Staff

| | FTE |
|---|---|
| **General Education** | |
| Teachers and Instructors | 592.9 |
| Paraprofessional Instructional Assistants | 123.4 |
| **Special Education** | |
| Teachers and Instructors | 126.7 |
| Paraprofessional Instructional Assistants | 265.1 |
| **Administrators, Coordinators and Department Chairs** | |
| District Central Office | 14.5 |
| School Level | 41.5 |
| **Library/Media** | |
| Specialists (Certified) | 3.0 |
| Support Staff | 5.8 |
| Instructional Specialists Who Support Teachers | 82.0 |
| Counselors, Social Workers and School Psychologists | 62.0 |
| School Nurses | 41.4 |
| Other Staff Providing Non-Instructional Services/Support | 487.2 |

[1] In the full-time equivalent count, staff members working part-time in the school are counted as a fraction of full-time. For example, a teacher who works half-time in a school contributes 0.50 to the school's staff count.

### Educators by Race/Ethnicity

| | District | | State |
|---|---|---|---|
| | Count | Percent of Total (%) | Percent of Total (%) |
| American Indian or Alaska Native | 0 | 0.0 | 0.1 |
| Asian | 16 | 1.7 | 1.3 |
| Black or African American | 58 | 6.2 | 4.6 |
| Hispanic or Latino of any race | 118 | 12.6 | 4.9 |
| Native Hawaiian or Other Pacific Islander | 1 | 0.1 | 0.1 |
| Two or More Races | 0 | 0.0 | 0.2 |
| White | 741 | 79.3 | 88.7 |

### Classroom Teacher Attendance: 2021-22

| | District | State |
|---|---|---|
| Average Number of FTE Days Absent Due to Illness or Personal Time | 14.0 | 13.2 |

## Instruction and Resources

### 11th and 12th Graders Enrolled in College-and-Career-Readiness Courses during High School[2]

| | 11th | | 12th | |
|---|---|---|---|---|
| | Count | Rate (%) | Count | Rate (%) |
| Black or African American | 61 | 91.0 | 79 | 96.3 |
| Hispanic or Latino of any race | 331 | 90.9 | 303 | 93.5 |
| White | 89 | 88.1 | 104 | 94.5 |
| English Learners/Multilingual Learners | 81 | 81.8 | 94 | 87.0 |
| Eligible for Free or Reduced-Price Meals | 384 | 91.2 | 356 | 94.7 |
| Students with Disabilities | 112 | 87.5 | 139 | 93.3 |
| District | 523 | 90.6 | 515 | 94.0 |
| State | | 86.5 | | 94.2 |

[2] College-and-Career-Readiness Courses include Advanced Placement®(AP), International Baccalaureate®(IB), Career and Technical Education(CTE), workplace experience and dual credit courses.

### Students Who Spend 80% or Greater Time with Nondisabled Peers[3]

| | Count | Rate (%) |
|---|---|---|
| Autism | 141 | 45.9 |
| Emotional Disability | 31 | 22.3 |
| Intellectual Disability | 26 | 27.7 |
| Learning Disability | 701 | 83.6 |
| Other Health Impairment | 271 | 66.9 |
| Other Disabilities | 18 | 21.4 |
| Speech/Language Impairment | 240 | 93.8 |
| District | 1,428 | 67.2 |
| State | | 68.6 |

[3] This table represents students ages 6-21 for whom the district is fiscally responsible (i.e., Nexus District students with an IEP or services plan).

JA91

# District Profile and Performance Report for School Year 2022-23
## New Britain School District

### Students with Disabilities by Primary Disability[1]

| | District | | State |
|---|---|---|---|
| | Count | Rate (%) | Rate (%) |
| Autism | 348 | 3.2 | 2.4 |
| Emotional Disability | 139 | 1.3 | 1.0 |
| Intellectual Disability | 94 | 0.9 | 0.6 |
| Learning Disability | 840 | 7.8 | 6.3 |
| Other Health Impairment | 409 | 3.8 | 3.4 |
| Other Disabilities | 172 | 1.6 | 1.1 |
| Speech/Language Impairment | 291 | 2.7 | 1.9 |
| All Disabilities | 2,293 | 21.2 | 16.7 |

[1] This table represents students in grades K-12 for whom the district is fiscally responsible (i.e., Nexus District students with an IEP or services plan).

### Students with Disabilities Placed Outside of the District[2]

| | District | | State |
|---|---|---|---|
| | Count | Rate (%) | Rate (%) |
| Public Schools in Other Districts | 301 | 13.1 | 8.1 |
| Private Schools or Other Settings | 99 | 4.3 | 4.7 |

[2] This table represents students in grades K-12 for whom the district is fiscally responsible (i.e., Nexus District students with an IEP or services plan).

### Overall Expenditures[3]: 2021-22

| | | Per Pupil | |
|---|---|---|---|
| | Total ($) | District ($) | State ($) |
| Instruction | $137,277,048 | $12,156 | $12,671 |
| Support services - students | $6,319,947 | $653 | $1,558 |
| Support services - instruction | $11,759,762 | $1,215 | $837 |
| Support services - general administration | $4,348,626 | $449 | $463 |
| Support services - school based administration | $7,025,454 | $726 | $1,133 |
| Central and other support services | $5,635,163 | $582 | $716 |
| Operation and maintenance of plant | $17,460,554 | $1,804 | $1,893 |
| Student transportation services | $14,066,116 | $1,757 | $1,464 |
| Food services | . | . | $5 |
| Enterprise operations | $791,510 | $82 | $186 |
| Total | $204,684,179 | $18,125 | $20,165 |

[3] Expenditures may be supported by local tax revenues, state grants, federal grants, municipal in-kind services, tuition and other sources.

### Special Education Expenditures: 2021-22

| | District | | State |
|---|---|---|---|
| | Total ($) | Percent of Total (%) | Percent of Total (%) |
| Teacher Salaries | $18,270,838 | 31.2 | 29.0 |
| Instructional Aide Salaries | $9,553,184 | 16.3 | 10.6 |
| Other Salaries | $4,242,514 | 7.3 | 10.1 |
| Employee Benefits | $4,819,113 | 8.2 | 13.1 |
| Purchased Services Other Than Transportation | $5,600,934 | 9.6 | 5.9 |
| Special Education Tuition | $10,002,056 | 17.1 | 21.8 |
| Supplies | $203,864 | 0.3 | 0.7 |
| Property Services | . | . | 0.4 |
| Purchased Services For Transportation | $5,761,708 | 9.8 | 8.1 |
| Equipment | $58,150 | 0.1 | 0.2 |
| All Other Expenditures | . | . | 0.1 |
| Total | $58,512,362 | 100.0 | 100.0 |
| Percent of Total Expenditures Used for Special Education | | 28.6 | 24.9 |

### Expenditures by Revenue Source[4]: 2021-22

| | Percent of Total (%) Excluding School Construction |
|---|---|
| Local | 24.4 |
| State | 56.0 |
| Federal | 18.3 |
| Tuition & Other | 1.3 |

[4] Revenue sources do not include state-funded Teachers' Retirement Board contributions, Connecticut Technical Education and Career System (CTECS) operations, CSDE-budgeted costs for salaries and leadership activities and other state-funded school districts (e.g., Dept. of Children and Families and Dept. of Correction).

**JA92**

# District Profile and Performance Report for School Year 2022-23
## New Britain School District

## Performance and Accountability

### District Performance Index (DPI)

A District Performance Index (DPI) is the average performance of students in a subject area (i.e., ELA, Mathematics or Science) on the state summative assessments. The DPI ranges from 0-100. A DPI is reported for all students tested in a district and for students in each individual student group. Connecticut's ultimate target for a DPI is 75.

| | English Language Arts (ELA) | | Math | | Science | |
|---|---|---|---|---|---|---|
| | Count | DPI | Count | DPI | Count | DPI |
| American Indian or Alaska Native | * | * | * | * | * | * |
| Asian | 78 | 54.6 | 78 | 50.2 | 38 | 48.5 |
| Black or African American | 515 | 49.5 | 513 | 41.2 | 203 | 44.7 |
| Hispanic or Latino of any race | 3,201 | 44.1 | 3,166 | 37.3 | 1,241 | 40.9 |
| Native Hawaiian or Other Pacific Islander | * | * | * | * | * | * |
| Two or More Races | 211 | 48.4 | 208 | 43.1 | 74 | 42.8 |
| White | 657 | 53.8 | 652 | 49.5 | 278 | 51.2 |
| English Learners/Multilingual Learners | 966 | 40.0 | 961 | 35.2 | 389 | 37.0 |
| Non-English Learners/Non-Multilingual Learners | 3,703 | 48.1 | 3,663 | 41.2 | 1,449 | 44.8 |
| Eligible for Free or Reduced-Price Meals | 3,644 | 44.9 | 3,605 | 38.3 | 1,373 | 41.4 |
| Not Eligible for Free or Reduced-Price Meals | 1,025 | 51.9 | 1,019 | 45.7 | 465 | 48.1 |
| Students with Disabilities | 999 | 35.0 | 978 | 28.8 | 382 | 34.7 |
| Students without Disabilities | 3,670 | 49.5 | 3,646 | 42.9 | 1,456 | 45.3 |
| High Needs | 3,937 | 44.6 | 3,896 | 38.2 | 1,514 | 41.2 |
| Non-High Needs | 732 | 56.3 | 728 | 49.5 | 324 | 52.0 |
| District | 4,669 | 46.4 | 4,624 | 39.9 | 1,838 | 43.1 |

### National Assessment of Educational Progress (NAEP): Percent At or Above Proficient[1]

| | NAEP 2022 | | NAEP 2013 |
|---|---|---|---|
| READING | Grade 4 | Grade 8 | Grade 12 |
| Connecticut | 35 | 35 | 50 |
| National Public | 32 | 29 | 36 |
| MATH | Grade 4 | Grade 8 | Grade 12 |
| Connecticut | 37 | 30 | 32 |
| National Public | 35 | 26 | 25 |

[1] NAEP is often called the "Nation's Report Card." It is sponsored by the U.S. Department of Education. This table compares Connecticut's performance to that of national public school students. Performance standards for state assessments and NAEP are set independently. Therefore, one should not expect performance results to be the same across Smarter Balanced and NAEP. Instead, NAEP results are meant to complement other state assessment data. To view performance on NAEP by student group, at
https://portal.ct.gov/-/media/SDE/Student-Assessment/NAEP/report-card_NAEP-2022.pdf

### Physical Fitness Tests:  Students Reaching Health Standard[2]

| | Percent of Students by Grade[3] (%) | | | | All Tested Grades | |
|---|---|---|---|---|---|---|
| | 4 | 6 | 8 | HS | Count | Rate (%) |
| Sit & Reach | 72.8 | 66.7 | 76.1 | 87.5 | 2,703 | 75.5 |
| Curl Up | 79.9 | 72.1 | 65.8 | 85.3 | 2,708 | 75.6 |
| Push Up | 60.0 | 50.2 | 52.1 | 68.0 | 2,706 | 57.4 |
| Mile Run/PACER | 66.0 | 54.9 | 37.5 | 40.1 | 2,710 | 50.2 |
| All Tests - District | 33.1 | 26.1 | 24.4 | 39.3 | 2,682 | 30.6 |
| All Tests - State | 51.5 | 46.0 | 44.1 | 41.1 | | 45.5 |

[2] The Connecticut Physical Fitness Assessment (CPFA) is administered to students in Grades 4, 6, 8 and High School (HS). The health-related fitness scores gathered through the CPFA should be used to educate and motivate children and their families to increase physical activity and develop lifetime fitness habits.

[3] Only students assessed in all four areas are included in this calculation.

JA93

# District Profile and Performance Report for School Year 2022-23
# New Britain School District

## Cohort Graduation: Four-Year[1]

| | 2021-22 | |
|---|---|---|
| | Cohort Count[2] | Rate (%) |
| Black or African American | 79 | 75.9 |
| Hispanic or Latino of any race | 410 | 74.1 |
| White | 110 | 79.1 |
| English Learners/Multilingual Learners | 115 | 71.3 |
| Eligible for Free or Reduced-Price Meals | 564 | 75.4 |
| Students with Disabilities | 168 | 63.1 |
| District | 644 | 76.6 |
| State | | 88.9 |

[1] The four-year cohort graduation rate represents the percentage of first-time 9th graders who earn a standard high school diploma within four years.

[2] Cohort count includes all students in the cohort as of the end of the 2021-22 school year.

## 11th and 12th Graders Demonstrating Postsecondary Readiness[3]

| | Participation[4] | Meeting Benchmark | |
|---|---|---|---|
| | Rate (%) | Count | Rate (%) |
| Female | 92.2 | 146 | 26.6 |
| Male | 89.9 | 85 | 14.8 |
| Non-Binary | N/A | N/A | N/A |
| Black or African American | 96.0 | 24 | 16.1 |
| Hispanic or Latino | 90.3 | 116 | 16.9 |
| White | 90.0 | 67 | 31.8 |
| English Learners/ Multilingual Learners | 83.1 | 11 | 5.3 |
| Eligible for Free or Reduced-Price Meals | 90.8 | 127 | 15.9 |
| Students with Disabilities | 80.9 | 10 | 3.6 |
| District | 91.0 | 231 | 20.5 |
| State | 95.2 | | 44.3 |

[3]Students demonstrate postsecondary readiness through at least one of the following:
- SAT® - meets benchmark score on SAT, Revised SAT or Connecticut School Day SAT
- ACT® - meets benchmark score on 3 of 4 exams (benchmark score varies by subject)
- AP® - 3 or higher on any one AP® exam
- IB® - 4 or higher on any one IB® exam
- Earning three or more non-remedial college credits cumulatively during high school.

[4]Participation Rate equals the number of test-takers in 11th and 12th grade divided by the number of students enrolled in those grades, as a percentage.
Sources:
  SAT® and AP® statistics derived from data provided by the College Board.
  Copyright © 2023 The College Board. www.collegeboard.org
  ACT® statistics derived from data provided by ACT, Inc.
  Copyright © 2023 ACT, Inc. www.act.org
  IB® statistics derived from data provided by the International Baccalaureate Organization.
  Copyright © International Baccalaureate Organization 2023

## College Entrance and Persistence

| | Class of 2022 | Class of 2021 |
|---|---|---|
| | Entrance[5] | Persistence[6] |
| | Rate (%) | Rate (%) |
| Female | 40.3 | 74.0 |
| Male | 34.8 | 73.5 |
| Non-Binary | N/A | N/A |
| Black or African American | 36.8 | 60.0 |
| Hispanic or Latino of any race | 28.4 | 70.9 |
| White | 54.5 | 81.5 |
| English Learners/ Multilingual Learners | 30.0 | 58.3 |
| Eligible for Free or Reduced-Price Meals | 34.8 | 71.1 |
| Students with Disabilities | 16.1 | * |
| District | 37.5 | 73.8 |
| State | 66.1 | 87.7 |

[5] College entrance refers to the percent of high school graduates from the year who enrolled in college any time during the first year after high school.

[6] College persistence refers to the percent of students who enrolled in college the first year after high school and returned for a second year (Freshman to Sophomore persistence).

Source: National Student Clearinghouse

JA94

# District Profile and Performance Report for School Year 2022-23
## New Britain School District

### Next Generation Accountability Results

Connecticut's Next Generation Accountability System is a broad set of 12 indicators that help tell the story of how well a district/school is preparing its students for success in college, careers, and life. It moves beyond test scores and graduation rates to provide a more holistic, multifactor perspective of district and school performance.

| Indicator | | Index/Rate | Target | Points Earned | Max Points | % Points Earned | State Average Index/Rate |
|---|---|---|---|---|---|---|---|
| ELA Performance Index | All Students | 46.4 | 75 | 30.9 | 50 | 61.9 | 63.9 |
| | High Needs Students | 44.6 | 75 | 29.7 | 50 | 59.5 | 54.1 |
| Math Performance Index | All Students | 39.9 | 75 | 26.6 | 50 | 53.3 | 59.7 |
| | High Needs Students | 38.2 | 75 | 25.4 | 50 | 50.9 | 48.9 |
| Science Performance Index | All Students | 43.1 | 75 | 28.7 | 50 | 57.5 | 61.6 |
| | High Needs Students | 41.2 | 75 | 27.5 | 50 | 54.9 | 51.1 |
| ELA Academic Growth | All Students | 51.2% | 100% | 51.2 | 100 | 51.2 | 57.2% |
| | High Needs Students | 49.9% | 100% | 49.9 | 100 | 49.9 | 52.5% |
| Math Academic Growth | All Students | 56.8% | 100% | 56.8 | 100 | 56.8 | 61.8% |
| | High Needs Students | 55.7% | 100% | 55.7 | 100 | 55.7 | 55.5% |
| Progress Toward English Proficiency | Literacy | 53.5% | 100% | 26.8 | 50 | 53.5 | 55.3% |
| | Oral | 48.9% | 100% | 24.4 | 50 | 48.9 | 56.1% |
| Chronic Absenteeism | All Students | 37.8% | <=5% | 0.0 | 50 | 0.0 | 20.0% |
| | High Needs Students | 40.9% | <=5% | 0.0 | 50 | 0.0 | 28.5% |
| Preparation for CCR | % Taking Courses | 92.3% | 75% | 50.0 | 50 | 100.0 | 90.4% |
| | % Meeting Benchmark | 20.5% | 75% | 13.7 | 50 | 27.4 | 44.3% |
| On-track to High School Graduation | | 66.8% | 94% | 35.5 | 50 | 71.1 | 82.4% |
| 4-year Graduation All Students (2022 Cohort) | | 76.6% | 94% | 81.4 | 100 | 81.4 | 88.9% |
| 6-year Graduation - High Needs Students (2020 Cohort) | | 81.5% | 94% | 86.7 | 100 | 86.7 | 85.6% |
| Postsecondary Entrance (Class of 2022) | | 37.5% | 75% | 50.0 | 100 | 50.0 | 66.1% |
| Physical Fitness (estimated part rate) and (fitness rate) | | 93.5% \| 30.6% | 75% | 20.4 | 50 | 40.8 | 93.0% \| 45.5% |
| Arts Access | | 48.6% | 60% | 40.5 | 50 | 81.0 | 54.5% |
| **Accountability Index** | | | | **812.2** | **1450** | **56.0** | |

*NOTE: A dot (.) appears in the table above when there are fewer than 20 students in the student group or the indicator is not applicable based on grades served.*

| Gap Indicators | Non-High Needs Rate[1] | High Needs Rate | Size of Gap | State Gap Mean +1 Stdev[2] | Is Gap an Outlier?[2] |
|---|---|---|---|---|---|
| Achievement Gap Size Outlier? | | | | | N |
| ELA Performance Index Gap | 56.3 | 44.6 | 11.7 | 16.6 | |
| Math Performance Index Gap | 49.5 | 38.2 | 11.3 | 18.0 | |
| Science Performance Index Gap | 52.0 | 41.2 | 10.8 | 17.8 | |
| Graduation Rate Gap | 94.0% | 81.5% | 12.5% | 8.7% | Y |

[1]If the Non-High Needs Rate exceeds the ultimate target (75 for Performance Index and 94% for graduation rate), the ultimate target is used for gap calculations.
[2]If the size of the gap exceeds the state mean gap plus one standard deviation, the gap is an outlier.

*NOTE: A dot (.) appears in the table above when there are fewer than 20 students in at least one of the student groups used to calculate the gap measure or the indicator is not applicable based on grades served. Gap calculations are based on unrounded rates.*

| Subject/Student Group | | Participation Rate (%)[3] |
|---|---|---|
| ELA | All Students | 97.9 |
| | High Needs Students | 97.6 |
| Math | All Students | 97.1 |
| | High Needs Students | 96.7 |
| Science | All Students | 93.1 |
| | High Needs Students | 92.9 |

[3]Minimum participation standard is 95%.

**Connecticut's State Identified Measurable Result (SIMR) for Children with Disabilities**

Increase the reading performance of all 3rd grade students with disabilities statewide, as measured by Connecticut's English Language Arts (ELA) Performance Index.

Grade 3 ELA Performance Index for Students with Disabilities:

**District: 42.6**      **State: 49.6**

**Supporting Resources:** https://public-edsight.ct.gov/Overview/Next-Generation-Accountability-Dashboard#related-links

**District Profile and Performance Report for School Year 2022-23**
**New Britain School District**

## Narratives

### School District Improvement Plans and Parental Outreach Activities

New Britain's District Theory of Action scorecard embeds multiple access points for parent and community outreach activities. The shift back to an in person model that still allows for students to access supports virtually when necessary has included parent outreach activities. We included a parent and community subcommittee in our re-entry planning last summer. This also included technology support. Recovery programming across PK-12 included significant parent outreach from Lead Teachers and Family School Liaisons at each school site in order to invite students and inform families of programming opportunities. All teachers have been provided time and support to implement learning tools that build their capacity to deliver instruction in unique ways. As part of the District's Theory of Action, the District-wide Attendance Team continues to meet monthly to determine areas of weakness and develop targeted interventions aimed at confronting the root causes of truancy and developing viable solutions. This team's work has evolved to focus on increasing the level of student engagement in their learning. Each Site-Based Theory of Action aligns with the District's plan. Site-based strategies and interventions are customized to the needs of each school community. The Director of Pupil Services and his team have completed an in-depth analysis of the special education programs and services for students with disabilities. The Continuum of Services provides a road map for processes and procedures ensuring that students are receiving support in the appropriate LRE, as well as supporting families in the virtual environment as necessary.

### Efforts to Reduce Racial, Ethnic and Economic Isolation

While CSDNB's academic performance data continues to show that English Learners, special education students and students of color are disproportionately lagging behind peer counterparts, professional development opportunities designed to engage staff in culturally responsive teaching were offered. In addition, the District Equity Leadership Team (DELT) created a Equity Transformation Plan focused on leadership development, students at the center, culturally responsive teaching and learning, and family/community engagement and empowerment.

In an effort to reduce racial, ethnic and economic isolation, CSDNB has expanded access to opportunities through the career academies at New Britain High School to incorporate high level skill attainment through coursework in focused areas: business and finance, health sciences, manufacturing, engineering & technology (MET), and public service including education and first responder careers. A strong emphasis has been placed on vertically aligning Pk-12th grade with Career Technology Education (CTE) & Science, Technology, Engineering, Arts and Mathematics (STEAM) with an instructional model that focuses on increasing student engagement and technology-based learning. All K-8 students participate in STEAM learning and 6-12 students have increased opportunities in CTE. CTE-STEAM's philosophy is based on a learning by doing inquiry model in order to develop critical thinking and problem solving skills.

CSDNB is committed to high-quality, accessible, culturally responsive curriculum. School-based supports include instructional coaches to ensure effective lesson planning to address the needs of all students. We added the Latinos in Action Program at NBHS and 3 middle schools.

CSDNB ensures that all students have access to a device and internet at home. Students' individual needs and abilities dictate what type of device is the most appropriate developmentally. Technology has expanded our ability to differentiate and meet the needs of our English Learners and students within special education by determining a student's entry point to the curriculum and supporting their individual needs. Access has empowered our students and enabled them to be successful within the general education curriculum.

**JA96**

**District Profile and Performance Report for School Year 2022-23
New Britain School District**

### Equitable Allocation of Resources among District Schools

Central Office administration and staff collaboratively complete a needs analysis when preparing allocations of district resources aligned to student needs. This team focuses on equitable distribution of funding to respond to the needs of all students. A needs assessment is done to develop plans and identify goals that align with the district. All recommendations are presented to the Superintendent for approval. The team meets quarterly to discuss, evaluate and assess the equitable use of funds and resources.

The Partnership, Finance and Accounting departments meet as a Grants Team to monitor the implementation of specific grant protocols and monitor use of funds and grant budget guidelines and requirements. The Coordinator of Partnership and Engagement meets with the  building administrative teams to review district procedures and policies surrounding grant applications and spending.  Monthly, the Coordinator of Partnership & Engagement presents the status of grant funding, balances and resources to the Superintendent and her Cabinet.

**JA97**

# Declaration of Matthew T. Martens Exhibit B



## CONSOLIDATED SCHOOL DISTRICT OF NEW BRITAIN

---

### Board Policy Statement
**2120.00 – Assignment and Organization of Personnel**
Approved on July 1, 2014

---

Subject to the Charter of New Britain, the General Statutes of Connecticut, the written policies of the Board of Education and the contracts with various unions and associations, and subject to funds provided by the School Board, the Superintendent shall have the authority and responsibility for assigning, transferring, organizing and reorganizing all members of the staff as the Superintendent deems to be in the best interest of the New Britain School District.

For the purpose of clarity and uniformity between the Board of Education Policies and Administrative Procedures, the following titles identify administrative personnel with recent title changes:

- Superintendent
- Chief Academic Officer/Assistant Superintendent for Instructional Services
- Chief Operations Officer/Assistant Superintendent for Business and Operations
- Chief Human Resources Officer/Director of Human Resources
- Chief Financial Officer/Manager of Finances and Contracted Services
- Chief Facilities and Special Projects Officer/Director of Facilities Management

**JA99**

# Declaration of Matthew T. Martens Exhibit C

JA100

 An official website of the United States government  Here's how you know ⌄

**U.S. Department of Education**  ☰

# Guidance on Constitutionally Protected Prayer and Religious Expression in Public Elementary and Secondary Schools

I. Introduction

Section 8524(a) of the Elementary and Secondary Education Act of 1965 (ESEA), as amended by the Every Student Succeeds Act and codified at 20 U.S.C. § 7904(a), requires the Secretary of Education (the Secretary) to issue guidance to State educational agencies (SEAs), local educational agencies (LEAs), and the public on constitutionally protected prayer in public elementary and secondary schools. In addition, section 8524(b), codified at 20 U.S.C. § 7904(b), requires that, as a condition of receiving ESEA funds, an LEA must annually certify in writing to its SEA that it has no policy that prevents, or otherwise denies participation in, constitutionally protected prayer in public elementary and secondary schools, as detailed in this updated guidance.

The purpose of this updated guidance is to provide information on the current state of the law concerning constitutionally protected prayer and religious expression in public schools. Part I is an introduction. Part II clarifies the extent to which prayer in public schools is legally protected. SEAs and LEAs are responsible, under section 8524(b) of the ESEA, to certify each year their compliance with the standards set forth in Part II.

**JA101**

Part III of this updated guidance addresses constitutional principles that relate to religious expression in public schools more broadly, not limited to prayer, and Part IV discusses requirements under other Federal and State laws relevant to prayer and religious expression. These sections are designed to advise SEAs and LEAs on how to comply with governing law, certifying compliance with Parts III and IV is not a part of the required certification under section 8524(b) of the ESEA.

The principles outlined in this updated guidance are similar to the U.S. Department of Education's (Department's) 2003 and 2020 guidance on constitutionally protected prayer in public schools and with guidance that President Clinton issued in 1995.[1] The Department's Office of the General Counsel and the Office of Legal Counsel in the U.S. Department of Justice have verified that this updated guidance reflects the current state of the law concerning constitutionally protected prayer in public elementary and secondary schools. This updated guidance will be made available on the Department's website (www.ed.gov).

## A. The Section 8524(b) Certification Process

To receive funds under the ESEA, an LEA must annually certify in writing to its SEA that no policy of the LEA prevents, or otherwise denies participation in, constitutionally protected prayer in public elementary and secondary schools, as detailed in Part II of this updated guidance. An LEA must provide this certification to the SEA by October 1 of each year during which the LEA participates in an ESEA program.

Each SEA should establish a process by which its LEAs may provide the necessary certification. There is no specific Federal form that an LEA must use in providing this certification to its SEA. The certification may be provided as part of the application process for ESEA programs, or separately, and in whatever form the SEA finds most appropriate, as long as the certification is in writing and clearly states that the LEA has no policy that prevents, or otherwise denies participation in, constitutionally protected prayer in public elementary and secondary schools, as detailed in this updated guidance.

Section 8524(b) of the ESEA also requires that, by November 1 of each year, each SEA must send to the Secretary a list of those LEAs that have not filed the required

certification or that have been the subject of a complaint to the SEA alleging that the LEA has a policy that prevents, or otherwise denies participation in, constitutionally protected prayer in public elementary and secondary schools. The SEA must provide a process for filing a complaint against an LEA that allegedly denies a person, including a student or employee, the right to participate in constitutionally protected prayer. The SEA must report to the Secretary all complaints that are filed through the process the SEA provides, including complaints that the SEA may deem meritless. In addition, to the extent the SEA has notice of any public legal charges or complaints, such as a lawsuit filed against an LEA alleging that the LEA denied a person the right to participate in constitutionally protected prayer, the SEA should report the charges and complaints to the Secretary.

The list required by section 8524(b) should be emailed to OESE@ed.gov. If an SEA is providing any Personally Identifiable Information the email must be encrypted. If an SEA is unable to electronically send the list, please email OESE@ed.gov to request an alternative submittal method.

The SEA's submission should describe what investigation and/or enforcement action, if any, the SEA has initiated with respect to each listed LEA and the status of the investigation or action. After receiving the SEA's submission, the Department may request additional information about listed LEAs. The SEA should not send the LEA certifications themselves to the Secretary but should maintain these records in accordance with its usual records retention policy.

## B. Enforcement of Section 8524(b)

Section 8524(c) of the ESEA, codified at 20 U.S.C. § 7904(c), requires the Secretary to effectuate section 8524(b) by issuing, and securing compliance with, rules or orders with respect to an LEA that fails to certify, or is found to have certified in bad faith, that no policy of the LEA prevents, or otherwise denies participation in, constitutionally protected prayer in public elementary and secondary schools. The General Education Provisions Act also authorizes the Secretary to take actions against recipients of Federal education funds that are not in compliance with the ESEA and/or other applicable law. *See* 20 U.S.C. §§ 1234c − 1234f. Such actions include, among other things, entering into a compliance agreement with the recipient to bring it into

**JA103**

compliance, issuing a cease and desist order, and withholding funds until the recipient comes into compliance.

If an LEA fails to file the required certification, or is found to have a policy that prevents, or otherwise denies participation in, constitutionally protected prayer in public elementary and secondary schools, the SEA should ensure compliance in accordance with its regular enforcement procedures.

## C. Overview of Governing Constitutional Principles

The First Amendment to the U.S. Constitution both prevents the government from establishing religion and protects religious exercise and religious expression from unwarranted government interference and discrimination.[2] School administrators and teachers have an opportunity to assist America's youth in developing an understanding of these constitutional protections as they apply to people of all faiths and no faith and an appreciation for the core American values and freedoms that undergird them.

A public school and its officials may not prescribe prayers to be recited by students or by school authorities.[3] Indeed, it is "a cornerstone principle of [the U.S. Supreme Court's] Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.'"[4] Nothing in the First Amendment, however, converts the public schools into religion–free zones, or requires students, teachers, or other school officials to leave their private religious expression behind at the schoolhouse door. The line between government–sponsored and privately initiated religious expression is vital to a proper understanding of what the Religion and Free Speech Clauses of the First Amendment prohibit and protect.[5] Although a government may not promote or favor religion or coerce the consciences of students, schools also may not discriminate against private religious expression by students, teachers, or other employees. Schools must also maintain neutrality among faiths rather than preferring one or more religions over others.[6]

The Supreme Court's decisions set forth principles that distinguish impermissible governmental religious speech from constitutionally protected private religious speech.

**JA104**

For example, teachers, coaches, and other public school officials acting in their official capacities may not lead students in prayer, devotional readings, or other religious activities,[7] nor may they attempt to persuade or compel students to participate in prayer or other religious activities or to refrain from doing so.[8] The Supreme Court has held, for instance, that public school officials violated the Establishment Clause by inviting a rabbi to deliver prayers at graduation ceremonies because such conduct was "attributable to the State" and applied "subtle coercive pressure" that effectively required students to choose between praying or openly displaying their opposition to the prayer.[9]

Although the Constitution forbids public school officials acting in their official capacities from directing or favoring prayer, students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[10] The Supreme Court has made clear that "private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."[11] Moreover, not all religious speech that takes place in public schools or at school-sponsored events is governmental speech.[12] For example, "nothing in the Constitution . . . prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday,"[13] and therefore students may pray with fellow students during the school day on the same terms and conditions that they may engage in other comparable conversations or activities. Students may also speak to, and attempt to persuade, their peers about religious matters just as they may do with regard to, for example, political matters.

School officials may impose reasonable rules of order on student speech and activities as long as they do not discriminate against student speech or activities for being religiously motivated or reflecting a religious perspective. The Supreme Court has repeatedly recognized that schools have a special interest in regulating speech that occurs under their supervision where that speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others."[14] In addition, although school officials may not promote or favor religion or coerce students to pray, they also may not structure or administer the school's rules so as to discriminate against private student speech or activities that are religiously motivated or that reflect a religious perspective. Where schools permit student expression on the basis of

**JA105**

genuinely content-neutral criteria in a context in which the speech is not school-sponsored (or otherwise disseminated under the school's auspices), the speech of students who choose to express themselves through religious means such as prayer is not attributable to the State and may not be restricted because of its religious content.[15] Student remarks are not attributable to the school simply because they are delivered in a public setting or to a public audience,[16] and the Constitution mandates neutrality toward privately initiated religious expression.[17]

When teachers, coaches, and other public school officials speak in their official capacities, they may not engage in prayer or promote religious views. More broadly, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[18] However, not everything that a public school teacher, coach, or other official says in the workplace constitutes governmental speech, and schools have less leeway to regulate employees' genuinely private expression. To be sure, a public school, like any other governmental employer, may reasonably restrict its employees' private speech in the workplace where that speech may have a detrimental effect on close working relationships, impede the performance of the speaker's duties, or otherwise interfere with the regular operation of the enterprise.[19] In contexts where a school permits teachers, coaches, and other employees to engage in personal speech, however, it may not prohibit those employees from engaging in prayer merely because it is religious or because some observers, including students, might misperceive the school as endorsing that expression.[20] That said, a school may take reasonable measures to ensure that teachers, coaches, and other school officials do not pressure or encourage students to join in the private prayer of those officials or other students.

Top

II. Applying the Governing Constitutional Principles in Particular Public School Contexts Related to Prayer

## A. Prayer and Religious Exercise During Non-Instructional Time

**JA106**

Students may pray when not engaged in school activities or instruction, subject to the same rules designed to prevent material disruption of the educational program that are applied to other privately initiated expressive activities. Students also may read from religious materials; say a prayer or blessing before meals; and engage in worship or study religious materials with fellow students during non-instructional time (such as recess or the lunch hour) to the same extent that they may engage in nonreligious activities. Although school authorities may impose rules of order and pedagogical restrictions on student activities, they may not discriminate against student prayer or religious perspectives in applying such rules and restrictions.

## B. Organized Prayer Groups and Activities

Students may organize prayer groups and religious clubs to the same extent that students are permitted to organize other noncurricular student activity groups. Such groups must be given the same access to school facilities for assembling as is given to other noncurricular groups, without discrimination because of the groups' religious character or perspective. School officials should neither encourage nor discourage participation in student-run activities based upon the activities' religious character or perspective. Schools may take reasonable steps to ensure that students are not pressured to participate (or not to participate) in such religious activities. School authorities possess substantial discretion concerning whether to permit the use of school media for student advertising or announcements regarding noncurricular activities. However, where student groups that meet for nonreligious activities are permitted to advertise or announce their meetings—for example, by advertising in a student newspaper, making announcements on a student activities bulletin board or public address system, or handing out leaflets—school authorities may not discriminate against groups that meet to engage in religious expression such as prayer. School authorities may choose to issue appropriate, neutral disclaimers of the school's sponsorship or approval of noncurricular groups and events.

## C. Teachers, Administrators, and Other School Employees

Teachers, school administrators, and other school employees may not encourage or discourage private prayer or other religious activity.

**JA107**

The Constitution does not, however, prohibit school employees themselves from engaging in private prayer during the workday where they are not acting in their official capacities and where their prayer does not result in any coercion of students. Before school or during breaks, for instance, teachers may meet with other teachers for prayer or religious study to the same extent that they may engage in other conversation or nonreligious activities. School employees may also engage in private religious expression or brief personal religious observance during such times, subject to the same neutral rules the school applies to other private conduct by its employees. Employees engaging in such expression or observance may not, however, compel, coerce, persuade, or encourage students to join in the employee's prayer or other religious activity, and a school may take reasonable measures to ensure that students are not pressured or encouraged to join in the private prayer of their teachers or coaches.

School employees may participate in their personal capacities in privately sponsored baccalaureate ceremonies or similar events.

## D. Moments of Silence

If a school has a "moment of silence" or other quiet periods during the school day, students are free to pray silently, or not to pray, during these periods of time. Teachers and other school employees may not require or encourage students to pray, or discourage them from praying, during such time periods.

## E. Accommodation of Prayer and Religious Exercise During Instructional Time

Students may engage in prayer or religious expression during instructional time to the same degree they may engage in nonreligious private expression during such time. Students may, for example, bow their heads and pray to themselves before taking a test.

## F. Student Assemblies and Noncurricular Events

Student speakers at school assemblies and noncurricular activities such as sporting events may not be selected on a basis that either favors or disfavors religious perspectives. Where a student speaker is selected on the basis of genuinely content–

**JA108**

neutral, evenhanded criteria, and the school does not determine or have control over the content of the student's speech, the expression is not reasonably attributed to the school and therefore may not be restricted because of its religious content (or content opposing religion) and may include prayer. In these circumstances, school officials may choose to make appropriate, neutral disclaimers to clarify that such speech (whether religious or nonreligious) is the speaker's and not the school's speech. By contrast, where school officials determine or have control over the content of what is expressed, such speech is attributable to the school and may not include prayer or content promoting (or opposing) religion.

## G. Prayer at Graduation

School officials may not mandate or organize prayer at graduation or select speakers for such events in a manner that favors religious speech such as prayer. Where students or other private graduation speakers are selected on the basis of genuinely content–neutral, evenhanded criteria, and schools do not determine or have control over their speech, however, that expression is not attributable to the school and therefore may not be restricted because of its religious content (or content opposing religion) and may include prayer. In these circumstances, school officials may choose to make appropriate, neutral disclaimers to clarify that such speech (whether religious or nonreligious) is the speaker's and not the school's speech.

## H. Baccalaureate Ceremonies

School officials may not mandate or organize religious baccalaureate ceremonies. However, if a school makes its facilities and related services available to other private groups, it must make its facilities and services available on the same terms to organizers of privately sponsored religious baccalaureate ceremonies. In addition, a school may disclaim official sponsorship or approval of events held by private groups, provided it does so in a manner that neither favors nor disfavors groups that meet to engage in prayer or religious speech.

Top

III. Applying Constitutional Principles Regarding Religious Expression Other Than Prayer

**JA109**

in Particular Public School Contexts

## A. Religious Literature

Public school students have a right to distribute religious literature to their schoolmates on the same terms as they are permitted to distribute other literature that is unrelated to school curricula or activities. Schools may impose the same reasonable time, place, or manner restrictions on distribution of religious literature as they do on non-school literature generally, but they may not target religious literature for more permissive or more restrictive regulation.

## B. Teaching about Religion

Public schools may not provide religious instruction, but they may teach *about* religion and promote religious liberty and respect for the religious views (or lack thereof) of all. For example, philosophical questions concerning religion, the history of religion, comparative religion, religious texts as literature, and the role of religion in the history of the United States and other countries are all permissible public school subjects. Similarly, it is permissible to study religious influences on philosophy, art, music, literature, and social studies. For example, public schools generally may allow student choirs to perform music inspired by or based on religious themes or texts as part of school-sponsored activities and events, provided that the music is not performed as a religious exercise and is not used to promote or favor religion generally, a particular religion, or a religious belief.

Although public schools may teach about religious holidays, including their religious aspects, and may celebrate the secular aspects of holidays, schools may not observe holidays as religious events, nor may schools promote or disparage such observance by students.

## C. Student Dress Codes and Policies

Public schools generally may adopt policies relating to student dress and school uniforms to the extent consistent with constitutional and statutory civil rights protections. Schools may not, however, target religious attire in general, or the attire of

**JA110**

a particular religion, for prohibition or regulation. If a school makes exceptions to a dress code to accommodate nonreligious student needs, it ordinarily must also make comparable exceptions for religious needs. Students may display religious messages on items of clothing to the same extent and pursuant to the same conditions that they are permitted to display nonreligious messages. In addition, in some circumstances Federal or State law may require schools to make accommodations that relieve substantial burdens on students' religious exercise. School officials may wish to consult with their attorneys regarding such obligations.

## D. Religious Expression in Class Assignments and Homework

Students may express their beliefs about religion in homework, artwork, and other written and oral assignments free from discrimination based on the religious perspective of their submissions. Such home and classroom work should be judged by ordinary academic standards of substance, relevance, and other legitimate pedagogical objectives. Thus, if a teacher's assignment involves writing a poem, the work of a student who submits a poem in the form of a prayer (for example, a psalm) should be judged on the basis of academic standards (such as literary quality) and be neither penalized nor rewarded on account of its religious perspective.

## E. Excusals for Religious Activities

Public schools have discretion to permit students to attend off-premises religious instruction, provided that schools do not encourage or discourage participation in such instruction or penalize students for attending or not attending. Similarly, schools may excuse students from class to remove a burden on their religious exercise, including prayer or fasting, at least where doing so would not impose material burdens on other students. For example, it would be constitutional for schools to excuse students from class to enable them to fulfill their religious obligations regarding prayer, religious holidays, or other observances.

Where school officials have a practice of excusing students from class on the basis of requests for accommodation of nonreligious needs, religiously motivated requests for excusal may not be accorded less favorable treatment. In some circumstances, Federal or State law may require schools to make accommodations that relieve substantial

**JA111**

burdens on students' religious exercise. School officials may wish to consult with their attorneys regarding such obligations.

Top

IV. Additional Requirements under the Equal Access Act and Other Federal and State Laws

In addition to the constitutional principles discussed above, public schools may also be subject to requirements under Federal and State laws relevant to prayer and religious expression. (Such Federal and State laws may not, however, obviate or conflict with a public school's Federal constitutional obligations described herein.)

For example, the Equal Access Act, 20 U.S.C. § 4071, is designed to ensure that student religious activities are accorded the same access to Federally funded public secondary school facilities as are student secular activities. Under the Equal Access Act, a public secondary school receiving Federal funds that creates a "limited open forum" may not refuse student religious groups access to that forum.[21] A "limited open forum" exists "whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). Such meetings, as defined and protected by the Equal Access Act, may include a voluntary and student-initiated prayer service, scripture reading, or other worship exercise. Under the Act, a public secondary school receiving Federal funds must also allow student religious groups to use school media— including the school's newspaper, public address system, and bulletin board—to announce their meetings on the same terms as other noncurriculum-related student groups are allowed to use school media. Any policy concerning the use of school media must be applied to all noncurriculum-related student groups in a nondiscriminatory matter. Schools may, however, issue appropriate, neutral disclaimers of the school's sponsorship or approval of noncurricular groups and events. Consistent with the First Amendment, the Equal Access Act also states that it should not be construed (among other things) to authorize a public school or its officials to influence the form or content

**JA112**

of any prayer, require any person to participate in prayer, or abridge the constitutional rights of any person. 20 U.S.C. § 4071(d).

Top

Notes:

[1] *See* U.S. Dep't of Educ., Guidance on Constitutionally Protected Prayer and Religious Expression in Public Elementary and Secondary Schools (Jan. 16, 2020); U.S. Dep't of Educ., Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools (Feb. 7, 2003); President William J. Clinton, Religious Expression in Public Schools, 2 Pub. Papers 1083 (July 12, 1995).

[2] The relevant portions of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I. The first two quoted clauses are often referred to as the Establishment Clause and the Free Exercise Clause of the First Amendment, collectively the Religion Clauses. The language "or abridging the freedom of speech," also relevant to prayer and religious expression, is usually referred to as the Free Speech Clause of the First Amendment. The Supreme Court has held that the Fourteenth Amendment makes these provisions applicable to States and localities, *see, e.g., Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), and therefore they apply to the actions of public schools.

[3] *Town of Greece v. Galloway*, 572 U.S. 565, 581 (2014) (citing *Engel v. Vitale*, 370 U.S. 421, 430 (1962)).

[4] *Lee v. Weisman*, 505 U.S. 577, 588 (1992) (quoting *Engel*, 370 U.S. at 425); *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 – 25 (1963) (holding that it violated the Establishment Clause for schools to require the selection and reading at the opening of the school day of verses from the Bible and the recitation of the Lord's Prayer by the students in unison, under the supervision and with the participation of teachers).

**JA113**

[5] *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 − 24 (2022) (making the point with respect to the Free Speech Clause); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) ("'there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect'" (quoting *Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality op.))); *accord Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995).

[6] *Larson v. Valente*, 456 U.S. 228 (1982); *Epperson v. Arkansas*, 393 U.S. 97 (1968).

[7] *Schempp*, 374 U.S. 203 (invalidating state laws and policies requiring public schools to begin the school day with Bible readings and prayer); *Engel*, 370 U.S. 421 (invalidating a state law and regulation directing the use of prayer in public schools); *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam) (holding that a state statute requiring posting of Ten Commandments on walls of every public school classroom was unconstitutional).

[8] *See Lee*, 505 U.S. at 599 *see also Wallace v. Jaffree*, 472 U.S. 38 (1985); *Kennedy*, 142 S. Ct. at 2429, 2431 (emphasizing that the football coach in that case did not coerce, require, or ask any students to pray, nor seek to persuade them to participate in his private prayer).

[9] *Lee*, 505 U.S. at 592 − 94; *see also Town of Greece*, 572 U.S. at 590 (describing *Lee* as having held that a religious invocation was coercive as to an objecting student "in the context of a graduation where school authorities maintained close supervision over the conduct of the students and the substance of the ceremony").

[10] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

[11] *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (citing *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Mergens*, 496 U.S. 226; *Widmar v. Vincent*, 454 U.S. 263 (1981); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981)).

[12] *Santa Fe*, 530 U.S. at 302 (explaining that "not every message" that is "authorized by a government policy and take[s] place on government property at government–

**JA114**

sponsored school-related events" is "the government's own").

[13] *Id.* at 313.

[14] *See, e.g., Morse v. Frederick*, 551 U.S. 393, 397 (2007) (the rights of students "'must be 'applied in light of the special characteristics of the school environment'" (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506))); *see also Tinker*, 393 U.S. at 513; *Mahanoy Area Sch. Dist. v. B. L. by and through Levy*, 141 S. Ct. 2038, 2045 (2021); *Morse*, 551 U.S. at 403 − 04.

[15] *Rosenberger*, 515 U.S. at 829 ("Once it has opened a limited forum, . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." (citations and quotation marks omitted)); *see also Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1589 − 90 (2022) (explaining that the Court looks to various factors to determine whether the government intends to speak for itself or to regulate private expression, including "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression"); *Lamb's Chapel*, 508 U.S. at 392 − 93 ("[C]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." (quotation marks omitted)); *Widmar*, 454 U.S. at 269 − 76; *Good News Club*, 533 U.S. at 122 (Scalia, J., concurring) ("Even subject-matter limits must at least be reasonable in light of the purpose served by the forum[.]" (quotation marks omitted)). When, by contrast, student speech is made in the context of school-sponsored activities, such as in school-sponsored publications or theatrical productions, educators have more discretion to regulate such speech and generally do not offend the First Amendment by exercising editorial control over the style and content so long as their actions are reasonably related to legitimate pedagogical concerns. *See Hazelwood*, 484 U.S. at 271 − 73.

[16] *Santa Fe*, 530 U.S. at 302 *Rosenberger*, 515 U.S. at 834 − 35; *Mergens*, 496 U.S. at 250 (plurality op.).

[17] *Rosenberger*, 515 U.S. at 845 — 46 *Everson*, 330 U.S. at 18.

[18] *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *accord Lane v. Franks*, 573 U.S. 228, 237 (2014).

[19] *See Kennedy*, 142 S. Ct. at 2423 — 24; *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 — 73 (1968); *see also Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1286 (11th Cir. 2012); *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 — 51 (9th Cir. 2006); *Brown v. Polk Cty.*, 61 F.3d 650, 658 (8th Cir. 1995).

[20] *Kennedy*, 142 S. Ct. at 2426 — 28.

[21] *See, e.g.,*20 U.S.C. § 4071(c)(3) (Equal Access Act provision stating that a school "shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that," inter alia, "employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity"); *see also Mergens*, 496 U.S. at 251 (plurality op.) (explaining that this feature of the Equal Access Act helps ensure there will be "little if any risk of official state endorsement or coercion" of students); *cf. Lee*, 505 U.S. at 592 (recognizing "heightened concerns with protecting freedom of conscience from subtle coercive pressure" and noting that prayer exercises in public elementary and secondary schools "carry a particular risk of indirect coercion").

---

Archived 2020 Guidance

Archived 2003 Guidance

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: January 14, 2025

**JA116**

JA117

## Pay for College

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Site Notices and Privacy Policies

Accessibility Support

## ED Archive

JA118

# U.S. Department of Education



ES

## Contact Us
1–800–USA–LEARN



www.ed.gov

**An official website of the Department of Education**

About Dept of Education        Accessibility Support        No FEAR Act data

Office of the Inspector General        Performance reports        FOIA        Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO<br>                Plaintiff,<br><br>    vs.<br><br>ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br>                Defendants. | Civil Action No. 3:25-cv-00153<br><br><br>**ANSWER AND AFFIRMATIVE DEFENSES** |

Defendants Anthony Gasper, Maryellen Manning, Dario Soto, and Andrew Mazzei

(collectively "Defendants"), by and through their attorneys, answer and respond to plaintiff

Marisol Arroyo-Castro's Complaint as follows:

**INTRODUCTION**

1.      Federal and state law prohibit government officials from using the Establishment Clause as an excuse to abridge the free speech and religious free exercise rights of their employees.  Indeed, fewer than three years ago, in *Kennedy v. Bremerton School District*, the Supreme Court held that a public school violated the Constitution by terminating a football coach for praying in the presence of students when other staff were allowed to engage in their own personal expression.  597 U.S. 507 (2022).  Here, officials of the Consolidated School District of New Britain disregarded the plain import of *Kennedy* and punished Ms. Castro for displaying a crucifix in her personal space by her desk.  Other teachers, meanwhile, display in their classroom workspaces Wonder Woman action figures, images of Baby Yoda and Santa Claus, and other personal expressive items.  Yet only Ms. Castro has been suspended and threatened with termination.  The disparity of treatment here against religious expression makes this an easy case under *Kennedy*: if Defendants permit teachers to display personal expressive items like family photos and inspirational quotes in their classrooms, they may not punish Ms. Castro for doing the same by hanging a crucifix in the personal workspace aside her desk.

ANSWER: Paragraph 1 of the Complainant is an improper introductory argument, to which no

response is required.  To the extent a response is necessary, Defendants deny that they violated

Plaintiff's rights and deny that Plaintiff is entitled to any relief whatsoever.

22228075

## NATURE OF THE ACTION

2.    Plaintiff Marisol Arroyo-Castro brings this action to enjoin Defendants' present violations of her rights to free speech and religious free exercise, and to prevent future infringements on those rights.

ANSWER:    Defendants deny that they have violated Plaintiff's rights, and therefore deny

Paragraph 2.

3.    Defendants have punished and continue to punish Ms. Castro for engaging in private, non-coercive expression—specifically, hanging a crucifix among other personal items on the wall next to her desk—solely because her expression is religious and takes place on school property. This conduct, however, is protected by the First Amendment of the U.S. Constitution and Connecticut's Act Concerning Religious Freedom, Conn. Gen. Stat. § 52-571b(a)–(b) (2018). Ms. Castro's First Amendment rights are and continue to be violated as a result of Defendants imposing upon her an ongoing involuntary administrative leave.

ANSWER:    Denied.

4.    Ms. Castro brings this action for prospective injunctive relief against Defendants in their individual and official capacities. Ms. Castro also seeks attorneys fees and costs incurred in defending her constitutional rights as provided by federal law.

ANSWER:    Defendants deny that they have violated Plaintiff's rights, and therefore deny that Plaintiff is entitle to any of the relief requested in Paragraph 4.

## PARTIES

5.    Plaintiff Marisol Arroyo-Castro is a grandmother of five who has served as a professional educator for nearly 33 years. She is a resident of the city of New Britain, Connecticut, and a tenured teacher employed by the Consolidated School District of New Britain. (the "District"). As part of her employment with the District, she has taught various ages and grades at DiLoreto Elementary & Middle School ("DiLoreto") since 2004.

ANSWER:    Defendants admit that Plaintiff is a tenured teacher employed by the Consolidated School District of New Britain, and that she has taught various ages and grades at DiLoreto Elementary & Middle School since 2004. Defendants have insufficient knowledge or information to admit or deny the remaining allegations in Paragraph 5.

6.    Defendant Anthony Gasper is Superintendent of the Consolidated School District of New Britain. Defendant Gasper serves as the Chief Executive Officer of the Board of the Consolidated School District of New Britain,[2] has unilateral authority over personnel

2

22228075

**JA120**

assignments and suspensions in the District,[3] and has the power to commence termination proceedings against tenured public school teachers.[4]

ANSWER:    Admitted.

7.    Defendant Maryellen Manning is Chief of Staff for Relationships and Accountability for the District.  Defendant Manning is Defendant Gasper's chief subordinate in personnel matters and has policymaking responsibility for the District as to personnel and disciplinary matters.

ANSWER:    Defendants admit the allegations in Paragraph 7, except deny that Ms. Manning has "policymaking responsibility for the District as to personnel and disciplinary matters."

8.    Defendant Dario Soto is principal of DiLoreto Elementary & Middle School.

ANSWER:    Admitted.

9.    Defendant Andrew Mazzei is vice principal of DiLoreto Elementary & Middle School.  Defendant Mazzei is Ms. Castro's immediate supervisor.

ANSWER:    Admitted with the clarification that Mr. Mazzei's title is Assistant Principal Middle School.

## JURISDICTION

10.    Ms. Castro brings claims for equitable relief against Defendants under 42 U.S.C. § 1983.  This Court thus has original federal-question jurisdiction under 28 U.S.C. § 1331.  Ms. Castro also brings claims for equitable relief under Conn. Gen. Stat. § 52-571b(c), over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

ANSWER:    Defendants do not challenge this Court's jurisdiction, and therefore admit Paragraph 10 but deny any implication that Plaintiff is entitled to relief from this Court.

## VENUE

11.    The events giving rise to Ms. Castro's claims each occurred in the District of Connecticut and thus venue is proper under 28 U.S.C. § 1391(b)(2).

ANSWER:    Defendants do not challenge venue in this District, and therefore admit Paragraph 11 but deny any implication that Plaintiff is entitled to relief from this Court.

## FACTUAL BACKGROUND

12.    Ms. Castro is a tenured public-school teacher and grandmother of five who has educated students for over three decades.  According to her June 2024 evaluation, she is a

3

22228075

**JA121**

"proficient" teacher who "holds [her class] to high expectations" and whose students "showed growth." She has regularly received "proficient" or "exemplary" evaluations.

ANSWER:    Defendants admit that Plaintiff is a tenured public-school teacher and that the quoted language in contained in her June 2024 evaluation, among other things. That evaluation speaks for itself in its entirety. Defendants have insufficient knowledge or information to admit or deny the remaining allegations in Paragraph 12.

13.    After many years teaching 4th grade students at DiLoreto, Ms. Castro was assigned at the beginning of the fall 2024 semester to teach 7th grade social studies.

ANSWER:    Defendants admit that Plaintiff was assigned to teach 7th grade social studies for the 2024-2025 school year, after having taught third grade for the prior six years. Defendants admit that Plaintiff taught fourth grade in the past, but deny Ms. Castro taught 4th grade immediately prior to her assignment.

14.    Teachers at DiLoreto are permitted to engage in personal expressive conduct by displaying items, images, or quotes on or in the area immediately around their desks. Examples of personally expressive items immediately around or on the desks of DiLoreto teachers (other than Ms. Castro) include the following:

 a. action figures and images of Wonder Woman;[5]

 b. a desk mat with images of Baby Yoda;[6]

 c. a miniature picture of the Mona Lisa;[7]

 d. a New England Patriots football team pennant;[8]

 e. a Connecticut State University decal;[9]

 f. photos of family and pets;[10]

 g. inspirational phrases, such as "Yes you can!," "You are loved," "Keep calm and call Wonder Woman," and "Every Day Matters!"[11]; and

 h. other items with religious origins or connotations, such as a picture of Santa Claus,[12] a coffee mug with a citation to chapter 31 of the biblical book of Proverbs,[13] a photograph of a statue of the Virgin Mary,[14] and a Christmas tree.[15]

ANSWER:    Defendants admit that teachers generally have been permitted to display some personal items in their classrooms or work areas, but have insufficient knowledge or information, apart from the photographs attached to the complaint, to admit or deny whether any particular employee displayed any such item in that employee's work area, when, or where. Defendants have insufficient knowledge or information to admit or deny that by doing

4

22228075

**JA122**

so, these employees categorically have intended to engage in "personal expressive conduct," or for these displays to be "personal expressive items," although Defendants understand Plaintiff to be taking these positions about the crucifix that she hung on the front wall of the classroom where she taught in the fall of 2024. Defendants deny any implication that such displays are immune from oversight by supervisors, and deny any implication from the allegations in Paragraph 14 that the District or its officials or employees treated Plaintiff impermissibly by instructing her to take down the crucifix from the wall or by disciplining her when she refused to do so.

15.    For approximately ten years, Ms. Castro has displayed a small crucifix on the wall of her classroom next to her desk:



ANSWER:    Defendants have insufficient knowledge or information on which to admit or deny whether Plaintiff displayed a cross in prior years, but admit she displayed it in the fall semester of the 2024-2025 school year.  Defendants deny the allegation that the cross depicted in Paragraph 15 is "small," and further deny that the picture in Paragraph 15 accurately depicts Plaintiff's room in school years prior to 2024-2025.

16.    A crucifix is a cross with the figure of Jesus suspended on it.

ANSWER:    Admitted.

17.    The crucifix hung in a location vis-à-vis Ms. Castro's desk that is analogous to the area where other teachers display their personal items.  This year, the crucifix hung to the side of her desk, at the very bottom of an adjacent whiteboard. *See* Complaint Exhibit B.  The crucifix was placed off to the side and below the level of a nearby computer monitor, surrounded by student artwork and a calendar.  Ms. Castro also displayed in her room a New York Yankees team pennant.

5

22228075

**JA123**

ANSWER:    Defendants admit that the crucifix was placed on a whiteboard on the front wall of Plaintiff's classroom, which was near her desk, among other items such a calendar and student artwork. Defendants further admit that Plaintiff had a New York Yankees pennant in her classroom. Defendants have insufficient knowledge or information to admit or deny the remaining allegations in Paragraph 17, which are based on Plaintiff's own thoughts and beliefs. Defendants deny any implication that the crucifix was not visible to students.

18.    Ms. Castro sincerely considers the crucifix a part of her personal and religious identity.  The crucifix was given to her by the family of a deceased friend who gave it to her as a memento because, as a practicing Catholic, Ms. Castro was particularly likely to treasure it.

ANSWER:    Defendants have insufficient knowledge or information to admit or deny the allegations in Paragraph 18.

19.    Having the crucifix in her view at her desk brought Ms. Castro daily calm. Throughout her school days, looking at the crucifix provided her with peace and strength, especially when the (already stressful) task of teaching young students proved particularly challenging.  During her lunch breaks, rather than going to the teachers' lounge, she would remain at her desk, look at the crucifix, and pray.

ANSWER:    Defendants have insufficient knowledge or information to admit or deny the allegations in Paragraph 19, except admit that Plaintiff had the ability to remain at her desk during lunch breaks and pray if she chose to, with or without her crucifix.

20.    On December 3, 2024, Defendant Mazzei, in his capacity as vice principal, emailed Ms. Castro the following:

Hi Ms. Castro, I hope this email finds you well. I wanted to reach out to discuss a concern that has been brought to my attention regarding a cross displayed in your classroom. Please know that this meeting is non-disciplinary in nature and is intended to review district policies to ensure clarity and consistency. If you would like, you are welcome to bring a union representative to the meeting for support. I have scheduled the meeting for Friday at 2:15 in my office....

ANSWER:    Defendants admit that Paragraph 20 accurately quotes a portion of Mr. Mazzei's December 3, 2024 email to Ms. Castro, which speaks for itself.

21.    On Friday, December 6, 2024, Defendant Mazzei, in his capacity as vice principal, met with Ms. Castro per his email of December 3.  At the meeting, Defendant Mazzei instructed Ms. Castro to take down the crucifix by the following Monday.  Mr. Mazzei confirmed this directive with a follow-up email, which stated as follows:

Hi Ms. Castro, Thank you for taking the time to meet with me today from 2:18 - 2:35, in a nondisciplinary meeting involving the permanent display of a religious

6

22228075

**JA124**

symbol. During the meeting, which was attended by [your union representative], I shared that any permanent displays of religious symbols are prohibited from public schools, based on the First Amendment of the United States Constitution. I shared the cross you have displayed in your classroom behind your desk must be taken down by Monday. You inquired if you could "think about it or pray on it," which I replied that you could, however, it would not change the outcome of the meeting. Your next question was, "what if I don't take it down?" I replied that it would lead to insubordination and disciplinary measures. I understand that the conversation and situation is difficult and I thank you in advance for complying with the expectation to remove the permanent religious display as public schools may not erect any type of religious display on school property. I will stop by your room on Monday at 8:00 am to observe if the cross is still displayed. Thank you and have a great weekend.

ANSWER:    Defendants admit that Mr. Mazzei met with Plaintiff on December 6, 2025, and instructed her to take the crucifix down by Monday, and further admit that Paragraph 21 accurately quotes a portion of Ms. Mazzei's December 6, 2025 email to Plaintiff, which speaks for itself.

22.    Ms. Castro did not take down the crucifix from the wall beside her desk.

ANSWER:    Defendants admit that Plaintiff did not take the crucifix down from the front wall of her classroom.

23.    On Tuesday, December 10, 2024, Ms. Castro met with Defendant Mazzei; Defendant Soto, in his capacity as principal of DiLoreto Elementary & Middle School; and Defendant Manning, in her capacity as the District's Chief of Staff for Relations and Accountability.

ANSWER:    Defendants admit the allegations in Paragraph 23.

24.    At the meeting, Defendant Manning directed Ms. Castro to remove the crucifix from the wall beside her desk, saying that a religious item could not be hung on the walls of public-school buildings. Ms. Castro pointed out that other teachers kept their personal items near their desks. But Defendant Manning refused to change her directive.

ANSWER:    Defendants admit that that Plaintiff was instructed to remove the crucifix from the front wall in her public-school classroom, and was informed that the crucifix could not be hung on the front wall in her classroom. Defendants admit the final two sentences of Paragraph 24.

25.    Defendant Manning went on to state that Marisol's employer (i.e., Defendants) would never tell her exactly how to pray and to whom. Yet she went on to suggest that Ms.

7

22228075

**JA125**

Castro put the crucifix in a desk drawer, only to be pulled out when Ms. Castro wished to "ground herself."

ANSWER:    Defendants admit that they would never tell Plaintiff how to pray or to whom, and that they did not do that in the December 10, 2024 meeting. Defendants further admit that they had an interactive discussion with Plaintiff about what she could do with the crucifix, and that putting it in the desk drawer and taking it out when she wished to pray on a break was one of the options discussed by the parties. Defendants clarify Plaintiff is employed by the New Britain Board of Education.

26.    Defendant Soto pressured Ms. Castro to remove the crucifix from the wall by stating his religious opinion that Christians are to worship no "idols" and asking if Ms. Castro wanted to stay "true" to that as a Christian.

ANSWER:    Defendants admit that Principal Soto discussed the crucifix with Plaintiff, but deny that the remaining allegations in Paragraph 26 accurately reflect that conversation.

27.    At the end of the meeting, a compromise was seemingly reached among the participants: Ms. Castro could hang the crucifix in a way that was less visible to students but where Ms. Castro herself could still see it.

ANSWER:    Defendants admit that, after Plaintiff had a chance to talk privately with her union representative, this meeting's participants seemingly reached the compromise that, at the union representative's suggestion, which the District seconded, would have allowed Ms. Castro to hang the crucifix below her desk, where it would not be visible to students.

28.    Following the meeting, all the attendees walked to Ms. Castro's classroom. There, Defendant Manning told Ms. Castro to attach the crucifix to the underside of her desk, by her legs. In contrast, other DiLoreto teachers have not been forced to hide their personal items under their desks.

ANSWER:    Defendants admit that the parties walked to Plaintiff's classroom at the suggestion of Plaintiff's union representative, and in the classroom they discussed the suggestion from Plaintiff and her union representative that she attach the crucifix on the underside of her desk, by her legs. Defendants have insufficient knowledge to admit or deny the final sentence of Paragraph 28, which is vague.

29.    Although shocked, Ms. Castro complied. See Complaint Exhibit C.

ANSWER:    Defendants admit that Plaintiff agreed to place the crucifix on the underside of her desk, as suggested by her union representative. Defendants have insufficient knowledge or information to admit or deny the remaining allegations in Paragraph 29.

8

22228075

**JA126**

30.     As soon as she put her hand on the crucifix to move it, Ms. Castro felt sick and grew distraught. The other attendees left her sobbing only minutes before a scheduled parent-teacher conference.

ANSWER:     Defendants have insufficient knowledge or information to admit or deny the allegations in Paragraph 30, which are based on Plaintiff's own thoughts and beliefs, but admit that Plaintiff was emotional at the end of the meeting.

31.     Ms. Castro left the crucifix under the desk that night. But the next morning, Wednesday, December 11, 2024, Ms. Castro returned the crucifix to its place on the wall. She did so out of personal conscience and sincere religious conviction that to do otherwise would be an affront to her faith. Ms. Castro informed the Defendants of her decision.

ANSWER:     Defendants admit that the next day Plaintiff rejected the compromise previously suggested by her union representative and retuned the crucifix to the wall in her public-school classroom. Defendants have insufficient knowledge or information upon which to admit or deny the remaining allegations in Paragraph 31.

32.     That same day, Defendant Manning issued a Letter of Reprimand to Ms. Castro stating that her actions were "insubordinate." *See* Complaint Exhibit D. Additionally, the letter told her that Defendant Soto would come into her class at the end of the day to "assist [Ms. Castro] with removing the cross from [her] classroom." Defendant Manning cc'd Defendants Gasper, Soto, and Mazzei, among others. Defendant Manning designated the letter to be included in Ms. Castro's disciplinary file.

ANSWER:     Defendants admit that Plaintiff was issued a letter of reprimand for insubordination on December 11, 2024, and that the quoted language in Paragraph 32 is contained in the letter of reprimand, which speaks for itself in its entirety.

33.     When he came into her class, Ms. Castro told Defendant Soto she would not remove the cross. Defendant Soto stated that she must remove the cross to properly "live out [her] faith" and exhorted her to "give Caesar what is Caesar's."[16]

ANSWER:     Defendants admit the first sentence of Paragraph 33. Defendants admit that Principal Soto said "give Caesar what is Caesar's," but deny that phrase was used in the way alleged in Paragraph 33 during the conversation between Principal Soto and Plaintiff about their shared Christian faith.

34.     Defendant Soto then instructed her that if she did not take down the cross, the next morning she should not report to her classroom to teach but rather should come directly to the principal's office to meet. Moreover, he said Ms. Castro could face suspension and eventually termination for being insubordinate. The crucifix remained on the wall when Ms. Castro left her classroom that evening.

ANSWER:     Admitted.

9

22228075

**JA127**

35.    On Thursday, December 12, 2024, Ms. Castro arrived at school and briefly stopped in her classroom to pick up some personal items.  She saw the crucifix had been removed from the wall.

ANSWER:    Defendants admit that the crucifix was removed from the classroom wall. Defendants have insufficient knowledge or information to admit or deny the remaining allegations in Paragraph 35.

36.    Ms. Castro then attended another meeting in the principal's office with Defendants Manning, Soto, and Mazzei.  At that meeting, Defendant Manning told Ms. Castro that a few days without pay would help her better "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the wall.

ANSWER:    Defendants admit that Plaintiff met with Chief of Staff Manning, Principal Soto, and Assistant Principal Mazzei.  Defendants deny the remaining allegations in Paragraph 36, which inaccurately reflect the conversation in that meeting.

37.    Making good on this threat, Defendant Manning issued a Notice of Suspension to Ms. Castro reiterating that her actions were "insubordinate." *See* Complaint Exhibit E.  Ms. Castro was suspended without pay for two days and sent home with her crucifix in a box.  The Notice stated Ms. Castro could return to work on Monday, December 16, 2024, only under the condition that she agree to remove the crucifix from its location on the wall next to her desk. Defendant Manning cc'd Defendants Gasper, Soto, and Mazzei, among others. Manning designated the Notice to be included in Ms. Castro's disciplinary file.

ANSWER:    Defendants deny that Ms. Manning "threatened" Plaintiff.  Defendants admit that the District issued Plaintiff a notice of 2-day suspension, which speaks for itself. Defendants admit the remaining allegations in paragraph 37.

38.    On Monday, December 16, 2024, Ms. Castro emailed the Defendants.  She wrote, *inter alia*, that she could not in good conscience return to school under the school's condition that she hide the crucifix:

On Thursday the 13th, I was suspended until I agreed to return to school but only hang the crucifix in what you all my "private space," *i.e.*, under my desk. I cannot in good conscience agree to return to school under that condition, which violates not only my faith but also my rights under the First Amendment of the Constitution.

\* \* \*

It is my understanding that your application of the Constitution is not only wrong but quite outdated, particularly in light of some recent Supreme Court decisions. In 2022 in *Kennedy v. Bremerton School District*, the United States Supreme Court made clear that it "long ago abandoned *Lemon* and its endorsement test

10

22228075

**JA128**

offshoot," affirming that personal religious expression by public school employees does not violate the Establishment Clause. That same case held that school employees' First Amendment rights receive double protection under the Free Exercise and Free Speech Clauses, and the Court concluded that the football coach's postgame prayer at a time when coaches were free to attend to personal things was constitutionally protected – despite the fact that students could see his private religious expression.

* * *

[G]uidance from President Biden's U.S. Department of Education [in 2023] explains: "In contexts where a school permits teachers, coaches, and other employees to engage in personal speech … it may not prohibit those employees from engaging in prayer [or other personal expression] merely because it is religious or because some observers, including students, might misperceive the school as endorsing that expression."[17]

The crucifix that I hang by my desk does not violate the Establishment Clause. In fact, it is protected by my free exercise and free speech rights. And I am also protected by Connecticut's [Act Concerning Religious Freedom].

ANSWER:     Defendants admit that the above accurately quotes the email sent by Plaintiff, which speaks for itself in its entirety.  Defendants deny that they required Plaintiff "to hide" the crucifix.

39.     That same day, Ms. Castro was placed on paid administrative leave.

ANSWER:     Admitted

40.     Ms. Castro has been pressured by Defendants to resign or retire early and sign an agreement not to sue the District.  Upon information and belief, Defendants Gasper, Manning, Soto, and Mazzei have each been involved in these efforts to pressure Ms. Castro.

ANSWER:     Defendants deny the allegations in Paragraph 40, as none of the named defendants have had a conversation with Plaintiff about resignation or retirement, much less pressured her to resign or retire.

41.     Defendants Mazzei, Soto, Manning, and Gasper each threatened disciplinary action against Ms. Castro unless she agreed to conceal the crucifix underneath her desk or in a similarly hidden place.  In some cases, Defendants explicitly noted the possibility of suspension or termination for insubordination related to Ms. Castro's refusal to remove her crucifix.

ANSWER:     Defendants deny that they "threatened" Plaintiff.  Defendants admit the allegations in the second sentence of Paragraph 41.

11

22228075

**JA129**

42.    Upon information and belief, Defendants have not similarly disciplined other DiLoreto teachers for their personal displays.

ANSWER:    Because no teachers have displayed crucifixes in their classrooms at DiLoreto, Defendants admit that they have not had occasion to issue discipline for such actions. Defendants have insufficient knowledge or information to admit or deny any remaining allegations in Paragraph 42.

43.    Still held on administrative leave, Ms. Castro attended a videoconference on January 24, 2025, with Defendant Gasper, in his capacity as Superintendent of the District; and Defendant Manning.  All parties were represented by counsel.

ANSWER:    Admitted.

44.    Seven times, Defendant Gasper asked Ms. Castro whether she would continue to refuse to remove or relocate the crucifix to a hidden place in her classroom.  And seven times, Ms. Castro confirmed she would not agree to removing or relocating the crucifix within the classroom so long as other teachers were permitted to keep personal expressive items in analogous locations.

ANSWER:    Defendants admit that Superintendent Gasper and Chief of Staff Manning met with Plaintiff in an attempt to reach a resolution and return Plaintiff to the classroom, and in that meeting asked Plaintiff seven questions about her return and possible accommodations related to the crucifix, all of which were rejected by Plaintiff.

45.    Based on Ms. Castro's responses, Defendant Gasper confirmed the imposition of administrative leave, where she remains today.

ANSWER:    Admitted.

46.    Ms. Castro and her counsel have repeatedly raised to Defendants Ms. Castro's constitutional rights under *Kennedy v. Bremerton School District* and related law.

ANSWER:    Defendants admit that Plaintiff and her counsel reference *Kennedy v. Bremerton School District*, but deny implication that Plaintiff's rights were violated.

47.    As of January 30, 2025, Ms. Castro's school email address was de-activated.

ANSWER:    Defendants admit that Plaintiff's access to email was deactivated due to her placement on administrative leave but was reactivated when moved to a temporary assignment.

48.    Upon information and belief, Defendants—particularly Defendants Gasper and Manning—are currently engaged in the process of terminating Ms. Castro from employment under the provisions of Conn. Gen. Stat. § 10-151(d).

22228075

ANSWER:    Defendants denies the allegations that § 10-151 proceedings have been initiated.

CLAIMS FOR RELIEF

**COUNT I – VIOLATION OF FEDERAL CONSTITUTIONAL RIGHT TO FREE EXERCISE AGAINST ALL DEFENDANTS**

49.    Ms. Castro hereby incorporates and adopts by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth herein.

ANSWER:    Defendants restate and reincorporate by reference all of its forgoing answers and responses to the preceding paragraphs of the Complaint as if set forth herein.

50.    Defendants, acting under color of state law, have violated and continue to violate Ms. Castro's federal constitutional right to freely exercise her religion, rendering Defendants liable under 42 U.S.C. § 1983.

ANSWER:    Denied.

51.    Made applicable to state actors by the Fourteenth Amendment, the First Amendment protects the free exercise of religion. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

ANSWER:    Defendants admit that the First Amendment applies to state actors, but deny that Defendants have violated Plaintiff's rights under this or any provision.

52.    When the government burdens a person's sincere religious practice in a way that is neither neutral nor generally applicable, the government has violated the U.S. Constitution's free-exercise guarantee unless the government demonstrates that its course was narrowly tailored to pursuing a compelling government interest. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–32 (1993).

ANSWER:    Paragraph 56 of the Complainant is an improper argument, to which no response is required. To the extent a response is required, Defendants note that the cited decisional law speaks for itself, note that its proper interpretation is a matter for the courts, and deny that Defendants have violated Plaintiff's rights under this or any legal standard.

53.    Defendants have burdened Ms. Castro's sincere religious practice. For her peace of mind and spirit, Ms. Castro has long placed a crucifix beside her desk. Defendants put her to a choice: remove the crucifix or face discipline. Since Ms. Castro was unwilling to compromise her religious exercise: Defendants Mazzei and Soto began disciplinary proceedings against her; Defendant Manning suspended her without pay for two days and then placed her on indefinite administrative leave; and Defendant Gasper confirmed the

13

22228075

**JA131**

administrative leave. Defendants have thus punished and continue to punish Ms. Castro for her religious practice, all for placing a crucifix beside her desk for her personal prayer and reflection.

ANSWER:    Defendants admit that Plaintiff was required to move the crucifix off the classroom wall, that Plaintiff would not remove the crucifix from the classroom wall, that Plaintiff was suspended without pay for two days, and that Plaintiff was placed on paid administrative leave. Defendants deny the remaining allegations in Paragraph 53, except for having insufficient knowledge or information to admit or the deny that paragraph's second sentence.

54.    Far from being neutral to religion, Defendants' actions have punished Ms. Castro precisely because of the religious nature of the crucifix.

ANSWER:    Denied.

55.    And far from being generally applicable, Defendants' actions have singled out Ms. Castro for discipline despite other teachers having their own personal expressive items (including some with religious origins and connotations) on display.

ANSWER:    Denied.

56.    Defendants cannot state a compelling government interest in precluding Ms. Castro from displaying a crucifix in her private workspace. In their communications with Ms. Castro, Defendants have repeatedly stated just one reason for their actions—a concern that Ms. Castro's expression would make the school appear to endorse religion. But the Supreme Court has rejected that erroneous understanding of the Establishment Clause. *See Kennedy*, 597 U.S. at 532–536. And Defendants have offered no other reason, let alone a compelling one, to justify punishing Ms. Castro for displaying a crucifix in her private workspace.

ANSWER:    Paragraph 56 of the Complainant is an improper argument, to which no response is required. To the extent a response is necessary, Defendants deny that they violated Plaintiff's rights, and deny that Paragraph 56 accurately summarizes Defendants' communications to Plaintiff.

57.    Additionally, a free exercise violation occurs when the government has expressed hostility to the religious exercise it burdens. *Id.* at 525 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018)).

ANSWER:    Defendants note that the cited decisional law speaks for itself, note that its proper interpretation is a matter for the courts, and deny that Defendants have violated Plaintiff's rights under this or any legal standard.

22228075

**JA132**

58.    The comments by Defendant Soto particularly evince hostility towards Ms. Castro's Catholic faith.  On two occasions, he insinuated her crucifix was an "idol" not fit for worship.  When Ms. Castro resisted removing the crucifix, Defendant Soto stated that she must do so to properly "live out [her] faith."  He also exhorted her to "give Caesar what is Caesar's."

ANSWER:    Defendants deny the first sentence of Paragraph 58, and deny the remaining allegations in Paragraph 58 based on the answers to Paragraph 26 and 33 of the Complaint.

59.    Accordingly, Defendants have violated and continue to violate Ms. Castro's federal constitutional rights to freely exercise her religion.  She prays for prospective injunctive relief against all defendants as authorized by 42 U.S.C. § 1983.

ANSWER:    Defendants deny that they have violated Plaintiff's rights, and deny the claim that she is entitled to injunctive relief.

60.    Furthermore, Defendant Gasper has the unilateral authority to begin termination proceedings against Ms. Castro under the provisions of Conn. Gen. Stat. § 10-151(d).

ANSWER:    Admitted.

61.    As previously alleged, Defendant Gasper has and continues to violate Ms. Castro's federal constitutional rights to freely exercise her religion.  Ms. Castro has a reasonable fear that, absent injunctive relief, Defendant Gasper will initiate termination proceedings against her for insubordination.

ANSWER:    Denied.

62.    Ms. Castro thus prays for prospective injunctive relief against Defendant Gasper as authorized by 42 U.S.C. § 1983.

ANSWER:    Denied.

**COUNT II – VIOLATION OF FEDERAL CONSTITUTIONAL RIGHT TO FREE SPEECH AGAINST ALL DEFENDANTS**

63.    Ms. Castro hereby incorporates and adopts by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth herein.

ANSWER:    Defendants restate and reincorporate by reference all of its forgoing answers and responses to the preceding paragraphs of the Complaint as if set forth herein.

64.    Defendants, acting under color of state law, have violated and continue to violate Ms. Castro's federal constitutional right to free speech, rendering Defendants liable under 42 U.S.C. § 1983.

15

22228075

**JA133**

ANSWER:    Denied.

65.    Made applicable to state actors by the Fourteenth Amendment, the First Amendment protects freedom of speech. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

ANSWER:    Defendants admit that the First Amendment applies to state actors, but deny that Defendants have violated Plaintiff's rights under this or any provision.

66.    Religious expression is protected by the Free Speech Clause of the First Amendment. *Kennedy*, 597 U.S. at 523–524.

ANSWER:    Defendants admit that the Supreme Court has stated this general principle in certain First Amendment decisions, but deny that Defendants have violated Plaintiff's rights under this or any provision or theory.

67.    Public employees such as school teachers retain free speech rights to personal expression even when on school grounds and during teaching hours. Government officials violate those rights when they prohibit private expression without adequate justification. *Kennedy*, 597 U.S. at 527–528.

ANSWER:    Defendants admit that the Supreme Court has stated these general principles in certain First Amendment decisions, but Defendants deny that Plaintiff's alleged "free speech" was actionable under the First Amendment in these circumstances and deny that Defendants have violated Plaintiff's rights under these or any principles.

68.    Expression is private when it is not within the ordinary scope of duty or otherwise does not owe its existence to the government. *Id.* at 529.

ANSWER:    Defendants note that the cited decisional law speaks for itself, note that its proper interpretation is a matter for the courts, and deny that Plaintiff's alleged "[e]xpression" was actionable under the First Amendment in these circumstances.

69.    Defendants unconstitutionally prohibited Ms. Castro from displaying her crucifix in her personal space, a prototypical act of private speech.

ANSWER:    Denied.

70.    Defendants have not offered a valid justification for suppressing Ms. Castro's private speech. Erroneous over-enforcement of the Establishment Clause is not a valid justification for restricting private religious speech. *See id.* at 532–536. Nor is a concern that students or other staff would take offense at the sight of religious expression. *Id.* at 538.

16

22228075

ANSWER:    Defendants note that the cited decisional law speaks for itself, note that its proper interpretation is a matter for the courts, deny any implication that Defendants have engaged in "[e]rroneous over-enforcement of the Establishment Clause," deny that Defendants have violated Plaintiff's rights under these or any principles, and otherwise deny the allegations in Paragraph 70.

71.    Accordingly, Defendants have violated and continue to violate Ms. Castro's federal constitutional rights to free speech. She prays for prospective injunctive relief against all defendants as authorized by 42 U.S.C. § 1983.

ANSWER:    Denied.

72.    Furthermore, Defendant Gasper has the unilateral authority to begin termination proceedings against Ms. Castro under the provisions of Conn. Gen. Stat. § 10-151(d).

ANSWER:    Admitted.

73.    As previously alleged, Defendant Gasper has and continues to violate Ms.

Castro's federal constitutional rights to free speech. Ms. Castro has a reasonable fear that, absent injunctive relief, Defendant Gasper will initiate termination proceedings against her for insubordination.

ANSWER:    Denied.

74.    Ms. Castro thus prays for prospective injunctive relief against Defendant Gasper as authorized by 42 U.S.C. § 1983.

ANSWER:    Denied.

**COUNT III – VIOLATION OF CONNECTICUT'S ACT CONCERNING RELIGIOUS FREEDOM AGAINST ALL DEFENDANTS**

75.    Ms. Castro hereby incorporates and adopts by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth herein.

ANSWER:    Defendants restate and reincorporate by reference all of its forgoing answers and responses to the preceding paragraphs of the Complaint as if set forth herein.

76.    By statute, Connecticut prohibits all its political subdivisions—including their officers or employees—from burdening someone's religious exercise, unless the government actor demonstrates that it has used "the least restrictive means" of furthering "a compelling government interest." Conn. Gen. Stat. § 52-571b(a)–(b), (f).

17

22228075

ANSWER:     Defendants note that § 52-571b speaks for itself, note that its proper interpretation is a matter for the courts, and deny any implication that they violated Plaintiff's rights under this statute.

77.     Defendants have burdened Ms. Castro's sincere religious practice. For her peace of mind and spirit, Ms. Castro has long placed a crucifix beside her desk. The District put her to a choice: remove the crucifix or face discipline. Since Ms. Castro was unwilling to compromise her religious exercise: Defendants Mazzei and Soto began disciplinary proceedings against her; Defendant Manning suspended her without pay for two days and then placed her on indefinite administrative leave; and Defendant Gasper confirmed the administrative leave. Defendants have thus punished and continue to punish Ms. Castro for her religious practice, all for placing a crucifix beside her desk for her personal prayer and reflection.

ANSWER:     Defendants admit that Plaintiff was required to move the crucifix off the classroom wall, that Plaintiff would not remove the crucifix from the classroom wall, that she was suspended without pay for two days, and she was placed on paid administrative leave. Defendants deny the remaining allegations in Paragraph 77.

78.     Defendants cannot state a compelling government interest in precluding Ms. Castro from displaying a crucifix in her private workspace. In their communications with Ms. Castro, Defendants have repeatedly stated just one reason for their actions—a concern that Ms. Castro's expression would make the school appear to endorse religion. But the Supreme Court has rejected that erroneous understanding of the Establishment Clause. *See Kennedy*, 597 U.S. at 532–536. And Defendants have offered no other reason, let alone a compelling one, to justify punishing Ms. Castro for displaying a crucifix in her private workspace.

ANSWER:     Denied.

79.     Accordingly, Defendants have and continue to violate Connecticut's Act Concerning Religious Freedom.

ANSWER:     Denied.

80.     Ms. Castro prays for prospective injunctive relief against all defendants as authorized by Conn. Gen. Stat. § 52-571b(c), (f).

ANSWER:     Defendants admit that Plaintiff seeks injunctive relief, but denies that she is entitled to such relief.

81.     Furthermore, Defendant Gasper has the unilateral authority to begin termination proceedings against Ms. Castro under the provisions of Conn. Gen. Stat. § 10-151(d).

ANSWER:     Admitted.

18

22228075

**JA136**

82.    As previously alleged, Defendant Gasper has and continues to violate Connecticut's Act Concerning Religious Freedom.  Ms. Castro has a reasonable fear that, absent injunctive relief, Defendant Gasper will initiate termination proceedings against her.

ANSWER:    Denied.

83.    Ms. Castro thus prays for prospective injunctive relief against Defendant Gasper as authorized by Conn. Gen. Stat. § 52-571b(c), (f).

ANSWER:    Defendants admit that Plaintiff seeks injunctive relief, but denies that Plaintiff is entitled to such relief.

## REQUEST FOR ATTORNEYS FEES & COSTS

84.    Ms. Castro is entitled to recover reasonable attorneys fees and costs under 42 U.S.C. § 1988(b), in an amount to be proven at trial.

ANSWER:    Denied.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Castro hereby incorporates and adopts by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth herein, and prays for relief as follows:

- Equitable relief enjoining Defendants or their agents from suspending, re-assigning, or otherwise disciplining Ms. Castro in any way for hanging her crucifix on her classroom wall aside her desk, in the same location as it was prior;

- A mandatory injunction against Defendants and their agents requiring them to take Ms. Castro off of administrative leave and assign her to return to full-time teaching, without any condition that she cease hanging her crucifix on her classroom wall aside her desk in the same location as it was prior;

- A mandatory injunction against Defendants and their agents requiring them to expunge any and all disciplinary records from Ms. Castro's files concerning her refusal to cease hanging her crucifix on her classroom wall aside her desk;

- Equitable relief enjoining Defendants and their agents from participating in any process of terminating Ms. Castro's contract as a tenured teacher with the Consolidated School District of New Britain based on her display of a crucifix;

- A declaratory judgment that the actions of Defendants and their agents in disciplining Ms. Castro for her refusal to remove the crucifix from the wall aside her desk violate the United States Constitution and Connecticut law;

19

22228075

**JA137**

- Costs & attorneys fees;

- Any other relief deemed appropriate by this Court.

**ANSWER** Defendants deny that Plaintiff is entitled to relief requested in the Prayer for Relief, or any relief whatsoever.

### AFFIRMATIVE DEFENSES

**First Affirmative Defense**: Plaintiff's request for injunctive relief should be denied because Plaintiff fails to establish any legal violation for which this relief can or should be provided.

**Second Affirmative Defense**: Plaintiff's request for declaratory relief should be denied because Plaintiff fails to establish any legal violation for which this relief can or should be provided.

**Third Affirmative Defense**: Any relief is foreclosed under the legal framework specific to First Amendment challenges to regulation of public employees' expression, which also provides the exclusive standard of review for all of Plaintiff's claims.

**Fourth Affirmative Defense**: The challenged actions satisfied strict scrutiny, insofar as applicable, because Defendants acted in furtherance of the District's compelling interest to avoid an Establishment Clause violation and their actions were narrowly tailored to achieving that interest.

**Fifth Affirmative Defense**: Because Defendants undertook the challenged actions to avoid, at a minimum, an objectively substantial risk of an Establishment Clause violation, this conduct cannot subject them to any of the relief sought in the complaint.

**Sixth Affirmative Defense**: Because Defendants did not substantially burden Plaintiff's sincerely held religious beliefs or practice, the challenged conduct is not actionable under Conn. Gen. Stat. § 52-571b.

**Seventh Affirmative Defense**: The balance of equities and the public interest outweigh any harm to Plaintiff from the absence of an injunction and therefore preclude any form of injunctive or declaratory relief to Plaintiff.

**Eighth Affirmative Defense**: The individual Defendants have not violated any clearly established constitutional or statutory right about which a reasonable person would have known and therefore are entitled to qualified immunity from any or all monetary liability that Plaintiff may pursue at any stage of this case.

22228075

**Additional Defenses**: Defendants deny any allegations in the complaint that are not specifically admitted, have not knowingly or voluntarily waived any applicable defenses for which any party bears the burden of proof, and reserve the right to assert such additional defenses as may become available or apparent as the case progresses.

DEFENDANTS,


By____/s/ *Peter J. Murphy*_____
     Peter J. Murphy (ct26825)
     Eric Del Pozo (ct31359)
     Sarah N. Niemiroski (ct31281)
     For Shipman & Goodwin LLP
     One Constitution Plaza
     Hartford, CT  06103-1919
     Telephone: (860) 25l-5070
     Facsimile: (860) 251-5316
     pjmurphy@goodwin.com
     edelpozo@goodwin.com
     sniemiroski@goodwin.com
Its Attorneys

21

22228075

**JA139**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO,<br><br>*Plaintiff,*<br><br>v.<br><br>ANTHONY GASPER et al.,<br><br>*Defendants.* | No. 25-cv-00153 (SFR) |

## DECLARATION OF MARYELLEN MANNING

I, Maryellen Manning, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1. I am of legal age and am competent to testify in this proceeding.

2. I work for the Consolidated School District of New Britain ("the District") as its Chief of Staff, a position that I have held since May 2020. Overall, I have worked in education for more than twenty years. My current role entails, among other duties, leading all aspects of administrative supervision and talent oversight for the District. In particular, I oversee all staff issues, labor relations and standards, contract negotiations, and employment law matters.

3. DiLoreto Elementary & Middle School is one of the schools in the District.

4. I am familiar with the events underlying this lawsuit brought by plaintiff Marisol Arroyo-Castro, who most recently taught seventh-grade social studies at DiLoreto. I base this declaration on my own personal knowledge.

5. Ms. Arroyo-Castro has been a teacher in the District since 2003 and has taught at DiLoreto since 2008. Presently, Dario Soto is the Principal and Andrew Mazzei is one of the Assistant Principals at DiLoreto.

6. Teachers employed by the District may elect to become members of the New Britain Federation of Teachers, Local 871, the teacher's union covering the District. This union's

**JA140**

members are subject to the collective bargaining agreements entered at periodic intervals between the District and the union. Ms. Arroyo-Castro presently belongs to the teacher's union. In my capacity as Chief of Staff, I am familiar with the collective bargaining agreement and help to administer its terms. A true and accurate copy of the excerpted current agreement is attached to this declaration as Exhibit A.

7.    Article VII of the currently operative collective bargaining agreement contains provisions regarding teacher transfers. With some exceptions, teachers may express a preference to be assigned to open positions. The collective bargaining agreement permits involuntary transfers of teachers, following prior notice to the teacher and consultation between the teacher and the Superintendent or a designee. Ex. A, § 7:5. According to the current agreement, the "decision to involuntarily transfer shall not be arbitrary or capricious." Ex. A, § 7:6.

8.    There is no guarantee that a teacher will maintain the same placement from year to year. The District retains the right to exercise its discretion to assign teachers to classes they are qualified to instruct, based on enrollment patterns and educational needs.

9.    A successor collective bargaining agreement between the District and the teacher's union will take effect in July 2025. The new agreement's specific subsections regarding involuntary teacher transfers will remain the same as in the current agreement, though these sections will be renumbered as §§ 7:6 and § 7:7, respectively. A true and accurate copy of the excerpted successor agreement is attached to this declaration as Exhibit B.

10.    For the majority of the past decade, Ms. Arroyo-Castro taught third graders, and in some years she taught English-language learners.

11.    For the 2024-2025 school year, the District assigned Ms. Arroyo-Castro to teach seventh-grade social studies.

2

**JA141**

12.    During the fall 2024 semester, Ms. Arroyo-Castro had a thirty-minute daily lunch break and three-and-a-half hours of aggregate weekly "planning" time—or time spent on school grounds, free from other responsibilities, in which to prepare lessons and review students' work.

13.    Towards the end of November 2024, Assistant Principal Mazzei asked my input about responding to concerns that students and staff reportedly had raised about Ms. Arroyo-Castro's classroom environment. Of specific concern, Ms. Arroyo-Castro visibly displayed a crucifix on the classroom wall near the teacher's desk. After Mr. Mazzei and I spoke, it was decided that he would convene an informational meeting with Ms. Arroyo-Castro following the Thanksgiving holiday.

14.    I understand that, at that meeting, Mr. Mazzei instructed Ms. Arroyo-Castro to take the crucifix down from the classroom wall. Mr. Mazzei later informed me that, despite this direction, the crucifix remained in place.

15.    The District took the position that it was within its legal rights to request that this middle-school teacher remove a visible crucifix from the classroom wall, because displaying such a religious object in that context would violate the Establishment Clause.

16.    Over several days, Principal Soto, Assistant Principal Mazzei, and I variously met with Ms. Arroyo-Castro and her union representative to try to reach an accommodation. As I recall, during these meetings, I explained to Ms. Arroyo-Castro that the crucifix in her classroom made it appear that she was promoting Christianity and favoring this religion over others. I also recall mentioning to her that we did not want to hinder her religious beliefs, only to ensure that the District complied with the law. At one point, I seconded the union representative's proposal that Ms. Arroyo-Castro hang the crucifix underneath her desk, next to the drawers, which she initially agreed to do, and briefly did, before restoring the cross to its earlier place on the classroom wall.

3

**JA142**

17.    The District decided to reprimand Ms. Arroyo-Castro for insubordination, for the reasons outlined in a Letter of Reprimand, dated December 11, 2024, that I signed in my capacity as the District's head of personnel matters. The District then decided to suspend Ms. Arroyo-Castro for two days without pay, for the reasons outlined in a Notice of Suspension, dated December 12, 2024, that I also signed in my capacity as the District's head of personnel matters. When she failed to show up to work after the suspension, the District determined to place Ms. Arroyo-Castro on paid leave indefinitely.

18.    On January 24, 2025, Ms. Arroyo-Castro and her counsel met with District Superintendent Dr. Anthony Gasper and me to discuss a potential return by her to teaching. During this meeting, the Superintendent proposed that Ms. Arroyo-Castro place the crucifix in a desk drawer, under the desk with a magnet, in her pocket to be a source of comfort, or behind a screen that would obscure the crucifix from the view of students who were sitting at nearby desks or sitting near the teacher's desk for individual instruction. Ms. Arroyo-Castro would not agree to these or any other proposals made at that meeting about the crucifix's location.

19.    On March 6, 2025, the Superintendent, Deputy Superintendent Evie Velasquez, and I met with Ms. Arroyo-Castro to inform her of the District's decision temporarily to reassign her to assist in updating the District's curriculum. The Deputy Superintendent explained that this temporary role would involve creating documents for use by school staff, to ensure fidelity to the District's approved lessons and to assist in preparing students for statewide examinations. We gave Ms. Arroyo-Castro access to electronic models and online aids to complete these tasks.

20.    The District has an ongoing personnel investigation into complaints about Ms. Arroyo-Castro's classroom interactions. As a common protocol, the District will reassign a teacher for the duration of such an investigation, although Ms. Arroyo-Castro's reassignment occurred while this investigation already was underway. Any comments made during the March

4

6, 2025, meeting referencing Ms. Arroyo-Castro's pedagogy or personal beliefs simply reiterated the nature of complaints from students and staff that had prompted the school to investigate and temporarily reassign Ms. Arroyo-Castro in the meantime.

21.    Ms. Arroyo-Castro's temporary office is located in District headquarters. Students cannot access this new office. Last I checked, the crucifix was displayed in her office. To my knowledge, no administrator has ordered her to take it down.

Dated: New Britain, CT
     April //, 2025
                        Maryellen Manning, Chief of Staff

5

**JA144**

# EXHIBIT A

COLLECTIVE BARGAINING AGREEMENT

Between

THE NEW BRITAIN BOARD OF EDUCATION

And

THE NEW BRITAIN FEDERATION OF TEACHERS, LOCAL 871

JULY 1, 2022 - JUNE 30, 2025

10441202v3

**JA146**

**TABLE OF CONTENTS**

PAGE

Preamble ........................................................................................................ 1
Agreement...................................................................................................... 1
Article I        Definitions................................................................................ 1
Article II       Management Rights and Union Recognition ........................... 2
    2:2          DSAP Holders........................................................................... 3
Article III      Fair Practices and Teacher Protection...................................... 5
Article IV       Instructional Staff Work Year/Work Day ................................ 5
    4:1          School Year............................................................................... 5
    4:2          End of School Year Assistance................................................. 6
    4:3          Teacher Workday...................................................................... 6
    4:5          Teacher Programs ..................................................................... 7
    4:6          Teacher Preparations................................................................ 7
    4:7          Collaborative Meetings ............................................................ 7
    4:8          Parent/Teacher Conferences ..................................................... 8
    4:9          Special Help Period.................................................................. 8
    4:10         Notification of PPT's and Other Meetings ............................... 8
    4:11         Professional Learning .............................................................. 8
    4:12         Substitute Teaching.................................................................. 8
    4:13         Case Management: Special Education, Pupil Services............... 9
Article V        Class Size ................................................................................. 9
Article VI       Leaves .................................................................................... 12
    6:1          Unpaid Leaves ....................................................................... 12
    6:2          Sabbatical Leave .................................................................... 12
    6:3          Other Unpaid Leave ............................................................... 13
    6:4          Maternity, Paternity, Adoption and Foster Care Leave .......... 13
    6:5          Federation Leave.................................................................... 14
    6:6          Paid Sick Leave...................................................................... 15
    6:7          Bereavement Leave................................................................ 15
    6:8          Professional Leave ................................................................. 16
    6:9          Religious Holiday Leave......................................................... 16
    6:10         Jury Duty Leave...................................................................... 16
    6:11         Uniformed Services Leave ...................................................... 16
    6:12         Paid Personal Leave............................................................... 16
    6:13         Family and Medical Leave...................................................... 17
    6:14         Superintendent's Discretion ................................................... 17
Article VII      Teacher Transfer .................................................................... 17
Article VIII     Teacher Files .......................................................................... 18
Article IX       Grievances.............................................................................. 19
    9:1          Informal Disposition of Problems........................................... 19
    9:2          Definitions.............................................................................. 19
    9:3          Procedure ............................................................................... 19
    9:6          Arbitration.............................................................................. 20

i

**JA147**

PAGE

9:7        General Provisions .................................................................. 20
Article X        Student Discipline ................................................................. 21
Article XI       Notices and Announcements................................................ 21
Article XII      Extra-Curricular Activities................................................... 22
Article XIII     Miscellaneous ...................................................................... 22
    13:1         Labor and Management Meetings ........................................ 22
    13:2         Union Meetings.................................................................... 22
    13:3         Notification Regarding Certain Students ............................. 22
    13:4         Assignments......................................................................... 23
    13:5         Certification Requirement.................................................... 23
    13:6         Assignment of Classrooms .................................................. 23
    13:7         Telephone for Parent-Teacher Consultations....................... 23
    13:8         Teacher Dress Code ............................................................ 23
Article XIV      Recall Procedure ................................................................. 23
Article XV       Salaries and Fringe Benefits ............................................... 24
    15:1         Salaries................................................................................ 24
    15:5         Salary Advancement ........................................................... 25
Article XVI      Peaceful Resolution of Differences ..................................... 25
Article XVII     Savings Clause .................................................................... 26
Article XVIII    Matters Not Covered............................................................ 26
Article XIX      Duration .............................................................................. 26
Appendix A-1    Salary Schedules ................................................................. 28
Appendix A-2    Longevity Schedule, Other Programs ................................. 31
Appendix B       Extra-Curricular Salary Schedule 2022-25 ........................ 32
Appendix C       Fringe Benefits.................................................................... 34
                 Medical/Health Insurance ................................................... 34
                 Premium Cost Sharing ......................................................... 34
                 Section 125 and Flexible Spending Accounts ..................... 35
                 Notification of Retirement ................................................... 35
                 Change of Carrier................................................................ 35
                 Retiree's Insurance.............................................................. 35
                 Alternative Health Insurance .............................................. 36
                 Reimbursement for Loss ..................................................... 36
Appendix D-1    Oversize Class Grievance Form........................................... 37
Appendix D-2    Grievance Form .................................................................. 38
Appendix E       Recall Script........................................................................ 39
Appendix F       Teacher Layoff.................................................................... 40
Appendix G       HSA Plan Summary............................................................. 41
Appendix H       Request for Absence Personal Reasons Form ..................... 44

**JA148**

## PREAMBLE

The Board of Education of the City of New Britain, and the New Britain Federation of Teachers, Local 871, agree and recognize that they have an interest in educational excellence that is far beyond the scope of a collective bargaining agreement governing terms and conditions of employment.  The Board of Education and the New Britain Federation of Teachers wish to declare their mutual intent to work toward the achievement of common aims as follows:

1. The formation of realistic goals and programs consistent with the best educational theory.

2. The development of a system of communication and consultation designed for more harmonious relations of the parties concerned as well as to expedite business to a fruitful conclusion.

It is hoped that this common effort will contribute in significant measure to the advancement of public education in the City of New Britain.

## AGREEMENT

**WHEREAS**, Connecticut law prescribes the procedure of collective bargaining between boards of education and teacher organizations; and

**WHEREAS**, in a secret ballot election conducted among certified personnel of the New Britain School District by the American Arbitration Association under the auspices of the Connecticut State Board of Education in accordance with Connecticut law, the New Britain Federation of Teachers received a majority mandate to act as their collective bargaining agent; and

**WHEREAS**, the Board has voluntarily endorsed such procedure by meetings with the Union as a fair and orderly method of regulating and conducting its affairs appropriate to its lawful functions with those concerned in New Britain it is agreed as follows:

## ARTICLE I
## DEFINITIONS

1:1   **Board**:  Board of Education of the Consolidated School District of the City of New Britain.

1:2   **Union**:  New Britain Federation of Teachers, Local 871, American Federation of Teachers, A.F.L.-C.I.O.

1:3   **Administration**:  The Superintendent of Schools and the entire administrative staff as defined by the Connecticut State Board of Education, as well as other administrators whose positions do not require state certification.

1:4   **Teacher**:  A person employed by the Board as defined in Article 2, Section 2:1.

1:5   **Substitute Teacher**:  Any instructional employee employed on a day-to-day basis.

1:6   **School**:  Any work location to which a member of the bargaining unit is assigned.

1:7   **Union Representative**:  The Union Building Representative or their designated representative.

1

**JA149**

1:8    Whenever the singular is used in this Agreement, it is to include the plural.

1:9    **Seniority**:  Seniority or length of continuous service of the employee from the last date of employment in any position requiring Connecticut State Certification.  Seniority will continue to accrue during any authorized unpaid leave for purposes of transfer, layoff and recall rights only.  Seniority will continue to accrue during any uniformed services leave for all purposes.  Seniority will be lost if an employee quits, resigns or is discharged, or exceeds an authorized leave of absence.

1:10   **Course Credit**:  Course credit shall mean credit given for graduate courses, which are part of a program of higher learning (the individual teacher need not be matriculated in said program), licensed by the Connecticut Department of Higher Education and offered by an institution of higher learning, accredited by the Connecticut Department of Higher Education or in the case of out-of-state institutions, by Regional Accredited Agency (as accredited on www.collegesource.org), or course/credits approved in writing, in advance, by the Superintendent or their designee.  Course credit shall not be given for professional development courses. There is no blanket ban on internet and/or video courses.  Courses credited under this Article must be professionally appropriate.  Prior to starting any coursework, a teacher shall notify the Superintendent or their designee.  Any denial of course credit shall be subject to the grievance-arbitration process in the collective bargaining agreement.

1:11   **Hours**:  As used in Appendix A-1 shall mean course credits.

## ARTICLE II
## MANAGEMENT RIGHTS AND UNION RECOGNITION

2:0    Except where such rights, powers and authority are specifically relinquished, abridged or limited by the provisions of this Agreement, the Board has and will continue to retain, whether exercised or not, all of the rights, powers and authority heretofore had by it and, except where such rights, powers and authority are specifically relinquished, abridged or limited by the provisions of this Agreement, it shall have the sole and unquestioned right, responsibility and prerogative of management of the affairs of the public schools and direction of the working forces, including, but not limited to the following:

   a.    To establish or continue policies and procedures for the conduct of Board business and, from time to time, to change or abolish such policies or procedures.

   b.    To describe and enforce reasonable rules and regulations for the maintenance of discipline and for the performance of work in accordance with the requirements of the Board, provided such rules and regulations are made known in a reasonable manner to the employees effected by them.

   c.    To create job specifications and to revise existing job descriptions.

2:1    The Board recognizes the Union as the exclusive bargaining representative of all those employees in positions requiring a teaching or special services certificate, except nurses, paraprofessionals, persons in the "administrators' unit" as defined by Connecticut law and other personnel excluded by state statute for the purpose of negotiating with respect to salary schedules, working conditions, and other conditions relative to employment. The Board further recognizes the Union as the exclusive bargaining representative for all those teachers referred to above who are employed in the areas of Adult Education, Summer School, and part-time Tutoring.  The Board agrees not to negotiate with other organizations, individuals or groups of individuals over matters reserved to the Union as the Exclusive Bargaining Representative.

2

**JA150**

**ARTICLE VII**
**TEACHER TRANSFER**

7:1    Recognizing that in the New Britain Public School District there exists a need for a transfer policy based upon seniority and qualifications, and that teachers will plan their movements, aspirations and professional development in accordance with this policy, the details of an orderly transfer policy based upon these principles are set forth in the procedures which follow.

7:2    A list of the specific vacancies that occur in each building or responsibility center shall be made available to all staff by the Superintendent within ten (10) days following the adoption of a proposed budget, but in no event later than August 1.  The Superintendent may post earlier vacancy lists in all schools for a minimum of ten (10) school days and fill such vacancies in accordance with Section 7:3, below, in order to hire new teachers earlier than the main vacancy list is distributed.  Once a position is posted and filled, it does not have to be re-posted on any subsequent lists.

Additional hours that become available for Adult Education Teachers will be posted and offered to the most senior qualified Adult Education Teacher on a rotating basis.

The parties agree that the Board may post at any time during the school year vacant positions which were not posted by August 1 of the prior school year.  Any additional posting by the Board shall be posted in all schools for a minimum of ten (10) school days and those vacancies will be filled in accordance with Article 7:3 of the labor agreement.  Once a position is posted it does not have to be re-posted on any subsequent vacancy list, (although the Board may choose to post any remaining vacancies on the final vacancy list in July.)

7:3    Teachers may submit a list to the Personnel and Talent Management Department of the specific positions on the vacancy list to which the teacher requests transfer.  Major consideration shall be given to teachers having seniority in the District, so long as a system-wide balance of experienced teachers is maintained, and so long as the best interests of the School District are consistent with such voluntary transfer(s).

Newly hired teachers must remain in the position for which they were hired until they achieve tenure.  Newly hired teachers who are displaced must post for the position in which they were hired and once awarded a position from the vacancy list will not be permitted to transfer until they achieve tenure.

A complete Seniority List shall be given to the Federation each year by the first payroll date in October.

7:4    Below standard or developing teachers may not submit requests for voluntary transfers, unless there is mutual agreement between the parties.

7:5    Involuntary transfers shall not be made without prior consultations between the teacher and Superintendent or designee at which time the teacher shall be notified of the reason for the transfer.

7:6    A teacher who does not wish to be transferred may appeal the decision of the Superintendent by following the grievance procedure, and the standard for such an appeal shall be that the Superintendent's or designee's decision to involuntarily transfer shall not be arbitrary or capricious.

7:7    The number of teacher transfers from any school shall not exceed ten percent (10%) of

**JA151**

the school faculty in any one year.  The Superintendent may at their discretion exceed the ten percent (10%) stipulation contained herein.

7:8    No transfers shall normally be permitted at mid-year.  Internal awards from these postings will normally result in assignment for the following school year.

7:9    A teacher who posts for a specific vacant position and later reconsiders must withdraw their request before the position is awarded.  Once awarded, the teacher must accept the position.  If during the annual posting, an awarded position is eliminated or awarded in error, a non-displaced applicant shall return to their original position.

## ARTICLE VIII
## TEACHER FILES

8:1    All teacher files containing teacher evaluations and materials relating to their performance shall be maintained under the following circumstances:

8:2    Each teacher shall be entitled to knowledge of and access to supervisory records and reports of competence, personal character and efficiency contained in their personnel file with reference to evaluation of their performance in such school district.

8:3    The Board shall provide to each teacher copies of the records and reports described above upon request.

8:4    Upon reasonable notice, each teacher shall have the right to review and reproduce material in their personnel file to which they are entitled by law.

8:5    A teacher shall be notified before any document containing critical or negative material is placed in their personnel file.  The teacher will be required to sign the actual copy to be filed to certify that they have seen it.  The teacher's signature shall not be interpreted to signify agreement with the contents, only that they have read the document to be filed, reserving the right to respond within a reasonable time by addenda attached to the document.  There will be a waiting period of fifteen (15) school days after notification to the teacher before the document is placed into their personnel file.

## ARTICLE IX
## GRIEVANCES

9:1    Informal Disposition of Problems

The parties recognize that the informal disposition of problems is often preferable to formalized proceedings.

9:2    Definitions

a.    A grievance shall mean a complaint by an employee, that there has been a violation, misinterpretation, misapplication or infringement upon the provisions of this Agreement, established policy, or written practice.

b.    As used in this Article, the term "employee" shall mean (a) an individual employee, (b) a group of employees having the same grievance, (c) the Federation.

18

**JA152**

# EXHIBIT B

COLLECTIVE BARGAINING AGREEMENT

Between

THE NEW BRITAIN BOARD OF EDUCATION

And

THE NEW BRITAIN FEDERATION OF TEACHERS, LOCAL 871

JULY 1, 2025 - JUNE 30, 2028

21536194.2

**JA154**

## TABLE OF CONTENTS

PAGE

| | | |
|---|---|---|
| Preamble | | 1 |
| Agreement | | 1 |
| Article I | Definitions | 1 |
| Article II | Management Rights and Union Recognition | 2 |
| 2:2 | DSAP Holders | 3 |
| Article III | Fair Practices and Teacher Protection | 5 |
| Article IV | Instructional Staff Work Year/Work Day | 5 |
| 4:1 | School Year | 5 |
| 4:2 | End of School Year Assistance | 6 |
| 4:3 | Teacher Workday | 6 |
| 4:5 | Teacher Programs | 7 |
| 4:6 | Teacher Preparations | 7 |
| 4:7 | Collaborative Meetings | 7 |
| 4:8 | Parent/Teacher Conferences | 8 |
| 4:9 | Special Help Period | 8 |
| 4:10 | Notification of PPT's and Other Meetings | 8 |
| 4:11 | Professional Learning | 8 |
| 4:12 | Substitute Teaching | 9 |
| 4:13 | Case Management: Special Education, Pupil Services | 9 |
| Article V | Class Size | 9 |
| Article VI | Leaves | 11 |
| 6:1 | Unpaid Leaves | 11 |
| 6:2 | Sabbatical Leave | 12 |
| 6:3 | Other Unpaid Leave | 12 |
| 6:4 | Maternity, Paternity, Adoption and Foster Care Leave | 13 |
| 6:5 | Federation Leave | 14 |
| 6:6 | Paid Sick Leave | 14 |
| 6:7 | Bereavement Leave | 15 |
| 6:8 | Professional Leave | 15 |
| 6:9 | Religious Holiday Leave | 15 |
| 6:10 | Jury Duty Leave | 15 |
| 6:11 | Uniformed Services Leave | 16 |
| 6:12 | Paid Personal Leave | 16 |
| 6:13 | Superintendent's Discretion | 16 |
| Article VII | Teacher Transfer/Vacancies | 16 |
| Article VIII | Teacher Files | 17 |
| Article IX | Grievances | 18 |
| 9:1 | Informal Disposition of Problems | 18 |
| 9:2 | Definitions | 18 |
| 9:3 | Procedure | 18 |
| 9:6 | Arbitration | 19 |
| 9:7 | General Provisions | 19 |
| Article X | Workers Compensation Supplement | 20 |
| Article XI | Notices and Announcements | 21 |
| Article XII | Extra-Curricular Activities | 21 |

**JA155**

Article XIII   Miscellaneous .................................................................................. 21
    13:1       Labor and Management Meetings ................................................ 21
    13:2       Union Meetings .......................................................................... 22
    13:3       Notification Regarding Certain Students .................................... 22
    13:4       Assignments ............................................................................... 22
    13:5       Certification Requirement ........................................................... 22
    13:6       Assignment of Classrooms ......................................................... 22
    13:7       Telephone for Parent-Teacher Consultations .............................. 22
    13:8       Teacher Dress Code .................................................................... 22
Article XIV   Recall Procedure ........................................................................ 23
Article XV    Salaries and Fringe Benefits ....................................................... 24
    15:1       Salaries ....................................................................................... 24
    15:5       Salary Advancement .................................................................. 24
Article XVI   Peaceful Resolution of Differences ............................................. 25
Article XVII  Savings Clause ............................................................................ 25
Article XVIII Matters Not Covered ................................................................... 25
Article XIX   Duration ...................................................................................... 25
Appendix A-1 Salary Schedules .......................................................................... 27
Appendix A-2 Longevity Schedule, Other Programs ........................................... 29
Appendix B   Extra-Curricular Salary Schedule 2025-28 ................................... 30
Appendix C   Fringe Benefits ........................................................................... 32
             Medical/Health Insurance ........................................................... 32
             Premium Cost Sharing ................................................................ 32
             Section 125 and Flexible Spending Accounts .............................. 33
             Notification of Retirement ........................................................... 33
             Change of Carrier ....................................................................... 33
             Retiree's Insurance ..................................................................... 33
             Alternative Health Insurance ...................................................... 34
             Reimbursement for Loss ............................................................. 34
Appendix D-1 Oversize Class Grievance Form .................................................... 35
Appendix D-2 Grievance Form ............................................................................ 36
Appendix E   Recall Script .............................................................................. 37
Appendix F   Teacher Layoff ........................................................................... 38
Appendix G   HSA Plan Summary .................................................................... 39
Appendix H   Request for Absence Personal Reasons Form ............................... 42

ii

**JA156**

## PREAMBLE

The Board of Education of the City of New Britain, and the New Britain Federation of Teachers, Local 871, agree and recognize that they have an interest in educational excellence that is far beyond the scope of a collective bargaining agreement governing terms and conditions of employment. The Board of Education and the New Britain Federation of Teachers wish to declare their mutual intent to work toward the achievement of common aims as follows:

1. The formation of realistic goals and programs consistent with the best educational theory.

2. The development of a system of communication and consultation designed for more harmonious relations of the parties concerned as well as to expedite business to a fruitful conclusion.

It is hoped that this common effort will contribute in significant measure to the advancement of public education in the City of New Britain.

## AGREEMENT

**WHEREAS,** Connecticut law prescribes the procedure of collective bargaining between boards of education and teacher organizations; and

**WHEREAS,** in a secret ballot election conducted among certified personnel of the New Britain School District by the American Arbitration Association under the auspices of the Connecticut State Board of Education in accordance with Connecticut law, the New Britain Federation of Teachers received a majority mandate to act as their collective bargaining agent; and

**WHEREAS,** the Board has voluntarily endorsed such procedure by meetings with the Union as a fair and orderly method of regulating and conducting its affairs appropriate to its lawful functions with those concerned in New Britain it is agreed as follows:

## ARTICLE I
## DEFINITIONS

1:1   **Board:** Board of Education of the Consolidated School District of the City of New Britain.

1:2   **Union:** New Britain Federation of Teachers, Local 871, American Federation of Teachers, A.F.L.-C.I.O.

1:3   **Administration:** The Superintendent of Schools and the entire administrative staff as defined by the Connecticut State Board of Education, as well as other administrators whose positions do not require state certification.

1:4   **Teacher:** A person employed by the Board as defined in Article 2, Section 2:1.

1:5   **Substitute Teacher:** Any instructional employee employed on a day-to-day basis.

1:6   **School:** Any work location to which a member of the bargaining unit is assigned.

1:7   **Union Representative:** The Union Building Representative or their designated representative.

1

1:8    Whenever the singular is used in this Agreement, it is to include the plural.

1:9    **Seniority**: Seniority or length of continuous service of the employee from the last date of employment in any position requiring Connecticut State Certification. Seniority will continue to accrue during any authorized unpaid leave for purposes of transfer, layoff and recall rights only. Seniority will continue to accrue during any uniformed services leave for all purposes. Seniority will be lost if an employee quits, resigns or is discharged, or exceeds an authorized leave of absence.

1:10   **Course Credit**: Course credit shall mean credit given for graduate courses, which are part of a program of higher learning (the individual teacher need not be matriculated in said program), licensed by the Connecticut Department of Higher Education and offered by an institution of higher learning, accredited by the Connecticut Department of Higher Education or in the case of out-of-state institutions, by Regional Accredited Agency (as accredited on www.collegesource.org), or course/credits approved in writing, in advance, by the Superintendent or their designee. Course credit shall not be given for professional development courses. There is no blanket ban on internet and/or video courses. Courses credited under this Article must be professionally appropriate. Prior to starting any coursework, a teacher shall notify the Superintendent or their designee. Any denial of course credit shall be subject to the grievance-arbitration process in the collective bargaining agreement.

1:11   **Hours**: As used in Appendix A-1 shall mean course credits.

## ARTICLE II
## MANAGEMENT RIGHTS AND UNION RECOGNITION

2:0    Except where such rights, powers and authority are specifically relinquished, abridged or limited by the provisions of this Agreement, the Board has and will continue to retain, whether exercised or not, all of the rights, powers and authority heretofore had by it and, except where such rights, powers and authority are specifically relinquished, abridged or limited by the provisions of this Agreement, it shall have the sole and unquestioned right, responsibility and prerogative of management of the affairs of the public schools and direction of the working forces, including, but not limited to the following:

   a.    To establish or continue policies and procedures for the conduct of Board business and, from time to time, to change or abolish such policies or procedures.

   b.    To describe and enforce reasonable rules and regulations for the maintenance of discipline and for the performance of work in accordance with the requirements of the Board, provided such rules and regulations are made known in a reasonable manner to the employees effected by them.

   c.    To create job specifications and to revise existing job descriptions.

2

**JA158**

6:11    Uniformed Services Leave

A teacher who is called for National Guard or Reserve Duty shall try to have their service deferred to a time that will not conflict with their obligation to the students. If the teacher must serve, time shall be granted for no longer than two (2) weeks. Salary received for this period shall be equal to the teacher's full salary. The amount received for such National Guard or Reserve Duty shall be turned over to the School District. Additional leave will be granted in accordance with the Uniformed Services Employment and Reemployment Act.

6:12    Paid Personal Leave

Teachers shall be granted four (4) days paid personal days off in any school year. Unless there is a legitimate reason, personal days shall not be granted on the last work day before a holiday or the first work day after a holiday or to extend vacations. Any requests for the months of May or June must only be to attend weddings, educational events (defined as formal, school related recognition ceremonies) for members of the immediate family (defined as spouse, child, sibling or an individual domiciled in the teacher's household) or for extraordinary circumstances. Adult Education Teachers who are assigned to work a minimum of 25 hours per week in any semester shall be granted one (1) paid personal day for that semester. All personal leave requests must be granted in writing in advance by the building principal after a completion of the existing absence form (attached as Appendix H), except in cases of emergency. In cases of extreme personal nature, teachers may inform the Local President of the reason for the leave and the President shall inform the Director of Personnel and Talent Management. Such reason shall be kept confidential.

6:13    Superintendent's Discretion

Nothing agreed to herein precludes the Superintendent from granting additional days off, with or without pay, for circumstances not specifically covered or for circumstances specifically covered herein.

6:14    All requests for time off shall be brought to the Superintendent's attention through routine channels as speedily as possible. The Superintendent shall make an adjudication in the case of such requests for absence with regard to the number of days permitted, salary, etc.

6:15    Any teacher who is scheduled to start an authorized leave of absence prior to October 15 and who expects to be absent for at least five (5) weeks, may be placed on temporary assignment, in accordance with the FMLA, if applicable.

## ARTICLE VII
## TEACHER TRANSFER/VACANCIES

7:1    Job Vacancies: Announcement of vacancies or openings in newly created jobs shall be made when they occur. The qualifications of the position shall be posted for a minimum of five (5) calendar days. Outside notification and interviews for positions may occur concurrently with the posting to bargaining unit members. However, first consideration shall be given to qualified internal applicants. Notification of vacancies shall be sent electronically to all bargaining unit members district email accounts. Members interested in vacancies shall be responsible for checking their district email over the summer recess.

16

**JA159**

7:2    Additional hours that become available for Adult Education Teachers will be posted and offered to the most qualified Adult Education Teacher.

7:3    A complete Seniority List shall be given to the Federation each year by the first payroll date in October.

7:4    Voluntary Transfers:

Teachers who wish to be voluntarily transferred to a vacancy may submit an application to the Talent Management Department. Only teachers determined by the Administration to have the requisite knowledge and qualifications for such vacancy will be granted an interview. Such transfers shall only be granted if it is determined by the Administration that such applicant has the requisite qualifications and certification for the position. Major consideration shall be given to teachers having seniority in the District, so long as a system-wide balance of experienced teachers is maintained, and so long as the best interests of the School District are consistent with such voluntary transfer(s).

When a member is granted a voluntary transfer, the member shall not be permitted to apply for another position until the end of the current school year.

7:5    Meeting standard or not meeting standard teachers may not submit requests for voluntary transfers, unless there is mutual agreement between the parties.

7:6    Involuntary transfers shall not be made without prior consultations between the teacher and Superintendent or designee at which time the teacher shall be notified of the reason for the transfer.

7:7    A teacher who does not wish to be transferred may appeal the decision of the Superintendent by following the grievance procedure, and the standard for such an appeal shall be that the Superintendent's or designee's decision to involuntarily transfer shall not be arbitrary or capricious.

7:8    A teacher who posts for a specific vacant position and later reconsiders must withdraw their request before the position is awarded. Once awarded, the teacher must accept the position. If during the annual posting, an awarded position is eliminated or awarded in error, a non-displaced applicant shall return to their original position.

### ARTICLE VIII
### TEACHER FILES

8:1    All teacher files containing teacher evaluations and materials relating to their performance shall be maintained under the following circumstances:

8:2    Each teacher shall be entitled to knowledge of and access to supervisory records and reports of competence, personal character and efficiency contained in their personnel file with reference to evaluation of their performance in such school district.

8:3    The Board shall provide each teacher access to their personnel file, including the records and reports described above, through an electronic platform.

8:4    Upon reasonable notice, each teacher shall have the right to review and reproduce material in their personnel file to which they are entitled by law.

17

**JA160**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO,<br><br>*Plaintiff,*<br><br>v.<br><br>ANTHONY GASPER et al.,<br><br>*Defendants.* | No. 25-cv-00153 (SFR) |

**DECLARATION OF ANDREW MAZZEI**

I, Andrew Mazzei, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1. I am of legal age and am competent to testify in this proceeding.

2. I work for the Consolidated School District of New Britain ("the District") as the Assistant Principal for middle school at DiLoreto Elementary & Middle School, a position that I have held since July 2024. I have worked in the District for more than twenty years, starting out as a teacher, before attaining an administrative position. In my current role, I support DiLoreto's Principal in supervising students and staff, as well as implementing districtwide policies and goals, with a specific focus on the middle-school grades.

3. I am familiar with the events underlying this lawsuit brought by plaintiff Marisol Arroyo-Castro, who most recently taught seventh-grade social studies at DiLoreto. I base this declaration on my own personal knowledge.

4. In the fall 2024 semester, Ms. Arroyo-Castro had a homeroom class, taught four sections of social studies, and taught an advisory class of students needing reading and math support. Each section had at least twenty-five students. The students in Ms. Arroyo-Castro's homeroom were the same as in one social-studies section and as in the advisory class. Each class session lasted forty-eight minutes.

**JA161**

5. In the fall 2024 semester, near the time of these events, the approved seventh-grade social studies curriculum focused on the European colonization of Africa. Nothing in that semester's curriculum contemplated that a crucifix be visibly displayed for all or any portion of class. I do not understand Ms. Arroyo-Castro to be taking a contrary position.

6. In general, to address chronic absenteeism within the District, DiLoreto takes action, beyond legal requirements, to encourage student attendance. An attendance team meets weekly to review attendance concerns and plan for improved attendance. The school offers incentives for achieving attendance benchmarks. For example, homerooms with the best monthly attendance may receive craft time or get to perform a relay race. Individual students who have perfect monthly attendance enter a raffle for a DiLoreto Dragons sweatshirt, and homerooms with perfect attendance that day receive recognition over the loudspeaker.

7. DiLoreto's Parent and Student Handbook for 2024-2025 contains information about and guidelines for the school. The Handbook emphasizes that attendance at school is mandatory. It explicitly notifies parents and guardians of their obligations to assure their child's attendance at school, in accordance with Board of Education policy and Connecticut state law, and outlines the consequences of excessive absences. The Handbook also lists school staff, broken out by grade and subject area, for the 2024-2025 academic year. A true and accurate copy of the excerpted Handbook is attached to this declaration as Exhibit A.

8. In my capacity as Assistant Principal, I field complaints from students regarding their teachers. Sometimes, teachers will relay students' complaints to me. If I receive a complaint about a teacher, I will often raise the issue directly with the teacher first.

9. On November 26, 2024, Ayla Duve, a seventh-grade science teacher at DiLoreto, alerted me to complaints from students about a crucifix hanging in the classroom where Ms. Arroyo-Castro taught, as well as about Ms. Arroyo-Castro's making religiously themed

2

**JA162**

comments to students in class. When telling me this, Ms. Duve expressed her own concern about any teacher's subjecting students to religious ideologies or items in school, outside the context of the curriculum.

10.    The next day, I visited the classroom in question and noticed a crucifix hanging on the wall next to Ms. Arroyo-Castro's teaching desk. Without measuring it, I estimated that the crucifix stood nearly a foot tall, around the same height as a standard 8.5x11-inch sheet of printer paper. The crucifix would have been directly visible to students who sat parallel to the desk, or to anyone who approached the desk, and could also have been seen by students from other areas of the room.

11.    Around that same time, multiple students complained to me directly about religious language that Ms. Arroyo-Castro had used towards students in the classroom. More specifically, these students reported that Ms. Arroyo-Castro in class had been telling students things such as "You need Jesus," that "Papa God doesn't like liars," or that "Papa God is probably disappointed in you," or had referred to students as sinners.

12.    After I received these complaints, I reached out to the District's Chief of Staff, Maryellen Manning, for guidance. We decided that I would convene an informational meeting with Ms. Arroyo-Castro after the Thanksgiving holiday.

13.    On December 3, 2024, I emailed Ms. Arroyo-Castro requesting to meet with her to discuss the concern that had been raised with me regarding the cross displayed in her classroom and to review District policies. During the meeting, held on December 6, 2024, I instructed her to take down the crucifix by the following Monday, to comply with the First Amendment to the United States Constitution, which prohibited permanent displays of religious symbols on school property unless used as a curricular teaching tool. I promised to stop by the classroom on Monday morning.

3

14. On the morning of Monday, December 9, 2024, I observed that the crucifix remained in place on Ms. Arroyo-Castro's classroom wall. I informed Chief of Staff Manning and sought guidance on how to proceed.

15. The following afternoon, on December 10, 2024, Ms. Manning and I, along with DiLoreto's Principal, Dario Soto, met with Ms. Arroyo-Castro and her union representative regarding the refusal to remove the crucifix. To the best of my ability, I personally took contemporaneous handwritten notes of what everyone said in my presence during this meeting. I promptly scanned and saved the notes to a computer folder. A true and correct copy of the notes is attached to this declaration as Exhibit B.

16. For example, as the notes reflect, during this meeting, Ms. Manning explained to Ms. Arroyo-Castro that the crucifix gave the "perception of promoting Christianity" as a religion and "favoring it over others," meaning other types of religion. As the notes further reflect, Ms. Manning proposed that Ms. Arroyo-Castro could put the crucifix in her desk drawer and pull it out when she was alone. When that idea was rejected, the union representative suggested hanging the crucifix on the desk drawers, which Ms. Arroyo-Castro entertained because she still could "walk near it and see it," as the notes memorialize.

17. Ms. Arroyo-Castro agreed to place the crucifix on the underside of her desk.

18. The next day, the crucifix was back to its original location.

19. After another meeting, which I attended, the District suspended Ms. Arroyo-Castro for two days without pay.

20. On December 20, 2024, Ms. Arroyo-Castro posted on a text-message portal, to her entire seventh-grade homeroom class: "Unfortunately, I will not be able to respond to your contacts moving forward since I have been placed on Administrative Leave for refusing to remove a Crucifix from my desk area. The lesson to learn here is that doing what is right is not

4

always easy." This message continued: "Being good is hard… so you have to be strong to be good." The message ended by wishing her students a "Merry Christmas :-)". A true and accurate copy of this message is attached to this declaration as Exhibit C.

21.    A student shared the message with a teacher, who notified administrators of the posting. In a conversation in January, a student's parent described this message to me as an inappropriate thing to send to families.

22.    A photograph that is attached to this declaration as Exhibit D accurately shows Ms. Arroyo-Castro's teaching desk from the side, as viewed from a distance. I was present in the room when this photograph was taken. The photograph was taken in January, a little more than a month after Ms. Arroyo-Castro's suspension began. The crucifix previously occupied the now-empty spot on the wall between the two calendars, above the chair's armrests, and beneath the post-it notes. The classroom's entrance was along the far wall to the left of this image. Because our school strives for teachers to improve small group instruction, Ms. Arroyo-Castro created tables by combining multiple desks and would directly teach students in small groups around these tables. The photograph accurately reflects the desks' layout just prior to Ms. Arroyo-Castro's suspension. To that point, the scene had been left largely undisturbed, except for our having removed the crucifix.

Dated: New Britain, CT  
April 11, 2025    _____  
                  Andrew Mazzei, Assistant Principal

5

**JA165**

# EXHIBIT A

# DILORETO ELEMENTARY AND MIDDLE SCHOOL



## PARENT / STUDENT HANDBOOK
## 2024 - 2025

## POLICIES, PROCEDURES, RIGHTS & RESPONSIBILITIES
THIS HANDBOOK IS CURRENT AS OF 7/29/2024 AND IS SUBJECT TO CHANGE.

732 Slater Road | New Britain, CT 06053 | (860) 223-2885 | www.csdnb.org

**JA167**



# Diloreto Elementary and Middle School Mission

The DiLoreto Magnet School Community will empower student ambassadors to achieve their personal best by providing a culture of academic excellence. We aim to promote and sustain a safe learning environment where students are taught by caring and knowledgeable educators in cooperation with supportive, involved families.

# Diloreto Elementary and Middle School Vision

"Educational Excellence for All"

Dario Soto, Principal  sotoda@csdnb.org
Krista Crist, Assistant Principal  crist@csdnb.org
Andrew Mazzei, Assistant Principal  mazzei@csdnb.org

---

### School Hours

REGULAR SCHOOL DAY
8:10 a.m. – 2:50 p.m.

EARLY DISMISSAL DAY
8:10 a.m. – 12:50 p.m.

2 Hour Delayed Opening
10:00 a.m. – 2:50 p.m.

---

RESPECT | OWNERSHIP | ACCOUNTABILITY | RESPONSIBILITY

## Principal's Welcome

JA169

## PARENT/STUDENT HANDBOOK
TABLE OF CONTENTS

| | |
|---|---|
| **School Staff** | **7** |
| **District School Calendar** | **8** |
| **Arrival Procedures** | **9** |
| **Dismissal Procedures** | **9** |
| **School Closings Due to Inclement Weather** | **10** |
| **Attendance Guidelines** | **10** |
| Staying Home from School | 11 |
| Board of Education Policy Regarding School Attendance | 11 |
| **Uniform Expectations** | **12** |
| Tiered Flow Chart for Uniform Compliance | 12 |
| Dress Code for Dress Down Day | 13 |
| Board of Education Policy 5132.10 School Attire | 13 |
| **Technology Expectations and Guidelines** | **14** |
| Personal Electronic Devices | 14 |
| Chromebook Expectations | 14 |
| Parental Notice of School-Sponsored Access to the Internet | 14 |
| **Academics** | **15** |
| Curriculum | 15 |
| Dos en Uno | 15 |
| Spanish Language Development Program (SLD) | 15 |
| Assessments | 15 |
| Homework | 15 |
| Make Up Work | 15 |
| Parent/Guardian Academic Responsibilities | 16 |
| Intervention/MTSS | 16 |
| Multilingual Learners (ML) | 16 |
| Special Education and Related Services | 17 |
| Gifted/Talented | 17 |
| Grade Placement- Promotion and Retention | 17 |
| Limits on Retention | 17 |
| Qualifications for Retention | 18 |
| Action Steps Following the Retention of al Student | 18 |
| **School-Wide Behavior Expectations** | **18** |
| Student Expectations | 18 |
| Positive Behavioral Interventions and Supports (PBIS) | 18 |
| Discipline/Sanction Reporting Guidelines | 19 |
| Philosophy | 19 |
| Due Process | 19 |

RESPECT | OWNERSHIP | ACCOUNTABILITY | RESPONSIBILITY

**JA170**

| Safeguards: Protecting the Rights of Students & Parents/Guardians | 19 |
| Field Trips | 20 |
| School Dances and Activities | 20 |
| Policy 5131.911 – Safe School Climate | 20 |
| Policy 5131.00 – Student Discipline Code | 22 |
| Policy 5131.6 – Drug and Alcohol Policy | 22 |
| Policy 5145.50 – Student Sexual, Racial and Other Unlawful Harassment | 23 |
| 6121.00 – Student Equal Education Opportunity/Non-Discrimination | 25 |
| In Loco Parentis | 25 |
| **Home-School Communication** | **25** |
| Progress Reports and Report Cards | 26 |
| Parent-Teacher Conferences | 26 |
| Ongoing Communication | 26 |
| Parent and Student Surveys | 26 |
| **School Safety** | **27** |
| Visitors to School Buildings | 27 |
| Emergency Drills | 27 |
| Biking Safety | 28 |
| Security Recordings | 28 |
| Policy 4118.233/4218.223– Possession of Firearms/Deadly Weapons on School Property | 28 |
| Policy 5125.00 – Privacy Rights of Parents and Students | 28 |
| Protection of Pupil Rights Amendments (PPRA) | 29 |
| **Health and Medical** | **29** |
| Administration of Medication | 30 |
| Over the Counter Preparations and Emergency Prescription Medications: | 30 |
| Medical Emergencies | 31 |
| Communicating with the School Nurse | 31 |
| Health Assessment Requirement (physical examinations) | 31 |
| Immunizations | 31 |
| On-Site Behavioral Health Services | 31 |
| Policy 6142.101 – District Wellness | 32 |
| **General Information** | **32** |
| Change of Address/Telephone Number | 32 |
| Child Custody | 32 |
| Homeless Students | 32 |
| After School Programming | 32 |
| Telephone Use | 33 |
| Lockers | 33 |
| Photographing/Videotaping Students | 33 |

RESPECT | OWNERSHIP | ACCOUNTABILITY | RESPONSIBILITY

JA171

# School Staff

**Kindergarten**
Joelyz Lugo Vega – Dos en Uno
Mariam O'Neill Vega – Dos en Uno
Emma Ridzon
Daryl Tara

**1st Grade**
Sarah Altman
Raquel Galeano Rosado – Dos en Uno
Fabiola Minano – Dos en Uno
Joanna Robbins

**2nd Grade**
Deirdre Falla – Dos en Uno
Cristina Miano
Claudia Quintanilla
Estefani Rivera – Dos en Uno

**3rd Grade**
Nicole Dery – Dos en Uno
Tammy Goodwin
Lorel Salgado – Dos en Uno
Christina Valentine

**4th Grade**
Kristina Donza – Math
Maria Donnelly – ELA
Katherine Plourde – Math
Marcy Smith – ELA

**5th Grade**
Theresa Falkowski – Math
Christina LeMay – ELA
Kristy Olson – ELA
Ryan Pouliot – Math

**6th Grade**
Megan Howey – Math
Clint Matarazzo – Social Studies
Doug Sheldon – Science
Imari Watson – ELA

**7th Grade**
Marisol Arroyo-Castro – Social Studies
Sarah Bell – ELA
Ayla Duve – Science
Margaret Murray – Math

**8th Grade**
Martha Crawford – Social Studies
Leena Murali – Math
Jennifer Pagan – ELA
Jill Simko – Science

**Academic Arts**
Vacancy – ELEM Art
April Alessi – MS Art

Jessie Wills – ELEM Music
Vacancy – MS Music
Naveen Chadha – Band
Annie Seravalle – 4/5 Strings
Chuck Serravalle – MS Strings

Zachary Ferland – ELEM PE
David Conrad – MS PE
Tami Hyde – MS PE & Health

Hediona Beshiri – STEAM
Robin Pizzuto – STEAM

Luz Rodriguez – ELEM SLD
Baileys Irizarry – MS SLD

Charley Faria – LIA

**Special Education**
Veronica Barnes – SLP
Kyle Greene-Pendelton – SLP

Denise Cafiero
Leah Clark
Patricia Mayoussier
Elizabeth Modderno – PPT Specialist
Jenna O'Neil
Rosita Pouliot
Amanda Upchurch

**Support Services**
Celine Hines – ML Teacher
Suzy Vass – ML Teacher

Jennifer Ortiz – School Psychologist
Marissa Scarano – School Counselor
Ray Wilson – Social Worker

Melissa Abate – Reading Teacher
Marisa Garcia – Literacy Tutor
Marita Gereg – Literacy Tutor

Joseph Body – Dean of Students
Jose Garcia – Behavior Support Assistant

Timothy Maia – Family School Liaison

Sharon Czako – SBHC
Brenda Buzzi – Wheeler Clinic
Ral Etolue – Wheeler Clinic
Hanna Aforismo – Klingberg Family Centers

**Paraprofessionals**
Jazmine De Dios
Tanya Lombardo
Tiffany Rivera
Jeffery Tilton

**Instructional Coaches**
Lauren Gaudino – MS
Christine Morell – Literacy
Gabriela Ortiz – Math

**Secretary**
Amalya Leonard
Evelyn Lopez

**Nurse**

**Custodial Staff**
Wanda Diaz
Ethan Falla
Juwan Leonard
Fraizer Powers

**Library Assistant**
Sajada Henry

RESPECT | OWNERSHIP | ACCOUNTABILITY | RESPONSIBILITY

6

**JA172**

If students are being dismissed early, parents must communicate with the school via phone call or written note to the main office. Students will not be released early from class thirty minutes prior to the end of the regularly scheduled day which is after 2:20 pm to ensure a safe and orderly dismissal process for all members of the learning community.  This is an important time of the day for your child – a time when they are able to reflect on their learning for the day, receive guidance for homework, projects and future learning.

During the school day, students will only be dismissed from the school office. Upon arriving at the school to pick up your child, you should report directly to the office. You will be asked to show photo identification and sign a dismissal log before your child will be called to the office.  Children will not be dismissed to anyone other than the parents or guardians without written permission from the custodial parents or guardians. Parents/guardians are asked to complete an emergency form at the beginning of each school year which lists individuals to whom a child may be released.  An older sibling must also present written permission from the custodial parents or guardians to pick up a younger sibling. Even with such permission, we will try to verify by phone that you wish your child to go home with someone else. This precaution may be frustrating for you and/or the bearer of the note, but remember that our first concern is your child's safety.

## <u>School Closings Due to Inclement Weather</u>

In the event of school closings or early dismissal due to inclement weather, a call will be made using the automated calling system as soon as possible. Please be sure that your telephone numbers are up to date so that we can contact you in case of emergency.

Information regarding closings, early dismissals or the cancellation of after school activities will also be posted on our social media platforms (Facebook, Twitter and Instagram) as well as our website, located at [www.csdnb.org](www.csdnb.org). You can also watch the TV stations (WFSB, NBC 30 or Fox 61) for information.

In the event of an early dismissal due to weather, please make sure your child is aware of any alternate arrangements for going home. Inclement weather dismissal will occur at 12:50PM and is known as the "2-hour early dismissal."

**THERE IS NO SUPERVISION FOR CHILDREN IN THE EVENT OF A DELAYED OPENING.**

## <u>Attendance Guidelines</u>

Attendance at school is mandatory.  Students need to be present in order to learn. You can help by making school a top priority. Please do not schedule appointments during school hours, however, students can leave school early or come to school late if this cannot be avoided.  Contact the school to report your child's absence, and send a note to the teacher explaining the absence when your child returns to school. *Calls are made to the home of each absent student in the morning to ensure that the parent knows the child is not at school.*

An unreported absence is an unexcused absence. Absences are excused <u>only</u> for illness or certain family emergencies up to 9 absences with appropriate documentation including doctor's notes. If your child has excessive absences, a referral to the Attendance Committee will be completed, which may include parents attending a meeting to discuss attendance concerns. DiLoreto's Attendance Committee consists of the teacher, administration, school social worker, family school liaison, school counselor, and the district's attendance officer. If necessary, an additional referral will be made to the attendance review board. If the attendance issue continues, a referral will be made to DCF due to educational neglect.

STUDENTS BECOME IRREVERSIBLY CHRONICALLY ABSENT AFTER 18 MISSED SCHOOL DAYS.

## Staying Home from School

Deciding when to keep a sick child at home from school is not always easy. It's important for children to attend school and for some parents staying home means missing work. When a child is truly sick they need to stay home in the care of a responsible adult to get well and to prevent spreading illness to others.

Listed below are some conditions where Parents/guardians should keep the student home from school:

- Fever over 100 - student may return when their temperature has returned to normal for 24 hours without the use of fever reducing medications
- Two or more episodes of vomiting - student may return when they have not vomited for 24 hours.
- Two or more episodes of diarrhea - student may return when they have gone 24 hours without further diarrhea
- Persistent coughing, including coughing from asthma that is not resolved by using prescribed asthma medications
- Severe pain - such as from an earache or toothache. The student should see a medical or dental provider immediately for treatment
- Diagnosed communicable illness or condition - such as flu, chicken pox, scabies, or whooping cough. The student may not return to school until cleared by their medical provider.
- Thick drainage coming from the eye and causing the eyelids to stick together. Student should see a medical provider for treatment.
- Strep throat - students diagnosed with strep throat may return after they begin antibiotic treatment.

Simple stuffy noses, coughs, or minor allergy symptoms don't stop many children from enjoying and participating in school activities. If your child is congested or has a sore throat but is still active in the morning and able to get themselves ready, it's a good sign that they can handle the school day.

## Board of Education Policy Regarding School Attendance

In compliance with Connecticut State Law (Statute 10-184), we are providing written notice to you, as parents and guardians, of your obligations to assure your child's attendance at school.  Students are expected to be on time for school and attend classes every day, unless they are sick or have a serious reason to be out. The New Britain School District policy states that the only excused absences are those due to a child's illness, death in the family, a doctor or dentist appointment, religious obligations, or whenever administration considers that exemption from school is in the best interest of the student. The school administrator makes the final determination about whether an absence is excused.  As of April, 2013 CT State Department of Education has provided definitions to establish two levels of criteria for an absence to be considered excused.  The first nine absences in a school year can be deemed excused for any reason the parent or guardian provides.  The 10th and subsequent absence after has a specific set of reasons that qualify as excused.  The acceptable reasons for a student absence to be considered excused after 10 or more absences are as follows:

- Student illness with verification from an appropriately licensed medical professional regardless of absence length;
- Student's observance of a religious holiday;
- Death in a student's family or any other emergency beyond the control of the student's family;
- Mandated court appearances that are documented;
- Lack of transportation that is normally provided by a district other than the one the student attends;

RESPECT | OWNERSHIP | ACCOUNTABILITY | RESPONSIBILITY

- Extraordinary educational opportunities that meet specific criteria and are pre-approved by district administrators.

For more information regarding the Two-Level Approach to Excused Absences please visit http://www.sde.ct.gov/sde/lib/sde/pdf/publications/guidelines_excused_and_unexcused_absences.pdf.

# Uniform Expectations

All students in grades kindergarten - 8 must wear the approved universal uniform of a white, navy, red, or yellow collared shirt and either khaki or navy blue Dockers style slacks/bottoms.



**Bottoms**

Students are expected to wear pants or knee-length shorts. Pants should be "dress" or "Dockers" style and be belted at the waist only.  Denim jeans, jeggings, and leggings are not allowed.  Girls may also wear skirts, jumpers or skorts in either khaki, navy blue, black, or gray and must be knee length or longer.  We offer customized DiLoreto sweatpants as an alternative to Dockers style slacks/bottoms.

**Tops**

Student tops should be a solid color with a collar or turtleneck, worn tucked-in and tops may have long or short sleeves. No tee-shirts are allowed.  Sweaters, blazers or vests in a solid color of navy or white are acceptable.  Clothing with graphic designs, word screening, logos etc. are not allowed.

**Footwear**

Shoes and sneakers must have a back strap to keep them on a student's feet. Laces must be tied. Slides and slippers are unacceptable.

**DiLoreto Spirit Wear**

Students are allowed to wear DiLoreto spirit wear as a replacement for the school uniform.

## Tiered Flow Chart for Uniform Compliance

School uniforms are a district policy and will be enforced.  There may be times when students are not in uniform based on a variety of factors (access to laundry, students that have outgrown uniforms, financial

# EXHIBIT B

2:06     12.10.24     Mr Levy (out)     Castro

Mazlei

Manning

- Predisiplinary meeting

- Can you speak to us why you have not
complied
    → Castro - feel it is my right to my
    relijon
    - helps me the most
    -

2:08 - Soto joined

    - Castro - "I feel the cross is part of me"
    - I wear a cross
    - I feel bad to take it down
    - I see it as the cross thus anyone
      can see us
- this is what I believe to be my personal
space, I pray to it at lunch
    - "if you were able to hang on the cross,
      I can do anything."

- feel uncomfortable taking it down, it
is an the wall for me - it is a little
message to me

MM - perception of promoting christianity that
you are favoring your that
    - your employer will never tell you who
      to pray for

- consider other strategies
- the perception is you are favoring it one other
- want to go one strategies
- can cross be put in your drawer -
when alone you can pull it out - we
can I have it on the wall. We don't want
to be the ones to take it down. want
to work w/ you as a long time employee

Soto - ~~does not~~ brought up scripture
- can you have it in a place that
is not out
-- is this crow prevents your faith

(2:19 - Putting it into a drawer is too much)
(Levy)
→ hang it from the drawer handle -
would not promote to anyone

→ I think it is a good middle ground -
as far as a compromise that I am willing
to make
- I want to be able to see, I can walk
near it and see it

MM - I appreciate it

Levy - if we can land there → no discipline for
insubordination

2:22

2:30 are-adjourned
    ◦ our obligations as employer
    ◦ consider request
    ◦ take cross down

2:32 - Ed "we need a minute"

2:37 - returned
    - has magnets, can she address it now
JSMM - explains the law
    ◦ being respectful of an employees religious
        beliefs
    - need it to be taken off
        - if it is in a place where students can
        not see it

- can I promote
- an desk where id is not seen
- understanding that id needs to be
no consp. trans spot
  - id is a challenge that we hope
    can get addressed.

- Mr. Soto will help
- Ed will go up with her

2:42   went to class

2:45 - cross placed inside of
desk

- Cried - he said died for me so
  I can cry for him

# EXHIBIT C



# EXHIBIT D

**JA184**



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MARISOL ARROYO-CASTRO, <br><br> *Plaintiff,* <br><br> v. <br><br> ANTHONY GASPER et al., <br><br> *Defendants.* | No. 25-cv-00153 (SFR) |

### DECLARATION OF AYLA DUVE

I, Ayla Duve, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1.  I am of legal age and am competent to testify in this proceeding.

2.  I am a teacher employed by the Consolidated School District of New Britain. During the 2024-2025 school year, I have taught seventh-grade science at DiLoreto Elementary & Middle School.

3.  I am familiar with some of the events leading up to this lawsuit by plaintiff Marisol Arroyo-Castro, who also taught seventh graders at DiLoreto during the fall of 2024. I base this declaration on my own personal knowledge.

4.  At the start of this school year, I noticed a cross depicting Jesus displayed in the classroom where Ms. Arroyo-Castro taught. In my understanding, teachers should not be displaying religious items in class unless related to a lesson plan. Initially, I did not feel that it was my place to say anything about this item.

5.  Over the course of the semester, students generally settled in and some became increasingly comfortable sharing their concerns with me, or approaching me for advice. In general, I view it as part of my job to speak to supervisors about concerns or complaints that students have raised with me about the school environment.

**JA185**

6.    Two students in particular told me how Ms. Arroyo-Castro had been exposing students to religion in the classroom, unrelated to the content of the curriculum. Given their demeanor, and the substance of their complaints, these students appeared to me to be upset. As one of these students mentioned to me, this student was not a Christian.

7.    In these discussions, the students specifically brought up the cross near the teacher's desk. They also complained that Ms. Arroyo-Castro had been making religious comments in their presence in class. Although I do not know the exact words used, these students informed me that Ms. Arroyo-Castro in class had told students things to the effect that they needed Jesus, or had made other God-related comments. As these students also told me, Ms. Arroyo-Castro would use such phrases in a chastising manner, not in a lighthearted way.

8.    In November 2024, without identifying the students by name, I relayed their complaints to Andrew Mazzei, DiLoreto's Assistant Principal. I also shared my own concerns about students' being subjected to someone else's religious ideologies or having such a religious item on display in a classroom, unrelated to the curriculum, especially when many of our students are not Christian.

Dated: New Britain, CT
April 11, 2025                    Ayla Duve, Teacher

2

**JA186**