# 25-3047

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MARISOL ARROYO-CASTRO,

*Appellant,*

*v.*

ANTHONY GASPER, ET AL.,

*Appellees.*

On Appeal from U.S. District Court for the District of Connecticut,
No. 3:25-cv-00153-SFR

**JOINT APPENDIX**
**VOLUME 3 OF 3 (JA187 THROUGH JA319)**

JEFFREY C. MATEER
DAVID J. HACKER
JEREMIAH G. DYS
HOLLY M. RANDALL
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075
(972) 941-4444

REBECCA R. DUMMERMUTH
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave, NW, Suite 1410
Washington, DC 20037
(202) 921-4105

MATTHEW T. MARTENS
KEVIN M. GALLAGHER
DONNA M. FARAG
JONATHAN W. ELLISON
ANDREW NELL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
(202) 663-6921

ROBERT KINGSLEY SMITH
JAYNE HOLLOWAY MORRIS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State St.
Boston, MA 02109
(617) 526-6759

March 18, 2026

# APPENDIX

# TABLE OF CONTENTS

Page

**VOLUME 1**

Docket Report, No. 25-cv-00153 ...................................................................... JA1

Complaint, Dkt. 1 (Jan. 30, 2025) ................................................................... JA13

**VOLUME 2**

Declaration of Marisol Arroyo-Castro in Support of Motion for
    Preliminary Injunction, Dkt. 38-2 (Mar. 14, 2025) ................................... JA56

    Exhibit A to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-3
        (Mar. 14, 2025) .................................................................................. JA67

    Exhibit B to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-4
        (Mar. 14, 2025) .................................................................................. JA69

    Exhibit C to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-5
        (Mar. 14, 2025) .................................................................................. JA79

    Exhibit D to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-6
        (Mar. 14, 2025) .................................................................................. JA81

    Exhibit E to Declaration of Marisol Arroyo-Castro in Support
        of Motion for Preliminary Injunction, Dkt. 38-7
        (Mar. 14, 2025) .................................................................................. JA84

Declaration of Matthew T. Martens in Support of Motion for
    Preliminary Injunction, Dkt. 38-8 (Mar. 14, 2025) ................................... JA87

i

Exhibit A to Declaration of Matthew T. Martens in Support of
Motion for Preliminary Injunction, Dkt. 38-9
(Mar. 14, 2025)..................................................................JA89

Exhibit B to Declaration of Matthew T. Martens in Support of
Motion for Preliminary Injunction, Dkt. 38-10
(Mar. 14, 2025)..................................................................JA98

Exhibit C to Declaration of Matthew T. Martens in Support of
Motion for Preliminary Injunction, Dkt. 38-11
(Mar. 14, 2025)................................................................JA100

Answer and Affirmative Defenses, Dkt. 51 (Apr. 14, 2025)............................JA119

Declaration of Maryellen Manning in Support of Opposition to
Motion for Preliminary Injunction, Dkt. 50-1 (Apr. 14, 2025).............JA140

Exhibit A to Declaration of Maryellen Manning in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-1 (Apr. 14, 2025)................................................JA145

Exhibit B to Declaration of Maryellen Manning in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-1 (Apr. 14, 2025)................................................JA153

Declaration of Andrew Mazzei in Support of Opposition to Motion for
Preliminary Injunction, Dkt. 50-2 (Apr. 14, 2025) ................................JA161

Exhibit A to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................JA166

Exhibit B to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................JA176

Exhibit C to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................JA181

Exhibit D to Declaration of Andrew Mazzei in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-2 (Apr. 14, 2025)................................................................JA183

Declaration of Ayla Duve in Support of Opposition to Motion for
Preliminary Injunction, Dkt. 50-3 (Apr. 14, 2025) ...............................JA185

**VOLUME 3**

Declaration of Eric Del Pozo in Support of Opposition to Motion for
Preliminary Injunction, Dkt. 50-4 (Apr. 14, 2025) ...............................JA187

Exhibit A to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA189

Exhibit B to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA191

Exhibit C to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA194

Exhibit D to Declaration of Eric Del Pozo in Support of
Opposition to Motion for Preliminary Injunction,
Dkt. 50-4 (Apr. 14, 2025)...............................................................JA196

Corrected Exhibit D to Declaration of Eric Del Pozo in Support
of Opposition to Motion for Preliminary Injunction,
Dkt. 64 (May 13, 2025)..................................................................JA199

Supplemental Declaration of Marisol Arroyo-Castro in Support of
Reply to Opposition to Motion for Preliminary Injunction, Dkt.
60-1 (May 2, 2025)........................................................................JA210

Transcript of Oral Argument on Motion for Preliminary Injunction,
Dkt. 72 (May 13, 2025) ..................................................................JA215

Defendants' Third Notice of Supplemental Authority, Dkt. 82 (Aug.
27, 2025).....................................................................................JA311

Plaintiff's Response to Defendants' Third Notice of Supplemental
  Authority, Dkt. 83 (Aug. 28, 2025) ......................................................... JA314

Plaintiff's Notice of Appeal, Dkt. 89 (Dec. 3, 2025) ....................................... JA319

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MARISOL ARROYO-CASTRO, <br><br> *Plaintiff*, <br><br> v. <br><br> ANTHONY GASPER et al., <br><br> *Defendants*. | No. 25-cv-00153 (SFR) |

### DECLARATION OF ERIC DEL POZO

I, Eric Del Pozo, an attorney admitted to practice in this Court, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1.    I am a member of the law firm Shipman & Goodwin LLP, attorneys for defendants in this action. I base this affirmation on personal knowledge and on information and belief, from a review of the pleadings and proceedings in this action to date, as well as communications with others with relevant knowledge.

2.    Attached as Exhibit A to this declaration is a true and accurate copy of current Consolidated School District of New Britain Board Policy Statement 5113.00, regarding School Attendance.

3.    Attached as Exhibit B to this declaration is a true and accurate copy of current Consolidated School District of New Britain Board Policy Statement 6141.00, regarding Curriculum Development.

4.    Attached as Exhibit C to this declaration is a true and accurate copy of current Consolidated School District of New Britain Board Policy Statement 6141.00, regarding the Classroom "21" Checklist.

**JA187**

5.    Attached as Exhibit D to this declaration is a true and accurate copy of the first two pages of a January 21, 2025, letter from plaintiff's counsel, addressed to District Superintendent Dr. Anthony Gasper and the New Britain Board of Education.

Dated: New Britain, CT

April 11, 2025

*/s/ Eric Del Pozo*

Eric Del Pozo

# EXHIBIT A



## CONSOLIDATED SCHOOL DISTRICT OF NEW BRITAIN

---

**Board Policy Statement**
**5113.00 - School Attendance**
Approved on September 17, 2001

---

All students enrolled in the Consolidated School District of New Britain are required to attend school on a regular basis. Regular attendance is essential for schools to be effective and a requirement for annual promotion. Regular attendance is the responsibility of parents or guardians. Although parents are legally responsible for ensuring that their children regularly attend school, older students should assume a personal responsibility for regular attendance.

Connecticut Statutes require that "Each parent or other person having control of a child five to 18 years of age shall cause such child to attend a public day school regularly during the hours and times the public school in the District wherein such child resides is in session, or while the school is in session in which provision for the instruction of such child is made according to law, unless the parent or person having control of such child is able to show that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools".

The New Britain Board of Education has established and maintains administrative procedures for all grade levels to guide staff in assisting parents or guardians in meeting their responsibility of ensuring that their children attend school regularly.

**JA190**

# EXHIBIT B



## CONSOLIDATED SCHOOL DISTRICT OF NEW BRITAIN

---

**Board Policy Statement**
**6141.00 - Curriculum Development**
Approved on March 19, 2018 | Revised on January 4, 2021

---

The Consolidated School District of New Britain is committed to providing the best personalized and comprehensive whole-child education at every level so students will be prepared for, and positively contribute to, a profoundly different future. Educational objectives identified for students in the curriculum provide an organizational framework for this learning.  The District recognizes that, in order to ensure a quality and equitable education for all students, curriculum development must be an intentional, ongoing and systematic process. The process encompasses establishment of program philosophy and goals that are aligned to the district's mission and vision, identification of student needs and objectives, instructional strategies and methods of assessment, curriculum implementation and evaluation.  Curriculum development is linked to both professional development and teacher evaluation by assisting educators to acquire and maintain the knowledge, skills and attitudes necessary to ensure continuous improvement for all students.

Curriculum development shall be guided by:

- Needs assessments drawn from a variety of holistic data points speaking to the whole child
- Community aspirations for students, as outlined in the profile of a graduate
- Student relevance, interests, and individualized needs
- Culturally and linguistically responsive pedagogy applied through an intersectional lens
- National and state curriculum frameworks and statutes
- Provisions of negotiated agreements

Teachers shall teach within the approved curricula. The curriculum development and revision process will be conducted by the Department of Academics in conjunction with relevant grade level and content area instructional staff. All curricula shall be subject to approval by the Board of Education.

**Curriculum Approval and Review Process**

I.    **New Courses**

A.  Development of new courses shall require the approval of the Curriculum Committee of the Board of Education. The administration will develop a procedure by which such requests are presented to the Curriculum Committee before a course may be offered or taught. Such requests should include a general narrative outline of the course description, the student objectives, and the district need for such a course.

B.  Newly created courses may be taught for no more than one school year without the full curriculum reviewed and approved by the Board of Education.

**JA192**

## II. Approval of New or Revised Curricula

A. Curriculum submitted to the Curriculum Committee of the Board of Education for approval should conform to the current approved district format as set by the administration. All curricula should include, at minimum, a description of the class or course, any relevant state or national standards, examples of the types of assessments that will be used, student learning objectives for the course, and necessary resources or materials to allow for successful instruction of the curriculum.

B. Once reviewed by the Curriculum Committee the full curriculum will be sent to the Board of Education for approval. When a new curriculum first comes before the Board it may be put to a second reading at a future meeting at the request of any one member of the board, requiring no second.

C. In general the Board of Education should refrain from extensive revisions to curriculum presented before it. If there is a need for a large scale revision, the curriculum should be referred back to the Curriculum Committee with suggestions.

**Legal References/Citations**
Connecticut General Statutes
10-15c  Discrimination in public schools prohibited
10-16b  Prescribed courses of study
10-18    Courses in United States history, government and duties and responsibilities of citizenship
10-18a  Contents of textbooks and other general instructional materials
10-19    Effect of alcohol, nicotine, or tobacco and drugs to be taught.
10-20    Et. seq. re:  Vocational education and cooperation with business
10-221a High school graduation requirements

**JA193**

# EXHIBIT C



## CONSOLIDATED SCHOOL DISTRICT OF NEW BRITAIN

### Board Policy Statement
**6010.10 - Classroom "21" Checklist**
Approved on January 24, 2011

The Consolidated School District of New Britain supports classroom environments that set the stage for teachers to address the academic, social, and emotional needs of students and promote college and career readiness for all students.

The Board of Education recognizes that the classroom environment has a powerful influence on student performance and behavior.

The physical aspects of a classroom include, but are not limited to, room arrangement, seating, bulletin boards, and artifacts related to instructional areas. Each of these should be carefully considered with both individual students' needs and instructional goals in mind.

The Classroom "21" Checklist is consistent with the research and literature reviewed from the fields of education, psychology, and business regarding conditions that are likely to enhance learning, and provides a framework within which teachers can think about their practices.

The Board of Education adopted the Classroom "21" Checklist as a tool to ensure that the physical arrangement of the classroom is student-centered and task-focused:

- Addresses academic and social needs of our students
- Reflects the diverse cultural and linguistic characteristics of our students
- Ensures clean, and attractive settings that stimulate learning and help build a classroom community
- Establishes emotionally, socially, and physically safe environments for learning and encourages students' growth and development.

**JA195**

# EXHIBIT D

**WILMERHALE**

January 21, 2025

**By E-mail**

Dr. Anthony Gasper, Superintendent of Schools
Consolidated School District of New Britain
New Britain Education Administration Center
272 Main Street
New Britain, CT 06051

Board of Directors
Consolidated School District of New Britain
New Britain Education Administration Center
272 Main Street
New Britain, CT 06051

**Alyssa DaCunha**
**Matthew T. Martens**

+1 202 663 6454 (t)
+1 202 663 6363 (f)

Re: **Marisol Arroyo-Castro & Protected First Amendment Expression**

Dear Dr. Gasper and Directors of the Consolidated School District of New Britain:

We represent Marisol Arroyo-Castro, a teacher at DiLoreto Elementary & Middle School ("DiLoreto") who has been employed by the Consolidated School District of New Britain ("the District") since 2003. We understand that the District recently suspended Ms. Castro for two days without pay, placed Ms. Castro on administrative leave, and is threatening to terminate her employment, all for displaying a crucifix beside her desk in the corner of the classroom. To avoid litigation, we request that the District immediately reinstate Ms. Castro to her teaching position without the condition that she remove her crucifix. For the reasons explained below, Ms. Castro's current suspension and prospective termination violates the guarantees of the First and Fourteenth Amendments to the U.S. Constitution, Article I of the Connecticut Constitution, Connecticut's *Act Concerning Religious Freedom*, and federal and state statutes protecting her from religious discrimination in the workplace.

*Factual Background*

Ms. Castro is a tenured public-school teacher and grandmother of five who has educated students for over three decades. After many years teaching 4th grade students at DiLoreto, she was assigned this year to teach 7th grade social studies. According to her June 2024 evaluation, she is a "proficient" teacher who "holds [her class] to high expectations" and whose students "showed growth." She has regularly received "proficient' or "exemplary" evaluations.

Wilmer Cutler Pickering Hale and Dorr LLP, 2100 Pennsylvania Avenue NW, Washington DC 20037

Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Palo Alto    San Francisco    Washington

JA197

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 2

For about the past ten years, she has displayed a small crucifix beside her desk among other photos and personal items.[1]  Ms. Castro considers the crucifix a part of her personal and religious identity.  The crucifix was given to her by the family of a deceased friend who gave it to her as a memento because, as a practicing Catholic, Ms. Castro was particularly likely to treasure it.  Having the crucifix in view at her desk brought her daily calm.  During her lunch breaks, rather than going to the teachers' lounge, she would remain at her desk, look at the crucifix, and pray.  Throughout her school days, looking at the crucifix provided her with peace and strength, especially when the (already stressful) task of teaching young students proved particularly challenging.

This school year, the crucifix hung to the side of her desk, at the very bottom of an adjacent whiteboard.  The crucifix was placed off to the side and below the level of a nearby computer monitor, surrounded by student artwork and a calendar.  Analogous locations in other teachers' classrooms feature the following items (in addition to student artwork):

- images of Wonder Woman;
- pictures of Santa Claus;
- a desk mat with images of Baby Yoda;
- a miniature of the Mona Lisa;
- New England Patriots football team pennants;
- photos of family and pets; and
- inspirational phrases.[2]

Furthermore, one teacher's desk hosts a coffee mug with a citation to the biblical book of Proverbs,[3] and another's personal bulletin space features a small photograph of a statue of the Virgin Mary.

On Tuesday, December 3, 2024, Mr. Mazzei, vice principal at DiLoreto, emailed Ms. Castro to inform her of a concern raised about the crucifix displayed in her classroom and to request that she meet to discuss the matter.  On Friday, December 6, Ms. Castro met with Mr. Mazzei and a representative of her local union, Jennifer Pagan.  At the meeting, Ms. Castro was instructed to take down the crucifix by the following Monday.  Mr. Mazzei followed up the

---

[1] A crucifix is a cross with the figure of Jesus suspended on it.  Many of the Catholic faith and other Christian denominations use crucifixes for devotional purposes.  *E.g.*, *Catechism of the Catholic Church* 874 (2d ed. 2019), https://www.usccb.org/sites/default/files/flipbooks/catechism/874/.
[2] Examples include "Yes you can!," "You are loved," "Keep calm and call Wonder Woman," and "Every Day Matters!"
[3] Specifically, the mug has the word "Teacher" printed, along with a citation to Proverbs 31:26 ("She opens her mouth in wisdom; kindly instruction is on her tongue.").

WILMERHALE

January 21, 2025

Alyssa DaCunha
Matthew T. Martens

+1 202 663 6454 (t)
+1 202 663 6363 (f)

**By E-mail**

Dr. Anthony Gasper, Superintendent of Schools
Consolidated School District of New Britain
New Britain Education Administration Center
272 Main Street
New Britain, CT 06051

Board of Directors
Consolidated School District of New Britain
New Britain Education Administration Center
272 Main Street
New Britain, CT 06051

Re: **Marisol Arroyo-Castro & Protected First Amendment Expression**

Dear Dr. Gasper and Directors of the Consolidated School District of New Britain:

We represent Marisol Arroyo-Castro, a teacher at DiLoreto Elementary & Middle School ("DiLoreto") who has been employed by the Consolidated School District of New Britain ("the District") since 2003. We understand that the District recently suspended Ms. Castro for two days without pay, placed Ms. Castro on administrative leave, and is threatening to terminate her employment, all for displaying a crucifix beside her desk in the corner of the classroom. To avoid litigation, we request that the District immediately reinstate Ms. Castro to her teaching position without the condition that she remove her crucifix. For the reasons explained below, Ms. Castro's current suspension and prospective termination violates the guarantees of the First and Fourteenth Amendments to the U.S. Constitution, Article I of the Connecticut Constitution, Connecticut's *Act Concerning Religious Freedom*, and federal and state statutes protecting her from religious discrimination in the workplace.

*Factual Background*

Ms. Castro is a tenured public-school teacher and grandmother of five who has educated students for over three decades. After many years teaching 4th grade students at DiLoreto, she was assigned this year to teach 7th grade social studies. According to her June 2024 evaluation, she is a "proficient" teacher who "holds [her class] to high expectations" and whose students "showed growth." She has regularly received "proficient' or "exemplary" evaluations.

Wilmer Cutler Pickering Hale and Dorr LLP, 2100 Pennsylvania Avenue NW, Washington DC 20037

Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Palo Alto    San Francisco    Washington

**JA199**

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 2

For about the past ten years, she has displayed a small crucifix beside her desk among other photos and personal items.[1] Ms. Castro considers the crucifix a part of her personal and religious identity. The crucifix was given to her by the family of a deceased friend who gave it to her as a memento because, as a practicing Catholic, Ms. Castro was particularly likely to treasure it. Having the crucifix in view at her desk brought her daily calm. During her lunch breaks, rather than going to the teachers' lounge, she would remain at her desk, look at the crucifix, and pray. Throughout her school days, looking at the crucifix provided her with peace and strength, especially when the (already stressful) task of teaching young students proved particularly challenging.

This school year, the crucifix hung to the side of her desk, at the very bottom of an adjacent whiteboard. The crucifix was placed off to the side and below the level of a nearby computer monitor, surrounded by student artwork and a calendar. Analogous locations in other teachers' classrooms feature the following items (in addition to student artwork):

- images of Wonder Woman;
- pictures of Santa Claus;
- a desk mat with images of Baby Yoda;
- a miniature of the Mona Lisa;
- New England Patriots football team pennants;
- photos of family and pets; and
- inspirational phrases.[2]

Furthermore, one teacher's desk hosts a coffee mug with a citation to the biblical book of Proverbs,[3] and another's personal bulletin space features a small photograph of a statue of the Virgin Mary.

On Tuesday, December 3, 2024, Mr. Mazzei, vice principal at DiLoreto, emailed Ms. Castro to inform her of a concern raised about the crucifix displayed in her classroom and to request that she meet to discuss the matter. On Friday, December 6, Ms. Castro met with Mr. Mazzei and a representative of her local union, Jennifer Pagan. At the meeting, Ms. Castro was instructed to take down the crucifix by the following Monday. Mr. Mazzei followed up the

---

[1] A crucifix is a cross with the figure of Jesus suspended on it. Many of the Catholic faith and other Christian denominations use crucifixes for devotional purposes. *E.g.*, *Catechism of the Catholic Church* 874 (2d ed. 2019), https://www.usccb.org/sites/default/files/flipbooks/catechism/874/.

[2] Examples include "Yes you can!," "You are loved," "Keep calm and call Wonder Woman," and "Every Day Matters!"

[3] Specifically, the mug has the word "Teacher" printed, along with a citation to Proverbs 31:26 ("She opens her mouth in wisdom; kindly instruction is on her tongue.").

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 3

meeting with an email saying he would visit her classroom at 8:00 a.m. on the assigned Monday to observe whether the crucifix was still displayed.

On Tuesday, December 10, with the crucifix still displayed, Ms. Castro met with Mr. Mazzei; Mr. Soto, principal at DiLoreto; Maryellen Manning, the District's Chief of Staff for Relations and Accountability; and Ed Leavy, field operative with the Connecticut Federation of Teachers. Ms. Manning first told Ms. Castro that the District would never tell her exactly how to pray and to whom, yet she went on to suggest that Ms. Castro put the crucifix in a desk drawer, only to be pulled out when Ms. Castro wished to "ground herself." Mr. Soto stated that Christians are to worship no idols and asked if she wanted to stay true to that as a Christian.

At the end of the meeting, a compromise was seemingly reached: Ms. Castro could hang the crucifix in a way that was less visible to students but where Ms. Castro herself could still see it. All the meeting attendees walked to Ms. Castro's classroom where Ms. Manning told her to hide the crucifix underneath her desk, by her feet. Although shocked, Ms. Castro complied. Then she immediately felt sick and grew distraught; in fact, the other attendees left her sobbing only minutes before a scheduled parent-teacher conference.

Ms. Castro left the crucifix under the desk that night. But the next morning, Wednesday, December 11, Ms. Castro returned the crucifix to its place on the wall. She did so, out of personal conscience, because hiding the crucifix under her desk would "hide her light under a bushel."[4] Ms. Castro informed the District of her decision. That same day, the District issued a Letter of Reprimand to Ms. Castro stating that her actions were "insubordinate." The letter incompletely summarized the meeting of the day prior—it did not mention requiring Ms. Castro to place the cross underneath her desk, nor her emotional distress. Additionally, the letter told her that Mr. Soto would come into her class at the end of the day to "assist [Ms. Castro] with removing the cross from [her] classroom."

When he came into her class, Ms. Castro told Mr. Soto she would not remove the cross. Mr. Soto told her that she must remove the cross to properly "live out [her] faith" and exhorted her to "give Caesar what is Caesar's."[5] He then instructed her that if she did not take down the cross, the next morning she should not report to her classroom to teach but rather should come directly to the principal's office. Moreover, he said Ms. Castro could face suspension and eventually termination for being insubordinate. The crucifix remained on the wall when Ms. Castro left her classroom that evening.

On Thursday, December 12, Ms. Castro arrived at school and briefly stopped in her classroom to pick up some personal items. She saw the crucifix had been removed from the

---

[4] *Matthew* 5:14–15.
[5] *Mark* 12:17.

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 4

wall. She then attended another meeting in the principal's office with Ms. Manning, Mr. Soto, Mr. Mazzei, and Mr. Leavy. At that meeting, Ms. Manning told her that a few days without pay would help her better "reflect" on whether it was in her "best interest" to keep hanging the crucifix on the wall. Then, just before Christmas, she was suspended without pay for two days on the grounds of insubordination and sent home with her crucifix in a box.

On Friday, December 13, Ms. Castro's union representative said that she would face an additional five-day suspension for insubordination if she did not comply with the District's demands by the following Monday.

On Monday, December 16, Ms. Castro emailed the District explaining that she could not in good conscience return to school under the school's condition that she only hang the crucifix in her "private space," i.e., under her desk. That same day, Ms. Castro was placed on paid administrative leave, where she remains today. We are aware, however, that Ms. Castro has been pressured to resign or retire early and sign an agreement not to sue the District. We are additionally aware that the District has threatened to terminate Ms. Castro unless she agrees to conceal the crucifix underneath her desk or in a similarly hidden place.

### *The Establishment Clause does not enable the District to violate Ms. Castro's right to freely exercise her religion*

Under the First and Fourteenth Amendments to the U.S. Constitution, and under the Connecticut Constitution, the District may not abridge its employees' free speech rights, nor their rights to freely exercise their religion.[6] Multiple times over the past month, however, the District has said that it was concerned that Ms. Castro's hanging of her crucifix violated other provisions of the federal Constitution. In meetings and written communications, it stated that Ms. Castro hanging her cross on the wall near her desk posed the risk of appearing to observers that she favored Christian over non-Christian students or that the school endorsed Christian beliefs, in violation of the Establishment Cause.[7] The District cited this concern in ultimately punishing Ms. Castro for exercising her right to freely express her religious faith.

The United States Supreme Court, however, has recently dispelled the "false choice" between the Establishment Clause and the Free Exercise Clause which was at the heart of the District's decision.[8] Fewer than three years ago, in *Kennedy v. Bremerton School District*, the Supreme Court held that a public school football coach could not be fired on Establishment Clause grounds for engaging in personal prayer, even when he did so visibly at the 50-yard line

---

[6] U.S. Const. Amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); Conn. Const. Art. I. § 3. Connection's Act Concerning Religious Freedom provides additional protection. Conn. Gen. Stat. § 52–571b(a)–(b) (2018).

[7] U.S. Const. Amend. I.

[8] *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022).

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 5

of the stadium after home games.[9] The plaintiff, Coach Kennedy, was represented by First Liberty Institute, co-signatories to this letter, at the district court, the Ninth Circuit Court of Appeals, and the Supreme Court.

In *Kennedy*, school authorities threatened Coach Kennedy with discipline unless he agreed to stop praying at the 50-yard line.[10] At first he agreed to do so, but upon the first instance of driving away from the school without offering prayer, he felt upset that he had "broken [his] commitment to God."[11] He drove back that night to offer a prayer in the stadium, and, from that date forward, resumed praying at the 50-yard line after home games.[12] Although school authorities offered the "option" that Coach Kennedy could pray by himself in a closed room, away from view, he refused.[13] Rather, Coach Kennedy offered his prayers visibly at the 50-yard line after games, but made sure to do so at a time when students were otherwise occupied and when other school staff were allowed to make calls on their phones, check emails, talk with friends, or engage in other personal activities.[14]

Critically, in *Kennedy*, the Court explicitly rejected legal authorities the District cited in its various communications with Ms. Castro, specifically, the *Lemon* test[15] and the related "endorsement" test.[16] There, *contra* the repeated claims of the District this past month, the Court made clear that "[a]n Establishment Clause violation does not automatically follow whenever a public school or other government entity fails to censor private religious speech."[17] Indeed, the Court reminded the parties that it had "long ago" abandoned both the endorsement test and the test's propensity to allow for a "heckler's veto" of anything that "partakes of the religious."[18] So, by invoking the endorsement test in December 2024 to punish Ms. Castro, the District has relied on bad law that was long-outdated even as of 2022.

Moreover, even a cursory comparison between *Kennedy*'s facts and Ms. Castro's situation reveals how disciplining her for her protected religious speech violated her rights. Much like how Coach Kennedy had a long-standing tradition of public prayer post-games, Ms.

---

[9] *Id.* at 514.
[10] *Id.* at 519.
[11] *Id.* at 516.
[12] *Id.* at 516–517.
[13] *Id.* at 516–519.
[14] *Id.* at 513–514.
[15] *See id.* at 534–535 (discussing *Lemon v. Kurtzman*, 403 U. S. 602 (1971) (holding that laws should be evaluated under the Establishment Clause by considering their purposes, effects, and potential for entanglement with religion)).
[16] *See id.* at 534 (discussing post-*Lemon* cases that established a test of "whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion.") (internal citations omitted).
[17] *Id.* at 534–535 (internal citations omitted).
[18] *Id.* (internal quotations omitted).

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 6

Castro has hung her crucifix in her classroom for a decade.[19]  And just as Coach Kennedy chose a time to pray when others were permitted to attend to their personal needs, Ms. Castro placed a crucifix in an area of her classroom where other teachers have been permitted to post personal photos of family and pets, inspirational quotes, and pop culture references.  Furthermore, she did not use the cross for educational purposes, but only for her private reflection when not actively engaged in teaching.  Finally, just like the school district in *Kennedy* demanded Coach Kennedy cease praying in public and instead only pray if hidden in a closed classroom, the District here required Ms. Castro either to remove the crucifix entirely from the room or hide it underneath her desk, near her feet.  In both *Kennedy* and here, the demand to completely suppress from view religious expression proved an unreasonable burden on deeply held convictions: Coach Kennedy knew acquiescing would break his "commitment to God,"[20] just as Ms. Castro knew complying would force her to "hide her light under a bushel."  In short, given the similarities between the facts of *Kennedy* as those here, the same principles at work in *Kennedy* protect Ms. Castro's right to display her crucifix.

*Differential treatment between Ms. Castro's crucifix and other teachers' personal items is impermissible discrimination on the basis of religion*

The Supreme Court made clear in *Kennedy* that a public-school teacher's reasonable religious expression may not be infringed upon merely because such expression takes place on school property, visible to others.  But in *Kennedy* and myriad other cases, the Court also has made clear that religious expression does not take second-class status compared to secular speech.[21]  Rather, a government limitation on religious conduct is impermissible if similar secular conduct is allowed, despite the secular conduct posing an equal or greater burden on the asserted government interest.[22]  For instance, during the recent COVID-19 pandemic, the Court twice enjoined laws that prohibited religious gatherings over a certain size when similarly sized secular gatherings for so-called "essential" businesses were permitted.[23]  And in 2018, the Court found a state equal rights commission acted with impermissible animus towards religion when it punished a defendant baker for not making cakes with messages inconsistent with his religious beliefs, while at the same time it protected other bakers when they refused to make cakes with discriminatory or derogatory messages.[24]

---

[19] Indeed, other teachers have displayed religiously themed items in their classrooms, such as pictures of the Virgin Mary and coffee mugs with biblical citations.

[20] *Id.* at 516.

[21] *Id.* at 531.

[22] *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021).

[23] *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16–17 (2020) (per curiam); *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

[24] *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 637 (2018).

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 7

As discussed previously, Ms. Castro placed her crucifix vis-à-vis her desk in an
analogous location compared to other teachers' personal items and their desks. Specifically, she
hung it on the wall off to the side of her desk, at a level below a nearby computer monitor,
surrounded by student artwork and a calendar. The crucifix was therefore not visible to most
students while seated in their normal seating arrangements, although it was fully visible to Ms.
Castro for her own reflection and prayer when sitting alone at her desk. Items similarly placed in
other teachers' classrooms ranged from the fully secular (action figures of Wonder Woman, a
desk mat with images of Baby Yoda; New England Patriots football team pennants); to the
inspirational (a miniature portrait of the Mona Lisa, aspirational quotes); to the familial (photos
of living and deceased relatives, pictures of pets); and even to other items with clear religious
significance (a biblically inspired coffee mug, a picture of the Virgin Mary). To treat Ms.
Castro's religious expression (the hanging of her crucifix) dissimilarly from these other examples
would flout the Court's repeated exhortations that when religious and secular conduct both
impact the state's interests alike, they ought to also be treated alike.[25]

***District staff made multiple comments suggesting hostility towards Ms. Castro's religion***

The District's actions and its employees and representatives' comments indicate animus
towards Ms. Castro's Catholic faith, rendering any enforcement action against her doubly
suspect. As the Supreme Court has recognized, the Free Exercise Clause was meant to protect
those of faith from persecution and intolerance.[26] Accordingly, courts will not permit
government officials to discriminate against people because of their particular creed.[27]

A government official's subjective disapproval of another's worship does not undermine
the guarantees of the First Amendment. Indeed, even seemingly "distressing" religious
expression is protected from governmental discrimination.[28] In *Church of Lukumi Babalu Aye,
Inc. v. City of Hialeah*, for example, the Supreme Court struck down a city ordinance prohibiting
animal sacrifice which the city as protecting public hygiene and morals.[29] The Court rejected the
city's arguments when the text, effect, and legislative history of the law made clear the law was
intended to suppress a practice of the Santeria religion.[30] And in *Masterpiece Cakeshop*, the

---

[25] *See, e.g., Tandon*, 593 U.S. at 64–65. Since *Kennedy* makes clear that personal, albeit visible, religious conduct
on public school grounds does not raise an Establishment Clause issue, *see Kennedy*, 597 U.S. at 543, it is hard to
conceive of a valid state interest here that would justify requiring Ms. Castro to remove her crucifix, but allow other
teachers to keep, for instance, their pictures of Santa Claus.

[26] *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

[27] *See id.* at 547 ("The Free Exercise Clause commits government itself to religious tolerance, and upon even slight
suspicion that proposals for state intervention stem from animosity to religious or distrust of its practices, all
officials must pause to remember their own high duty to the Constitution and the rights it secures."); *see also
Masterpiece Cakeshop*, 584 U.S. at 634.

[28] *Church of Lukumi Babalu Aye*, 508 U.S. at 526.

[29] *Id.* at 547; *see also id.* at 526–278.

[30] *Id.* at 542, 545–546.

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 8

Court ruled for the plaintiff on evidence that members of the state's equal rights commission called the defendant's religious expression "despicable" and blamed religious belief generally for the Holocaust and slavery.[31]

Here, animosity towards Ms. Castro's Catholic faith is inferable from the District's conduct. She was not merely told to remove her crucifix from the wall but was ordered to conceal it in a drawer or under her desk—a location that would be demeaning for a family photo, let alone a devotional item given to her by the family of a deceased friend. Ms. Castro was also told by Mr. Soto that her prayers with her crucifix were a form of "idol"-worship, a deeply offensive charge for anyone who abides by the Ten Commandments.[32] Finally, as noted repeatedly above, Ms. Castro's religious worship was treated with hostility to the point of suspension, while colleagues with secular personal items on display on their desks were not threatened with discipline. Such conduct and commentary toward Ms. Castro would be inexcusable even if they were not married with the possibility of her losing her livelihood. But the fact that the District has displayed such animus towards her faith amidst suspension and termination proceedings renders those proceedings fatally flawed.

### Ms. Castro has additional constitutional and statutory claims against the District

Ms. Castro's treatment is a clear violation of her constitutional right to freely exercise her faith under the United States Constitution and the Connecticut Constitution.[33] But the District's actions also violate several other of Ms. Castro's constitutional and statutory rights, under both state and federal law.

First, the District's actions violate Connecticut's Act Concerning Religious Freedom of 1993, the first state statute in the nation to prohibit government actions burdening someone's religious exercise except those that use the "least restrictive means" to achieve a "compelling" public purpose.[34] And as discussed previously, the District only justified its actions on an inaccurate view of the Establishment Clause, which cannot serve as a "compelling" purpose.[35]

---

[31] *Masterpiece Cakeshop*, 584 U.S. at 634–636.

[32] Exodus 20:4.

[33] The Connecticut Supreme Court looks to federal constitutional law to establish the minimum individual rights guarantees of the state constitution. *See, e.g., Cambodian Buddhist Soc. of Conn., Inc. v. Plan. & Zoning Comm'n of Town of Newtown*, 941 A.2d 868, 881–82 (Conn. 2008); *Cologne v. Westfarms Assocs.*, 469 A.2d 1201, 1208 (Conn. 1984) (construing Connecticut state constitutional guarantees of free speech and assembly synonymously with their federal analogues despite differences in constitutional language).

[34] Conn. Gen. Stat. § 52–571b(a)–(b) (2018).

[35] *See Kennedy*, 597 U.S. at 542–543.

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 9

Moreover, the District's actions violate Ms. Castro's right to freedom of speech guaranteed under both the federal and Connecticut constitutions[36] and her freedom from discrimination on the basis of religion guaranteed under the same.[37]

Finally, the District's actions violate Ms. Castro's right to a workplace with reasonable religious accommodations, free of religious harassment under Title VII of the Civil Rights Act of 1964[38] and the Connecticut Fair Employment Practices Act.[39]

For many of these constitutional and statutory rights, federal and state statutes provide for shifting costs and attorneys' fees to a prevailing plaintiff.[40]

\*   \*   \*

We hope to resolve this matter amicably, returning Ms. Castro to what she does best—educating young people. Removing her from the classroom for expressing her Catholic faith does little to further the District's policy of "valu[ing] diversity of backgrounds, beliefs, and perspectives and . . . promoting an equitable and inclusive educational environment."[41] Furthermore, given the challenges that District students face academically and behaviorally,[42] the District can ill-afford to be without the services of a veteran educator; the District and its students will only suffer more from continued uncertainty over Ms. Castro's employment and protracted administrative or judicial proceedings.

---

[36] U.S. Const. Amend. I; Conn. Const. Art. I, § 5; *see also Kennedy*, 597 U.S. at 523–524 ("Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities. That the First Amendment doubly protects religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." (citations omitted)); *Shurtleff v. City of Boston*, 596 U.S. 243, 258 (2022) (holding that, under the Free Speech clause, a city program that allowed groups to raise flags with secular messages in front of City Hall could not prohibit a religious group from raising religion-themed flags on Establishment clause grounds).

[37] U.S. Const. Amend. XIV, § 1; Conn. Const. Art. I, § 3.

[38] 42 U.S.C. §§ 2000e-2(a), 2000e(j).

[39] Conn. Gen. Stat. §§ 46a-51(8), 46a-60(b)(1).

[40] 42 U.S.C. § 1988(b) (federal civil rights violations); 42 U.S.C. § 2000e-5(k) (Title VII violations); Conn. Gen. Stat. § 31-51q (for certain state or federal constitutional rights).

[41] New Britain Board of Education, *Position Statement on DEI*, https://www.csdnb.org/pdf/Board-Policies/New-Britain-DEI-Position-Statement.pdf (adopted October 4, 2021); *see also Kennedy*, 597 U.S. at 538 ("[L]earning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'") (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992)).

[42] *See* Connecticut State Department of Education, *District Profile and Performance Report for School Year 2022-23 New Britain School District* 1, https://edsight.ct.gov/Output/District/HighSchool/0890011_202223.pdf (noting district-wide chronic absenteeism and suspension/expulsion rates that exceed the state-wide rate); *id.* at 6 (noting the District Performance Indexes for English Language Arts, Math, and Science are at 46.4, 39.9, and 43.1 respectively, compared to the respective statewide indexes of 63.9, 59.7, and 61.6).

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 10

          To avoid litigation, please immediately reinstate Ms. Castro to her full-time teaching
duties and end any and all disciplinary proceedings against her related to this matter. We also
request any and all records related to this matter be expunged from Ms. Castro's disciplinary file.
Additionally, upon her return to the classroom, Ms. Castro must be allowed to resume hanging
her crucifix in the same location that she did prior, as other teachers are permitted to do with
their personally significant items.[43]

          If we do not receive assurances that Ms. Castro will *not* be terminated for her
constitutionally protected religious expression, we will be forced to file for immediate injunctive
relief to protect her rights under applicable state and federal law. We further note that any effort
to terminate Ms. Castro's contract due to receipt of this letter may violate the anti-retaliation
provisions of federal and state law, along with District policy.[44]

          Please respond to this letter by email within 48 hours of receipt.

Sincerely,


*Alyssa DaCunha*

Alyssa DaCunha
*Partner*, Wilmer, Cutler, Pickering, Hale &
Dorr LLP


Keisha Toni Russell
*Senior Counsel*, First Liberty Institute


Matthew T. Martens
*Partner*, Wilmer, Cutler, Pickering, Hale &
Dorr LLP


*Rebecca R. Dummermuth*

Rebecca Dummermuth
*Counsel*, First Liberty Institute

---

[43] We understand an administrative grievance process is currently pending regarding the two days Ms. Castro went
unpaid while suspended for insubordination. We fully expect Ms. Castro to be made whole after her grievance
process is completed. If not, however, we will consider additional litigation for damages for those two days.
[44] 42 U.S.C. §§ 2000e-3(a); Conn. Gen. Stat. § 46a-60(b)(4); Consolidated School District of New Britain, *Board
Policy Statement* 4118.11 - *Prohibition of Harassment (Employees)*, https://www.csdnb.org/pdf/Board-
Policies/4000/4118.11-Prohibition-Harassment-Employees.pdf (rev. April 5, 2021).

WILMERHALE

Anthony Gasper, Consolidated School District of New Britain Board of Directors
January 21, 2025
Page 11

cc: Maryellen Manning, *Chief of Staff, Relationships & Accountability*, Consolidated School
District of New Britain;
Ivelise Velazquez, *Deputy Superintendent*;
Tyrone Richardson, *Academics & Accountability Officer*;
Dario Soto, *Principal*, DiLoreto Elementary & Middle School;
Andrew Mazzei, *Vice Principal*
Susan Saluru, *President*, Local 871

**JA209**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO<br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br>　　　　　　　Defendants. | Civil Action No.  3:25-cv-00153<br><br><br>**SUPPLEMENTAL DECLARATION OF MARISOL ARROYO-CASTRO** |

Pursuant to 28 U.S.C. § 1746, and in response to Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction, I, Marisol Arroyo-Castro, declare as follows:

1.　　I have kept a crucifix on the wall of my classrooms in my personal area near my desk for the past ten years.  During that time, students, parents, teacher aides, student-teachers, fellow DiLoreto teachers, and DiLoreto administrators have regularly visited and spent time in my classrooms.  I never received a complaint about the crucifix until December 3, 2024, when Defendant Mazzei (who had frequently visited my room since August of that year) first emailed me.

2.　　I do not refer to the crucifix during instructional time or use it as a teaching tool.

3.　　I have never intended any of my verbal or symbolic conduct to proselytize or otherwise pressure students into sharing my religious beliefs.  Although I never preach to students or tell them what to believe, I occasionally talk to myself and reference religion.  For instance, if I cannot find my keys or my paper, I sometimes ask "Papa God" to help me find them.

4.　　I have never told students that they "need Jesus," that they are "sinners," that God is "disappointed" in them, that God "doesn't like liars," or made any other similar comments.

SUPPLEMENTAL DECLARATION OF MARISOL ARROYO-CASTRO

**JA210**

5.      In over three decades of teaching, I am not aware of ever being accused of making comments like those alleged by Defendants, until after filing this lawsuit.  I first became aware of these allegations when the District released a statement to the local media, after my attorneys sent a letter to the school saying I should be allowed to return to the classroom with my crucifix.  The notes were never shared with me by any Defendant.

6.      I have reviewed the personnel file the District has kept on me since at least 2003 and which teachers are entitled to request pursuant to our collective bargaining agreement.  My file contains no complaints related to religion until the December 11, 2024 Letter of Reprimand from Defendant Manning.

7.      Despite the events of this case beginning in late November 2024, the first time the District told me of the allegations that I made religious comments to students was April 15, 2025, the date Defendants filed their Response Brief.  I have repeatedly been told throughout this process that I could return to my teaching position if I agree to hide or remove my crucifix.  Defendants have not told me of any other condition necessary to return to my classroom teaching position.  No mention of allegations that I made religious comments to students or that Defendants believed the crucifix was disruptive was made on any of the following occasions:

- the December 3, 2024 email from Defendant Mazzei that alerted me to an issue with my crucifix;

- the December 6 meeting with Defendant Mazzei on the same subject;

- the December 10 pre-disciplinary meeting with Defendants Mazzei, Soto, and Manning;

- the December 11 Letter of Reprimand from Defendant Manning;

- the December 11 meeting in my classroom with Defendant Soto;

- the December 12 suspension meeting with Defendants Mazzei, Soto, and Manning;

SUPPLEMENTAL DECLARATION OF MARISOL ARROYO-CASTRO
2

**JA211**

- the January 24, 2025 conference with Defendants Manning and Gasper; or

- the March 6 involuntary transfer meeting with Defendant Manning.

8.     Over thirty years of teaching, I have found that maintaining boundaries and discipline—for example, by withholding privileges for misbehavior and defiance—are critical to providing a safe and effective learning environment.  Indeed, I was specifically told by Defendant Soto that my skills as a "strong" teacher were especially necessary this year when he assigned me to teach in the seventh-grade class.

9.     Some students reacted very negatively towards me for maintaining disciplinary standards in my classroom.  In October or November 2024, I heard a student tell a group of friends as they were leaving class that "I'm going to get her fired."  In the same semester, a student falsely accused me of calling her a "bitch"—an accusation which she later admitted to Defendant Mazzei was a lie.  On another occasion, a group of students asked me during instructional time to pray for them.  This group of students had expressed dissatisfaction with my teaching methods and discipline throughout the year.  I suspected that they were asking me to pray for them to get me in trouble.  I declined to pray out loud for them.

10.     One of the mottos in my classroom is "you have to be strong to be good." Many students think that if you are a bully or yelling at the teacher or stealing things that makes you strong and tough.  I talk with them about how easy it is to break relationships but how hard they are to put back together. I tell them it is easy to be bad, but if you are really strong, you can be good.

11.     The school district uses an internal messaging application called "DOJO." After I was suspended and then placed on administrative leave, I could see that I continued to receive messages from students and parents.  I did not want them to worry or to think that I was ignoring

SUPPLEMENTAL DECLARATION OF MARISOL ARROYO-CASTRO
3

**JA212**

JA213

them, so I send a brief message, explaining why I was no longer in the classroom and encouraging the students, as I so often that, that "you need to be strong to be good."

12.     Since the beginning of this case, I have hoped to return to my teaching role without unnecessary litigation.  On December 20, 2024, I noted my objections to Defendants' actions with a letter without involving counsel.  On January 21, 2025, only a few weeks later, my attorneys sent a letter to Defendants with similar objections.  On January 24, 2025, I met with Mr. Gasper and Ms. Manning along with counsel and repeated my objections.  I was told "we will let you know something next week."  By January 30, 2025, I had not been told anything.  That day, I discovered my email address had been deactivated.  I filed this suit later that day.

13.     I hoped that this issue could be resolved by simply filing my complaint.  That hope was dashed on March 6, 2025, when Defendant Manning told me I was being involuntarily and indefinitely reassigned as of March 10 to a "curriculum information" non-teaching role because of "concerns about [my] instructional pedagogy and [my] personal beliefs that [Defendants] need to look into."  Through counsel, I filed this motion for a preliminary injunction shortly thereafter, on March 14, 2025.

**I declare under penalty of perjury that the foregoing is true and correct.**

May 2, 2025

By:  /s/ Marisol Arroyo-Castro
Plaintiff Marisol Arroyo-Castro

///

SUPPLEMENTAL DECLARATION OF MARISOL ARROYO-CASTRO
4

Prepared by:

Matthew Martens (*pro hac vice*)
*Of counsel for Plaintiff Marisol Arroyo-Castro*
Alyssa DaCunha (*pro hac vice*)
Jonathan Ellison (*pro hac vice*)
Paul Piazza (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6921
matthew.martens@wilmerhale.com
alyssa.dacunha@wilmerhale.com

A. William Caporizzo, Bar No. 207995
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: 617-526-6411
Facsimile: 617-526-5000
william.caporizzo@wilmerhale.com

Jeremiah G. Dys (*pro hac vice*)
Keisha T. Russell (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Telephone: 972-941-4444
krussell@firstliberty.org

Rebecca R. Dummermuth (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue NW, Suite 1410
Washington, D.C. 20004
Telephone: 202-921-4105

Paul H. McConnell, Bar No. 29062
THE DOCTOR LAWYER TEAM
Telephone: 888-565-7043
638 Prospect Ave
Hartford, CT 06105

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

_____
MARISOL ARROYO-CASTRO   )
            Plaintiff  )    NO: 3:25CV153(SFR)
                       )    May 13, 2025
 vs.                   )    2:03 p.m.
ANTHONY GASPER, ET AL  )
            Defendants )
_____)    915 Lafayette Boulevard
                             Bridgeport, CT


    ORAL ARGUMENT ON MOTION FOR PRELIMINARY INJUNCTION




B E F O R E:

        THE HONORABLE SARAH F. RUSSELL, U. S. D. J.



A P P E A R A N C E S:

For the Plaintiff:   Matthew T. Martens
                     Paul Piazza
                     Wilmer Cutler Pickering Hale and
                     Dorr LLP
                     2100 Pennsylvania Ave, NW
                     Washington, DC 20037Anastasia King

                     Keisha Russell
                     First Liberty Institute
                     2001 W. Plano Pkwy
                     Ste 1600
                     Plano, TX 75075


For the Defendants : Eric Del Pozo
                     Paul Joseph Murphy
                     Sarah Niemiroski
                     Shipman & Goodwin LLP
                     One Constitution Plaza
                     Hartford, CT 06103

**JA215**

2

THE COURT:  Please be seated.  All right. So good afternoon.  We are here this afternoon in the case of Arroyo-Castro versus Gasper, et al.  Case number 25CV153.  Let me have appearances from counsel.  I will start with the plaintiff.

MR. PIAZZA:  Good afternoon, Your Honor.  Paul Piazza, Wilmer Hale for the plaintiff Marisol Castro.

MR. MARTENS:  Matthew Martens also for the plaintiff.

MS. RUSSELL:  Keisha Russell, First Liberty Institute for the plaintiff.

THE COURT:  From the defense?

MR. DEL POZO:  Eric Del Pozo from Shipman and Goodwin for the defendants.

MS. NIEMIROSKI:  Sarah Niemiroski for the defendants.

MR. MURPHY:  Peter Murphy also from Shipman and Goodwin.

THE COURT:  Great.  All right so why don't we just start by hearing from the plaintiff on your motion for application.

MR. MARTENS:  Your Honor, Mr. Piazza is going to be presenting the argument.  I think in your policies you encourage the opportunity for younger lawyers to have court experience.

THE COURT:  Terrific.  Thanks.

MR. PIAZZA:  May it please the Court.  DiLoreto School has long allowed teachers to display personal expressive items on or near their desks ranging from family photos to New England Patriots gear to Baby Yodas.

Ms. Castro for the last ten years has kept a small crucifix by her desk and she does that to express her identity and to help her practice her faith.

When the defendants ordered Ms. Castro to hide or remove the crucifix from the classroom, they treated it impermissibly as second class speech.  They did so relying on the justification of the endorsement test which has been squarely rejected by the Supreme Court in *Kennedy*.

When they punished her for refusing, Your Honor, that constituted a direct First Amendment violation that continues through today.  That is why we're here to ask you for a Preliminary Injunction to enjoin the defendants from continuing to adversely effect Ms. Castro's employment but-for the crucifix in her personal space.

If you have any questions at the outset, I'm happy to answer.  Otherwise, I would like to make sure to discuss each of the injunction factors in turn.

THE COURT:  Let's start with the but-for.  Is it your understanding that were your client to agree to the

4

removal of the crucifix, she would be permitted to return to the classroom?

MR. PIAZZA: That is absolutely the case, Your Honor. The defendants actually answered that in their answer to the Complaint. They admit that in Paragraphs 21, 24, 27, 32, 37, 41, 44 through 45. All of those have to do with the bargain if you agree to hide your crucifix or take it out of the classroom, you get to return to your position as a classroom teacher. That's what this case is about.

THE COURT: Let me ask you a little bit about timing. I understand school is probably still underway for the students of her previous classroom, but probably not for that much longer. So what is she looking for in terms of relief here?

MR. PIAZZA: All Ms. Castro is looking for is that the but-for cause, the crucifix, not factor into the decision whether to assign her to a classroom or not to.

So in this particular case, we understand that the only reason she is not teaching right now is because of this crucifix.

THE COURT: So let me stop you there. So I understand that point. I think what you asked for in your papers is broader. So essentially a return to the status quo previous to the dispute occurring which I

**JA218**

think at least in defendant's papers, they took to mean a return to that particular classroom with the crucifix in the particular location it was in and that obviously presents some practical considerations.  So what is it precisely that the order you want entered would say?

MR. PIAZZA:  Well, we do anticipate, Your Honor, that if that reason is removed, that unconstitutional rationale, then there would be no reason not to reassign her to the classroom.

THE COURT:  Let me stop you there.  "The classroom" the classroom meaning what classroom, where, what time period does the injunction need to issue?  Before the summer begins?  Is there a possibility of a summer assignment that she's seeking?  I'm just looking for some practical guidance because I think it relates to the equities in terms of the burden the school may face in complying with any injunction.

MR. PIAZZA:  Yes, Your Honor.  Maybe I can clarify something.  The defendants actually took Ms. Castro out of the classroom.  Her last day of teaching was a Wednesday about two weeks before Christmas. There was a similar time period in that semester.  I'm not sure based on that, I'm not sure it is that much of a practical burden to remove her or to switch her around to a classroom based on their needs.  If they have other

6

reasons, Your Honor, other than the crucifix to assign her to one classroom or another or some sort of assignment, they are welcome to do that. We anticipate but-for the crucifix she would be back in the classroom she was assigned to teach for this full year. That's what we expect to happen.

Of course, if Your Honor issues a ruling where we're in summer that will change that. All we ask is that she not be treated differently because of the crucifix in her personal space. That's all.

THE COURT: I'm taking your comments and you can correct me later if you are think I'm wrong. I'm taking your comments to mean that the injunction would be addressed specifically to essentially prohibiting defendants from removing her from the classroom based on the placement of the crucifix in an area similar to where it was previously in relation to her desk, something along those lines. But it would not be a requirement that she be based back in that particular classroom teaching seventh grade students social studies and so forth in that particular room. So that's my understanding if others want to speak to that as we go. I will just note I think that's somewhat different than what I saw in the papers which is fine. You are welcome adjust it. Okay. All right. Why don't you go from

**JA220**

there.

MR. PIAZZA:  Yes, Your Honor.  So first turning to likelihood of success on the merits.  We have a free speech claim because the defendants don't contest that this is speech on a matter of public concern.

The two questions are whether this speech, this crucifix in its space, was official government speech and whether defendants met their burden to justify suppressing that speech with their interest.

We think the answer to both is no, Your Honor. This speech was not official.  It was personal because it does not owe its existence to the government.  Both sides agree this is not curricular speech.

We have testimony in Ms. Castro's supplemental declaration that she never referred to it or used it for any purpose in her instructional time.  This is not like the classroom behavior management grievance at issue in *Weintraub.*  It was not used for any of those purposes.

By default, that automatically should make it personal speech, but there's more because the school by its practice over the course of many years allows teachers a zone by and around their desks to express themselves as people.  They have their family photo. There's a dog photo in Exhibit B-7.  There are the New England Patriots flag, the Baby Yodas. That's a space

8

where teachers can express themselves to a certain extent.

The but-for cause of Ms. Castro not being able to express herself is the fact that her item is religious.  We point in our briefs to the *Nichol's* case and the *Wood's* case in Florida.  I think the *Johnson v. Poway* case that defendant's cite to is particularly instructive because it shows the contrast between what would be the official speech on the walls of the classroom and contrasting it with the personal expressive items that would be on or near a desk.

In that case, there were two banners that were seven-feet wide and two-feet tall.  They naturally took up a large portion of the room.  It was much more reasonable to see that speech there, those banners, as official government speech.

Here, Your Honor, you have seen the exhibits. Exhibit A.  You have seen Exhibit E in Mr. Mazzei's declaration.  You have seen all the B exhibits where we show other teachers' classrooms. I think any reasonable observer would see those items in those desk spaces as personal speech for all of those teachers and confirming that is that Ms. Castro had this crucifix in her personal space for ten years and there is no evidence or testimony from anybody that anyone thought that this crucifix was

**JA222**

9

anything other than her speech.  No one was confused about the curricular position of the New Britain School District vis-a-vis this crucifix.  That confirms the speech is personal and that's --

I think it is important to note that defendants put forth a pretty extreme position that every single thing in the classroom, everything on the walls is by definition official speech.  That was rejected in this circuit in the two cases that we cite.  And it has also been rejected by the Supreme Court in *Kennedy*.  In *Kennedy,* the coach was on school property during school time.  He was still being paid for his activities, but he was still permitted his personal speech, Your Honor.

THE COURT:  In *Kennedy*, he was on the field, not in the classroom, correct?

MR. PIAZZA:  Yes.

THE COURT:  No one was required to go to the football game where the students here are required to be in class.  So why are those distinctions not relevant to determining whether this was private speech versus speech that was in the scope of her duty as a teacher which was taking place in the classroom?

MR. PIAZZA:  Well, that's why the *James* case and the *LaLaRusso* which are the cases we cite in our reply brief are so instructive.

**JA223**

10

In the *James* case, a teacher during instructional time in the classroom was wearing a black arm band to protest the Vietnam War and that was held to be personal speech that was protected.

The *LaRusso* case the teacher did refuse to stand up for the Pledge of Alliance and that was also held to be personal speech that's protected by the First Amendment.  Now, I grant you those cases were decided before the *Pickering Garcetti* analysis was brought to the floor in this area of cases.  I think both cases would actually be decided the same way today even using the *Pickering Garcetti* analysis.

Those two cases make clear there's a zone of personal speech within the classroom even when students are required to be there.  All we're saying is that the defendant here, the school, they are the ones by their policy have created the zone of personal expression by and around the teachers' desks.

THE COURT:  Let me ask you about that.  I think the fact that there were other personal items around other personal desks features largely in your papers, and I just I wonder where specifically in the analysis of your First Amendment claim are sort of what other people are doing in expressing.  How does that factor?  Where in other words do those factors fit in to your analysis of

**JA224**

the free speech claim?

MR. PIAZZA:  Sure.  Well, the basic principle, Your Honor, is that where personal speech is allowed you cannot discriminate specifically against religious speech.  In the *Shurtleff* case and the *Kennedy* case, it was important to the analysis in both that so-called secular speech was permitted.  But the only reason that the religious speech in that case was objected to was because it was religious.  There was a fear of an Establishment Clause violation.  That's squarely on point with this.

If the school has chosen by its practice to allow teachers to express themselves but-for religion cannot be the reason for suppressing that particular speech.

THE COURT:  I think you are referencing the Boston, the City Hall Flag case.

MR. PIAZZA:  Yes.

THE COURT:  So there the analysis proceeded under a forum, is it public forum, limited public forum or what have you.  Look to the viewpoint that essentially on those limited form of public forum, you can't engage in viewpoint discrimination.

Are you making that claim affirmatively here that this was viewpoint discrimination along the lines of

excluding one flag and not others?

MR. PIAZZA:  Yes, Your Honor.  I think we spend. I can't cite the page, but I think in our opening brief I think we make that more explicit.

THE COURT:  I was somewhat confused by that.  I think in the opening brief, you talk about it sort of in response to in the sort of section dealing with the defendant's burden so rather than presenting it as sort of an affirmative violation and yeah, I was trying to understand where essentially in a *Pickering Garcetti* framework case, and I take it to be that we'll talk about the Free Exercise claim in a minute.  I take it to be your view that *Pickering Garcetti* does the framework. Some agreement with some pieces of that.

But essentially defendant says she was speaking as a teacher as a government employee.  This was private speech as step one of the analysis.  But I guess the question is when you have *Pickering Garcetti* framework applying in a situation dealing with an employee, do you also get to have a forum analysis running alongside that? I think the Ninth Circuit in *Johnson*, I will pull that out.  They say it is sort of one or the other.  What's your view on that?

MR. PIAZZA:  We're not saying that this is a limited public forum.  I will note that even a non-public

13

forum viewpoint description is impermissible, but the point of us discussing *Shurtleff* is that the broad principle in deciding whether something is personal speech of government speech, that's the question they were answering in *Shurtleff*.

There was a question of how much control the government actually applied to the speech at issue. We think here because the school for many years has allowed teachers to express themselves, they have taken a hands-off approach to how teachers can express themselves by or around their desks. Their Baby Yodas, their New England Patriots, their family photos, those kinds of things.

But *Shurtleff* also stands for a very important proposition that cuts across all these doctrinal landscapes which is that religious speech is not second class speech and so from one doctrine to another that cannot be the reason to say this speech is worth keeping and this speech is worth disciplining for or objecting to.

So there's multiple reasons to cite *Shurtleff*, as well as *Carson v. Makin* as well as Rosenberger as well as the number of cases that we cite in our opening brief for that proposition. That part might go to balancing as you just indicated a moment ago.

**JA227**

14

I would like to point out that the school's effective policy here, Your Honor, is that this is how to sum it up.  There's a zone of personal expression where you can put whatever you like subject to some reasonable limits except if it is religious.  Specifically, if it is too religious.  That's what happened here.  That's what's been happening at the school.

THE COURT:  You are saying that as policy by reference to sort of the practices, but are there any written policies or other either documents or statements I can look at to understand the school's policy with respect to posting items in a classroom?

MR. PIAZZA:  There's no specific policy about not putting up religious items in the classroom.  In all of the communications with Ms. Castro in her meetings, the defendants referred to the First Amendment compels us to do this, per legal statutes, we have to do this.  They didn't point to any district specific policies.

What they noted in their response brief is that the school district has a general policy that the classroom must be arranged in a certain way to promote learning objectives. That's fine, Your Honor.

*Shurtleff* is important here again because theoretical control or a written policy is not the end of the analysis.  The question is whether the government, in

**JA228**

15

fact, has actually controlled that speech or contributed that speech or shaped that speech's message.

So defendants put those policies in their response brief and I'm sure Attorney Del Pozo will discuss those in more detail. The fact remains that their policy through their practice has been to allow teachers their family photos, dog photo in B7, all of the speech that we saw in B1 through 9 are exhibits except for this crucifix.

THE COURT: It sounds like if I were to fit those facts into the *Pickering Garcetti* framework, where specifically do those facts -- in other words, would you -- does your free speech claim turn on the fact that these other personal items were allowed or were the district to have a policy essentially that says no items may be posted in the classroom, would you still assert under *Pickering Garcetti* that there is a free speech right to have a crucifix?

MR. PIAZZA: I don't think so, Your Honor. Now that might be their policy. We would have to discuss that another day whether, in fact, they are following it or whether there's carve outs for certain favored form of speech.

If the actual policy that they followed in actual practice was no teacher is allowed to personal

16

speech.  Every teacher has to wear the same uniform, no family photos on the desks, no other items, then, Your Honor, this wouldn't be a disfavored speech analysis.

Let me clarify.  The question of what other teachers did goes to whether the speech was personal in the first place.  It also goes to balancing because it indicates whether there is an antireligious principle at work there.  It goes to both.

Just like in *Kennedy,* Your Honor*,* where Coach *Kennedy* was praying at a time when other teachers and other staff were allowed to attend to personal business, make personal phone calls, the fact that he was engaged in praying at the same time other teachers -- sorry. Other staff were engaging in that personal behavior was both for whether the analysis -- was both for whether the speech was personal in the first place as well as whether there is an antireligious speech principle at work here so it goes to both.

THE COURT:  *Kennedy* simply said you can't use whatever phantom Establishment Clause argument to disfavor religion.  There wasn't sort of a standalone hostile religion claim in that case, right?

MR. PIAZZA:  No, Your Honor.  The Establishment Clause issue was the one that was put forth by the school.  But I think as you read *Kennedy*, it is clear

**JA230**

17

that religious speech cannot be targeted for disfavored treatment. I think that's the fraud principle underlying that case as well others in this line of cases.

THE COURT: Okay. So essentially, it sounds like the personal -- the fact that other people are posting sports banners and photos and other items is relevant in your view to whether there's some sort of zone of private expression occurring around teacher's desks at the school.

MR. PIAZZA: That's right, Your Honor. For it to be otherwise, again if the defendants were claiming that wasn't the case, then they would be saying every one of the family photos in B2, B1, B2, B5 as well as the dog photo in B6, all of those would have to be official speech by the school. I don't think they are going to claim that so that's why this crucifix which again sits in a similar physical location, similar size and has personal meaning to Ms. Castro and doesn't exhibit any other outward message other than I'm a Christian. That's who I am. That's my identity. That's why it is critical to the analysis of whether it is personal or not.

Going to Free Exercise, similarly the defendants don't contest that the actions here are the result of some neutral or generally applicable principle. The question is whether the defendants avoided burdening Ms.

**JA231**

18

Arroyo-Castro's exercise of her religion and whether they met strict scrutiny and again we think the answer is no.

So defendants' burden Ms. Castro's religious exercise principally by asking her -- pressuring her.

THE COURT: So let's pause there. I will ask defendants. I didn't take there be much of a dispute about burden or whether this is generally applicable. But I did see a dispute over what is the proper framework to apply to the analysis. Is it your view that -- well, I guess I took it to be your view that *Pickering Garcetti* that that framework does not apply or doesn't apply in the same way to this claim.

Can you walk me through which steps, if any, of *Pickering Garcetti* apply to the Free Exercise claim?

MR. PIAZZA: *Pickering Garcetti* does not apply to the Free Exercise claim. The defendants in both cases have the burden of coming forward with adequate justifications for what they have done. The analyses are different.

The Supreme Court has been clear when it comes to burdening religious exercise, that's strict scrutiny. The burden is high for the defendants. We need to show that exercise of her religion was burdened which we believe it was.

THE COURT: I'm not so concerned about burden.

**JA232**

I think we'll hear from the defense whether they are contesting burden. But I am concerned about sort of what is -- by "burden," I mean the burden on her religious freedom. Not, you know, what their burden is.

I'm just not seeing -- at best *Kennedy* would seem to leave open the question of the role of *Pickering Garcetti* and then you are dealing with Second Circuit cases applying that framework to a Free Exercise claim. So just help me understand why *Pickering Garcetti* doesn't apply to Free Exercise claim. What authority do you have for that view?

MR. PIAZZA: Well, the reason that *Pickering Garcetti* doesn't apply is because some of this conduct was not speech. Speech requires a communicative act. Ms. Castro in some other religious exercise was looking at the crucifix throughout the day momentarily for inspiration. That act in and of itself is not speech.

THE COURT: Okay. But was that act arguably at least in her role. Isn't there a question was that act in her role as a teacher or personally. I mean if she's engaging in that act in the classroom during the school day, isn't that why we need *Pickering Garcetti* at step one?

MR. PIAZZA: No, Your Honor. Again this is not speech. *Pickering Garcetti* specifically applies to

20

speech.  I think that there are versions of what you are positing.  If somebody is engaging in religious exercise that takes away from school time instruction or disrupts the classroom.  Defendants can meet strict scrutiny in some of those cases. I'm not denying that, Your Honor.

What we're saying here is that there's no evidence here that any of Ms. Castro's religious exercise specifically actually disrupted any of the learning environment.

In her supplemental declaration, she said she does not refer to the crucifix in any way, shape or form during instructional time. She looks at it silently occasionally throughout the day for inspiration and prays with it at lunchtime.  Defendant's haven't put forward any evidence that her prayers, her religious exercise, interrupt the school environment.

If there's a teacher somewhere whose religious exercise does interrupt the school environment, that's going to be a different story.  Her religious exercise is not in all cases here communicative speech and the Supreme Court since *Smith* made clear when it comes to religious exercise, the strict scrutiny model applies. Now, Your Honor, I don't think it matters, but I think we win under both.

Just like in *Kennedy*, when it was resolved in

**JA234**

*Pickering Garcetti,* there's no reason to answer the strict scrutiny issue. Ultimately, the defendants have to show they have a compelling interest or they at least have to meet *Pickering Garcetti* burdening and because the only reason this entire time, Your Honor, for their discipline, they have pointed to is the crucifix in her personal space. That simply is not enough to meet *Pickering Garcetti*.

Your Honor, if you don't want to address the strict scrutiny issue, I think we will win on that grounds alone, the *Pickering Garcetti* analysis.

I want to make it clear again, Your Honor, defendants are the ones who said over and over again if you agree to hide your crucifix or remove it from the classroom, you get your job as a classroom teacher back. This is includes the March 6 meeting. In the Manning declaration, if you look at paragraph 20. I think this is important.

THE COURT: For the benefit of the record, if you could give us the ECF number.

MR. PIAZZA: This is Document 50-1.

THE COURT: Okay.

MR. PIAZZA: This is the sentence at the bottom of page four starting with any comments. Any comments made during the March 6, 2025 meeting referencing Ms.

22

Arroy-Castro's pedagogy or personal beliefs simply reiterated the nature of complaints from students and staff that had prompted the school to investigate and to temporarily assign Ms. Arroyo-Castro in the meantime. That last bit right there, Your Honor, confirms that even the March 16 meeting and the state of play right now is a continuation of all the reasons that the defendants have put forward about the crucifix up to this point.

This entire case is about the crucifix in Ms. Castro's personal space. Because there's no valid justification to discriminate against that religious act just because it is religious, they cannot meet their burden under either *Pickering Garcetti* or strict scrutiny.

THE COURT: Let me ask you about that meeting. So I guess I took that sentence any comments made during the March 6 meeting so I'm at paragraph 20 that you just read from. Simply reiterated the nature of complaints from students and staff. So I guess I'm wondering and I think your client's declaration addresses this. I guess my impression was from your client's perspective that she never heard about complaints on her teaching until the defendants filed their response; is that correct?

MR. PIAZZA: That's true, Your Honor. I think

**JA236**

23

if you look at the two exhibits in her first declaration, Exhibits D and E, those encapsulate the sum total of the reasons she was given for her discipline.  At no point ever was she told that there were allegations about classroom comments.  At no point did defendants act as if those were a reason for discipline.  Again, they made the choice clear to her, if you agree to hide your crucifix or remove it from the classroom, you get your job back.

If there's no mention of any other concern, no other opportunity for her to cure the supposed issue, then that was not a reason that defendants relied on in making these decisions.

THE COURT:  Has she I guess to this day been interviewed or questioned about the student statements? The students' claims of statements that she made.

MR. PIAZZA:  Your Honor, the record is that the investigation is ongoing.  I know that no definitive findings or factual conclusions are before us so that's all I'm aware of at this point, Your Honor.  I think that there's -- again there's an ongoing investigation is where we are on that.

Your Honor, I just wanted to make sure in our Free Exercise discussion again confirming that Ms. Castro -- I think the other side is contesting the burden analysis in their discussion of the Connecticut

**JA237**

24

Act Concerning Religious Freedom.  They mention there may not have been a burden.

Just to be clear, the choice she was put to is itself a burden and heightening and illustrating this is that each of the defendants specifically told her at various points, if you do refuse to take down or hid your crucifix, you'll eventually face discipline, reprimand and possibly termination.  And even more than that Mr. Soto tried to convince her to take down the cross by saying that she was engaging in idol worship.  Ms. Manning told her to hide the crucifix under her desk by her feet.  I think that those illustrate the nature of the coercive issue which is the burden.

Just a couple points, Your Honor, on the irreparable harm and the public interest factors.

THE COURT:  Let me pause for a second about the sort of attempts of accommodation that went on I guess in December of 2024.  In reading the materials, it looks like at one point there was a discussion of the crucifix being put not under the desk but maybe on the desk drawers. Is there anything more you can tell me about why that -- it seemed like that may be was an acceptable placement for everyone involved.

Do you have any more information why that didn't work out?

**JA238**

25

MR. PIAZZA: If we're on the same page, Your Honor, that's the discussion before Ms. Manning's seconded the suggestion to put the crucifix under the desk. I think maybe Ms. Castro at fist thought -- I think she testify to this in her declaration. That she thought that that was going to be on the desk in a place on the desk somewhere. But when it was actually manifested in reality and she was told to put it underneath the desk in the kneehole, I think that was an affront to what she feels sincerely is the dignity of the crucifix as part of her religious faith.

If you are discussing the last January meeting with Defendant Gasper where he said you can put it behind a screen, you can hide it here, you can put it in a drawer, that ultimately, Your Honor, it is not Ms. Castro's burden to justify her personal speech and where she can hide it out of view of students.

She should not be made to draw the blinds and blow out the candles for her to be a person of religion in the view of students. *Kennedy* said that the complaint at the mere sight of religion are not enough of an interest to justify burdening somebody's religious exercise. So every time the defendants told her not only must you take down the crucifix involved, you must hide it out of sight as if you are ashamed of it, as if it is

**JA239**

something that must be hidden from view, that in and of itself is the burden on her exercise because she sincerely believes the crucifix is worthy of dignity and equal respect and at the very least, the very bare minimum equal to the Baby Yodas and the New England Patriots' gear. If that speech, if that conduct, if that isn't protected or family photos would be a closer analogy, if those are protected and can be shown on the desk, then this crucifix should be as well and is an affront to her faith to ask her to do otherwise.

On the irreparable harm standard, Your Honor. Defendants noted in their response brief that there was a more stringent standard for employment cases. They didn't specifically identify what they meant. All I wanted to reiterate is we think *Elrod versus Burns* doesn't just stand for a principle, but it is an on-point controlled indication what we're talking about here.

In Elrod, there was a preliminary injunction and five justice at the Supreme Court agreed by necessity that there was sufficient irreparable harm to affirm the preliminary injunction because one of the plaintiffs in that case, at least one of the plaintiffs in that case, was still employed by the sheriff's department at issue and they were threatening to terminate him simply because of his political affiliation. That is the kind of burden

27

on First Amendment rights that coerces somebody throughout their employment.

Ms. Castro was coerced yesterday to give up her sincerely held beliefs when she showed up to the office. She'll be coerced tomorrow unless this Court enters a preliminary injunction to stop that unconstitutional choice and we have two more cites that I want to bring to the Court's attention.  I don't want to take up too much of your time.

These are two out of circuit cases that illustrate this principle so one is *Amalgamated Transit Union Local 85 versus Port Authority of Allegheny County*. 39 F.4th 95 from the Third Circuit 2022.

In that case, the plaintiffs were bus drivers who were ordered to come with face masks to work because of the Covid crisis and many of them had personal expression on their face masks and they were disciplined, they were not terminated but they were disciplined pretermination for doing so in ways that the City did not approve of and the Court there held that there was irreparable injury and affirmed a preliminary injunction based on that because that burdens their First Amendment right.

The other citation I won't need to describe it is *International Association Of Firefighters Local 365*

**JA241**

28

*versus City of East Chicago*, 56 F.4th 437.  It's from the Seventh Circuit in 2022.  Similarly pretermination posture and I think both of those cases are illustrative of what the Second Circuit has said many, many times which is that the purpose of a Preliminary Injunction is to stop the burden on First Amendment rights, on Constitutional rights to stop that choice.

THE COURT:  Can you give me the cite again on the second case, 56 F4 what?

MR. PIAZZA:  437.

THE COURT:  Is this the same argument as you were presenting essentially that it is a per se a violation of constitutional rights is per se irreparable harm or are you making a more nuanced argument?

MR. PIAZZA:  No.  We are agreeing with that.  We're just illustrating that.  It is not argument, Your Honor.  That's what the Supreme Court has said and what the Second Circuit adopted in *Paulsen* and what the Supreme Court more recently also adopted in many of its Covid cases.  The loss of First Amendment freedoms for even a temporary period of time is irreparable injury.  That's been adopted in majorities. *Elrod versus Burns* I think is fairly on point to our facts.  There the opinion with that language is a three justice plurality.  Five justices agree that there was irreparable harm because of

**JA242**

the First Amendment violation and we see that as controlling.

THE COURT:  Right.  To understand the argument, at the moment she's not being prohibited in a sort of direct sense from viewing the crucifix, but she's being punished or facing consequences for insisting on that in the classroom.  Is it the -- it's the ongoing punishment for having asserted her rights in that context that is the harm or what is the nature of the harm particularly?

MR. PIAZZA:  You said it as well as I could, Your Honor.  That's exactly it.

THE COURT:  All right.

MR. PIAZZA:  Finally, Your Honor, I just wanted to make two quick notes on the public interest prong.

THE COURT:  Let's stay for one more minute.  I guess this goes to the injunction sort of overall so the defendants cite a number of cases from the Second Circuit talking about essentially the State and some of the cases dealing specifically with school boards having leeway when they are trying to navigate between Free Exercise on the one hand and Establishment Clause on the other hand. Essentially, the Court should give them some leeway because it is a difficult in a changing area of the law to always get it exactly right.  So there seem to be some cases saying essentially even if there was an

30

Establishment Clause violation, we're not going to issue an injunction here on Free Exercise grounds.  What do you make of those Second Circuit cases?  Why aren't they controlling here?

MR. PIAZZA:  So defendants in the response brief I think gave *Kennedy* a little bit of short shrift. *Kennedy* changed the landscape of how this is analyzed, Your Honor.  What *Kennedy* made clear is that that leeway it may exist in certain instances, but if there's no Establishment Clause violation or if there's a phantom Establishment Clause violation that doesn't trump somebody's actual First Amendment Free Exercise rights.

To put another way, when Ms. Castro is speaking in her personal capacity she is not the State.  The Establishment Clause doesn't restrain anybody in their personal capacity.  Other things can.  Ms. Castro might have any number of reasons why her speech must be curtailed for disturbance purposes or because of some neutrally or generally applicable principle.  But in her personal capacity, the Establishment Clause is not one of them.

That's why I think *Kennedy* is so important because once the Supreme Court said he's speaking in his personal capacity, the school district has to be reasonable in what counts as an Establishment Clause

**JA244**

violation.

It's two principles: the Free Exercise Clause and the Establishment Clause are not in tension with each other. They don't bat back and forth. They complement each other and the way they complement each other is that when it is personal speech, it simply does not apply in that way.

I think a third way to put that, just to put a bow on this, that's exactly what overruling the endorsement test was about. The endorsement test took private speech and made somehow attributable to the state, but the Supreme Court in *Kennedy* said, no to the endorsement test.

The lines are clear. When the State does something, when there's official speech, that's a different analysis. When it's private speech, we still value people's personal free speech right and their free personal exercise rights.

THE COURT: It may be all well and good that it is clear once it is personal speech. We're not going to have the Establishment Clause problem after *Kennedy*. The line between personal speech and state-sponsored speech is not always clear and may depend on the exact factual circumstances and complicated analysis and conflicting cases and what have you. I think those earlier and

certainly they do predate *Kennedy*, but they do talk about leeway in that in that area for school districts.  So I take it your position is that *Kennedy* overruled that line of cases from the Second Circuit.  Is there anything else you can point to sort of post-*Kennedy* Second Circuit or cases even within our circuit finding those earlier Second Circuit cases are no longer good law?

MR. PIAZZA:  No, Your Honor.  We don't have to look to post-*Kennedy* again this is where the *Wood* case down in Florida I think it is important and the Western District of Pennsylvania that we cite in our opening brief involving the teacher with cross necklace is important because whether speech is personal or attributable to the Government, I don't think is one of those things that the school gets leeway on that.

That's a factual relevant inquiry like you said, Your Honor.  The Court decides those facts.  The school district doesn't just get to lay claim to every single thing that happens in the classroom.  Those are the *James* and *LaLaRusso* cases.  It is possible a zone of personal speech and once that happens, religion can't be discriminated against and here, Your Honor, the defendants by their pattern and practice for years have allowed other teachers their personal speech in their desks, by their desks, with their Baby Yodas, their New

**JA246**

England Patriots, their family photos, the dog photo.

The fact here, Your Honor -- I will put it this way.  There may be facts in other cases that are difficult.  I agree with you.  There's going to have to be some line.  Like in *Johnson v. Poway,* the seven-foot live banners first is what the Ninth Circuit there said were the more personal items on the desk. Yes, there is a line.

Here, Your Honor, it is very clear to any observer looking at the desks which speech, which area belong for lack of a better word, belonging to the teacher and their personal items.  Again for it to be otherwise would be to say the dog in B7 is the official speech of that school district and that cannot be the case.

THE COURT:  Is it your position that even if the Second Circuit cases continue to control that this simply wasn't a reasonable interpretation of the Establishment Clause post-*Kennedy* for the school district to take?

MR. PIAZZA:  Your Honor, again the cases that defendant cited weren't on point.  They are very clearly Government speech.  There was no vague line to sort of suss out the details on.  In *Stone*, there was a statute.  In *Lee versus Weisman* there was an official district policy inviting a religious speaker to graduation.  I

**JA247**

34

don't recall any case that was cited by the defendants that soft of skirted the line there.

But to the extent that *Kennedy* is important here.  I think it is all important is that the defendant's don't get the all powerful word on what's personal or what's not.  They can have policies, but they actually have to enforce them.  They actually have to apply them neutrally and generally applicably to everyone.  What they do matters more than what they say. Here what defendants did is they allowed teachers their personal expression.  That's the important part.

THE COURT:  All right.  Let me try to reiterate the question a little.  I'm looking at a case I believe it was Judge Newman writing in 1999 so this is 173 F.3d, 469.  And he says "The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause." I think he goes onto talk about leeway.

**JA248**

35

So in other words, there are cases predating *Kennedy* that talk about leeway whether it's a school district or a government entity trying to figure out if I go here, I will the violate Free Exercise.  If I go here I will violate the Establishment Clause in good-faith getting it right.

MR. PIAZZA:  I think I understand.

THE COURT:  So that's why they say essentially even if we got it wrong, even if post-*Kennedy* this is not an Establishment Clause violation, we shouldn't have an injunction issued here because the Second Circuit cases give us some leeway and we try in good-faith to get it right.

I'm trying to understand what your argument is for those cases not applying.  I think your argument is *Kennedy*.  But if there's something more, tell me.  And then I guess the second part is is it your position that even if these cases control, the decision the school district made simply wasn't a reasonable view of the Establishment Clause post-*Kennedy* because it really was quite obvious this is personal space and that they treated religion worse than everything else.  Is there anything other than *Kennedy* you can point to to tell me that the Second Circuit cases aren't good law?

MR. PIAZZA:  No new authority.  However, that

**JA249**

36

part of the reasoning in those cases and we're not disputing those cases and their specific holdings are still controlling. But to the extent that's the central part of their reasoning, that's not good law going forward. *Kennedy* said the tie does not go to the runner when there's only a phantom constitutional violation.

Ultimately, the school district if there's leeway, it does not show up in this kind of situation where the determination is whether the speech is personal or not. That's a decision for the Court to make. So that doesn't get leeway. In terms of the burden, I can imagine some situations, Your Honor, where there's a judgment call.

But recall here, Your Honor, that the reasons that they gave only had to do with her crucifix in her personal space and they put forward the worry that she was going to risk imputing to the school district a message that the school district endorsed religion. They were the ones who used the endorsement test language at all five meetings from December through January. They are the ones who put that are forward. They have the burden.

If they were relying on the endorsement test or the Establishment Clause generally for personal speech, leeway doesn't really matter here. We don't need leeway

**JA250**

either way to win the burden argument, Your Honor.

THE COURT:  I will look back at the cases.  I guess it is your position that the leeway relates to the sort of weighing in the burden part but not to the sort of initial -- so essentially the *Pickering* but not the *Garcetti* part?

MR. PIAZZA:  I think that's the most reasonable way to read it, Your Honor.  Because again *Shurtleff* says theoretical control over speech is not enough.  It is what they actually do that matters to determine whether it is personal speech or not.

THE COURT:  I will look back at that.  That hasn't stood out to me.  What I took those cases to say is maybe it's not an Establishment Clause violation in the end, we'll take a close look at it.  If it was reasonable to think that it was, and then the school district is not going to lose the case.  I'm trying to figure out is it your position that it was not reasonable for the school district to think this was an Establishment Clause violation?

MR. PIAZZA:  Correct, Your Honor.  It was not reasonable.

THE COURT:  I think I had a few other questions. If you have anything further.

MR. PIAZZA:  I wanted to note on the public

38

interest front, that's the last prong that we didn't talk about too much.  This is not a contract case.  This is not a national security case.  There's not vast sums of money.  This is a mine-run case of an individual asserting her First Amendment Rights as against the government.

I think that defendants essentially make the argument that they should be given discretion to treat this case how they want to on the public interest side. But public interest is measured by the Constitution and liberties protected.  Not by how much the government wants to control them.

And finally, defendants have never contested that Ms. Castro is qualified as credentialed experience with this case has nothing to do with her teaching abilities.  The only thing defendants have made this case is about is whether this crucifix could stay in her personal space.  Because the defendants allowed others their personal items in their personal space: Baby Yoda to New England Patriots to the dog to the family photos, she should be allowed her personal expression.  To do otherwise, would be to say religion is second class speech and the Supreme Court has foreclosed that argument many, many times.

THE COURT:  I have a few other questions.  So

**JA252**

39

with respect to the comments that the students allege that your client made, I take it that you won't be defending those comments as private speech or permissible under at Free Exercise Clause. We're not dealing with the question of whether those comments were permissible in this case; is that right?

MR. PIAZZA: You are right. We are not dealing with them because defendants didn't rely on them at any point in their discipline. Those comments which by the way, Ms. Castro categorically denies.

We gave some reasons in the supplemental declaration and the opening declaration for why in context they may not have accurately portrayed what happened in the classroom. But ultimately, those were not the actual reasons for the discipline that continues through today. They made no difference to the choice that defendants gave Ms. Castro. If you hide the crucifix, you get your job back. It didn't factor into that, so it is immaterial to this case because defendants did not rely on it.

THE COURT: Your client is not asserting a right to be able to make those kind of comments in the classroom?

MR. PIAZZA: We are not -- Your Honor, those were second and third hand accounts. We're not actually

**JA253**

40

even sure what was said.  I know we know she testified that there's occasions where she makes innocuous comments to herself as anybody would using some religious terminology, but without knowing what was actually said or how it was said, I don't want to categorically say that everything was unprotected.

Again, it doesn't really matter because defendants did not rely on those.  So I think as they were written on the page, no, we're not making that argument, Your Honor.  We're not relying on that, but neither did defendants.

THE COURT:  Just give me a moment to see if I had anything else for you.  All right.  I think I've gotten everything.  Thank you.

MR. DEL POZO:  Your Honor, would you mind if we took a very short break?

THE COURT:  Sure.  Would you like to a recess for a minute?

MR. DEL POZO:  Five minutes.

THE COURT:  Sure.  Let's recess for five minutes.

(Whereupon, a recess was taken.)

MR. PIAZZA:  Excuse me, Your Honor, with agreement from the other side --

THE COURT:  Let's just for the record, we're

**JA254**

41

back now on the record in the case of Arroyo-Castro versus Gasper 25CV153.  We took a brief recess and have now resumed.

MR. PIAZZA:  Thank you, Your Honor.  With the other side, I just wanted to clarify one factual question you asked.  You asked if there was an ongoing investigation or if Ms. Castro has been interviewed for the allegations about the student comments.  She has been interviewed.  We don't know the status.  The parties have both agreed that that investigation is not part of the motion before the Court.  I wanted to clarify, yes, there's an investigation.  Yes, she has been interviewed. That's not part of the present motion.  Thank you, Your Honor.

MR. DEL POZO:  That's our understanding as well.

THE COURT:  I may have some more questions about that.  Thank you.

So we'll hear from the defense now on the motion.

MR. DEL POZO:  Good afternoon, Your Honor. Again Eric Del Pozo, Shipman and Goodwin for the defendants.

Granting plaintiff a preliminary injunction would represent an extraordinary departure from controlling law and that includes the *Kennedy* decision.

**JA255**

42

Before I get into why, I will note it sounded like opposing counsel narrowed and somewhat changed the relief requested on this motion.

Instead of an injunction that would reinstall Ms. Castro in the classroom that she was in on December 3, 2024, it sounds like plaintiff now seeks an injunction that would allow her to hang her crucifix on whatever classroom she happened to be in or be assigned to either for the summer or for the upcoming school year.

So we wanted to note that that's what we heard. If so, I won't belabor the standard whether it is for a mandatory junction or not, it sounds like what they are asking for would not be a mandatory injunction if that's, in fact, what they want.

THE COURT:  That it would not be.

MR. DEL POZO:  That it would not be.  It would be remarkable for the reasons I will get to and unwarranted.

So *Kennedy's* second sentence in the decision's open paragraph highlighted that the football coach there prayed during a period when school employees were free to attend to personal matters.

Here as we know, Ms. Castro wants to hang a crucifix during class periods.  *Kennedy's* third sentence again in the opening paragraph emphasizes that the

**JA256**

43

coach's religious exercise came while the students were otherwise occupied.

Here the religious practice would occur in front of students. Moreover, *Kennedy* twice mentioned that the coach's prayers were not publicly broadcast or said to a captive audience. Opposing counsel on reply seems to think that "broadcast" means only over a PA system or load speaker. I'm going to quote from the *McCreary County ACLU of Kentucky*. It's a case that we cited in our brief in which the Supreme Court characterized *Stone v. Graham* that's holding that the Ten Commandments had to be woven into a course of secular study, quote, to forestall the broadcast of an otherwise clearly religious message, unquote. That is 545 U.S. 844 and 868.

In other words, according to the Supreme Court, religious items on a classroom wall broadcast a religious message to captive students. These distinctions hover over and repel just about every argument that opposing counsel has made. You have our briefs, and I will touch on all of them as best I can.

First and foremost on the Establishment Clause discussion, while perhaps very interesting is beside the point because we are correct that this was speech pursuant to Ms. Castro's official duties. Doesn't need to be government or sanctioned speech for all purposes.

44

The test under *Garcetti and Pickering* is whether the speech or at least for the first step is whether the speech is pursuant to the employee's official duties.

In Weintraub, it was a grievance.  It was actually against the school.  It wasn't the school's grievance.  It was a grievance to get the school to discipline a student.  That was held to be speech pursuant to the teacher's official duties.

Ms. Castro offers no decision, statute, policy, or administrable principle for this Court to determine which parts of the classroom wall were hers versus which parts belong to the school.  We have one zoomed photo showing her desk area. That in our estimation was not enough.  This was in class speech and yes, our position is that anything permanently hung on the seventh grade classroom walls in DiLoreto is speech pursuant to a teacher's official duties subject to taking down by the school.  It doesn't matter that the school allowed some other teachers or even all teachers to hang personal items.  The existence of other personal items might matter to show some sort of singling out and that might effect the standard of review under strict scrutiny, but it doesn't mean the school forfeits its own ability to police its own.

THE COURT:  I don't take it to be the argument

**JA258**

if the school simply said no personal items on your desks or your walls, it is distracting to the children. You are putting up all sorts of strange things. We're getting comments about it. It sounds like they don't think they would have a claim under free speech or Free Exercise. Essentially this would be a very different case if we were in a school where there's only school-sponsored preapproved items on the walls or very bare walls and we had one teacher who put up a crucifix.

Just to be clear that's not what we have so the kids are going and these are kids who are not just in this classroom, they are mid-schoolers going from classroom to classroom to classroom. In each classroom, they are going to they are encountering a whole mess of stuff that's on desks, posted on the walls. There's a Virgin Mary here, family photos here. It is not sort of an environment where this cross is standing out in a very pronounced way. And so I do think the context matters in that sense. And so why doesn't it?

MR. DEL POZO: Your Honor, I will get to why the fact that students may cycle through classrooms and not see a crucifix in every single one doesn't take this case out from *Stone v. Graham*.

But for the purposes of whether this was speech pursuant to a teacher's official duties, I point the

46

Court to *Johnson v. Public Unified School District* from the Ninth Circuit that effectively establishes the rule that we're advocating for here that anything on the wall of the classroom is necessarily speech pursuant to a teacher's official duties. The banners there were larger, but the decision actually recites a school's administrator's testimony, that it wasn't the size. Although she found the size somewhat off-putting. It wasn't the size that prompted action. The fact that it was a math class. Not a class in which banners containing religious messages could been integrated into the course of study. This wasn't a public forum. We have heard from Mr. Piazza that they are not making that claim. A public forum in school according to *Hazelwood v. Kuhlmeier* has to be open either to the entire public or to some appreciable segment of the community. *Hazelwood* gives the example student groups. These were school walls and only teachers in those classrooms would have decorated the walls.

As Your Honor alluded to or might have been alluding to earlier, this district does have a policy. A little bit general, but it does reinforce that the district formally believes that items on classroom walls or the physical aspects of the classroom, I think the phrase that they use is have a powerful impact on student

47

learning.

Ms. Castro in her declaration seems to agree. She said that personal items including her own crucifix made the class more conducive to learning. So we're not talking about something that's entirely outside the teacher's sphere of professional duties. She made an offhanded comment in response to a student's question after the bell about current events or the latest sports scores. I'm not sure that we would argue that that would be speech pursuant to her official duties. Hanging anything on the classroom walls most certainly is.

It is also not like wearing a cross or a head scarf or a yarmulke in *Kennedy*'s examples or even an arm band. Those come and go with the teacher decorating herself. It is not the same thing as decorating her classroom. The teacher doesn't take the walls with her when she leaves.

THE COURT: Why isn't it here? The only time students saw her was during -- in the classroom when she was there. It was for a portion of their day. How is this different than from wearing a cross around her neck or a hijab?

MR. DEL POZO: It is not part of her clothing. It is part of the environment around her desk. It is near the students' daily schedule, keyboard shortcuts for

**JA261**

48

the computer.

THE COURT:  Where in sort of the test I'm applying does that distinction come into play? Ultimately, we're deciding is this essentially personal expression as a citizen or is this an expression of a teacher in the scope of her duties.  How is it that a teacher's flag or a photo of the Virgin Mary or the photo of your children, how is that not a personal expression?

MR. DEL POZO:  I will say it has personal aspects to it, but it is still part and parcel of the teachers' duties.  The teachers come to class and at the beginning of the semester, they decorate their classrooms in part to make them more attractive environments for the students.  As Ms. Castro said, it makes the environment more conducive to learning.  It makes students see her as an individual.  Not just a teacher.  That's all fine.

I would point Your Honor to the two factors that the Second Circuit has recited time and again as governing this inquiry.

The first is is this speech within or the expression within the employee's scope of employment. Sort of like a scope of employment test arguing yes, decorating your classroom walls at the beginning of the semester before all the students get there is part and parcel of a teachers' duties.

**JA262**

49

The second is incredibly important and it is what the Ninth Circuit relied on.  That's is there a civilian analog and there's no civilian analog to decorating a seventh grade classroom.  If you stretched at the outer margins, as opposing counsel does, there's a civilian analog in that people generally decorate their desk areas at work.  I do as well.  That's not a classroom.  She's a public school teacher decorating her classroom for students.

THE COURT:  If I can stop you there.  I get the point of -- frankly, I was surprised to see what these areas look like in the classroom.  The way it seems to be functioning at the school there's a lot of personal material being posted on the desks and on the walls.

If the school doesn't like that, they can say no more personal expressive items.  It becomes problematic when you do allow this level of personal expression and then say all but one piece of your identity of your background can be posted here.

MR. DEL POZO:  And, Your Honor, that might be relevant to whether the alleged burden was neutral or generally applicable and we're not contesting those factors.  The school can order everything be taken down, they can have a policy no more personal effects at all, hanging anything then would be insubordination.  The

**JA263**

50

teacher couldn't do that or they could take down anything that for whatever reason in their educational judgment, they thought should not be on the wall.  This will bleed over to our argument about *Pickering* that they had carte blanch to tell any teacher that they disagreed with that teacher's classroom decorating choices.

Before I move on to Pickering which will be step two of this initial point, I will say that the reference to *Shurtleff,* the Boston City Hall case, is a category error.  It was a case in a long line of cases about public private general access to public forums. There's some cases about private access to public benefits.  The Supreme Court held time and again that the government can't discriminate against either religious entities or religious speech.  In those circumstances, this isn't a public forum.  It isn't that sort of case at all inside the classroom.

THE COURT:  It is little more complicated.  The cases seem -- that line of cases seem to take a view that there's a public forum.  There's a limited public forum.  There's a traditional public forum, a limited public forum, and goes all the way to the nonpublic forum.

Even in the nonpublic forum, the government can't engage in viewpoint discrimination which really I think you have a hard argument that this isn't viewpoint

51

discrimination in the sense of particularly picking religion and singling that out. Why isn't this a nonpublic forum? Does the *Pickering* framework just completely displace the forum framework?

MR. DEL POZO: In this circumstance, yes, we get to *Pickering* in step two and whether there's viewpoint discrimination or viewpoint hostility would be something to consider if there were. Here there's not. No evidence of it. Maybe the Government would have a harder time justifying that. In the second *Bronx Household* decision the one from 2014. The Second Circuit actually describes at length why taking action that has a religious reference or against a religious object or religious expression isn't automatically viewpoint discrimination.

THE COURT: That was very complicated. There were a lot of permutations of that case and a change in what the order from the ordinance said. I think in the end it landed on worship, restricting worship services -- religious worship services is not viewpoint discrimination because it is dealing with an activity. But I'm not sure it said that -- The closest analogy would seem to be the flag case where essentially it's the same thing. It is the cross versus the crucifix. It is a symbol of religion displayed and there it took all of

**JA265**

52

two sentences for the Court to say this viewpoint discrimination.

MR. DEL POZO:  I will quote directly from the *Bronx Household* decision at 750 F.3d 192.  It says that rules and policies designed to keep a governmental entity in conformity with its obligations under the religion clauses must have an effective focus on religion.

THE COURT:  I'm with you that if the school had to do this to be prevent an Establishment Clause violation, they can do it.  There's circumstances when they can engage in viewpoint discrimination.  That's a separate question.

I think the first question is I take it to be your argument we don't even get anywhere near this because this is government speech, not teacher speech and I'm trying to understand the right test for that and why we aren't in the world of the flag versus Garcetti.

MR. DEL POZO:  Well, maybe this will help as we have noted in our brief, this could be construed as a content-based restriction and the content is unambiguously sectarian religious items hung on classroom walls.  There's no evidence that there's actually viewpoint discrimination which is singling out a particular viewpoint for desperate treatment against another viewpoint nor is there any claim from what I have

**JA266**

53

seen or evidence of viewpoint hostility which would be its own problem.  As I understand it, it is not being asserted in that case.

In *Shurtleff* as well, the Supreme Court went out of their way to show there's no written policy or guidance at all about what the flags that the city allowed to be hung might communicate.  Here we do have a policy that teachers should be very intentional about how they design their classrooms.

THE COURT:  But I think what you don't have here at least on this record and this may change as facts are developed.  At least on this record, we don't have evidence that the school was doing anything to regulate what was present on the walls.  That's similar I think to the Boston situation where theoretically they could control it, but this flag was the very first one they ever denied.

MR. DEL POZO:  The school still had the latent authority to tell teachers that they had to take things down from the walls. They exercised that authority because they got a complaint.  There's no evidence they got a complaint whether about the Virgin Mary or about the Red Sox pennant, maybe from somebody that's a Yankee's fan.  They got the complaint and then they took action.

**JA267**

54

Even if Your Honor is unconvinced that this is government speech, we are convinced that it is, in step two, it fails under *Pickering* balancing.  Under *Knight v. Connecticut Department of Public Health*, *Pickering* is the exclusive standard for analyzing employee speech claims. Despite what the plaintiff has argued on reply, there was, in fact, a Free Exercise claim separately raised in that case.  The appellants argued in their briefing that strict scrutiny should apply because they were asserting rights under two provisions of First Amendment including a Free Exercise Clause and the Second Circuit said no because this is public employee speech, we're going to apply *Pickering.*  Not only does that analysis control, the outcome dictates the outcome of this case.  The Second Circuit there citing the leeway principle from *Marchi* and later cases held that a legitimate Establishment Clause concern would justify what the Second Circuit called a slight burden on the plaintiff's speech there and just don't bring up religion when you dealing with clients in the performance of your state job.

I think we have an even more aggravated version of that holding here because not only was Ms. Castro emitting her religious message from the crucifix on the walls, she was doing it before a captive student

**JA268**

55

audience.  The students had to attend school on pain of penalty to their parent or guardian educational neglect proceedings or monetary fines.  But as the Supreme Court reaffirmed in the *Con Edison* decision that we cited, and they went back to prior decisions where they actually held as much speaking to a captive audience gives you far less of a First Amendment interest.  Sometimes even not than speaking to a non-captive audience.

THE COURT:  In terms of accepting I guess the merits of the Establishment Clause analysis and so I take it to be your view as long as the school even if I determine under *Kennedy* that this is not -- that this did not violate the Establishment Clause.  I take it to be your view as long it was reasonable for the school to think that it was an Establishment Clause violation or that it could been found to be one, that's enough for the Second Circuit cases?

MR. DEL POZO:  Yes.  Our position is that there was an Establishment Clause violation here.  At least one in the offing.  We still don't think we need the breathing space principle, but that is the law in the Second Circuit.  It hasn't been overruled merely by *Kennedy*.  *Kennedy* talked of phantom constitutional violations I think.  Mr. Piazza mentioned *Carson v Makin*.

In that decision, the Supreme Court made clear

**JA269**

56

that the prior decision had foreclosed the Establishment Clause claiming there's another case in that series, *Trinity Lutheran* in which the parties stipulated that there's no Establishment Clause violation or at least an Establishment Clause concern and we don't yet have a case in which the Supreme Court has held that the Establishment Clause concern raised was legitimate or not a phantom concern and not allowed this sort of breathing space. Nothing in *Kennedy* overrules this principle.

THE COURT: This concept of breathing space is that just a Second Circuit principle or has the Supreme Court ever endorsed that as a concept?

MR. PIAZZA: In *Locke v. Davey* I think Justice Scalia talks a little bit about it. Could be seen as potentially endorsing it. But in *Locke v. Davey*, there's again a stipulation that there's no Establishment Clause concern there. The Supreme Court at least from my read of the cases or my recollection hasn't directly weighed in on this. The Second Circuit in *Bronx Household* actually ran through Supreme Court cases and listed them up to that point. There's *Good News*, *Lambs Chapel* and *Rosenberger* and said that in none of those cases did the Supreme Court foreclose the Second Circuit's rule that it had been applying in all cases we're discussing.

I think the phrase that the *Bronx Household*

57

panel used was the a Supreme Court has never said that a legitimate Establishment Clause concern couldn't allow a school district or governmental actor to avoid Free Exercise liability and from my reading of the cases, the Supreme Court hasn't done so since then either.

THE COURT:  What follows from that?  Say you are in that situation and it actually isn't an Establishment Clause violation but so how does the person begin to freely exercise their rights?

MR. DEL POZO:  The challenger or the plaintiff doesn't get an injunction against the defendants in the district court.  I hate to invite this, but they would have to take it up on appeal in this case, potentially get to the United States Supreme Court and have them overrule *Stone* and *Lee*.  Still wouldn't get an injunction against the defendants until the defendants failed to follow clear authority from that point going forward.  I think that's how that would play out.  That rule is perfectly sensible because as the Second Circuit has correctly said, this is a tough area in a lot of context for school administrators to have to navigate a lawsuit coming at you from one angle if you violate somebody's Free Exercise rights and then potentially you have a lawsuit coming at you from another angle if you are alleged to have violated somebody's Establishment Clause

**JA271**

rights.

We haven't cited these cases in our briefing and I'm not going to rely on it for any more than this purpose. But I think there's a case before the Fifth Circuit now about Louisiana law that dictated that schools had to hang the Ten Commandments. After *Kennedy*, somebody sued immediately. I think they are talking about Article III standing there. I don't know how helpful that will be. It goes to show these are imaginary concerns that you might face a lawsuit.

THE COURT: We're not talking about monetary damages here. This is an injunction that potentially would allow someone to do what the Court found under law they should be allowed to do after concluding that there's not an impediment penalty to not do it. It seems to be immunity-type doctrine in the sense that the findings in the context of an injunction. I mean what's so terrible really about the injunction versus -- and we can hear from you about what that is. It is not like there's monetary liability --

MR. DEL POZO: I agree. The rule from these Second Circuit decisions evokes qualified immunity for monetary individual capacity claims. That is a different context. I don't think anybody likes being under a federal injunction holding even as a preliminary

matter that you are likely to have violated an employee's rights. There's also the spector of attorney's fees under Section 1988 for a prevailing party.  That will potentially be litigated down the line and the school district did get or the administrators, teachers, assistant principal, we elevated them, did get complaints from students about the crucifix.  So they are acting out of a good-faith reasonable concern trying to navigate the shoals that we're all talking about and I would hesitate to go back to my clients and say, well, you're federally enjoined.  It is not a big deal.

THE COURT:  I don't mean to make light of it. I'm trying to understand.  I see the cases talking about the leeway and I'm trying to understand how it plays out that someone can then get to practice their religious beliefs and I guess the language from *Kennedy*.  They talk about phantom but there's also the -- I'm at *Kennedy* at 597 U.S. 507 is the cite at 533.  Because a reasonable observer could mistakenly infer that by allowing the prayer, the district endorsed Mr. Kennedy's message.  The district felt it had to act even if that meant suppressing otherwise protected First Amendment activity. In this way, the district effectively created its own vice between the Establishment Clause on the one side and Free Speech and Free Exercise Clause on the other.

60

Placed itself in the middle and then chose its preferred way out of a self-imposed track.  Why doesn't that tell you that the Supreme Court doesn't think there's a place in the middle that you can go one way or the other?  In fact, it is one way.

MR. DEL POZO:  I think all that says is that the religious expression in *Kennedy* wasn't in the middle.  We're talking about postgame brief femoral prayer where no students were even arguably coerced and there's no evidence of that.  Not hanging a religious unambiguously sectarian item in the classroom.

THE COURT:  There was a strenuous dissent in *Kennedy* about actually being very coercive circumstances so.

MR. DEL POZO:  Well, what we have and I will move onto the Establishment Clause argument full-bore in a second.  I would like to finish very briefly with *Pickering*.  We think we fit quite comfortably underneath existing Establishment Clause cases.  If Your Honor is disinclined to decide the case in terms of breathing space, Your Honor can simply decide the plaintiff hasn't shown a constitutional violation or likely constitutional violation.

On *Pickering*, I will add two things.  One, we're not affirmatively relying on Ms. Castro's in class

**JA274**

comments as the students have reported.  We presented them to the Court because they do form part of the background and narrative.  The full and complete picture of what the district had heard and what had come before when it was instructing Ms. Castro to relocate the crucifix from the classroom.  I will cite it under *Waters v. Churchill*.  They can act based on what they heard even if it is mistaken.  We're not arguing that Ms. Castro definitely said those things in the classroom.  Your Honor has to make a factual finding either way.

THE COURT:  So essentially those factual circumstances you are not relying on to demonstrate coercion as part of your Establishment Clause?

MR. DEL POZO:  That's right.  Nor were they cited in the disciplinary or predisciplinary correspondence.  They are still under investigation.

THE COURT:  That's correct.  Although your brief includes them as part of the discussion on coercion.  I want to be very clear that you are not relying on those statements to show coercion as part of your Establishment Clause argument?

MR. DEL POZO:  Yes. That is what I'm saying. But what we are relying on are the text messages Ms. Castro sent on December 20, has the date on the screen cap of the 19.  The 20 is when the district learned about

62

it.  The date might be underneath the message.  The full text is there in which she tells her students, texts her homeroom students saying that she was picked on administratively, I'm paraphrasing, because she wouldn't take the crucifix down.  The lesson is that doing what is right can sometimes be doing good.  I'm sorry if I've mangled it.  That came about a week after the disciplinary.

THE COURT:  Where does that fit into your analysis?

MR. DEL POZO:  It shows two things.  One, the potential for disruption.  You now have a teacher who is essentially creating a standoff with her supervisors in view of her homeroom class.

THE COURT:  Just to be clear.  It is a disruption that followed the discipline so it followed the adverse action here.

MR. DEL POZO:  But we have just heard is that -- this is the plaintiff's view.  The discipline was reaffirmed in January at the meeting to discuss whether Ms. Castro was making accommodation with the crucifix. Come back to class.  It was reaffirmed on March 6 when she was temporarily reassigned after that meeting, but even if Your Honor is disinclined to consider that text message under *Pickering*, it certainly counts towards the

**JA276**

63

equities in that total mix.  It was a pretty unfortunate thing in our view for Ms. Castro to be sending to her students.  A parent actually said as much.  The parent called it inappropriate.

THE COURT:  I can't understand where that fact fits in to the test that I'm applying.  It is not relevant to your defense that this was an Establishment Clause violation?

MR. PIAZZA:  It is not.

THE COURT:  Or that your client reasonably thought it was an Establishment Clause violation?

MR. PIAZZA:  It is not.

THE COURT:  Is it part of your *Pickering* balancing?

MR. DEL POZO:  It is part of the broader context of Ms. Castro's expression and behavior related to her hanging the crucifix.  We ask that Your Honor consider it there.  We have seen no authority that says Your Honor can't.  Totally foreclosed.  Especially when you have an ongoing situation where the parties are in dialogue whether the discipline will continue.

THE COURT:  Are you saying it is relevant to the *Pickering* balancing test?

MR. DEL POZO:  Yes, it is one of the overall facts and circumstances that show the context of the

**JA277**

64

dispute.  That's the phrase that some of the case law uses.  But at a minimum, it is relevant to the equities of the situation and whether a preliminary injunction should issue.  So I will move on.

THE COURT:  Can I ask you there, though, if the preliminary injunction issued that simply said the district may not discipline Ms. Castro for placing a crucifix in or immediately around her desk to the extent they continue to allow other teachers to place personal expressive items, something along those lines, that would not speak to your clients's ability to maintain discipline related to these comments?

MR. DEL POZO:  Not facially, but it would be a preliminary injunction issued under the *Pickering* standard which is the exclusive standard in the Second Circuit and would have to include an equitable analysis that we think should in some way account for Ms. Castro's message to her students.

THE COURT:  Just to be a little bit more specific so, one, what about it impacts a *Pickering* balancing and, two, what about it in particular related to equities?  The reason I'm pushing this it wasn't really fleshed out in the briefing and I want to be specific.

MR. DEL POZO:  It is in our briefing, Your

**JA278**

65

Honor, in the *Pickering* section of our brief.

THE COURT:  I see it there to some degree.

MR. DEL POZO:  Just in a paragraph but --

THE COURT:  Can you point me to that?

MR. DEL POZO:  It is in the paragraph breaking across pages 19 and 20.  This is our opposition brief.  The text message itself is in exhibit to the declaration ECF 50-2.

THE COURT:  On page 19, we're not considering that middle paragraph that starts further for *Pickering* balancing.

MR. DEL POZO:  That's right.

THE COURT:  Per your comments earlier.  That speaks to the comments allegedly said by the students, but you are relying on the next paragraph which speaks to a concern about Ms. Castro, in your words, boasting about defying to a student.

MR. DEL POZO:  That's right.  The relevance would simply be to show the potential disruption of her expression vis-a-vis the students in the context of the dispute.  It is not the largest point.  We think under *Knight* the legitimate Establishment Clause concern alone would carry the day, then you have got the captive student audience.  You also have got the text message which Ms. Castro on her reply including in her

**JA279**

66

declaration admits she sent.

THE COURT:  So it goes to the disruption element piece?

MR. DEL POZO:  That's right, Your Honor.

For purposes of the Establishment Clause even if strict scrutiny applied, plaintiff's motion still would fail.  The defendants dutifully followed not just one but two controlling Establishment Clause decisions in instructing Ms. Castro to relocate her crucifix.  We haven't heard much about them.  Particularly *Stone v Graham* either in the plaintiff's briefing or in the oral argument.  *Stone v. Graham* held, as Your Honor I'm sure is aware, that unambiguously sectarian religious artifacts can't be hung on classroom walls consistent with the Establishment Clause.  I get the rejoinder that this is a teacher's crucifix and not the state statute. I say two things to that.  One, *Stone* didn't have an exception for religious artifacts that the teacher independently wanted on the wall.  *Stone* held that religious artifacts, unambiguously sectarian religious artifacts just couldn't be hung on the wall.  And number two, *Lee v. Weisman* --

THE COURT:  Let me stop you on *Stone* for a minute.  I guess what would seem to distinguish *Stone* at least potentially is that it's abundantly clear it is a

**JA280**

67

government-sponsored message.  The statute from the government says you have to post it in every classroom, so the argument here is this was a private expression.  I know you disagree it was private.

MR. DEL POZO:  I will say a couple of things in response to that.  One, the Supreme Court in *Kennedy* said that failure to sensor private speech doesn't automatically violate the Establishment Clause.  Didn't say it never could.  If this is private speech, it will just eke over that line.  We're still talking about a public teacher in her own classroom with captive students compelled to attend.  So all of the same concerns in *Stone* would be present in this case in the classroom regardless of whose decision it was to hang the crucifix.

Number two, *Lee v. Weisman* says that a school official, there it was the principal, making the decision not to promote a religious exercise in front of students.  There was a complication.  Not a denominational prayer is the same as a state statue and so we think Ms. Castro acting as a teacher hanging the crucifix really doesn't distinguish down to the degree that there's no Establishment Clause concern or violation.

THE COURT:  Does it matter in *Stone* that this is the words so essentially with the purpose being the students should be looking at this and hopefully

**JA281**

68

following the Ten Commandments after reading them.  So it is speaking in a, one, from the state and, two, in a commanding way to the students who were forced to sit there.  How was the crucifix communicating in a coercive manner?

MR. DEL POZO:  Plaintiff's own brief characterizes the crucifix as transmitting an unambiguously religious sectarian message of Christian devotion that any onlooker would understand.  How to do that to try to make it symbolic speech to get under that rubric, but I think that characterization in their brief answers your question.

Having a crucifix hung on the wall for the entire class, 48 minutes long, 100 students cycle through the classroom per day.  It's a foot high.  We haven't seen any evidence that it wasn't.  That's the evidence that the district has put in was plenty pervasive enough.  Certainly, more pervasive than a two-sentence prayer.  Like in *Engel*, even a two-minute prayer at a graduation, like in *Lee* and arguably even more of a violation than the Ten Commandments in *Stone* which had a little disclaimer.  Although, the Court held it to be disingenuous that these were for secular educational purposes.  This crucifix, according to the plaintiff, is unambiguously religious and that's why it is there.

**JA282**

69

THE COURT:  I follow all of that but *Kennedy* says I have to look at coercion.  So and I see coercion and I think *Kennedy* says coercion is consistent with *Lee* and *Stone* so it is consistent with *Stone* because the purpose is to read and obey the commandment.  In *Lee*, it is compelling the student to participate at least silently in a paragraph that's ongoing.  How is the crucifix serving that same purpose when it is appearing in the classroom?

MR. DEL POZO:  To be clear, the coercion in *Lee* wasn't that any of the students had to chant along with the prayer nor is the coercion in *Stone* that the students actually had to read and venerate the commandments.  The coercion was they had to be there in the environment while those exercises were occurring.

THE COURT:  Is that how *Kennedy* views coercion it is just if you are required to be there?  Isn't it you are required to either participate silently or that you have this prayer occurring that you have to stand as a participant and part of?

MR. DEL POZO:  *Kennedy* might have viewed coercion as requiring something more when we're talking about a football coach after games on the 50-yard line when students were free to attend to other matters. *Kennedy* doesn't mention *Stone* at all and it does

**JA283**

70

distinguish what the football coach did there from prayers broadcast to a captive audience, recited before a captive audience, uses a couple of formulations of this phrase. *Stone* relied nearly exclusively on the school prayer cases. Pre-*Lemon* but didn't get very far in the analysis. It cited *Shent (ph.)* seven different times and also cited *Engel*. Both of those cases expressly hold that their decisions are not predicated on any showing of actual coercion. *Engel* says --

THE COURT: Hold on. I missed a line of what was cited there.

MR. DEL POZO: *Stone* relied nearly exclusively on pre-*Lemon* school prayer cases, *Engel* and *Shent*. The Supreme Court in *Van Orden v. Perry*. It is a case about the Ten Commandments I think at a courthouse cited in Ms. Castro's briefing. Actually it characterizes *Stone* that way. It says *Stone* is a case that relies nearly exclusively on *Engel* and *Shent*. Both of those decisions, pre-*Lemon* school prayer cases, say that you don't need evidence of actual coercion. They say this expressly. They say merely that the students having to be there was coercive enough. *Lee* calls it subtle or indirect coercion that happens in the school environment. Not like the football coach on the 50-yard line after games. We're in a completely didn't context and just the students having

**JA284**

to be there is the coercion.  We actually called it one of the earliest lessons for animating principles of the Establishment Clause.  I will paraphrase here.  But that the slightest encroachment will then end up leading to or tolerance of religious exercise by the Government will end up leading to intolerance or coercion.

THE COURT:  So in your view, the coercion is there by the students being forced to be present and it doesn't matter if -- I mean is the version of the Virgin Mary postcard a problem?  At what level are we able to say, look, the students understand that's the teacher's item and we're not expecting the students to feel like they have to be a piece of whatever is going on here.

MR. DEL POZO:  I will point to *Stone* for the limiting principle and that would be unambiguously sectarian items, the Ten Commandments qualifies, the crucifix qualifies, especially under Ms. Castro's characterization of it, the photo of the Virgin Mary statute in the record, it looks like a nondescript photo of a statute.  There's no evidence that anybody has lodged any complaint about that at least to my eye.  That doesn't look like a nondescript sectarian item.

THE COURT:  What is it about a religious item that is coercive to the students?

MR. DEL POZO:  I will answer the question.  I'm

**JA285**

72

not dodging it, but in the first instance, it is not for me to say so much as the Supreme Court has said it four times, in *Engel*, *Shent*, *Stone* and *Lee*.

THE COURT: So some of those cases are the -- *Lee* is the prayer and I understand that sort of as *Kennedy* would say dating back to compulsory prayers. So the other cases are Ten Commandment cases and in your view, those equate to sort of any unambiguously religious item that might be placed on a wall.

MR. DEL POZO: That is right. Reading *Stone* on its face, *Stone* talks about the unambiguous sectarian nature of the Ten Commandments that any observer would understand.

THE COURT: But *Stone* also says -- I'm at page -- this is *Stone* 449 U.S. 39. I'm at page 42. If the posted copies of the Ten Commandments are to have any effect at all, it would be to induce the school children to read, meditate upon, perhaps venerate and obey the commandments. I guess in *Stone,* I took it to be that it was the State commanding through a specific message that the students obey a certain religious view. I just don't know a crucifix communicates the same meaning to the students.

MR. DEL POZO: The students who were compelled to be in this class looking at the crucifix would

73

understand it to be a crucifix.  A Christian symbol.  Ms. Castro testified in her declaration that she would look at it during class to pray to provide peace and strength.

THE COURT:  What follows from the students identifying with my teacher has a Christian symbol at her desk?  What follows I guess that's meaningful for the Establishment Clause?

MR. DEL POZO:  What follows for at least the students whose desk Ms. Castro placed parallel to the crucifix, they would be staring at a crucifix in public school for 48 minutes.  The district took action in light of all of the decisions that we're discussing to avoid the Establishment Clause concern that that would pose.

I apologize for not being here to argue these principles, the first principles partially that's because opposing counsel in their brief hasn't meaningfully attempted to distinguish these cases in any way.  They simply said that the school district forfeited any ability to even make these arguments because sometimes they use the word "endorsement" in their correspondence. These cases squarely control in our view.  If not, I hope this discussion illustrates that the breathing space principle clearly applies to these circumstance.

I want to talk a little bit about the preservation point that I just mentioned.  The district

**JA287**

74

didn't forfeit its ability to make these arguments simply by using the word "endorse" or "endorsement" in its correspondence or some of its correspondence. It used a lot of different words, gave ample support about justifications.

The Supreme Court in *Engel* which is a pre-*Lemon* case, actually used the endorsement maybe loosely to discuss the effect of the prayer in that case. They called it government endorsement. To the extent that we're talking about those cases and going back to those cases, that's not the endorsement test that has pre-*Lemon* in it. Later cases fully articulate it. It's just a broad principle.

*Kennedy* for its part actually considered a coercion argument that hasn't been raised in the district's correspondence until after the coach was disciplined. Didn't find it persuasive. Didn't say that the district couldn't raise it. It was considered another strained Establishment Clause argument. The district wasn't required to defend. Ms. Castro in a multipoint legal brief in a letter of reprimand warning her of discipline, imposing the discipline. These letters come pretty close. What we have in the record is the assistant principal, Mr. Mazzei, meeting with Ms. Castro in an email, talking about the concern that has

75

been raised about her crucifix and informing her that the First Amendment prohibited permanent displays of religious items in the classroom.  That's *Stone*.

In the December 11th letter of reprimand, the district tells Ms. Castro among other many things, the district owns and controls the classroom walls theory. Went over that.  Two, that teachers have to remain neutral when speaking to students about a particular religion.  Sufficiently invokes the concern about exposing students to religion in class.  That would be *Lee*.  There's nothing that bars the district from elaborating on those points in response to a preliminary complaint, a preliminary injunction motion and frankly, that's the main argument that plaintiff's brief has raised.  District said endorsement.  Endorsement is a taboo word after *Kennedy*, so they have no defense. That's wrong on its own terms, but also if you dig a little deeper, the case law actually supports what the district did here.

I have touched on viewpoint discrimination. There's just no evidence of discrimination based on -- I don't mean in the nefarious sense.  I mean actually singling out a religious view for what it says versus that there's an Establishment Clause concern with an unambiguously sectarian religious item, no claim of

viewpoint hostility.

I will touch very briefly on the Connecticut state law claim.

THE COURT: Can you just go back to viewpoint discrimination again because you are saying there's no -- just elaborate.

MR. DEL POZO: So the fact that the action for lack of a better word targeted a religious item is simply unavoidable because we're dealing with Establishment Clause concerns. That's what the Second Circuit held in *Bronx Household* in a separate discussion from whether the discrimination there was viewpoint or content based.

What the Second Circuit said was simply because we're dealing with a religious policy that references religion or in our case, it would be a crucifix, doesn't mean it's viewpoint discrimination. Frankly, that's a little bit too easy. It means any time a school district or government actor took action with reference to something having to do with religion, it would be per se viewpoint discrimination isn't the rule. There's no claim of viewpoint hostility. I want to stress that again. That would open a different can of worms. Since there's been no claim, I will not belabor it.

The Connecticut statute the standard for triggering the statute's protection is a substantial

77

burden. The statute says burden. It doesn't say substantial but the Connecticut Supreme Court has held that the statute is ambiguous. I think they held it is not plain and unambiguous. You have to look to the purpose, history of the session. We've laid it out in our brief. It is a response to employment. *Employment Division v. Smith* reinstituted the substantial burden test from *Sherbert v Verner*. That's what the author of the law review article cited in plaintiff's brief says about the statute. It was clearly meant to reimpose the substantial burden test. *Sherbert v. Verner* said if you lose your employment, it is a substantial burden if you don't get unemployment benefits. Plaintiff is on paid leave. She's getting full pay. If that changes, maybe she should come back. I have no insight into whether it will or it won't. She hasn't alleged that she's at imminent threat of termination or anything like that. If it changes, she lost her employment, she wasn't getting paid, she'd probably have a better claim. *Knight* also called the burden of not speaking about religion while performing your government service to be slight, that's not substantial.

Lastly, I will talk about the equities which even if there is a First Amendment violation, I don't think there is one. Yes, the plaintiff would be entitled

**JA291**

78

to a presumption of irreparable harm. She's not entitled to the presumption, presumption, not an injunction, that harm would have to be quantified and weighed against all the other equitable factors, the analyses emergent governmental cases. Her claim of religious injury, not to be disparaging in any way, is not 100 percent coherent. She doesn't claim she has a First Amendment right to teach seventh graders. Nobody is forcing her to teach without a crucifix on the wall. That's why we're all here. She wants to be able to teach again with the crucifix on the wall. She's free to hang the crucifix in her temporary office in the district headquarters. She's also apparently willing to take the crucifix down entirely if everyone else has to take their personal effects down under the sort of policy that we have been discussing a little bit earlier. Blanket ban on displaying personal effects. That undermines the severity of the injury in that she at least in her declaration paragraph 50 is not claiming a crucifix has to be up no matter what.

THE COURT: That could be an acknowledgment that the law would support her were it to be that kind of case.

MR. DEL POZO: I'm not inviting anything but nothing would prevent her from seeking an injunction even

**JA292**

79

with a neutral generally applicable policy.  She would be able to bring her claim under the Connecticut state law.  She can satisfy the substantial burden standard.  She might have a tougher time.  She might get strict scrutiny necessarily.  We just point out the inconsistency in what she's alleging and what she's testifying.

On the other side of the ledger, we have 100 or so students come through the classroom every day, 48 minutes at a time, two to three times without a parent or guardian.  The Supreme Court has said in the majority opinions and in dissenting opinions in various permutations in religion cases that parents entrust their children to the school's care and the school doesn't have license at least within the classroom to unduly impose it owns child-rearing prerogatives and this is in the context of exposing children to religion in class.  Another factor to consider.  There's that mass text that she sent to the students about her prerogative to hang the crucifix without her supervisors, assistant principal, principal, superintendent all were wrong.  In a nutshell, any claimed injunction relief can simply wait to the end of the case.  We don't think she would be entitled to it then.

THE COURT:  Can you articulate the text messages relevant to equities how?

**JA293**

80

MR. DEL POZO:  Because she is seven or eight days after her initial suspension, four to five days after being placed on indefinite paid leave, telling all of her students that she is correct and righteous for hanging a crucifix on the wall.  That may be her counsel's view as a legal matter and may be her view as a moral matter.  Telling students all of that in a mass text in the context of an incipient legal dispute with your supervisors is disruptive and in our view, inequitable.

THE COURT:  Just to back up a little on the irreparable harm.  I think as the Supreme Court has set out the test, it is essentially four factors: irreparable harm, likelihood of success on the merits and public interest and balance of equities.  The Second Circuit had some different permutations.

So is it your view they have shown irreparable harm because that's per se in this circumstance, but it is on the balance of the equities where they come short?

MR. DEL POZO:  Yes, that is our argument.  If they can show a likely First Amendment violation, that's where we disagree that they have or can, they meet their burden of production on irreparable harm.  That's what I would say.  But doesn't get them all the way home.  You have to quantify that harm.  I know the courts don't

**JA294**

probe the sincerity of people leave necessarily or the neutrality of the practice.  They accept at face value her view that teaching requires at least for this purpose, that teaching requires the wall-mounted crucifix in her seventh grade classroom or any future classroom from kindergarten up to eighth grade the district may assign her to. That's what she is seeking.  That will have to be weighed I call it in a caldron of equitable factors.  We have concerns on the other side. I think the phrases that we've used in our brief, again no disparagement intended, or that her alleged religion harm is narrower and negligible all things considered.

THE COURT:  On the sort of burden to the district of complying with any injunction, I know there was concern previously because it was sort of back in that classroom with the same students and what have you, in the sort of more narrowly presented version of it, is there a burden with compliance?

MR. DEL POZO:  There would be the burden on the students, the parents or their interest.  There's also a different burden.  We cited it in our brief.  The burden of administration.  I hate to think that we would be back before this court potentially in the Fall arguing over whether a particular placement was good enough or perhaps there's a different crucifix that she would like to hang

82

instead, whether the crucifix is too large or too small or where it should be.  Then this Court would unfortunately be put in the role of a classroom design professional.  So we think that injunction we think would be pretty hard to craft.  The school district would have to comply on pain of contempt if plaintiff or her counsel came back and said they haven't complied.  They think our crucifix is too big.  We think it's just the right size and it should be here instead of there.  I've never heard of an injunction like this, but that Your Honor's competency to issue one.  I'm just pointing out how administrable it would be.  Yet another reason why a preliminary injunction shouldn't issue.

THE COURT:  Okay.  Were the crucifix issue to be removed from this dispute, would she be entitled to return to the classroom or are there other proceedings underway that may prevent her return to the classroom?

MR. DEL POZO:  So I will point to Chief of Staff Manning's declaration, ECF 50-1.  Ms. Castro has been reassigned temporarily given the pending investigation into her alleged classroom comments, so I don't know if she would be entitled to come back to the classroom or the district would put her back in the classroom right away given the testimony shows a pretty common protocol if there's been a complaint made or more than one

**JA296**

83

complaint made about a teacher's classroom interactions. I will say, though, that that would simplify the dispute. We would be talking solely not in the context of this motion, perhaps in proceedings down the line which I'm not personally involved in. It's an independent outside investigation about whether there should be some action or not taken based on whatever that investigation happens to find, but this dispute would be extraordinarily streamlined and there would be nothing stopping her at least in the record before the Court from resuming her teaching position.

THE COURT: Well, that's what I'm trying to determine. If an injunction issued, would it give her the relief she's ultimately seeking which is to return to the classroom? It sounds like maybe not. There would be an intermediate step. Is that accurate?

MR. DEL POZO: My clients would, of course, follow Your Honor's injunction to the letter to the best of their ability. There might be subsequent events that provided an independent basis. I'm not here to predict what might happen. I'm not involved in that. It is not in the record. I'm simply answering Your Honor's questions to the best of my ability. That may change the landscape. I can't predict what might happen then. If Your Honor issued an injunction, to be clear, we don't

**JA297**

84

think you should, my clients would follow it.

THE COURT:  What I'm trying to understand is the injunction request now is just don't let the crucifix -- essentially resolve the crucifix issue, so I can put the crucifix back where it was or some comparable place were that injunction to issue and I'm trying to determine were that injunction to issue, would it actually accomplish anything in terms of her return to the classroom.  It sounds like in her view, yes, she would return and it sounds in your view, not necessarily.

MR. DEL POZO:  The district would retain its prerogative to keep her in the temporary assignment at least until the pending investigation were resolved.  I suspect that if there were some material development, the parties would come back to Your Honor and explain why or why not that development affected the injunction.  I want to be absolutely clear in no way do we think an injunction should issue.

THE COURT:  I understand.  Okay so I guess what's in the record before me is that the investigation is ongoing, not been resolved.

MR. DEL POZO:  That's right.

THE COURT:  Let me see if I had other questions for you.  Thank you.  I will hear any response from the plaintiff.

**JA298**

85

MR. PIAZZA:  Thank you, Your Honor.  One logistical matter, Your Honor, then three quick points. We have without objection from the other side the remainder of the demand letter that was included in Mr. Del Pozo's.  If you want, we can enter this separately into the record or hand it over now.

THE COURT:  You can hand it over.  Bring it up to the courtroom deputy.

MR. PIAZZA:  (Handing.).  Just to complete the record.

THE COURT:  Okay.  We'll make this -- we'll put that up on ECF.

MR. PIAZZA:  So three points.  The first is I want to be very clear about the relief we're asking for. I think we have all come to the understanding that what we seek is that whatever happens to Ms. Castro in her teaching position, whatever happens in her employment, the crucifix in her personal space cannot impact it.

We offered a proposed order, Your Honor, and the language that we used could have included defendants and agents are enjoined from suspending, holding on leave, reassigning, or otherwise disciplining Ms. Castro in any way that alters the status quo ante as it stood on December 3rd, pending the preceding controversy. We could have said for hanging the crucifix but at that point,

**JA299**

there was absolutely no suggestion from the other side

that there was any other reason but hanging the crucifix.

Recall, Your Honor, that the defendant's response brief

was the first time that Ms. Castro was told about any

other potential concerns.  The crucifix was the only

thing in this case up to that point, so that's why we

worded it that way.

THE COURT:  Okay.

MR. PIAZZA:  Along those lines, Ms. Castro does

not need an independent right to teach.  That is *Mount

Healthy v. Doyle*.  Sorry.  *Doyle v. Mount Healthy School

District*.  Well, then Justice Renquist made clear that

the answer to somebody being unconstitutionally

terminated from a position even if they have no

independent property interest in it is reinstatement to

that position.  So I don't think that's a particularly

important point on their part.  The crucifix is not going

to grow or shrink.  It will stay in her personal space if

this order is entered in our favor.  In terms of the

ongoing investigation, Your Honor, we don't know yet what

exactly is going on with that investigation or the final

findings.  If the crucifix is a but-for cause for any

actions involved in the investigation or following the

investigation, the Preliminary Injunction would impact

that because that is an unconstitutional reason for Ms.

**JA300**

87

Castro to be disciplined in any way.  If there are other things involved, the school district can pursue those through other remedies.  Ms. Castro can contest them through other remedies.  But the crucifix is all we're talking about, Your Honor.

Two other points.  A couple of factual things about the crucifix.  We've heard a couple of times that it was permanently affixed to the walls.  It followed Ms. Castro from classroom to classroom for ten years.  There was nothing permanent about it.  In fact, magnets were put on it so it could be hidden under the desk when Ms. Manning asked Ms. Castro to do that.

There's no evidence that anybody in the ten years that Ms. Castro had this crucifix thought this was anything other than her personal speech.  Along those lines, the defendants said that they have policies about what goes on the walls of the classroom, but this is not about what's on the walls.  They told Ms. Castro that this crucifix had to be completely hidden from sight of the students.  That doesn't matter if it is on the desk or under the desk or on the wall.  Their policy doesn't have to do with the walls.  It has to do with whether it is visible or not.  I think that's an important clarification of what defendants are actually saying because if they are right, Your Honor, if they are right,

**JA301**

88

an unambiguously sectarian symbol is enough to make speech unprotected even though it is personal in the classroom, that would include the cross necklace, a kippah on top of the head. There would be no logical distinction between those two things and that would contradict *James* and *LaLaRusso* which do carve out a zone of personal speech even by teachers, even in the classroom environment, even with students who are required to be there.

THE COURT: I think their argument is that it being affixed to the wall of a classroom as in *Stone* means that it is not -- it is not personal in the way that a cross around your neck would be.

MR. PIAZZA: Right. I think what they are hoping to achieve by that is establishing that anything on the wall at any time is subject entirely to their control. But by their pattern and practice over the last many years by teachers being able to put their family photos on the wall and their other items, they haven't acted toward that way. They are making a religion-only policy when it comes to the walls right now through their actual practice. Not formally what's in their papers.

I will note finally, Your Honor, that personal speech is unreasonable for defendants to think there's an Establishment Clause issue here. Because personal speech

**JA302**

89

cannot create an Establishment Clause problem.  The Establishment Clause applies to the government and government speech.  Every single one of the cases they cited, as you noted, was obviously state speech.  State speech has inherent coercive effects because the State has a police force, it has all sort of things, the threshold is much lower for coercion of the State.  But *Kennedy* made clear that personal religious speech needs much more than just being uttered for it to be coercive.

THE COURT:  Right.  But that's what it turns on was this personal speech or was this government speech.  They are saying it was on the wall of a government-owned school.  That means it is not personal.

MR. PIAZZA:  I don't take their position to be any different if it was visible but sitting on her desk.  I don't understand their position to be any different if it was on a stand on her desk and still visible to students.

Based on what they told Ms. Castro, hide the crucifix or you don't get your job back.  I don't see a difference between those two positions.  The desk belongs to the school, too.  I don't see a difference.

THE COURT:  Why wouldn't that be -- why would that be a problem to have the crucifix on the desk?  In their view, having a religious item in the classroom is a

**JA303**

90

problem whether it is on the school-owned desk or school-owned wall.

MR. PIAZZA:  Right.  And *James* and *LaLaRusso* say a teacher can have personal space personal speech even inside the classroom even when students are required to be there.  That's what it comes down to and the facts of the case, you are right, will decide whether the speech is personal or not.  We think by their practice, they have created a zone of teachers being allowed to express themselves, their Baby Yodas, the New England Patriots.  We don't have to do the whole list.  It's by their practice that they made the zone, Your Honor, so that's -- that's how we put it.  That's why it's personal.

I will finally end on, Your Honor, that the Ten Commandments give an instructional message, prayers give a devotional message.  Ms. Castro's crucifix, it being her personal speech, all it does is her raising her hand and saying I'm a Christian.  That's all it does.  It expresses her identity and you need more for there to be coercion.  The evidence of student complaints we don't get many details about what they were about the crucifix specifically.  But there's no evidence that any student actually thought that this was the State endorsing religion.  There's no evidence that anybody thought this

**JA304**

91

was anything other then her identifying herself as a Christian and that's why, Your Honor, this is personal speech and defendant's justifications just do not overcome her interest as a speaker.  Thank you, Your Honor.

THE COURT:  Any response from defense?

MR. DEL POZO:  No.

THE COURT:  So let me ask a few questions to the parties more on the logistical front.  I understand you want to undertake some discovery moving forward.  My understanding is that you are sort of targeting December as the time to be ending that.  In some cases, courts combine a preliminary injunction with a permanent injunction and just sort of do it all at once.  We are obviously here at oral argument.  We haven't conducted a whole evidentiary hearing.  I'm looking at the reality of the school schedule which is coming to a close soon.  Do the parties have any interest in deferring a decision on a preliminary injunction and trying to have a proceeding related to the permanent injunction in early August say and trying to get the case resolved fully before the school year starts.  You don't need to answer that now. I want to put that out there.  Because I'm not sure that obviously it is going to take me some time.  I put a lot of time in this case already.  Take some time to issue a

92

written decision on this issue so looking at the reality of the school year and then it sounds like there would not be an instantaneous return to the classroom in any event, some investigation that needs to wrap up.

One question is does it make sense to try to reach a permanent conclusion in the case before the school year starts. And a second may be related question given the sort of multiple layers of issues going on. The issues you brought me but then there's an underlying investigation as well going on. So in terms of thinking about what's best for both clients here. We have a wonderful group of magistrate judges here in the district who parties walk in thinking there's no possible chance they will settle and sometime come out reaching a solution that's workable for all. A referral can be made any time to one of our magistrate judges just for a conversation. What would happen they would do an initial conversation to talk to you about scheduling and what kind of information might need to be exchanged in order to have a productive settlement discussion and schedule the discussion. It can be done in person. They are great doing it by Zoom as well and so that possibility is availability to the parties as well. So let me hear maybe from both sides your initial reaction to that. Then happy to hear from you further if you need time

**JA306**

93

obviously to confer with your clients and otherwise.

MR. MARTENS:  I would like to talk to the client.  Our concern is speed.  I don't want this to go to December either as the Court points out.  The reason we did that schedule is because I think there was some lack of clarity as we were discussing how many of these other extraneous issues would require discovery.  For example, the student complaints.  What I heard today was the student complaints aren't being relied on to argue coercion.  If that's the case, then that changes what discovery is necessary in that regard.  You know, I heard something today about the text message so now I'm sitting here thinking, you know, depending on what role that plays in the Court's ruling, it could have an impact on whether or not I need discovery on that at all or whether or not the preliminary injunction and permanent injunction could be combined, so I think there's a little bit of I don't know because I don't know sort of how the Court would rule on a preliminary injunction.  Depending how the Court rules on that, I may say I'm satisfied with that and wouldn't be so concerned about an expeditious permanent injunction because the parties can appeal from a preliminary injunction and get ultimately a resolution around that, so it is hard to say in the abstract how the discovery issue becomes necessary in sort of the merging

**JA307**

94

the two.  I recognize as the Court said, you have a lot of cases.  This isn't your only one.  This will take some time.  Maybe all of that to say I need to talk to my client a little bit about what accomplishes her interest and protects her interests at the same time of trying to find some way to streamline this so that it is done efficiently.

MR. DEL POZO:  I say basically what Mr. Martens said.  The district would certainly be interested in promoting efficiency.  All the points that Your Honor raised sound good in theory.  I need to talk them as well and talk to my friends on the other side to see what makes the most sense but efficiency should be the goal.

THE COURT:  In terms of a referral to a magistrate judge to discuss settlement is that something you are interested in?  Something you need to talk to your client about?

MR. DEL POZO:  We would need to talk to the client about that given the history so far and discussions that have been had.

MR. MARTENS:  I think the same.  We have had cordial relationships.  We have tried to talk about that.  I haven't been optimistic that there's a resolution to be had here but I'm also not opposed subject to talking to my clients to find a way through.

**JA308**

THE COURT:  It strikes me and I will not get involved myself navigating any settlement discussions with you all.  To be clear, it would be referred to a magistrate judge.  It would be someone other than the person paired on this case.  So Judge Garcia is paired with us for purposes of pretrial referrals, discovery disputes so it would be someone other than Magistrate Judge Garcia.  On that front, let me know if the parties are interested in the referral.

It does strike me from reading the papers that the parties were awfully close to navigating something that might have walked in that classroom and walked into the room and were trying out different ideas.  One of them seemed to be about on the desk or on the drawers, some retreat from that.  It strikes me that maybe something could be worked out here that would accommodate everyone and get Ms. Castro back into the classroom doing what she by all accounts was doing very well in terms of teaching the students and you all can continue to litigate this.  But at the same time, there's a need for teachers to be doing their jobs.  If there's a way she can do that in a way that is consistent with her beliefs, that would seem to be a win for everybody.  With that in mind, I hope you will think carefully about whether it might be worth the time to at least explore a

96

resolution under a capable mediation of one of my colleagues.

We can continue down this path. I can write a lengthy opinion for you all to digest and we can go onward from there for discovery, a whole nother round before we reach final relief. Perhaps this is something you all might work out otherwise. Okay.

MR. MARTENS: We'll discuss that with our clients. Thank you.

THE COURT: Anything else that I can address from either party? Okay. We'll stand adjourned.

(Adjourned: 4:25 p.m.)


COURT REPORTER'S TRANSCRIPT CERTIFICATE

I hereby certify that the within and foregoing is a true and correct transcript taken from the proceedings in the above-entitled matter.


/s/  Terri Fidanza

Terri Fidanza, RPR

Official Court Reporter

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MARISOL ARROYO-CASTRO, <br><br> *Plaintiff,* <br><br> v. <br><br> ANTHONY GASPER et al. <br><br> *Defendants.* | No. 25-cv-00153 (SFR) <br><br><br><br><br><br> AUGUST 27, 2025 |

### THIRD NOTICE OF SUPPLEMENTAL AUTHORITY

On August 20, 2025, a federal district court preliminarily enjoined a Texas law requiring that a copy of the Ten Commandments be posted "in a conspicuous place" in public-school classrooms. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, 2025 WL 2417589, at *13 (W.D. Tex. 2025). This is another in a series of recent decisions applying U.S. Supreme Court precedent enforcing the separation of religious messaging and public schools in this country. Accordingly, Defendants submit this notice of supplemental authority, pointing the Court to three key aspects of the *Nathan* decision that are relevant to the issues and arguments the parties have raised here.

First, the district court in *Nathan* rejected the idea that the wall-mounted Ten Commandments were merely a passive display. That is because "'students in public schools are forced to engage with them and cannot look away.'" *Id*. at *24 (quoting *Stinson v. Fayetteville Sch. Dist. 1*, 2025 WL 2231053, at *11 (W.D. Ark. 2025)). In this regard, the *Nathan* court echoed the Supreme Court's recent observation that "'[t]he government's operation of the public schools . . . implicates direct, coercive interactions between the state and its young residents.'" *Id.* (*quoting Mahmoud v. Taylor*, 145 S. Ct. 2332, 2357 (2025)).

**JA311**

These sentiments bear directly on Plaintiff's in-class actions here. In court filings, Plaintiff has admitted that middle schoolers could see her foot-tall, wall-mounted crucifix during instructional time. The students in Plaintiff's classroom would be forced to view and engage with the crucifix—much like the students in Texas would have to view and engage with the Ten Commandments. Indeed, just last week, Plaintiff freely told a national news outlet that "people look at" her classroom crucifix—adding that, from years past, she knows that "students really appreciate it, and they like having it there."[1] As her sworn declaration attested, prior to the 2024-2025 school year, Plaintiff taught third and fourth graders. *See* ECF No. 38-2 ¶ 15. Plaintiff's rather astonishing public comments that these small children "really appreciate[d]" the crucifix, and "like[d] having it there" on the wall, reflect her belief that these students *did* engage with the crucifix—which seems to have been part of the point. Those candid statements for mass consumption seriously undercut Plaintiff's argument to this Court that her crucifix was meant only for "silent prayer and reflection," a type of "personal religious expression [that] is not coercive." ECF No. 81, at 1.

Second, the *Nathan* court was the latest to confirm that *Stone v Graham*, 449 U.S. 39 (1980), remains good law following *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). On this subject, the court aptly noted that, in "*Kennedy*, the majority affirmed that it remains 'problematically coercive' for public schools to impose religious messages on a 'captive audience' of students." *Nathan*, 2025 WL 2417589, at *26 (quoting 597 U.S. at 541-42). Plaintiff's various filings confirm that her claims rely almost entirely on *Kennedy*. *See, e.g.*, ECF No. 81. But the district court in *Nathan* correctly distinguished Coach Kennedy's on-field,

---

[1] Fox News Flash, *Connecticut teacher fears classroom cross dispute could cost her job* (Aug. 18, 2025), https://www.foxnews.com/media/connecticut-teacher-fears-classroom-cross-dispute-could-cost-her-job (videotaped interview of Plaintiff Marisol Arroyo-Castro, comments beginning at 00:40).

JA312

noncoercive, postgame prayer during his (and students') personal time from the "'potentially coercive'" transmission of religious messages to students in class. 2025 WL 2417589, at *26 (quoting *Mahmoud*, 145 S. Ct. at 2355).

Third, in motion briefing, Plaintiff has argued that historical traditions support her attempt to bring religion into her classroom. In *Nathan*, Texas made a similar argument to support hanging the Ten Commandments in class. Like the Fifth Circuit in *Roake v. Brumley*, 141 F.4th 614, 640-46 (5th Cir. 2025), the district court in *Nathan* held that even irrespective of *Stone*, displaying the Ten Commandments in class did not fit within any "broad tradition in place at the time of the Founding, or within the history of public education," 2025 WL 2417589, at *21. Contrary to the arguments made by Texas there and by Plaintiff here, "historical practices and understandings" dictate the exact opposite—that special attention must be paid to protect public-school students from subtle religious coercion in the classroom setting. *See id.* at *26 (surveying authority). In all, the *Nathan* court's analysis is relevant to and should inform this Court's assessment of Plaintiff's arguments.

Respectfully submitted,

By: */s/ Eric Del Pozo*
      Eric Del Pozo (ct31359)
      Peter J. Murphy (ct26825)
      Sarah Niemiroski (ct31281)
      Shipman & Goodwin LLP
      One Constitution Plaza
      Hartford, CT 06103
      Tel: (860) 251-5331
      edelpozo@goodwin.com
      pjmurphy@goodwin.com
      sniemiroski@goodwin.com

*Attorneys for Defendants*
*Anthony Gasper, Maryellen Manning,*
*Dario Soto, and Andrew Mazzei*

**JA313**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARISOL ARROYO-CASTRO<br>        Plaintiff,<br><br>vs.<br><br>ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br>        Defendants. | Civil Action No.  3:25-cv-00153<br><br><br>**RESPONSE TO DEFENDANTS'<br>THIRD NOTICE OF<br>SUPPLEMENTAL AUTHORITY** |

On August 27, 2025, Defendants notified the Court of *Nathan v. Alamo Heights Independent School District*, 2025 WL 2417589 (W.D. Tex. Aug. 20, 2025). *See* Dkt. 87. This is the third time now that Defendants have written the Court to highlight a challenge to a state statute requiring public schools to prominently display the Ten Commandments in their classrooms. *See* Dkt. 75; Dkt. 80; Dkt. 87. Like the last two Ten Commandments cases, and like *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), *Nathan* is beside the point for the same basic reason. It concerns a statute mandating religious government speech, not the singling out of a teacher's religious personal expression. Ms. Castro's crucifix is her own religious expression, and she alone has been punished for such personal speech.

Like the other state statutes involved in Defendants' previous notices, the statute in *Nathan* directs—in no uncertain terms—religious government speech. It requires a specific version of the Ten Commandments with 16-inch by 20-inch dimensions to be posted "in each classroom in each public school on a poster or framed document, in a conspicuous place, in a large, easily readable font." *Nathan*, 2025 WL 2417589, at *13-14. If the text of the statute did not make the message clear, the Texas legislators who wrote the statute did. The statute's Senate sponsor and author declared that "we want every kid … every day, in every classroom they sit in to look on the wall

**JA314**

and read … those words … to understand how important … those statements of God, those rules of God are…." *Id.* at \*21.  The statute's House sponsor stated, "It is incumbent on *all of us* to follow God's law." *Id.* at \*22 (emphasis added).

In contrast, Ms. Castro's crucifix is not a government display meant to tell all public-school students how to think.  To insinuate otherwise, Defendants emphasize Ms. Castro's response in a television interview that some students "appreciate" the crucifix or "like having it there" when she was asked whether students complained.  *See Connecticut Teacher Fears Classroom Cross Dispute Could Cost Her Job*, Fox News (Aug. 18, 2025, 10:16 AM), https://www.foxnews.com/ media/connecticut-teacher-fears-classroom-cross-dispute-could-cost-her-job.    But students' appreciation for Ms. Castro's crucifix has no bearing on whether it is her personal speech by which she, among other things, expresses her religious identity, just as other teachers' visible sports pennants and family photos remain those teachers' personal speech whether or not students "appreciate" or "like" them.  Dkt. 38-2 ¶¶ 20-21.  Just because someone hears or sees the speech does not make the speech the government's.

Whatever *Nathan* may say about government-mandated displays of the Ten Commandments, under binding precedent, Ms. Castro's personal expression is not coercive government speech just because some students can see it.  *See Kennedy v. Bremerton School District*, 597 U.S. 507, 540-541 (2022); *see also James v. Bd. of Educ. of Cent. Dist. No. 1 of Towns of Addison, et al.*, 461 F.2d 566, 574 (2d Cir. 1972)*; Russo v. Cent. Sch. Dist. No. 1, Towns of Rush, et al., Monroe Cnty., N.Y.*, 469 F.2d 623, 633 (2d Cir. 1972).  It is no more coercive (or government speech) than the sports pennants, inspirational quotes, and action figures allowed in other teachers' workspaces.  *See* Dkt. 38-4.  It is no more coercive than a teacher's quiet prayer over lunch or "wearing a yarmulke to school." *Kennedy*, 597 U.S. at 540-541.  Even if some

**JA315**

students take offense, such prayer and speech enjoy "robust constitutional protection," because "[o]ffense … does not equate to coercion." *Id.* at 539 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014) (plurality opinion)). Like the "private religious exercise" of Coach Kennedy, Ms. Castro's conduct "did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id.* at 537.

Ms. Castro's personal religious speech is categorically different than the government speech in *Nathan*. As "personal religious observance," Ms. Castro's speech is "doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment." *Kennedy*, 597 U.S. at 543. The government cannot override that protection based "on a mistaken view that it had a duty to ferret out and suppress religious observances even as it allows comparable secular speech." *Id.* at 543-544; *see also Widmar v. Vincent*, 454 U.S. 263, 276 (1981) ("[T]he state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well."). No matter what *Nathan* said about a generally applicable government statute, the Supreme Court has confirmed that "[t]he Constitution neither mandates nor tolerates th[e] kind of discrimination" that Ms. Castro has suffered. *Kennedy*, 597 U.S. at 544.

**JA316**

Respectfully submitted,

August 28, 2025

<table>
<tr>
<td>

Jeremiah G. Dys (*pro hac vice*)
Keisha T. Russell (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX  75075
Telephone: 972-941-4444
krussell@firstliberty.org


Rebecca R. Dummermuth (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue NW, Suite 1410
Washington, DC  20004
Telephone: 202-921-4105

Paul H. McConnell, Bar No. 29062
THE DOCTOR LAWYER TEAM
638 Prospect Avenue
Hartford, CT  06105
Telephone: 888-565-7043

</td>
<td>

By:    */s/ Matthew Martens*
Matthew Martens (*pro hac vice*)
*of counsel for Plaintiff Marisol Arroyo-Castro*
Alyssa DaCunha (*pro hac vice*)
Jonathan Ellison (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC  20037
Telephone: 202-663-6921
Facsimile: 202-663-6363
matthew.martens@wilmerhale.com

</td>
</tr>
</table>

**JA317**

### <u>CERTIFICATE OF SERVICE</u>

I, Matthew Martens, hereby certify that this 28th day of August, 2025, copies of the Response to Defendants' Second Notice of Supplemental Authority were filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

By:     */s/ Matthew Martens*
Matthew Martens (*pro hac vice*)
*Of counsel for Plaintiff Marisol Arroyo-Castro*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6921
Facsimile: 202-663-6363
matthew.martens@wilmerhale.com

**JA318**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

<table>
<tr><td>

MARISOL ARROYO-CASTRO<br>
          Plaintiff,<br><br>

vs.<br><br>

ANTHONY GASPER, in his individual and official capacity; MARYELLEN MANNING, in her individual and official capacity; DARIO SOTO, in his individual and official capacity; and ANDREW MAZZEI, in his individual and official capacity,<br>
          Defendants.

</td><td>

Civil Action No. 3:25-cv-00153<br><br><br>

**NOTICE OF APPEAL**<br><br><br>

December 3, 2025

</td></tr>
</table>

Pursuant to Federal Rule of Appellate Procedure 3(a)(1) and 28 U.S.C. § 1292(a)(1), notice is hereby given that Plaintiff Marisol Arroyo-Castro appeals to the U.S. Court of Appeals for the Second Circuit from the Memorandum and Order on Plaintiff's Motion for a Preliminary Injunction (Dkt. 88) entered by this Court in this action on November 3, 2025.

Respectfully submitted,

/s/ Matthew Martens

Jeremiah G. Dys (*pro hac vice*)
Keisha T. Russell (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX  75075
Telephone: 972-941-4444
krussell@firstliberty.org

Rebecca R. Dummermuth (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue NW, Suite 1410
Washington, DC  20004
Telephone: 202-921-4105

Matthew Martens (*pro hac vice*)
Alyssa DaCunha (*pro hac vice*)
Jonathan Ellison (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC  20037
Telephone: 202-663-6921
matthew.martens@wilmerhale.com

Paul H. McConnell, Bar No. 29062
THE DOCTOR LAWYER TEAM
638 Prospect Avenue
Hartford, CT  06105
Telephone: 888-565-7043

*Counsel for Plaintiff*

**JA319**