# 25-3047

IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————————————————————

MARISOL ARROYO-CASTRO,

*Plaintiff-Appellant,*

v.

ANTHONY GASPER, ET AL.,

*Defendant-Appellee*

———————————————————————

On Appeal from the United States District Court of Connecticut

(No. 3:25-cv-00153) (Hon. Sarah F. Russell)

———————————————————————

**BRIEF OF THE LAW AND RELIGION CLINIC AT THE UNIVERSITY OF TEXAS SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL**

———————————————————————

Steven T. Collis
  *Counsel of Record for Amicus Curiae*
John Greil
Law & Religion Clinic
University of Texas
School of Law
727 E. Dean Keeton St.
Austin, TX 78705
512-475-9090
Steven.Collis@law.utexas.edu
John.Greil@law.utexas.edu

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ................................1

INTRODUCTION & SUMMARY OF ARGUMENT ..................................2

ARGUMENT ...............................................................................................5

I. The Establishment Clause does not forbid teachers' private religious expression.........................................................................................5

II. The district court's reasoning would forbid ordinary personal religious expression by public school teachers and revive the logic of the anti-garb laws that this country has rejected ..........................................7

   A. The district court's reasoning is so sweeping that it would expand the no-coercion rule to bar all personal religious expression of teachers and staff, including religious attire.......................................7

   B. Anti-garb policies historically barred teachers from wearing visible religious dress for the same reason the school suppressed Castro's crucifix ................................................................................ 13

      1) Many anti-garb bans were rooted in anti-Catholic animus masquerading as Establishment Clause concerns.................. 15

      2) Americans have long opposed garb bans as antithetical to American ideals of religious freedom and equal citizen-ship........................................................................................ 16

   C. The fears of indoctrination that drove anti-garb laws did not justify those bans, and several states have since abandoned them ................ 17

III. Castro's crucifix is private religious expression, akin to garb ..................... 18

   A. The effects of the cross are identical to religious garb ........................ 18

i

B. The personal crucifix no more coerces religion than religious garb does ................................................................................................ 20

    1) Castro's crucifix does not directly coerce or compel participation in religious activity ............................................... 20

    2) Castro's crucifix does not indirectly coerce religious activity ........................................................................................ 23

    3) This is not a "captive audience" case because the students are not captive to the religious activity ........................................... 25

    4) This is not a *Stone v. Graham* case because it involves one teacher's personal religious expression, and not a state-mandated command ................................................................... 28

CONCLUSION ............................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Arroyo-Castro v. Gasper*, No. 3:25-CV-00153 (SFR),
2025 WL 3063247 (D. Conn. Nov. 3, 2025) .............................................. *passim*

*Cooper v. Eugene Sch. Dist. No. 4J*,
723 P.2d 298, 313 (1986)........................................................................ 14

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ................................................................ 8, 11, 25–27

*Engel v. Vitale*,
370 U.S. 421 (1962) ..........................................................................21, 23–24

*Gerhardt v. Heid*,
66 N.D. 444 (1936)................................................................................ 16

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001).................................................................................7

*Hysong v. Gallitzin Borough Sch. Dist.*,
164 Pa. 629 (1894).................................................................................16

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)............................................................... *passim*

*Lee v. Weisman*,
505 U.S. 577 (1992)............................................................... *passim*

*Mahmoud v. Taylor*,
606 U.S. 522 (2025).................................................................................11

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
157 F.4th 713 (5th Cir. 2025) .................................................................28

*O'Connor v. Hendrick*,
184 N.Y. 421 (1906) ........................................................................ 14, 16

*Rawlings v. Butler*,
290 S.W.2d 801 (Ky. 1956) ................................................................16

*Roake v. Brumley*, No. 24-30706,
2026 WL 482555 (5th Cir. Feb. 20, 2026) ........................................28

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000) ................................................................ *passim*

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963)................................................. 8, 20–21, 23–27

*State ex rel. Johnson v. Boyd*,
217 Ind. 348 (1940)..........................................................................16

*Stinson v. Fayetteville School District No. 1*,
798 F. Supp. 3d 931 (W.D. Ark. 2025) .............................................28

*Stone v. Graham*,
449 U.S. 39 (1980)................................................................ 18–19, 28

*Van Orden v. Perry*,
545 U.S. 677 (2005)............................................................................6

*Wallace v. Jaffree*, 472 U.S. 38 (1985)................................. 21, 23–24

*Zellers v. Huff*, 55 N.M. 501 (1951) .....................................................14

**Statutes**

Neb. Rev. Stat. § 79-898 .......................................................................14

Neb. Rev. Stat. § 79-899 .......................................................................14

N.D. Cent. Code § 15-47-29 .......................................................... 14, 18

N.D. Cent. Code § 15-47-30 .......................................................... 14, 18

Or. Rev. Stat. § 342.650.................................................................. 14, 18

Or. Rev. Stat. § 342.655 .................................................................. 14, 18

24 Pa. Cons. Stat. § 11–1112 ....................................................... 13, 18

**Other Authorities**

Tim Carey, *The North Dakota Anti-Garb Law of 1948*, Sch. Sisters of Notre Dame (Feb. 21, 2023) .........................................................................17

Steven T. Collis, *Public Employees as a Reflection of a Religiously Diverse Culture*, 99 Notre Dame L. Rev. Reflection 229 (2024) ........................... 1–2, 29

Steven T. Collis, *The New and Confused Establishment Clause*, 104 Texas L. Rev. Online (forthcoming 2026) .................................................................5–6

Committee for Separation of Church and State, *North Dakota Protestantism Challenged at the Primary Election* (June 29, 1948) ..........................................15

Linda Grathwohl, *The North Dakota Anti-Garb Law: Constitutional Conflict and Religious Strife*, 13 Great Plains Q. 187 (1993)..................................................16

Kathleen Holscher, *Religious Lessons: Catholic Sisters and the Captured Schools Crisis in New Mexico* (2012) ...............................................................15

*In Union There is Strength* (June 29, 1948).........................................................16

Iowa Att'y Gen. Reps. and Ops. 40 (1929–30) ....................................................13

Mark A. Kellner, *Pennsylvania Teachers Can't Wear 'Religious Garb' to Class But a Repeal Effort May be Possible*, The Herald-Times (Dec. 12, 2014) .........17

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003)..........20

*Nebraska Ends Ban on Religious Garb in Public Schools*, AP News (Mar. 27, 2017) .............................................................................................18

Nathan Walker, *The First Amendment and State Bans on Teachers' Religious Garb* (2020) .............................................................................................4

*Schools—Catholic Sisters Teaching in Public Schools in Church Garb*, 1939-1940 Op. Att'ys Gen. Wa. 105 (1939)......................................................................14

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

The Law and Religion Clinic at the University of Texas School of Law is a teaching clinic at the University of Texas School of Law in Austin, Texas. Students in the Law and Religion Clinic participate in representing individuals and groups of all faiths who face challenges to their religious liberty. Students work under the close and regular supervision of experienced licensed attorneys and professors who specialize in religious liberty law.

The students of the Law and Religion Clinic frequently work on matters involving the Free Exercise Clause, the Establishment Clause, similar state constitutional provisions, anti-discrimination statutes, Title VII, and other areas of religious liberty law. The Law and Religion Clinic aims to ensure that the protections of religious freedom enshrined in our Constitution are properly understood and applied by government and private actors.

Undersigned counsel have published scholarship on religious liberty more broadly, as well as in distinct other areas. They have a particular interest in the application of the Religion Clauses to the public school context, having published scholarship on the role of teachers' religious exercise, *see* Steven T. Collis, *Public*

---

[1] Counsel for all parties consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae certify that this brief was not authored by counsel for either party, and no other entity or person, other than amicus curiae made a monetary contribution to the preparation or submission of this brief.

1

*Employees as a Reflection of a Religiously Diverse Culture*, 99 Notre Dame L. Rev. Reflection 229 (2024), and the impact of religious accommodations on public-school students and families, *see* Steven T. Collis, Samy Ayoub, & John Greil*, Religious Diversity in Schools and Islamic Perspectives on Antidiscrimination Law and Religion* in *The Oxford Handbook of Antidiscrimination Law and Religion* (Mark Graber & Ionna Tourkochoriti eds., 2026) (forthcoming). Thus, amicus is interested in this case due to its precedent and impact on the application of the Establishment Clause in public schools.

## INTRODUCTION & SUMMARY OF ARGUMENT

Establishment Clause doctrine has long been confusing. Although *Kennedy v. Bremerton School District* attempted to bring clarity to how the Clause applies in public schools, educators and courts are still trying to determine its proper scope and a consistent methodology for interpreting it.

This case, however, lies squarely within a principle on which the Supreme Court left no doubt: in public schools, employees may engage in personal religious expression so long as they do not coerce students to join them. This brief explains what constitutes government coercion of religion in schools and why this case does not involve it. It clarifies existing confusion about the Establishment Clause and provides historical context and understanding for why our constitutional order

forbids government from preventing private religious expression like religious garb and the crucifix in this case.

The central question this Court must decide is whether Ms. Castro's crucifix is more akin to an official religious display (and therefore government speech) or to religious garb (and thus personal religious expression). The district court treated it as government speech that coerces captive students. But the better view is that it is more like personal religious garb. The Establishment Clause does not forbid noncoercive personal religious expression in public schools. If it did, schools would cease their critical role of preparing students to live in a religiously diverse society.

*Kennedy* clarified that the Establishment Clause does not prohibit teachers' private, noncoercive religious expression. Put another way, teachers may bring their religious identities with them into public schools. This is in line with decades-old precedent holding that exposure to religious exercise in school does not violate the Establishment Clause. If the crucifix is private religious expression, like religious garb, then it deserves protection rather than prohibition.

The logic of the district court's opinion lacks a limiting principle. The school stated that the Establishment Clause requires removing the crucifix because the district controls the walls and has policies regarding wall decor. But the school also exerts control over teachers' attire through its dress code. If having school policies about wall decor means all wall decor is attributable to the school, then having a

3

dress code would similarly mean teacher attire—including religious garb—is attributable to the school. Anti-garb policies are not new. Popular in the early twentieth century, they were often motivated by anti-Catholic bias. *See* Nathan C. Walker, *The First Amendment and State Bans on Teachers' Religious Garb: Analyzing the Historic Origins of Contemporary Legal Challenges in the United States* 52 (2020) ("The [Oregon] statute . . . was enacted by open members of the Ku Klux Klan in 1923."). State actors feared that public-school teachers' visible religious expression would indoctrinate students. But fear and bigotry motivated those laws, and they either lie dormant or have been repealed. The district court's opinion risks reviving anti-garb policies that our country has rejected.

Like religious garb, Castro's crucifix does not coerce anyone—directly or indirectly—to conform to Castro's religious practices. The school's "machinery" is not behind its display. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992). Nor does this religious symbol sort students into government-favored "insiders" and disfavored "outsiders." *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308–09 (2000). Public school students are in a broad sense captive in the classroom, but Castro's students are not captive to a school-sponsored religious message, for it is just a small religious symbol placed in a teacher's personal space to which they need not look.

In our religiously diverse society, exposure to religious exercise fosters mutual respect and tolerance. Our public schools reflect our communities: they

4

contain students and teachers from a variety of religious backgrounds. Preparing students to flourish as citizens requires exposing them to the diversity of religious exercise that they will encounter in their lives. The district court's opinion fails to recognize this essential educational principle and would inadvertently deprive students of a full education.

The decision below should be reversed.

## ARGUMENT

### I. The Establishment Clause does not forbid teachers' private religious expression.

Today, the Establishment Clause has uncertain boundaries. But *Kennedy* crystallized one principle: in public schools, the Establishment Clause does not forbid the private, noncoercive religious expression of teachers or other employees. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 514 (2022) ("Nor does a proper understanding of the . . . Establishment Clause require the government to single out private religious speech for special disfavor.").

*Kennedy* seemed to abandon the rule that government violates the Establishment Clause merely by endorsing religion. *See id.* at 534 (stating "this Court long ago abandoned [a previously used] endorsement test"). It also seems to have adopted some sort of originalist methodology for lower courts to apply when interpreting the Establishment Clause. *See id.* at 535–36; *see also* Steven T. Collis,

*The New and Confused Establishment Clause*, 104 Texas L. Rev. Online (forthcoming 2026). What that methodology is remains unclear. *Id.*

But none of that need trouble the Court in this case. For whatever confusion *Kennedy* may have caused, it clarified that teachers and staff may bring their religious identities with them into public schools and engage in personal religious expression so long as they do not coerce others to join them. *Kennedy*, 597 U.S. at 540–41.

Bremerton School District disciplined a high school football coach, Joseph Kennedy, for praying after football games because it "thought anything less could lead a reasonable observer to conclude (mistakenly) that it endorsed Mr. Kennedy's religious beliefs." *Id.* at 514. *Kennedy* is an oft-misunderstood case, as the majority and dissent disagreed on which facts were relevant. To understand the case's holding, it is important to see what the coach was not seeking to do: he was not asking to lead students in prayer or to deliver sermons. Once the litigation commenced, he asked for only the right to kneel by himself at the fifty-yard line after football games and offer a brief, quiet prayer. *Id.* at 517. The Supreme Court ruled that the Establishment Clause does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Id.* at 535.[2] Accordingly, both "the Free Exercise and Free

---

[2] (citing *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring) (internal quotations omitted)).

Speech Clauses of the First Amendment protect expressions like Mr. Kennedy's."
*Id.* at 514.

Mere exposure to others' religious exercise does not create an Establishment Clause violation. That was true long before *Kennedy*. Two decades ago, the Supreme Court clarified that public schools do not violate the Establishment Clause when they permit religious organizations to meet on school premises, even when "elementary school children may witness the [organization's] activities." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001). The Establishment Clause leaves no room for a "heckler's veto," under which "religious activity can be proscribed" due to what the most sensitive observer "might misperceive." *Id.* at 119.

The only question, then, is whether the crucifix is the personal religious expression of Castro or government speech. If it is the former, it receives protection, for both historical and modern reasons.

## II. The district court's reasoning would forbid ordinary personal religious expression by public school teachers and revive the logic of the anti-garb laws that this country has rejected.

### A. The district court's reasoning is so sweeping that it would expand the no-coercion rule to bar all personal religious expression of teachers and staff, including religious attire.

The district court's theory of attributing teachers' personal religious expression to the government has no limiting principle. Its reasoning would require

7

the undoing of Supreme Court case law that permits teachers to bring their religious identities into public schools.

The district court reached its conclusion through a mixture of correct and incorrect logical steps. The court was correct that school-age children are susceptible to indoctrination. *See Arroyo-Castro*, No. 3:25-CV-00153, 2025 WL 3063247, at *23 (D. Conn. Nov. 3, 2025). That idea has long been a rationale for treating religion delicately in elementary and secondary public schools. *See Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools."). The same is true for its worry that children are captive audiences in the classroom. *See Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963) (holding unconstitutional a required reading "of verses from the Holy Bible and the recitation of the Lord's Prayer by the students . . . as part of the curricular activities of students who are required by law to attend school.").

But the district court erred in treating Castro's crucifix as part of her job duties, in assuming that anything displayed on the walls of a public school classroom is government speech, in concluding that students' mere exposure to religious symbols unconstitutionally advances religion, and in reasoning that students are always a captive audience to all religious expression whenever they are in a

8

classroom. Its reasoning would ban huge swaths of personal religious expression by public school teachers in a way the Establishment Clause has never demanded.

The district court states that a "teacher's job duties" prohibit her from displaying a small cross on the wall because she is required to "ensure the physical aspects of the classroom further student learning." *Arroyo-Castro*, 2025 WL 3063247, at *11 n.16. Put another way, because decorating the physical space is part of a teacher's job duties, the district court reasoned that *every* decoration on the wall must then be government speech. But the crucifix is not the only personal item on the wall of Castro's classroom. For example, neither her New York Yankees team pennant nor another teacher's picture of Santa Claus appear to "further student learning." *Id.* at *3, *11 n.16. The district's policy contradicts the Supreme Court's holding that an "excessively broad job description" could treat "everything teachers . . . say in the workplace as government speech subject to government control . . . eviscerat[ing] [the] Court's repeated promise that teachers do not 'shed their constitutional rights . . . at the schoolhouse gate.'" *Kennedy*, 597 U.S. at 530–31 (citation omitted). The problem becomes clearer with another example. Undoubtedly, teachers' job duties include showing up for work every day. But if that is true, then, according to the district court's logic, every teacher would always be engaged in government speech. Teachers would lose their right to personal religious expression. The relevant constitutional inquiry is whether Castro spoke pursuant to

9

her official duties, *not* whether she spoke pursuant to her official duties *as defined by the school district*.

The more appropriate way of thinking about Castro's job duties is that there are parts of the room she is obligated to decorate to influence student learning, and there are parts she decorates for herself. As long as the parts she decorates for herself do not coerce religion onto her students, she may engage in her private religious expression there. The district court worries this is problematic because the school district would need to analyze whether each item placed on the wall disrupts the classroom or coerces students. *See Arroyo-Castro*, 2025 WL 3063247, at *14. That worry misses the point. Yes, government employers must engage in a bit more administrative work to ensure their employees' religious exercise does not disrupt the workplace or run afoul of the Establishment Clause. That is what the Constitution demands. The district court should not lament that; it should embrace it. Instead, the district court values ease of administration over religious freedom.

In a footnote justifying its conclusion that walls are always government speech, the district court states that the classroom walls are "an immutable feature of the educational environment—a uniquely governmental medium of expression," unlike a teacher's cross necklace. *Id.* at *11 n.16. But the immutability of the walls cannot be the decisive factor. When a teacher places pictures of her family on a classroom wall, no one would reasonably believe those are government speech. The

10

ground in a public park is immutable as well, but no one would conclude that immutability makes every demonstration held on park grounds government speech. Courts must look to the nature of the teacher's behavior and the entirety of the circumstances to determine if a teacher is engaged in personal religious expression. *See Kennedy,* 597 U.S. at 530 (stating that *where* the religious speech occurs is not "dispositive" and that the "timing and circumstances" and "substance" are to be considered in assessing whether the public employee was "acting within the scope of [her] duties").

As for susceptibility, the district court states that school-age children are categorically susceptible to what their teachers present to them. *See Arroyo-Castro*, 2025 WL 3063247, at *23 ("[S]chool-age children are particularly susceptible to subtle pressure to conform their beliefs to those of their teachers."); *see id.* ("[Y]oung children are often impressionable and implicitly trust their teachers." (citing *Mahmoud v. Taylor*, 606 U.S. 522, 555 (2025)) (internal quotation marks omitted); *see also id.* at *24 (noting that students view "teachers as role models" (quoting *Edwards*, 482 U.S. at 584)). But if visibility plus student susceptibility is enough to coerce students, the same logic would reach a teacher's yarmulke, hijab, turban, or cross necklace. That is not the law. And students are not *that* susceptible. Taken to its logical conclusion, the district court's susceptibility theory would require schools to ban all religious symbols from classrooms. It would forbid public school teachers

11

from wearing any religious garb because of the immense influence teachers have over their students—directly opposing Supreme Court jurisprudence allowing teachers to wear items of religious expression. *Compare Kennedy*, 597 U.S. at 540–41 (stating that a rule where teachers could be fired for wearing religious garb "would have [the Court] preference secular activity . . . [r]ather than respect the First Amendment's double protection for religious expression."), *with Arroyo-Castro*, 2025 WL 3063247, at *23 ("[S]chool-age children are particularly susceptible to subtle pressure to conform their beliefs to those of their teachers"), *and id.* at *11 n.16 ("[A] teacher wearing a necklace on her body differs from a teacher posting an image on a classroom wall.").

The same is true for students as a captive audience. This is a legitimate worry about indoctrination of students in classrooms. But context matters. A cross prominently displayed in the room that students must see during teacher-led instruction causes students to be a captive audience to religious expression. A cross at waist height, hidden mostly behind a computer monitor and desk, in the teacher's nonteaching personal space, surrounded by obviously personal items does not raise the same concerns. Students may come and go from that area and choose not to look at it. They need not even look in that direction during instruction time. This is not a situation like *Lee v. Weisman*, which involved "compelled attendance" and students as captive audiences with "no real alternative to avoid" participating in a religious

12

exercise or experiencing social coercion. *Lee*, 505 U.S. at 598. And the proof is in the pudding. Castro has kept the cross in the same location for a decade, and no one has said a word about it until now. *See Arroyo-Castro,* 2025 WL 3063247, at *3. If the mere presence of students in the classroom is enough to justify quelching all personal religious expression, logic dictates no religious expression should be allowed. History shows that the United States long ago rejected that way of thinking.

### B. Anti-garb policies historically barred teachers from wearing visible religious dress for the same reason the school suppressed Castro's crucifix.

The school wrongly warned that "[w]hen a public school employee hangs a religious artifact in their classroom, it sends the message that the school district (which is an arm of the government) is promoting that religion." *Id.* at *5. It repeated an old American fear: students will treat a teacher's visible faith as a government endorsement and be indoctrinated into that faith. That fear once drove "anti-garb" laws across America. Decades of experience proved that fear unfounded, and those laws have since been repealed or are unenforced.

Several states once barred public-school teachers from wearing distinctive religious garb. *See, e.g.*, 24 Pa. Cons. Stat. § 11-1112 (1948) (repealed by 2023, P.L. 166, No. 26, § 1) (prohibiting public-school teachers from wearing religious garb); 1929 Iowa Att'y Gen. Reps. and Ops. 40, 338–39 (1929–30) ("[A] teacher in the public schools of this state cannot wear in the school room a distinctive garb of a

13

religious or sectarian institution."); Neb. Rev. Stat. §§ 79-898, 79-899 (repealed by 2017, LB 62, § 1) (prohibiting public-school teachers from wearing religious garb and imposing penalties on violators); *Zellers v. Huff*, 55 N.M. 501, 525 (1951) ("[W]e feel compelled to announce our decision that wearing religious garb and religious insignia must be henceforth barred, during the time the Religious are on duty as public school teachers."); *O'Connor v. Hendrick*, 184 N.Y. 421, 424–25 (1906) ("The regulation [barring public-school teachers from wearing distinctive religious garb] was a proper one for the superintendent of public instruction to make and is consistent with the school policy of this state."); N.D. Cent. Code §§ 15-47-29, 15-47-30 (1949) (repealed by N.D. Bill No. 1034, Mar. 3, 1999) (prohibiting religious garb and imposing penalties); Or. Rev. Stat. §§ 342.650, 342.655 (repealed by Or. H.B. 3686, July 1, 2011) (including "religious dress" prohibition and sanctions for violators); *Schools—Catholic Sisters Teaching in Public Schools in Church Garb*, 1939-1940 Op. Att'ys Gen. Wa. 105 (1939) (banning public-school teachers from wearing visible religious clothing due to its impermissible "sectarian influence").

States were motivated, in part, by anti-establishment concerns that teachers' religious garb might leave students with the impression that the school endorsed the teacher's faith. *See, e.g.*, *Cooper v. Eugene Sch. Dist. No. 4J*, 723 P.2d 298, 313 (Or. 1986) ("[The concern of anti-garb laws] is that the teacher's appearance in religious

14

garb may leave a conscious or unconscious impression among young people and their parents that the school endorses the particular religious commitment of the person whom it has assigned the public role of teacher."). That is the same premise Castro's school invoked when it told her that her crucifix communicated government promotion of religion. The district court's reasoning follows the logic of the anti-garb laws: because children are impressionable and captive and teachers serve as role models, schools must suppress visible religious expression.

But America has abandoned the anti-garb laws, recognizing that they are incompatible with our First Amendment freedoms.

### 1. Many anti-garb bans were rooted in anti-Catholic animus masquerading as Establishment Clause concerns.

Many anti-garb measures adopted in the early twentieth century were driven by anti-Catholic sentiment dressed up as concern for the "separation of church and state" or the exclusion of "sectarian influence" from public education. *See* Kathleen Holscher, *Religious Lessons: Catholic Sisters and the Captured Schools Crisis in New Mexico* 73 (2012) (noting "[the public's] objections were . . . above all [rooted in] the separation of church and state . . . and the necessity of excluding Catholicism to preserve that [religious] freedom [in education.]"); *see also* Committee for Separation of Church and State, *North Dakota Protestantism Challenged at the Primary Election* (June 29, 1948), https://ssnd.org/the-north-dakota-anti-garb-law-of-1948/ (stating that voters should "Vote 'Yes' . . . to prohibit garbed persons from

15

teaching in the public schools."). States reasoned that allowing religiously clothed teachers would result in "sectarian influences in the public schools." *O'Connor*, 184 N.Y. at 428.

### 2. Americans have long opposed garb bans as antithetical to American ideals of religious freedom and equal citizenship.

Anti-garb policies did not go unchallenged. Americans opposed them for reasons that resonate today: those laws were "an invasion of the freedom of religion and a denial of equal rights to all." *See* Linda Grathwohl, *The North Dakota Anti-Garb Law: Constitutional Conflict and Religious Strife*, 13 Great Plains Q. 187, 191 (1993); *see also In Union There is Strength* (June 29, 1948), https://ssnd.org/the-north-dakota-anti-garb-law-of-1948/ (political pamphlet opposing anti-garb measures to "avoid division and strife" in communities). And many state courts rejected anti-garb claims altogether because allowing them would be a violation of the Fourteenth Amendment's guarantee of equal protection. *See Rawlings v. Butler*, 290 S.W.2d 801, 804 (Ky. 1956); *State ex rel. Johnson v. Boyd*, 217 Ind. 348 (1940); *Gerhardt v. Heid*, 66 N.D. 444 (1936); *Hysong v. Gallitzin Borough Sch. Dist.*, 164 Pa. 629 (1894).

16

**C. The fears of indoctrination that drove anti-garb laws did not justify those bans, and several states have since abandoned them.**

Anti-garb laws were predicated on the belief that a teacher's visible religious identity would indoctrinate students or compromise the neutrality of public schools. The historical record does not support that fear.

Most state policies were rarely, if ever, enforced. In discussing North Dakota's policy, Sister Josepha Forster explained that "[w]e taught in secular garb for 12 years. After the first few years of excitement, no one seemed to care anymore about our dress, so we started to wear our habits again." Tim Carey, *The North Dakota Anti-Garb Law of 1948*, Sch. Sisters of Notre Dame (Feb. 21, 2023), https://ssnd.org/the-north-dakota-anti-garb-law-of-1948/. Similarly, a Pennsylvania attorney explained that the state's anti-garb law was "not a big issue" for school districts as "the 'religious garb' question ha[d] come before him three times" in his "27 years of providing legal counsel to various school districts in the commonwealth." Mark A. Kellner, *Pennsylvania Teachers Can't Wear 'Religious Garb' to Class But a Repeal Effort May be Possible*, The Herald-Times (Dec. 12, 2014),https://www.heraldtimesonline.com/story/lifestyle/faith/2014/12/12/pennsylvania-teachers-cant-wear-religious-garb-to-class-but-a-repeal-effort-may-be-possible/47754839/.

After decades of nonenforcement, several states repealed their anti-garb laws. In 2017, Nebraska repealed its policy in response to a Catholic substitute teacher

17

being denied employment. *Nebraska Ends Ban on Religious Garb in Public Schools*, AP News (Mar. 27, 2017), https://apnews.com/article/69c6a2a9168d4f339f4 0b5bc491a6a6e. Oregon, Pennsylvania, and North Dakota have done the same. Or. Rev. Stat. §§ 342.650, 342.655 (repealed by Or. H.B. 3686, July 1, 2011); 24 Pa. Cons. Stat. § 11-1112 (1948) (repealed by 2023, Nov. 6, P.L. 166, No. 26, § 1); N.D. Cent. Code §§ 15-47-29, 15-47-30 (1949) (repealed by N.D. Bill No. 1034, Mar. 3, 1999).

The First Amendment does not require public schools to revive a discredited and abandoned approach by suppressing Castro's modest personal display of religious expression.

### III. Castro's crucifix is private religious expression, akin to garb.

#### A. The effects of the cross are identical to religious garb.

In nearly every respect, the crucifix here is similar to one Castro might wear around her neck. Students will see it and recognize it as uniquely hers. If anything, the cross is much less visible than a teacher's religious garb. It is behind her desk, waist high, often masked by her monitor, and students will only see it if they are looking at her personal area.

Here, the district court based its Establishment Clause concerns on "the Supreme Court's cases relating to religious displays and exercise in public schools." *Arroyo-Castro*, 2025 WL 3063247, at *25 (citing *Lee*, 505 U.S. at 592; *Stone v.*

18

*Graham*, 449 U.S. 39, 42 (1980); *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309–10). But the district court opinion never explains why Castro's crucifix is analogous to those cases. *See id.* (noting only that the cross is *different* from the prayer in *Kennedy* because it was near students "required to be in the classroom"). *Lee* and *Santa Fe* involved school-sponsored prayer that pressured students to participate or conform. In *Stone*, the problem was a state-mandated religious text posted in classrooms.

Castro's crucifix does not involve the features that made those cases constitutionally problematic: captive audiences, coerced religious activity, or a state-mandated religious display. Context shows that the crucifix is Castro's personal religious expression, not state religious indoctrination.

The important principle of the garb cases is that visible personal religious expression by a teacher does not become government speech merely because students can see it. A cross necklace, a headscarf, and a small cross displayed in a teacher's personal classroom corner each communicate the teacher's own religious identity. *Kennedy* confirmed that a teacher's visible personal religious expression does not become government speech simply because students can see it, recognizing the constitutional problem with firing "a Muslim teacher for wearing a headscarf in the classroom." *Kennedy*, 597 U.S. at 531.

Once it becomes clear that her private decorations are not part of her official duties, the only question is whether they coerce religion upon students.

19

### B. The personal crucifix no more coerces religion than religious garb does.

In public schools, religious coercion can be direct or indirect, either by compelling participation in religious activity or by subtly pressuring students to conform. *See Schempp*, 374 U.S. at 221. Neither is present here.

### 1. Castro's crucifix does not directly coerce or compel participation in religious activity.

Forced participation in religious services is among the clearest hallmarks of a religious establishment. *See* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131, 2144–46 (2003). For example, the first written law of the first colony at Jamestown required all to attend church or face harsh penalties. *Id.* at 2144. Colonial Virginia's General Assembly enacted a religious code in 1623–24 that fined citizens for nonattendance at Sunday services. *Id.* In 1646, the General Court of the Massachusetts Bay Colony similarly imposed fines for missing worship services, as did Connecticut. *Id.* at 2145. The Supreme Court has stated that the government may not "make a religious observance compulsory," "coerce anyone to attend church," or "force citizens to engage in 'a formal religious exercise.'" *See Kennedy*, 597 U.S. at 537 (citations omitted). No such direct coercion is present in Castro's case.

20

The Supreme Court has found school practices that do violate this principle. For example, in *Abington v. Schempp*, the Court treated Pennsylvania's requirement that public-school students participate in Bible recitations as compelled religious activity. *Schempp*, 374 U.S. at 221, 224 (holding that "laws prescribing a particular form of religious worship" can constitute "coercion of such individuals"). The Court viewed the public school board's requirement that students pray aloud with their teachers each morning in *Engel v. Vitale* as similarly coercive. *Engel v. Vitale*, 370 U.S. 421, 430 (1962) ("[G]overnment . . . is without power to prescribe by law any particular form of prayer which is to be used as an official prayer in carrying on any program of governmentally sponsored religious activity.").

The Court understood an Alabama law authorizing public schools to have a daily period of silence for prayer as "a state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view." *Wallace v. Jaffree*, 472 U.S. 38, 51–52 (1985). The Court also viewed the "[s]tate's involvement in the school prayers" in *Lee* as "violat[ing]" the "central principle[]" that the government may not "coerce anyone to support or participate in religion." *Lee*, 505 U.S. at 587. The Court regarded the broadcasting of a pregame prayer in *Santa Fe Indep. Sch. Dist. v. Doe* as "coercing those present to participate in an act of religious worship." *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 312.

21

A policy of directed religious exercise conducted as part of a school's activities is notably absent from Castro's case. In those cases, the religious activity, whether prayer or Biblical recitations, was directed *at* students. By contrast, a personal crucifix resting near a teacher's personal desk is not an "exercise" that students are instructed to perform. There is no evidence that Castro told her students to respect, pray towards, or even look at the crucifix or observe her doing so. Neither does the record relate that she even expressly *permitted* students to perform any action in respect to the crucifix—it played no role in any school activity whatsoever. And unlike in *Lee v. Weisman*, students may choose not to see it anytime they like. *See Lee*, 505 U.S. at 595 ("[A] student is not free to absent herself from the graduation exercise in any real sense of the term 'voluntary,' for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years.").

This case falls on the *Kennedy* side of the school-prayer issue. Like Mr. Kennedy's silent prayer on the football field, Castro's crucifix is a "quiet, personal religious observance" that is neither directed at students nor backed by any coercive threat of punishment or promise of reward. *See Kennedy*, 597 U.S. at 543. Castro's crucifix does not directly coerce students to engage in religious activity and does not run afoul of the Establishment Clause on that basis.

### 2. Castro's crucifix does not indirectly coerce religious activity.

Even absent a formal requirement, the Establishment Clause forbids school practices that place official pressure on students to conform to preferred religious activity. *See Lee*, 505 U.S. at 593 (holding that "subtle and indirect" pressure can be "as real as any overt compulsion"). Castro's crucifix does not indirectly coerce religious activity.

In *Engel*, *Schempp*, *Wallace*, *Lee*, and *Santa Fe*, the school placed the machinery of the State behind prayer, Bible reading, or other religious exercise directed at students. Students then faced pressure to participate or to mark themselves as dissenters.

In *Engel*, students could opt out of the morning prayer. Even without a formal mandate, the Court reasoned that "indirect coercive pressure" to conform arises "when the power, prestige and financial support of government is placed behind a particular religious belief." *Engel*, 370 U.S. at 431; *see also Schempp*, 374 U.S. at 207, 221, 223 (holding that "indirect coercive pressure" was present in the voluntary scripture reading, both due to the compulsory school setting and the fact that the activity was prescribed by curriculum and broadcast over the intercom system); *Wallace*, 472 U.S. at 60 n.51, 61 (noting the "indirect pressure" present during the designated period for "voluntary" prayer). Further, the Court emphasized in *Santa Fe* that the student-led prayers sent the ancillary message that nonadherents were

23

"outsiders" and not "full members of the political community," while adherents were "insiders" and "favored members." *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309–10; *see also Lee*, 505 U.S. at 593 (holding that the "school district's supervision and control of a high school graduation ceremony placed public pressure, as well as peer pressure, to stand as a group or, at least, maintain respectful silence" during the prayer).

By contrast, Castro's crucifix does not threaten to impose an outsider/insider line. Her personal religious expression is not backed by the school's authority or machinery any more than her New York Yankees pennant is. It does not convey that this religious object is "stamped with [the] school's seal of approval" or that students are expected to conform to it. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 308. Whether students look at it or not will remain completely up to them; no one—not Castro or other students—will even notice.

The crucifix was not (i) part of a class exercise like the prayer in *Engel*, 370 U.S. at 422, the recitation in *Schempp*, 374 U.S. at 205, or the period of silence in *Wallace*, 472 U.S. at 40–42, (ii) announced to students like the prayers in *Santa Fe*, 530 U.S. at 294 and *Lee*, 505 U.S. at 580–82, (iii) incorporated into instruction, (iv) paired with any request or implicit suggestion that students stand, pray, read, recite, or otherwise participate, or (v) enforced through grades, discipline, or social

sanctions administered by the school. The crucifix also does not invite a student response that might subtly pressure others to do the same.

Again, this case aligns with *Kennedy* once the coach asked only to kneel by himself in prayer. As in *Kennedy*, there is no record evidence that students felt any pressure from Castro or peers regarding the crucifix. *See Kennedy*, 597 U.S. at 539. The only evidence is that some students complained about merely having to see the crucifix. *Arroyo-Castro*, 2025 WL 3063247, at *4. Like Coach Kennedy's prayer, Castro's crucifix is personal religious expression, not directed at students, not backed by the machinery of the school, and not marking students as insiders and outsiders. Just as Castro's crucifix does not directly coerce religious activity, neither does it do so indirectly.

### 3. This is not a "captive audience" case because the students are not captive to the religious activity.

Public-school students are often a captive audience because school attendance is mandated by state law and students cannot simply walk away from what the school puts before them. But that does not mean every visible religious reference in a school violates the Establishment Clause.

The "captive audience" doctrine addresses the physical and psychological confinement that renders students uniquely vulnerable to coercive pressure while at school. The district court, relying on *Schempp*, *Edwards*, *Lee*, *Santa Fe*, and Connecticut's compulsory attendance statute, held that "children are compelled by

25

law to be at school and thus 'captive audiences.'" *See Arroyo-Castro*, 2025 WL 3063247, at *2, *14, *22. But the school-prayer cases presented captive-audience problems because students were made a captive audience *to the religious activity*, not simply because they were in school.

The captive-audience problem arises when students are compelled to attend a school-mandated religious activity and have no real choice but either to participate or to conspicuously dissent. *See Schempp*, 374 U.S. at 223 (noting that students were "required by law to attend school" and were "held . . . under [school] supervision"); *Edwards*, 482 U.S. at 584 (explaining that the "State exerts . . . coercive power through mandatory attendance requirements"); *Lee*, 505 U.S. at 598 (explaining that "the State . . . in every practical sense compelled attendance and participation . . . and left no real possibility for objecting students to opt out"); *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 311 (noting that attendance at football games was required for "cheerleaders, members of the band, and, of course, the team members themselves").

The mere exposure of students to religion while at school does not trigger the 'captive audience' doctrine. *See Kennedy*, 597 U.S. at 540–542 (describing the Supreme Court's "traditional understanding that permitting private speech is not the same thing as coercing others to participate in it"). Students' status as a captive audience may contribute to coercion, but it does not by itself rise to an Establishment Clause violation. Coercive pressure of some kind—direct or indirect—is still

26

required. In *Schempp* and *Edwards*, that coercive pressure was built into the school's curriculum. *See Schempp*, 374 U.S. at 223 (holding that "the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison . . . prescribed as part of the curricular activities of students . . . under the supervision and with the participation of teachers" violated the Establishment Clause); *Edwards*, 482 U.S. at 581, 597 (citations omitted) (holding that a law "forbid[ding] the teaching of the theory of evolution in public schools unless accompanied by instruction in 'creation science'" also violated the Establishment Clause). In *Lee* and *Santa Fe*, the coercive pressure was exerted through a school-organized prayer. *See Lee*, 505 U.S. at 593–594 (holding that prayer during a high school graduation ceremony gave rise to a "reasonable perception [of] being forced by the State to pray"); *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 290 (holding that "[t]he delivery of [a religious] message . . . over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer" was impermissibly coercive).

Here, it is true that Connecticut requires attendance at school, but unlike in *Schempp, Edwards, Lee*, and *Santa Fe*, no student is required to participate in or sit through a religious activity or see the crucifix. It was not part of a lesson, prayer, announcement, ceremony, curriculum, or other school-directed activity. Nor was the

crucifix positioned so that students were required to look at it during instruction or throughout the school day. No student was asked to pray, stand, bow, recite, listen, or even look at it. The Establishment Clause prohibits coercion sanctioned by the State—not mere exposure to every personal religious expression.

### 4. This is not a *Stone v. Graham* case because it involves one teacher's personal religious expression, and not a state-mandated command.

The district court's reliance on *Stone v. Graham* collapses the distinction between state-mandated religious displays and a teacher's personal religious expression. *Stone v. Graham* involved a Kentucky statute requiring the posting of Ten Commandments displays in every public-school classroom. *See Stone*, 449 U.S. at 40–42. More recently, a district court struck down a legislative mandate to post "the Commandments in every classroom—even in gym class," concluding that it was unavoidable state-sponsored religious speech. *Stinson v. Fayetteville Sch. Dist. No. 1*, 798 F. Supp. 3d 931, 952 (W.D. Ark. 2025). The constitutionality of similar laws in Texas and Louisiana is still being litigated. *See Roake v. Brumley*, No. 24-30706, 2026 WL 482555, at *1 (5th Cir. Feb. 20, 2026) (explaining that the constitutionality of displaying the Ten Commandments in schools turns on "the context of the display" and "how the text is *used*"); *see also Nathan v. Alamo Heights Indep. Sch. Dist.*, 157 F.4th 713, 714 (5th Cir. 2025) (mem.) (granting motion for initial hearing en banc).

Those laws are paradigmatic state action: the government itself selected a sacred text, provided for its display, and instructed that it be placed before students. Castro's crucifix, by contrast, represents a personal choice by one individual, not different in kind from a necklace or hijab. *See Arroyo-Castro*, 2025 WL 3063247, at *3.

## CONCLUSION

Public schools teach core academic subjects. But they also train students to participate in a pluralistic democracy. *Kennedy*, 597 U.S. at 510 ("A rule that the only acceptable government role models for students are those who eschew any visible religious expression would undermine a long constitutional tradition in which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" (quoting *Lee*, 505 U.S. at 590)). Our balance between free exercise and anti-establishment rights in public schools serves that end. By ensuring that the diverse religious beliefs, and non-beliefs, of teachers and students have a healthy presence in public schools, schools prepare students to enter the most religiously diverse society on earth. Steven T. Collis, *Public Employees as a Reflection of a Religiously Diverse Culture*, 99 Notre Dame L. Rev. Reflection 229, 239 (2024).

A school that permits teachers to display ordinary personal items but forbids modest religious expression teaches students the wrong lesson about the Constitution

29

and the wrong lesson about our society. It suggests that religion is a light that believers need to hide. But America today comprises citizens of many faiths, and of no faith. Public schools better serve our society when they balance preventing religious coercion with the need to reflect the full religious diversity of the communities they serve.

For the foregoing reasons, amicus respectfully urges this Court to reverse the district court's order denying Castro's motion for a preliminary injunction.

Dated: March 25, 2026

Respectfully submitted,

/s/ Steven T. Collis
Steven T. Collis
     *Counsel of Record for Amicus Curiae*
John Greil
Law & Religion Clinic
University of Texas School of Law
727 E. Dean Keeton St.
Austin, TX 78705
512-475-9090
Steven.Collis@law.utexas.edu
John.Greil@law.utexas.edu

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this brief complies with the type-volume limitation of 2nd Cir. R. 29.1(c), 2nd Cir. R. 32.1(a)(4), and Fed. R. App. P. 32(a)(7)(B) because it contains 6,902 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: March 25, 2026

*/s/ John Greil*
John Greil

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate ACMS system on March 25, 2026. I certify that all participants in the case are registered ACMS users, and that service will be accomplished by the appellate ACMS system.

Dated: March 25, 2026

*/s/ John Greil*
John Greil