# 25-3047

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

MARISOL ARROYO-CASTRO,

*Plaintiff-Appellant*,

v.

ANTHONY GASPER, in his individual and official capacity,
MARYELLEN MANNING in her individual and official capacity,
DARIO SOTO, in his individual and official capacity,
ANDREW MAZZEI, in his individual and official capacity,

*Defendants-Appellees*.

---

On Appeal from the United States District Court for the
District of Connecticut
No. 3:25-cv-00153-SFR (Hon. Sarah F. Russell)

---

**BRIEF OF NOTRE DAME RELIGIOUS LIBERTY CLINIC
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT**

---

John A. Meiser
Meredith H. Kessler
LINDSAY AND MATT MOROUN
  RELIGIOUS LIBERTY CLINIC
Notre Dame Law School
1338 Biolchini Hall
Notre Dame, IN 46556
(574) 631-3880

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Lindsay and Matt Moroun Religious Liberty Clinic is not a corporate entity, does not issue stock, and operates within Notre Dame Law School at the University of Notre Dame, a nonprofit educational institution organized exclusively for charitable, religious, and scientific purposes within the meaning of section 501(c)(3) of the Internal Revenue Code.

Dated: March 25, 2026

*/s/ Meredith H. Kessler*
Meredith H. Kessler
*Counsel for* Amicus Curiae

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

INTEREST OF *AMICUS CURIAE*..................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................... 2

ARGUMENT ................................................................................................... 3

    I.     The government does not have free rein to censor everything its employees say while they are on the job..................................................... 3

        A.    Private expression does not become the government's speech simply because it occurs while an employee is on the job ............. 3

        B.    Employees' personal speech is protected even if outsiders mistake it for a governmental message......................................................... 10

        C.    The government may still regulate employee speech in the workplace—but it must justify its actions. ................................... 12

    II.    Courts must be especially cautious in employing *Pickering* to restrict free exercise rights................................................................................. 13

    III.   The Supreme Court has repeatedly rebuffed governmental overreach that suppresses religious expression in public life ......................................... 19

CONCLUSION................................................................................................ 22

CERTIFICATE OF COMPLIANCE................................................................... 24

CERTIFICATE OF SERVICE .......................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011)..............17

*Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019)...................................19, 21

*Brown v. Polk County*, 61 F.3d 650 (8th Cir. 1995)..................................................17

*Carson v. Makin*, 596 U.S. 767 (2022)......................................................................20

*Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*,
    605 U.S. 238 (2025) ..............................................................................................15

*Connick v. Meyers*, 461 U.S. 138 (1983)...........................................................13, 14

*Engel v. Vitale*, 370 U.S. 421 (1962) ........................................................................16

*Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464 (2020) .............................................20

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).........................................15, 20

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................................passim

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)....................................11

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) .........................................11

*Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011).......................17

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ...................................passim

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ..............................................................................................19

*Larson v. Valente*, 456 U.S. 228 (1982) ...................................................................15

*Lee v. Weisman*, 505 U.S. 577 (1992) .......................................................................20

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ................................................................21

*Matal v. Tam*, 582 U.S. 217 (2017) ......................................................................8, 13

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ..............................................17

*Montero v. City of Yonkers, New York*, 890 F.3d 386 (2d Cir. 2018) .......................6

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)..............2, 19

*Ross v. Breslin*, 693 F.3d 300 (2d Cir. 2012)..............................................................4

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ..............................................passim

iii

*Town of Greece v. Galloway*, 572 U.S. 565 (2014)................................................20

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) .........20

*Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) ..................................17

*Watts v. Florida Int'l University*, 495 F.3d 1289 (11th Cir. 2007).........................16

*Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*,
593 F.3d 196 (2d Cir. 2010).............................................................................12

## Other Authorities

James Madison, *Memorial and Remonstrance*, in The Separation of Church and
State: Writings on a Fundamental Freedom by America's Founders
(Forrest Church ed., 2004). ..............................................................................15

John Witte, Jr. et al., Religion and the American Constitutional Experiment
(5th ed. 2022) ...................................................................................................16

Michael W. McConnell, *Establishment and Disestablishment at the Founding,
Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003).........20

Michael W. McConnell, *Religious Freedom at a Crossroads*,
59 U. Chi. L. Rev. 115 (1992)...........................................................................21

Randy J. Kozel, *Government Employee Speech and Forum Analysis*,
1 J. Free Speech L. 579 (2022) ................................................................. 12, 19

Randy J. Kozel, *Reconceptualizing Public Employee Speech*,
99 Nw. U. L. Rev. 1007, 1025 (2005) ............................................................. 14

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* is the Lindsay and Matt Moroun Religious Liberty Clinic within Notre Dame Law School.[2]  As an academic institution and teaching law practice, the Clinic promotes and defends the freedom of religion for all people.  It advocates for the right of all people to exercise, express, and live according to their beliefs.  It defends individuals and organizations of all faiths against interference with these fundamental liberties and has represented an array of groups in cases to defend the right to religious exercise.

Among other things, the Clinic works to ensure that courts uphold meaningful constitutional protections to safeguard the rights of religious believers not only to worship and practice their religion at home, but also to participate fully, equally, and openly in public life.

---

[1] Counsel for all parties consented to the filing of this brief.  No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.  *See* Fed. R. App. P. 29(a)(4)(E).

[2] The views expressed by the Clinic do not necessarily represent those of the University of Notre Dame or Notre Dame Law School.

1

## SUMMARY OF THE ARGUMENT

The First Amendment promises religious believers, of all faiths, the right "to participate on equal terms" in public life. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 852–53 (1995) (Thomas, J., concurring). The Supreme Court has repeatedly rejected the idea that individuals sacrifice those rights by accepting government employment. *See*, *e.g.*, *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). So too for public school employees, who do not "shed their constitutional rights . . . at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (quotation omitted).

Of course, even First Amendment rights are not boundless, and the government has certain leeway to regulate workplace expression to carry out the work it conducts. But the balance the Supreme Court has struck between employees' constitutional rights and the government's workplace interests requires a clear understanding of that speech which is the government's to control and that which isn't.

The decision below undermines these bedrock principles through a capacious understanding of "government speech" that would subject nearly anything a teacher expresses openly while at school to government control. It invites censorship of personal expression and threatens to obliterate the First Amendment's protections for millions of public employees. And it defies recent cases safeguarding the right of religious expression in the public sphere. It must be corrected.

## ARGUMENT

### I. The government does not have free rein to censor everything its employees say while they are on the job.

The Supreme Court has made clear that not all expression by public employees while they are at work is subject to governmental control. *Pickering* sorts the government's impermissible restriction of employees' personal expression from its permissible regulation of speech on matters of workplace concern. Public employees are "paid in part to speak on the government's behalf and convey its intended messages," *Kennedy*, 597 U.S. at 527, and it is well understood that the First Amendment does not prevent the government from shaping its own messages, *see Shurtleff v. City of Boston*, 596 U.S. 243, 251–52 (2022). But, even in the workplace, the First Amendment safeguards an *employee's own* speech on a matter of constitutional value—and demands that the government actually justify any restrictions it imposes on that speech. *Kennedy*, 597 U.S. at 528; *Pickering*, 391 U.S. at 568.

### A. Private expression does not become the government's speech simply because it occurs while an employee is on the job.

In *Kennedy*, the Supreme Court made clear the controlling standard for speech by public employees: The First Amendment protects employees' expression of their own messages in the workplace, even if the government may control their delivery of "speech the government itself ha[s] commissioned or created." 597 U.S. at 527 (quotation omitted). So, the law must ask at the threshold whether an instance of

3

speech was *the employee*'s (and thus protected) or *the government*'s (and thus not).[3] The lower court here misunderstood this inquiry.

As directed by *Kennedy*, the pertinent question is whether a public employee speaks "as a citizen" or "pursuant to [her] official duties." *Id.* at 527–28. That question demands a "practical" inquiry into what the employee is actually paid to do. *Id.* at 529 (quotation omitted). "Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) (quotation omitted). Where the speech arises from the employee's duties, the First Amendment "generally will not shield [it] from an employer's control" because "that kind of speech is—for constitutional purposes at least—the government's own." *Kennedy*, 597 U.S. at 527. In other words, government employers can exercise control over an employee's "work product." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). By contrast, an employee's speech is private and constitutionally protected if its "purpose" is not "to further the ends of the employer, on a course charted by someone higher up the chain-of-command." *Heim v. Daniel*, 81 F.4th 212, 226 (2d Cir. 2023). The distinction "serve[s] the goal of treating public employees like 'any member of the general public.'" *Garcetti*, 547 U.S. at 420–21 (quoting *Pickering*, 391 U.S. at 573).

---

[3] The district court's decision and this appeal turn on the first part of *Pickering*'s threshold inquiry: whether the employee spoke "pursuant to . . . official duties" or "as a citizen." *Kennedy*, 597 U.S. at 527–28 (quotation omitted). The parties do not dispute that Castro's speech satisfies the second part, which asks whether the employee's speech addressed "a matter of public concern." *Id.* at 528 (quotation omitted); SPA18.

4

Here, the answer to the question *Kennedy* demands should not be difficult. Castro's personal display was not a government-created message she was hired to deliver. Instead, she hung a crucifix near her desk—along with other items like a New York Yankees team pennant, a painting containing a Puerto Rican flag, and her church calendar—as a "personal expressive item." SPA5. She did not use the crucifix as part of her curriculum or instruction. SPA18. And the school obviously did not "commission[]" or "create[]" that personal display, *Kennedy*, 597 U.S. at 529 (quotation omitted), nor did it "purposefully express[] a message of its own through" Castro and her crucifix, *Shurtleff*, 596 U.S. at 267 (Alito, J., concurring).

The district court, however, confused this inquiry for the more expansive question of whether Castro's expression occurred while she performed her job. In its view, the crucifix must be the government's speech because Castro supposedly "communicated the message to students on a classroom wall during instructional time." SPA21; *see also id.* at 22 ("While she was with students in the classroom for class, Ms. Castro fulfilled her core duties and acted in her capacity as a teacher."). That description paints Castro's expression with far too broad a brush. Indeed, by those lights, presumably *all* of Castro's expression while in her classroom with students present is the school's message.[4]

---

[4] The district court offered no objection to Castro "displaying" her crucifix at times when students are not present. SPA33–34. But the fact that Castro's "official duties" include teaching students does not turn every given message she utters in front of them into speech she was "commissioned" to express. Moreover, the district court's theory that the origin of a message changes based on who might happen to observe it is nonsensical and leads to the bizarre conclusion that the *same* expression is sometimes Castro's personal message and sometimes the government's depending on who is around.

5

The district court's "speech while working" theory flouts the Supreme Court's direction in *Kennedy*. As the Court repeatedly emphasized, the question is not whether the employee's speech occurred *in relation* to his work, "touched on matters" relevant to his employment, or was expressed "within the office environment." *Kennedy*, 597 U.S. at 529–30 (quotation omitted); *see also Garcetti*, 547 U.S. at 420–21 (rejecting the argument that "all speech within the office is automatically exposed to restriction"). Nor is it conclusive, as this Court has made clear, that an ordinary citizen is not provided the same opportunity to speak in a public employee's workplace. *Montero v. City of Yonkers*, 890 F.3d 386, 397–98 (2d Cir. 2018). In other words, it is not enough to ask whether the employee's speech would have occurred absent her public employment. The question is instead whether the employee spoke "pursuant to government policy," "convey[ed] a government-created message," or delivered "speech the [government] paid him to produce." *Kennedy*, 597 U.S. at 529–30. Indeed, *Kennedy* soundly rejected the idea that a high school football coach's on-field prayer became the school's "message" simply because it was performed at the place and time of his job and in view of the players he was hired to coach. *Id.* at 530.

The district court nonetheless suggests that *Kennedy* has nothing to do with this case because the postgame "timing" of the coach's expression was different than that of Castro's, which occurred while "students were in the classroom for instructional time." SPA22. But *Kennedy* squarely rejects that reasoning too. The Supreme Court refuted the argument that everything teachers and coaches say while "on duty" loses its constitutional value and is "subject to government control" simply

because their jobs include "serv[ing] as vital role models" to students. *Kennedy*, 597 U.S. at 530–31. Otherwise, "a school could fire a Muslim teacher for wearing a headscarf in the classroom or prohibit a Christian aide from praying quietly over her lunch in the cafeteria." *Id.* at 531. The First Amendment does not tolerate—let alone require—such a result.

Nor is it dispositive, as the district court surmised, that school policy asks teachers to construct the "physical aspects of [their] classroom[s]" with "both individual students' needs and instructional goals in mind." SPA21. To be sure, Castro generally decorated the walls of her classroom to create a friendly environment. SPA 21. That she *also* hung some personal items near her desk does not transform them into instructional materials too. And the expectation that employees consider their expression with others in mind could be applied to virtually any instance of personal expression in the workplace. What employee does not choose his words, his gestures, his office decor, or his style of dress with an eye toward how his colleagues or clients might react? Sensitivity to the opinions of others in a government office does not mean that every workplace expression is therefore the product of public employment. That logic would nullify, entirely, the idea of First Amendment protections within the office.

More to the point, the Supreme Court has already made clear that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 425. Courts, therefore, should not answer the question whether an employee

7

spoke pursuant to her official duties "with a blinkered focus on the terms of some formal and capacious job description." *Kennedy*, 596 U.S. at 529. Doing so would "allow public employers to use 'excessively broad job descriptions' to subvert the Constitution's protections." *Id.* (quoting *Garcetti*, 547 U.S. at 424). That is exactly the problem here—especially where the school district apparently does not provide specific materials to be hung on classroom walls, nor do administrators review or approve decorations before they are hung. And, if every decoration from a family photo to a sports pennant hung by every teacher were the government's own message to control, the bizarre implication would be that the school expresses a variety of conflicting messages, perhaps supporting both the Yankees and the Red Sox. That cannot be right. *Cf. Matal v. Tam*, 582 U.S. 218, 236 (2017) ("[I]t is far-fetched to suggest that the content of a registered mark is government speech. If [it is] . . . , the Federal Government is babbling prodigiously and incoherently . . . [and] expressing contradictory views.").

Tellingly, the district court struggled to reconcile its theory of "official duties" with the First Amendment's bedrock protections. Seemingly aware that *Kennedy*—and the First Amendment—requires the tolerance of a variety of private religious expression by schoolteachers, the court strained to find a reason that Castro's crucifix must go. The court below swept aside cases concluding that a teacher engages in protected speech when wearing a cross necklace, SPA22–23, on the narrow theory that a necklace is protected because it "come[s] and go[es] with the teacher," while displays on "classroom walls" don't move. SPA23 n.16. That unfounded distinction doesn't hold up. To start, it cannot be right that everything

8

on the classroom walls is the government's expression simply because it owns the walls on which the message is hung. The Supreme Court told us otherwise in *Shurtleff*, where it concluded that flags hung on the City of Boston's flagpole were still protected private expression. *Cf.* 596 U.S. at 259. Moreover, the district court's proposed line misunderstands the "official duties" inquiry, which does not turn specifically on where expression occurs. The lower court fares no better in observing that the school district asks teachers to ensure that classrooms promote student learning. Dist. Ct. Op. at 23 n.16. Again, it is perfectly normal for an employer to put general expectations of decorum on how its employees speak, act, or dress. Consider, for example, a teacher who is subject to a dress code requiring her to wear professional, appropriate, and nondisruptive clothing while teaching. Those expectations do not transform every article of clothing or jewelry a teacher chooses to wear into the school's own message to control. And no one would seriously contend that it would allow the school to outright ban religious head coverings or other religious symbols. To be sure, the government may have different *reasons* to regulate the messages its teachers express when students are present. But while sufficiently strong regulatory interests might justify a restriction on constitutionally protected speech, they do not transform private speech into "governmental speech" free from those protections in the first place. *See infra* Part I.C.

This Court must correct this errant course and reaffirm that the government cannot escape the mandates of the First Amendment by broadly defining "official duties" to encompass all workplace speech.

9

### B. Employees' personal speech is protected even if outsiders mistake it for a governmental message.

The district court further erred in suggesting that an employee's personal expression might lose its First Amendment protections if it is difficult for observers to draw the line between that private speech and speech the government has created. *Cf., e.g.,* SPA26, 50. Again, this is a theory of public-employee speech that is unmoored from the premises of *Pickering* and *Garcetti* and squarely contradicts *Kennedy*.

As recounted above, the question of employer versus employee speech asks from whom the speech effectively originated—the employee in his private capacity or the government as part of the speech the school "pa[ys] him to produce." *Kennedy*, 597 U.S. at 529–30. Or, as Justice Alito recently put it, "government speech occurs if—but only if—a government purposefully expresses a message of its own through persons authorized to speak on its behalf." *Shurtleff*, 596 U.S. at 267 (Alito, J., concurring). Accordingly, the Court's analysis of that question in *Kennedy* turned exclusively on whether the coach's on-field prayer was done "pursuant to [his] official duties," giving no attention to how those in attendance might perceive it. 597 U.S. at 527–30. Most damning, the Court rejected the school district's argument that it could censor the prayer out of concerns that a "reasonable observer [might] (mistakenly) infer that . . . the District endorsed Mr. Kennedy's [religious] message." *Id.* at 533. The more salient point was that the government had not "actually endorsed" or created that "private" message. *Id.* Indeed, well before *Kennedy*, the Supreme Court cautioned that the First Amendment does not set forth a "heckler's

10

veto" through which protected activity "can be proscribed on the basis of what . . . [onlookers] might misperceive." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001); *accord Kennedy*, 597 U.S. at 534.

More generally, the focus on mistaken perceptions reflects an approach to government speech that has fallen out of favor in First Amendment law. In *Kennedy*, the Court declared its "abandon[ment]" of the much-derided *Lemon* test for Establishment Clause cases because its "estimations about whether a reasonable observer would consider the government's challenged action an endorsement of religion" had "invited chaos in lower courts" and "created a minefield" for officials attempting to decide what could take place in settings like schools. 597 U.S. at 534 (citations and internal quotation marks omitted). Only weeks before, three members of the Court called for an end to similar inquiries in cases asking whether government-facilitated messages in public spaces are "governmental" or "private" speech, complaining that "[u]nless the public is assumed to be omniscient, public perception cannot be relevant to whether the government *is* speaking, as opposed to merely *appearing* to speak." *Shurtleff*, 596 U.S. at 265 (Alito, J., concurring). And in addressing a challenge to a law that required certain manufacturers to subsidize government-created advertisements, the Court rejected the argument that the constitutionality of compelled support for government speech depends on whether a "reasonable viewer would identify the speech as the government's." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 564 n.7 (2005).

In all these areas, the constitutional point is the same: The First Amendment protects the right of private individuals to speak, whether or not others will correctly

understand the source of the message they hear. *See, e.g.*, *Shurtleff*, 596 U.S. at 266 (Alito, J., concurring) ("[T]here is no obvious reason why a government should be entitled to suppress private views that might be attributed to it . . ..").  The same is true within the public workplace.  *See* Randy J. Kozel, *Government Employee Speech and Forum Analysis*, 1 J. Free Speech L. 579, 590 & n.47 (2022) ("The Supreme Court is suitably skeptical of claims that audience reaction justifies the restriction of speech. . . . Nor may supervisors ban all religious speech by public employees based solely on concerns about perceived endorsement.").

### C. The government may still regulate employee speech in the workplace—but it must justify its actions.

None of this is to say that personal speech in the workplace cannot be regulated.  But the *Pickering-Garcetti* framework requires the government to *justify* its actions by showing that its legitimate interests "in promoting the efficiency of the public services it performs through its employees" outweigh the individual's interest in personal expression.  *Pickering*, 391 U.S. at 568; *see also Kennedy*, 597 U.S. at 528 (test requires "a delicate balanc[e] of the competing interests" (quotation omitted)).  Those restrictions that can be justified must be "directed at speech that has some potential to affect [the school's] operation."  *Garcetti*, 574 U.S. at 418.  Thus, for example, the government might regulate even protected employee speech that could "contravene governmental policies or impair the proper performance of governmental functions."  *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010) (quotation omitted).

12

To be sure, how Castro's personal expression actually affects students might matter to the ultimate conclusion on whether the school district's actions were permissible. But that is not a question for *Pickering*'s threshold inquiry—which determines only whether it was personal speech deserving of any constitutional protection. The consequence of finding that the speech is actually "the government's" is not that it can be regulated for good cause; rather, as "the government's" own speech, it risks being wantonly, arbitrarily, and possibly even discriminatorily censored. *See Tam*, 582 U.S. at 235 ("If private speech could be passed off as government speech[,] . . . government could silence or muffle the expression of disfavored view[s]."). This flies in the face of *Pickering*, which is meant to stop the government from "suppress[ing] the rights of public employees to participate in public affairs." *Connick v. Meyers*, 461 U.S. 138, 144–145 (1983).

The need to allow room for appropriate regulations based on legitimate governmental interests cannot justify the lower court's move to nullify entirely the First Amendment's protections for wide swaths of private speech by declaring it "the government's" own.

## II. Courts must be especially cautious in employing *Pickering* to restrict free exercise rights.

*Pickering* and its progeny focus on employees' free speech rights. That inquiry does not translate well—indeed threatens great harm—to free exercise claims. For this reason, the Supreme Court recently questioned whether *Pickering* and *Garcetti* should apply differently to claims brought under the Free Exercise Clause. *Kennedy*, 597 U.S. at 531 n.2. The court below recognized as much, but

13

nonetheless suggested that the *Pickering-Garcetti* framework "applies at least in some form to free exercise claims." SPA32. And, because it had already concluded that the crucifix was displayed pursuant to Castro's official duties under *Pickering*, the district court surmised that the same conclusion "precludes [her] free exercise claim." *See* SPA33–34. That circular reasoning misses the mark. The question, as the Supreme Court has noted, that this Court must answer is instead whether the Free Exercise Clause demands a threshold inquiry like *Pickering* and *Garcetti* at all. *See Kennedy*, 597 U.S. at 531 n.2; *see also id.* at 544 (Thomas, J., concurring) ("It remains an open question, however, if a similar analysis can or should apply to free-exercise claims in light of the 'history' and 'tradition' of the Free Exercise Clause.").

The disconnect between the *Pickering* inquiry and the Free Exercise Clause is most apparent at this threshold step, which sorts constitutionally protected expression from unprotected expression, based on some conception of its broader social value. *See supra* Part I.A; *Connick*, 461 U.S. at 146; Randy J. Kozel, *Reconceptualizing Public Employee Speech*, 99 Nw. U. L. Rev. 1007, 1025 (2005). To be sure, that inquiry has been criticized even in speech cases. *See, e.g., Waters v. Churchill*, 511 U.S. 661, 692 (1994) (Scalia, J., concurring); Kozel, *Reconceptualizing Public Employee Speech, supra*, at 1026. But, for better or worse, free speech doctrine is littered with lines separating types of speech that enjoy different constitutional protections. *See generally, e.g.*, Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765 (2004).

14

That line drawing makes no sense for claims concerning personal religious exercise—an activity that always has constitutional value. The notion of varying constitutional "value" for different forms of religious exercise is anathema to the First Amendment. Indeed, "laws [that] establish a preference for certain religions based on the content of their religious doctrine," including "how they worship," are "fundamentally foreign to our constitutional order." *Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248–49 (2025). This is because the promise of free exercise is an "unalienable right" which derives from the individual "conviction and conscience" of each citizen. James Madison, *Memorial and Remonstrance Against Religious Assessments*, in The Separation of Church and State: Writings on a Fundamental Freedom by America's Founders (Forrest Church ed., 2004). That right is inherently personal: It both depends "only on the evidence contemplated by [one's] own mind[]" and reflects one's individual "duty towards the Creator." *Id.* The right to religious exercise has therefore long "enjoyed broad protection." *Fulton v. City of Philadelphia*, 593 U.S. 522, 574 (2021) (Alito, J., concurring). To be sure, that freedom is not absolute; the state's interest in ensuring public peace or safety may at times justify measures that inhibit religious exercise. *See id*. at 575. But such limits do not reflect a judgment that the First Amendment places different value on different forms of religious exercise. The First Amendment, manifestly, does not. *See, e.g.*, *Cath. Charities Bureau*, 605 U.S. at 248–49 (describing the "serious harm" of "differential treatment across religions"); *Larson v. Valente*, 456 U.S. 228, 245 (1982) ("Free exercise . . . can be guaranteed only when legislators—and voters—are required to accord [all] religions the very same

15

treatment . . . ."); John Witte, Jr. et al., Religion and the American Constitutional Experiment 68–75 (5th ed. 2022) (discussing the Framers' interest in safeguarding religious pluralism and protecting against religious discrimination).

The *Pickering-Garcetti* threshold inquiry into "personal" versus "governmental" activity also makes little sense for religious exercise. Under longstanding First Amendment doctrine, there is no tenable concept of the government's "own" religious exercise. *Cf. Kennedy*, 597 U.S. at 537. Indeed, concluding that Castro's crucifix display is the government's own message to control leads to the bizarre suggestion that the school district "created" or "commissioned" that religious exercise. That suggestion would raise very different constitutional questions than those the government confronts here. *Cf. id.* ("Government may not coerce anyone to attend church nor may it force citizens to engage in a formal religious exercise." (citations and quotation omitted)); *Engel v. Vitale*, 370 U.S. 421, 425 (1962) ("[I]t is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.").

Perhaps for these reasons, other courts have omitted this threshold filtering entirely in free exercise cases. For example, in *Watts v. Florida International University*, 495 F.3d 1289 (11th Cir. 2007), a public-university counselor alleged that his rights to free speech and religious exercise were violated when he was fired for encouraging a Catholic patient to consider therapy options offered by a church. Despite rejecting his free speech claim at the threshold step of *Pickering-Garcetti*, the Eleventh Circuit allowed his free exercise claim to proceed without any

16

application of the same. *See id*. at 1293–95. Similarly, in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), a public-university professor alleged that his university's communication policies concerning gender identity violated his rights to free speech and religious exercise. The Sixth Circuit applied *Garcetti* and *Pickering* to the professor's free speech claim but not to his free exercise claim. *See id*. at 504–17. In a similar vein, other courts have suggested that religious expression "is unquestionably of inherent public concern," and thus may easily surpass the threshold in any event. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011); *accord Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1212–13 (9th Cir. 1996); *see also, e.g.*, *Brown v. Polk County*, 61 F.3d 650, 658 (8th Cir. 1995); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011). And this Court has not said otherwise.

The court below nonetheless imported *Pickering*'s threshold inquiry wholesale because, in its view, Castro's religious exercise involved "communication of a religious message." SPA34. In the court's words, Castro's speech and free exercise claims must rise and fall together because her religious activity is "necessarily communicative." SPA 33. But that move cannot be squared with the protections of the First Amendment. The Free Speech and Free Exercise Clauses "work in tandem" to give "overlapping protection for expressive religious activities." *Kennedy*, 597 U.S. at 523. In other words, "the First Amendment *doubly protects* religious speech." *Id.* This, of course, "is no accident." *Id.* The Constitution was designed, in particular, to guard against centuries of "government suppression of speech" that had "been directed precisely at religious speech." *Capitol Square Rev.*

17

*& Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). The First Amendment thus unquestionably protects religious expression—but not simply as a result of the protections that otherwise exist under the Free Speech Clause. Rather, the Free Exercise Clause independently (and simultaneously) protects *all* religious exercise, "whether communicative or not." *Kennedy*, 597 U.S. at 523. The district court badly erred by collapsing Castro's free exercise claim into her free speech claim. *Pickering*'s lessened protections for speech on matters of workplace concern cannot be invoked to ignore the Free Exercise Clause's *additional* protections for Castro's personal religious exercise simply because it happens to be expressive. Indeed, because religious exercise often involves expression, ignoring this second source of constitutional protection risks substantially eroding the First Amendment's protections for public employees who exercise their religion in the workplace.

This Court should reject the application of any "threshold" filtering for employee free exercise claims. Whatever the value of the threshold inquiry to sort between government speech and personal expression, it has no place when the right at issue concerns religious exercise. That exercise is always constitutionally valuable and constitutionally protected. The Court should thus proceed directly to evaluating the government's claimed justifications for restricting Castro's religious exercise.

18

### III. The Supreme Court has repeatedly rebuffed governmental overreach that suppresses religious expression in public life.

Many courts have warned against extending the *Pickering-Garcetti* framework beyond its core context.[5] Indeed, any effort to foster First Amendment "exceptionalism" for workplace speech "creates a risk that fundamental constitutional precepts . . . will lose their resonance for government employees nationwide." Kozel, *Government Employee Speech, supra*, at 580. The district court's ambitious expansion of *Pickering* and *Garcetti* not only threatens to do that but also risks an even broader harm that the Supreme Court has repeatedly worked to prevent: the removal of religious expression from public life.

Our nation has a "long tradition of allowing religious adherents to participate on equal terms" in public life. *Rosenberger*, 515 U.S. at 852–53 (Thomas, J., concurring). The Founders' response to the occasionally violent religious conflicts of their time was not to relegate religion to the private sphere but instead to jealously guard the freedom to engage in public religious expression, regardless of belief or viewpoint. Indeed, "[t]he Religion Clauses of the Constitution aim to foster a society in which people of all beliefs can live together harmoniously." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 38 (2019). The Founders encouraged this diversity of religious expression because they "believed that the public virtues inculcated by religion are a public good." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,

---

[5] *See, e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 678–80 (1996) (Pickering applies with less force to government contractor's speech than an employee's); *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1317 (11th Cir. 2024) (declining to apply Pickering to religious speech by a volunteer minister); *CarePartners, LLC v. Lashway*, 545 F.3d 867, 881–82 (9th Cir. 2008) (collecting cases from First, Second, Third, Fifth, Sixth, Seventh, and Tenth Circuits).

508 U.S. 384, 400–01 (1993) (Scalia, J., concurring); *see also* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2195 (2003). Religion— and a diversity of religious expression—was not to be quieted in public life; it was understood as a "unifying mechanism" to be welcomed there. *Lee v. Weisman*, 505 U.S. 577, 646 (1992) (Scalia, J., dissenting); *see also Town of Greece v. Galloway*, 572 U.S. 565, 584 (2014) (our political history "strive[s] for the idea that people of many faiths may be united in a community of tolerance and devotion").

In recent years, the Supreme Court has worked to safeguard these founding principles by repeatedly rejecting governments' attempts to carve out swaths of public life from which religious expression or religious believers were excluded. In a series of cases, the Court held that states may not bar religious schools from public programs offering valuable benefits to support the education of children enrolled in private schools. *See Carson v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). In *Fulton*, the Court rejected the argument that Philadelphia's "heightened powers when managing its internal operations" allowed it to discriminate against religious groups who wished to participate in the City's foster-care system. 593 U.S. at 535–36. In *Shurtleff*, the Court held that the City of Boston could not invite private groups to display any flag of their choosing—except a religious one—in front of City Hall. 596 U.S. at 259. In *Kennedy*, the Court rebuked a school district for censoring the on-field prayers of a high school football coach on the district's "view that the only acceptable government role models for students are

those who eschew any visible religious expression." 597 U.S. at 540. And, just last year, in *Mahmoud v. Taylor*, the Court held that the government cannot effectively exclude families of certain religious beliefs from the public schools by imposing mandatory curricular material that "interferes with the religious development of their children." 606 U.S. 522, 550 (2025).

Each of these cases saw the government claiming some segment of public life for its own and then secularizing it in the name of official religious "neutrality." But "[o]ur Constitution was not designed to erase religion from American life." *Shurtleff*, 596 U.S. at 288 (Gorsuch, J., concurring). Our governments do not "roam[] the land, . . . scrubbing away any reference to the divine." *Am. Legion*, 588 U.S. at 56. Indeed, as Justice Gorsuch observed in *Shurtleff*, throughout history "the suppression of unpopular religious speech and exercise has been among the favorite tools of petty tyrants. Our forebears resolved that this Nation would be different." 596 U.S. at 284–85 (Gorsuch, J., concurring) (citation omitted). Thus, the Supreme Court has taken great care to ensure that governments extend "mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike." *Kennedy*, 597 U.S. at 514. Far from "creat[ing] a secular public sphere," the First Amendment allows religious believers to "participate fully and equally with their fellow citizens in public life without being forced to shed their religious convictions and character." Michael W. McConnell, *Religious Freedom at a Crossroads*, 59 U. Chi. L. Rev. 115, 117 (1992).

This case yet again asks the courts to prevent government officials from encroaching upon these central freedoms in public life. Cases like *Pickering* and

21

*Garcetti* allow governments to impose certain rules for their employees' speech *as justified* by sufficient governmental interests. They do not, however, embrace the district court's capacious theory that essentially everything expressed in the course of public employment is the government's own speech to control however it sees fit. This Court must reverse the decision below. As the Supreme Court has warned, to hold any "differently would be to treat religious expression as second-class speech and eviscerate" fundamental constitutional rights that safeguard it. *Kennedy*, 597 U.S at 531.

## CONCLUSION

The decision below rests on an overly broad understanding of government speech that would grant the government complete control over nearly everything that is publicly expressed in the workplace. That capacious theory cannot be squared with the Supreme Court's repeated defense of government employees' First Amendment rights while balancing governmental workplace interests. And it threatens to allow the government to unconstitutionally censor—or exclude—the religious from the public square. It must be corrected.[6]

---

[6] *Amicus curiae* thank students Annabella Biancheri, David Jordan, and Jennifer Merkley for their assistance in preparing this brief.

Dated: March 25, 2026          Respectfully submitted,

/s/ *Meredith H. Kessler*

           John A. Meiser
           Meredith H. Kessler
           LINDSAY AND MATT MOROUN
               RELIGIOUS LIBERTY CLINIC
           Notre Dame Law School
           1338 Biolchini Hall
           Notre Dame, IN 46556
           (574) 631-3880

           *Counsel for Amicus Curiae*

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), Fed. R. App. P. 32(a)(7)(B), L.R. 29.3, and L.R. 32.1(a)(4)(a) because it contains 5,908 words, excluding the portions exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it was prepared in Microsoft Word using 14-point Times New Roman, a proportionally spaced font.

Dated: March 25, 2026            */s/ Meredith H. Kessler*
                                 Meredith H. Kessler
                                 *Counsel for* Amicus Curiae

24

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the Court's electronic filing system. I further certify that service was accomplished on all parties via the Court's electronic filing system.

Dated: March 25, 2026

/s/ *Meredith H. Kessler*
Meredith H. Kessler
*Counsel for* Amicus Curiae

25