# No. 25-3047

## In the United States Court of Appeals for the Second Circuit

---

MARISOL ARROYO-CASTRO,

*Plaintiff-Appellant,*

v.

ANTHONY GASPER, in his individual and official capacity, MARYELLEN MANNING, in her individual and official capacity, DARIO SOTO, in his individual and official capacity, and ANDREW MAZZEI, in his individual and official capacity,

*Defendants-Appellees.*

---

On Appeal from the
United States District Court for the District of Connecticut

---

**BRIEF OF RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS AS *AMICI CURIAE* SUPPORTING DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

LUKE ANDERSON
JESS ZALPH
Americans United for Separation
 of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(771) 244-2404
*anderson@au.org*
*zalph@au.org*

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nongovernmental organizations. They have no parent corporations, and no publicly held corporation owns any portion of them.

## TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................i

Table of Authorities.............................................................................. iii

Interests of the *Amici Curiae* ................................................................. 1

Introduction ....................................................................................... 2

Argument ........................................................................................... 3

I.    The Free Exercise Clause does not require the school district to
      allow religious classroom displays............................................3

      A.    Religious material on classroom walls is official speech.................5

      B.    Public employees cannot bring free-exercise challenges to
            the governance of their official duties .................................9

II.   Ms. Castro's religious display violated the Establishment
      Clause .......................................................................13

      A.    Courts have routinely prohibited governmental religious
            displays, including in public-school classrooms...........................14

      B.    Ms. Castro's religious display was unconstitutionally
            coercive ...............................................................18

      C.    Ms. Castro's religious display officially favors one religion
            over others.............................................................22

      D.    Ms. Castro's religious display does not fit within any
            historical tradition....................................................23

III.  Ms. Castro's religious display violated her students' free-
      exercise rights .............................................................28

Conclusion........................................................................... 30

Certificate of Compliance............................................................ 32

Certificate of Service .............................................................. 33

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*ACLU of Ohio Found., Inc. v. Ashbrook,*
    375 F.3d 484 (6th Cir. 2004) ..................................................................15

*Ahlquist v. City of Cranston,*
    840 F. Supp. 2d 507 (D.R.I. 2012) ..........................................................14

*Berry v. Dep't of Soc. Servs.,*
    447 F.3d 642 (9th Cir. 2006) ........................................................9, 11, 15

*Bosse v. Oklahoma,*
    580 U.S. 1 (2016) ......................................................................................17

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.,*
    115 F.4th 1266 (11th Cir. 2024) ................................................................8

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995) ....................................................................................3

*Carson ex rel. O.C. v. Makin,*
    596 U.S. 767 (2022) ..................................................................................29

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,*
    605 U.S. 238 (2025) ............................................................................22, 27

*Cooper v. United States Postal Serv.,*
    577 F.3d 479 (2d Cir. 2009) .....................................................................15

*Doe v. Phillips,*
    81 F.3d 1204 (2d Cir. 1996) .....................................................................17

*Edwards v. Aguillard,*
    482 U.S. 578 (1987) ........................................................... 13, 17, 19, 24

*Engel v. Vitale,*
    370 U.S. 421 (1962) ..................................................................................24

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ....................................................................................22

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Ermold v. Davis,*
130 F.4th 553 (6th Cir. 2025)......................................................10

*Everson v. Bd. of Educ.,*
330 U.S. 1 (1947) .......................................................................24

*Fields v. Speaker of Pa. House of Representatives,*
936 F.3d 142 (3d Cir. 2019)........................................................11

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) .........................................................3, 4, 5, 8

*GLBT Youth in Iowa Schs. Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024).......................................................8

*Gonzales v. N. Twp. of Lake Cnty.,*
4 F.3d 1412 (7th Cir. 1993) .......................................................15

*Gundy v. City of Jacksonville,*
50 F.4th 60 (11th Cir. 2022)..................................................10, 11

*Hilsenrath v. Sch. Dist.,*
136 F.4th 484 (3d Cir. 2025) ......................................................27

*Johnson v. Poway Unified Sch. Dist.,*
658 F.3d 954 (9th Cir. 2011) ...........................................5, 10, 12

*Joki v. Bd. of Educ.,*
745 F. Supp. 823 (N.D.N.Y. 1990) .............................................14

*Jusino v. Fed'n of Cath. Tchrs., Inc.,*
54 F.4th 95 (2d Cir. 2022) .........................................................18

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ............................... 4–8, 12, 17–20, 23, 27

*Knight v. Conn. Dep't of Pub. Health,*
275 F.3d 156 (2d Cir. 2001)........................................................15

*Lane v. Franks,*
573 U.S. 228 (2014) .....................................................................4

iv

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Larson v. Valente,*
    456 U.S. 228 (1982) ................................................................22

*Lee v. Weisman,*
    505 U.S. 577 (1992) ................................. 5, 13, 18–19, 27, 29

*Lee v. York Cnty. Sch. Div.,*
    484 F.3d 687 (4th Cir. 2007) ...............................................5, 6

*Lindke v. Freed,*
    601 U.S. 187 (2024) ................................................................10

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ...................................... 18–19, 28–30

*Marchi v. Bd. of Coop. Educ. Servs.,*
    173 F.3d 469 (2d Cir. 1999)..................................................10

*Marsh v. Chambers,*
    463 U.S. 783 (1983) ....................................................21, 22, 23

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.,*
    474 F.3d 477 (7th Cir. 2007) ...................................................4

*Mech v. School Bd.,*
    806 F.3d 1070 (11th Cir. 2015) ...............................................4

*Mirabelli v. Bonta,*
    607 U.S. 492 (2026) ................................................................30

*Montero v. City of Yonkers,*
    890 F.3d 386 (2d Cir. 2018)......................................................6

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ...........................................................4, 12

*Reges v. Cauce,*
    162 F.4th 979 (9th Cir. 2025).....................................................8

*Roberts v. Madigan,*
    921 F.2d 1047 (10th Cir. 1990) .......................................21, 22

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Santa Fe Indep. Sch. Dist. v. Doe,*
530 U.S. 290 (2000) ..................................................................18, 27

*Sch. Dist. v. Schempp,*
374 U.S. 203 (1963) ..........................................................................25

*Shurtleff v. City of Boston,*
596 U.S. 243 (2022) ..................................................................7, 8, 27

*Simpson v. Chesterfield Cnty. Bd. of Supervisors,*
404 F.3d 276 (4th Cir. 2005) ...........................................................10

*Stinson v. Fayetteville Sch. Dist. No. 1,*
798 F. Supp. 3d 931 (W.D. Ark. 2025)..............................................17

*Stone v. Graham,*
449 U.S. 39 (1980) ................................................................14, 15, 16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ..........................................................................28

*Town of Greece v. Galloway,*
572 U.S. 565 (2014) ..............................................................20, 22, 23

*Van Orden v. Perry,*
545 U.S. 677 (2005) ....................................................................13, 19

*Washegesic v. Bloomingdale Pub. Schs.,*
33 F.3d 679 (6th Cir. 1994) ..........................................................14, 21

*Weintraub v. Bd. of Educ.,*
593 F.3d 196 (2d Cir. 2010).................................................................6

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ..........................................................................29

## Statutes, Rules, and Regulations

Conn. Gen. Stat. § 10-184 .................................................................19

# TABLE OF AUTHORITIES—continued

**Page(s)**

## Other Authorities

1 *The Writings of Thomas Jefferson* (Paul Leicester Ford ed., 1892) ........................................................................................26

Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 Minn. L. Rev. 1415 (2023) ...................................23

David S. Bogen, *The Origins of Freedom of Speech and Press*, 42 Md. L. Rev. 429 (1983) ......................................................26

CBN News, *Teacher on Leave for Refusing to Remove Crucifix Speaks Out* (YouTube, Jan. 29, 2026), https://bit.ly/4xxgnIc [https://perma.cc/3QWR-4L3H].......................16, 30

Commentary to Matthew 5:13–14, *The Ignatius Catholic Study Bible* (Rev. Standard Version Second Catholic Ed. 2001), https://bit.ly/4aj2hjI [https://perma.cc/NA9C-BSUC]...........................20

Andrew Koppelman, *Phony Originalism and the Establishment Clause*, 103 Nw. U. L. Rev. 727 (2009)...................................26

John Leland, *The Rights of Conscience Inalienable* (1791), https://bit.ly/3HDcEyO [https://perma.cc/63ER-J7FW] .........................27

Letter from Thomas Jefferson to Samuel Miller (Jan. 23, 1808), https://bit.ly/31BeShI [https://perma.cc/49CR-AGTM] .........................25

James Madison, *Detached Memoranda* (1820), https://bit.ly/3HGs2e7 [https://perma.cc/33ND-4UGX].........................26

James Madison, *Memorial and Remonstrance against Religious Assessments* (1785), https://bit.ly/2YwACub [https://perma.cc/S6C5-VDQJ] .........................25

Michael A. Helfand, *Why the Ten Commandments Don't Belong in Public Schools*, The Dispatch (May 26, 2026), https://bit.ly/4vix4pq [https://perma.cc/6FU8-6RSA] .............................20

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* are religious and civil-rights organizations that share a commitment to the free exercise of religion and the separation of religion and government. *Amici* have a long history advocating for public-school children and are deeply concerned about the effect of religion in public-school classrooms.

The *amici* are:

- Americans United for Separation of Church and State

- DignityUSA

- Global Justice Institute

- Hindu American Foundation

- Hindus for Human Rights

- Metropolitan Community Churches

- Reconstructionist Rabbinical Association

- Sadhana: Coalition of Progressive Hindus

- Society for Humanistic Judaism

- The Sikh Coalition

---

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

## INTRODUCTION

The leaders of the DiLoreto Elementary & Middle School have a variety of obligations—chief among them to educate and protect their students. When administrators asked Marisol Arroyo-Castro to remove a crucifix from the wall of the classroom where she teaches seventh grade, they did so to protect students from a government actor's violation of their constitutional rights and to enable those students to live and learn freely in a classroom free from religious coercion.

Ms. Castro argues that the crucifix on the classroom wall was part of her private religious practice—an aid in her private prayer—and that any regulation of where the crucifix could be placed was therefore a violation of her free-exercise rights. But this case is not about whether Ms. Castro can engage in private prayer at school—she can. It is about whether she may decorate a public-school classroom wall with religious iconography, especially over the objections of school administrators.

When Ms. Castro acts as a public-school teacher, such as when she decorates her classroom walls, she *is* the government. This comes with a heightened set of responsibilities—including upholding the Establishment Clause and protecting the free-exercise rights of her students. Both of these are violated by the display. And, as a public-school teacher, Ms. Castro is not free to speak without any constraints. The school district is ultimately

2

responsible for the speech of its teachers, and the First Amendment rights that would protect Ms. Castro in her private capacity do not apply to her expression in her official capacity. The Free Exercise Clause cannot be used to undermine valid restraints on public employees' official-capacity expression.

Even if this were not the case, and even if the display were not official speech, the school district has multiple compelling interests in requiring classroom walls to be free of religious displays. The public-school environment is unique: Captive audiences of young children look up to their teachers and are susceptible to peer pressure and bullying. For these reasons, courts are particularly insistent on religious neutrality in elementary and secondary public schools. Against this backdrop, the district court carefully applied binding precedent and correctly ruled in favor of the school district. This Court should affirm.

## ARGUMENT

### I. The Free Exercise Clause does not require the school district to allow religious classroom displays.

"Government employers, like private employers, need a significant degree of control over their employees' words and actions . . . ." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). While public employees receive greater protections than private employees, these protections do not stretch so far

that public employees can assert constitutional rights to contravene their official responsibilities. *Id.* at 418–19, 421. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." *Id.* at 421; *see also Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (the "school system does not 'regulate' teachers' speech as much as it *hires* that speech," to transmit messages acceptable to school officials).

Along these lines, while the Free Exercise Clause protects teachers in their private capacity (*see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022)), they do not have the same free-exercise protections when they act as the government; this is because the First Amendment protects individuals *from* the government. *See Mech v. Sch. Bd.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)). A teacher's speech is attributable to the government if it occurs in the course of activities "'ordinarily within the scope' of [the teacher's] duties." *Kennedy*, 597 U.S. at 529 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). And if speech, including religious speech, "owes its existence to a public employee's professional responsibilities," it is part of the teacher's official duties, and its regulation therefore "does not infringe any liberties." *See Garcetti*, 547 U.S. at 421–22.

4

### A.    Religious material on classroom walls is official speech.

Curating the content of classroom walls is within the ordinary scope of DiLoreto teachers' duties, and the decorations are therefore government speech. "[T]he classroom is inherently an instructional setting . . . ." *Lee v. Weisman*, 505 U.S. 577, 643 (1992) (Scalia, J., dissenting). And while teachers of course exercise some discretion, "[t]he Board of Education owns and controls the classroom walls." Castro Decl. Ex. D, JA83.

Classroom wall displays, including religious ones, have been consistently described as official speech. For example, in *Johnson v. Poway Unified School District*, 658 F.3d 954, 967 (9th Cir. 2011), the Ninth Circuit held that a calculus teacher spoke in his capacity as a public employee when he displayed religious banners in his math classroom. Similarly, in *Lee v. York County School Division*, 484 F.3d 687, 698 (4th Cir. 2007), the Fourth Circuit explained that religious postings on a classroom bulletin board were "school-sponsored speech" because they "were constantly present for review by students in a compulsory classroom setting."

When a public employee's expressive religious activity is made possible by and occurs in the course of their official duties, it is official speech. *See Garcetti*, 547 U.S. at 421–22; *cf. Kennedy*, 597 U.S. at 529. That teachers, including Ms. Castro, can post personal items as well as instructional items on the classroom walls does not convert those classroom walls into private

5

expressive spaces. Since the walls are "school-owned" and "[school]-controlled," even postings that are the result of teachers' "substantial discretion" are "school-sponsored" public-employee speech. *Lee v. York Cnty.*, 484 F.3d at 698–99. Important to the inquiry is whether a "non-employee citizen[]" could engage in the same activity. *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 204 (2d Cir. 2010); *see also Montero v. City of Yonkers*, 890 F.3d 386, 397 (2d Cir. 2018). Plainly, private citizens cannot decorate the classroom walls. As the district court correctly explained, "creating a physical classroom conducive to learning," including by decorating the walls, is part of a DiLoreto teacher's official duties. SPA20. Thus, the factors that led the Supreme Court to conclude the coach's prayer in *Kennedy* was private speech do not apply here—unlike that prayer, this speech is "ordinarily within the scope" of Ms. Castro's duties. *See Kennedy*, 597 U.S. at 529.

Nor does the law governing crucifix necklaces govern here. *Contra* Appellant's Br. 25. Classroom walls are inherently instructional—even if personal expression in this space is allowed—and decorating them is part of a teacher's official duties. By contrast, teachers' personal jewelry is not inherently instructional, and wearing jewelry is not part of a teacher's duties. A crucifix necklace therefore would not be official speech and does not pose the same concerns as a wall display. *Contra* Appellant's Br. 25. And

through the crucifix display, Ms. Castro *was* attempting to fulfill her responsibilities: As she said herself, she believes the crucifix "make[s] the classroom environment more conducive to learning." Castro Decl. ¶ 18, JA58.

Ms. Castro nevertheless argues that she displayed the crucifix as a private citizen. She seems to suggest that if the *purpose* of the crucifix is for only her own personal religious exercise, that is sufficient, or at least close to sufficient, to convert it from official to private activity. Appellant's Br. 19. But Ms. Castro's subjective purpose does not address the key elements of the inquiry—whether the activity would be "ordinarily within the scope of [her] duties," and "owe [its] existence to [her] responsibilities as a public employee." *Kennedy*, 597 U.S. at 529–30 (citation modified). And unlike the private, personal prayer at issue in *Kennedy*, Ms. Castro's religious activity—posting a crucifix—is "before . . . [a] captive audience." *Kennedy*, 597 U.S. at 525.

Ms. Castro proceeds by evaluating the crucifix under the factors outlined in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022). Appellant's Br. 25–28. But as the district court correctly held, *Garcetti* (and its progeny) alone, not *Shurtleff*, provides the correct standard for evaluating official-capacity speech in this context. SPA25. *Shurtleff*'s factors help distinguish between government speech and a government-provided forum for private speakers'

7

views. *See* 596 U.S. at 252. This case is about whether a public employee's speech is official speech.[2]

In the course of these arguments, Ms. Castro asserts that no one would "reasonably" understand the religious display as "speech attributable to the government" or think it "represent[s] the school district's position." Appellant's Br. 15–16. She frames the issue as whether the school district itself delivers the expressive content of personal wall items. Appellant's Br. 26. But when Ms. Castro carries out her official duties as a public-school teacher, she *is* the government. And the test for whether she acted in her official capacity turns on the nature of her job description, not on whether her expression appeared to reflect the official position of the school district as a whole. *See Garcetti*, 547 U.S. at 421; *Kennedy*, 597 U.S. at 530 (evaluating the coach's prayer in the context of his duties as a coach).

Ms. Castro further states that the crucifix cannot be official speech in part because "[t]here is no evidence that DiLoreto classrooms are routinely

---

[2] The cases Ms. Castro cites in support of her suggestion that *Shurtleff*'s factors apply here (Appellant's Br. 28) do not actually support this proposition. While, yes, they involve the "public-education context," none of them involves speech by government employees that would be governed by *Garcetti*. *See Reges v. Cauce*, 162 F.4th 979, 995–96 (9th Cir. 2025) (a professor's academic speech); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) (books in a library); *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1277–78 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 607 (2025) (private use of a state-provided loudspeaker).

adorned with crucifixes" and therefore the "public is unlikely to regard the crucifix as representing the school district's position regarding Christianity." Appellant's Br. 26–27. But this type of reasoning would leave nothing of *Garcetti*—it would mean that statements that teachers make in the classroom would only be treated as official speech if most other teachers are making similar statements. School districts' ability to protect students from improper messages by teachers would be drastically weakened as a result.

**B.** **Public employees cannot bring free-exercise challenges to the governance of their official duties.**

The fact that Ms. Castro's speech is religiously motivated should not change this Court's analysis. *See Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 650 (9th Cir. 2006) (government officials' religious speech is evaluated the same way "regardless of the reason an employee believes his or her speech is constitutionally protected"). Ms. Castro's free-exercise argument boils down to one idea—she was required to take down her crucifix because it is a religious symbol. Therefore, she says, the policy targets religion and strict scrutiny is triggered under the Free Exercise Clause. Appellant's Br. 18–19. If she were only a private citizen, this argument could have merit—the government cannot force private citizens to hide their religious speech because it is religious. But she is not at home, or in a public space, or in her

9

private office—she is in a public-school classroom full of children, and she is responsible for their education and safety. *See Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 475 (2d Cir. 1999) (the validity of a free-exercise restraint depends on context, and the "special nature" of public schools requires extra care). And the Free Exercise Clause does not apply to government employees acting in their official capacity.

Religious liberties are "secured *to the people*," not to the government itself. *See Gundy v. City of Jacksonville*, 50 F.4th 60, 71 (11th Cir. 2022) (quoting *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 289 (4th Cir. 2005) (Niemeyer, J., concurring)); *see also Ermold v. Davis*, 130 F.4th 553, 562 (6th Cir.), *cert. denied*, 146 S. Ct. 398 (2025). For this reason, public employees cannot properly raise free-exercise claims when acting in their official capacities. *See Ermold*, 130 F.4th at 561–62 (holding that the Free Exercise Clause could not be raised by a government official as a defense for refusing to perform her official duties). "[W]hen a public official wields the 'authority of the state,' she 'engage[s] in state action,' which, by definition, cannot be protected by the First Amendment." *Id.* at 562 (quoting *Lindke v. Freed*, 601 U.S. 187, 196–98 (2024)).

This holds true for Ms. Castro—her right to worship publicly is protected when she acts as a private citizen, but not when she acts as a public-school teacher. *See Johnson*, 658 F.3d at 957 ("Just as the Constitution would not

10

protect [a math teacher] were he to decide that he no longer wished to teach math at all . . . it does not permit him to speak as freely at work in his role as a teacher about his views on God . . . as he might on a sidewalk, in a park, at his dinner table, or in countless other locations.").

In *Berry v. Department of Social Services*, the Ninth Circuit refused to apply free-exercise tests to a government employee's display of religious items in the workplace, noting that those tests were not "directly applicable" because they "concerned government restrictions on citizen activities . . . rather than a public employer's limitation on an employee's speech." 447 F.3d at 649 & n.4. And in *Gundy v. City of Jacksonville*, the Eleventh Circuit explained that a pastor delivering politicized religious remarks at a legislative meeting was engaged in government speech, and that the pastor therefore could not bring free-speech *or* free-exercise claims against the city council for regulating, and ultimately prohibiting, his speech. 50 F.4th at 64. The court noted that since the invocation was government speech, the pastor's free-speech claims "must fail," and "in that circumstance, [his] free exercise claims also must fail." *Id.* at 71; *see also Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 160 (3d Cir. 2019) ("Because legislative prayer is government speech, the Free Exercise Clause does not apply, and the . . . free-exercise claim fails.").

11

*Kennedy* does nothing to undermine the principle that the Free Exercise Clause does not apply to public employees' official speech. While the Supreme Court did say there that a governmental policy is not neutral if it targets a practice because it is religious, it said so in the context of a coach's "*private*" prayer that was delivered outside the course of his official duties. *Kennedy*, 597 U.S. at 525–26 (emphasis added).

This body of law makes sense. The consequences of a contrary legal regime would be stark. A social media manager at a federal agency could assert that as part of their personal religious practice they must spread the word of their faith to as many people as possible—and then bring a free-exercise challenge against the agency when the agency stops them from proselytizing on official social media accounts. Or an administrative law judge hearing appeals about disability benefits could use the Free Exercise Clause to defend hanging on the wall of their hearing room religious posters that assert their religion's disapproval of "government handouts." The government is supposed to be able to "select the views that it wants to express." *Johnson*, 658 F.3d at 975 (quoting *Summum*, 555 U.S. at 468). A framework in which the government loses control over its own messaging *because* it is religious would be unworkable—and in the classroom setting, potentially harmful for children.

## II. Ms. Castro's religious display violated the Establishment Clause.

No matter how this Court resolves the other issues in this case, the school district's disciplinary actions were justified because the Establishment Clause prohibits Ms. Castro's religious display. As Ms. Castro seems to concede (Appellant's Br. 35), adherence to the Establishment Clause is a compelling governmental interest that satisfies any level of scrutiny under the First Amendment. *See Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995); *Lee v. Weisman*, 505 U.S. at 587.

The Supreme Court has been "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (quoting *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987)). And courts have repeatedly held that, under the Establishment Clause, governmental bodies and public employees must not communicate religious messages to members of the public, including through symbols. Such displays are particularly problematic when, as here, they are in a coercive setting and favor one religion over others. And contrary to Ms. Castro's suggestion (Appellant's Br. 37–38), there is simply no longstanding historical tradition that

13

supports religious displays by government officials in public-school classrooms.

### A. Courts have routinely prohibited governmental religious displays, including in public-school classrooms.

The extensive case law on religious government displays governs this case. In *Stone v. Graham*, 449 U.S. 39, 42 (1980), the Supreme Court struck down a statute requiring the posting of the Ten Commandments on public-school classroom walls. The statute violated the Establishment Clause because the Ten Commandments displays were likely to "to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* Applying *Stone*, federal courts have struck down other forms of religious imagery in public-school classrooms. For example, in *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 684 (6th Cir. 1994), the Sixth Circuit required a public school to remove a portrait of Christ from a school wall because the portrait amounted to "proselytizing," even though it "may seem 'de minimis' to the great majority." *See also Ahlquist v. City of Cranston*, 840 F. Supp. 2d 507, 526 (D.R.I. 2012) (Christian prayer mural); *Joki v. Bd. of Educ.*, 745 F. Supp. 823, 832 (N.D.N.Y. 1990) (painting of "a figure whom the average observer would believe to be Jesus Christ at his crucifixion").

Courts have reached similar conclusions outside of the public-school setting. For instance, in *Cooper v. United States Postal Service*, 577 F.3d 479, 497 (2d Cir. 2009), this Court prohibited religious displays in a contracted-for post-office space operated by a church, despite a disclaimer stating that the expressed religious viewpoints did not belong to the Postal Service. *See also Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 164–66 (2d Cir. 2001) (Establishment Clause concerns justified reprimand of sign-language interpreter and home-healthcare worker who promoted religious messages to clients receiving state services); *Berry*, 447 F.3d at 657 (public employer's interest in avoiding Establishment Clause violation justified prohibiting employee who had regular in-person contact with the public from displaying religious items in plain view in his cubicle); *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 490–95 (6th Cir. 2004) (display of Ten Commandments poster in courtroom violated Establishment Clause).

Ms. Castro's crucifix, as in *Stone*, 449 U.S. at 41, is "plainly religious in nature." "[T]he crucifix is arguably the quintessential Christian symbol because it depicts Christ's death on the cross and recalls thoughts of his passion and death." *Gonzales v. N. Twp. of Lake Cnty.*, 4 F.3d 1412, 1418 (7th Cir. 1993). And Ms. Castro wishes to use it in a religious manner: In her own words, the crucifix is a way for her to "express [her] identity as a Christian." Castro Decl. ¶ 21, JA59. Ms. Castro's seventh graders had no

15

trouble identifying the crucifix as a religious object, such that multiple students reported it as a distressing exposure to religion. Duve Decl. ¶¶ 6–7, JA186. And like in *Stone*, the crucifix was not "integrated into the school curriculum" through "appropriate study of history, civilization, ethics, comparative religion, or the like" (449 U.S. at 41–42). Castro Decl. Ex. D, JA82–83.

Moreover, Ms. Castro's display was likely to "induce the schoolchildren to . . . meditate upon, perhaps to venerate" the crucifix. *Stone*, 449 U.S. at 42. It was plainly visible to students, and it hung among educational items. Compl. Ex. B, JA43; Duve Decl. ¶¶ 7, JA186. Students are, of course, likely to meditate upon their physical classroom environments, which "ha[ve] a powerful influence on student performance and behavior." Del Pozo Decl. Ex. C, JA195 (school district's policy statement); Castro Decl. ¶ 18, JA58 (expressive items "make the classroom environment more conducive to learning"). Ms. Castro's own description of her young students' inquiries about the crucifix suggests just that. In a January 2025 interview, she explained, "I was teaching fourth grade, third, sixth, seventh. Kids will come up to me and ask me about [the crucifix]. I will tell them that's my cross." When kids asked, "Why is Jesus on it?" she would say, "[B]ecause he was crucified." CBN News, *Teacher on Leave for Refusing to Remove Crucifix*

16

*Speaks Out*, at 02:43 (YouTube, Jan. 29, 2026), https://bit.ly/4xxgnIc [https://perma.cc/3QWR-4L3H].

Ms. Castro's attempt to distinguish *Stone* as inapplicable to religious displays by *"individual[]"* public officials (Appellants' Br. 40 n.6) is misguided. Individual public officials are every bit as capable of violating the Establishment Clause as a public body. *See, e.g., Doe v. Phillips*, 81 F.3d 1204, 1210–11 (2d Cir. 1996) (holding that, under the Establishment Clause, an individual assistant district attorney "has no authority to require a religious act"). Moreover, as demonstrated by students' reactions to Ms. Castro's display, an individual teacher's effect on their classroom is powerful. After all, "students[] emulat[e] . . . teachers." *Edwards*, 482 U.S. at 584.

Ms. Castro also suggests (Appellant's Br. 40 n.6) that this Court should disregard *Stone* altogether because it applied the test set out by *Lemon v. Kurtzman,* 403 U.S. 602 (1971). To be sure, the Supreme Court declared in *Kennedy* that the "Court had long ago abandoned *Lemon*." 597 U.S. at 534. But *Kennedy* did not overrule (or even mention) *Stone. See Stinson v. Fayetteville Sch. Dist. No. 1*, 798 F. Supp. 3d 931, 948 (W.D. Ark. 2025). And it is the "[Supreme] Court's prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016). Moreover, the Second Circuit has already rejected Ms. Castro's suggestion that Supreme Court

17

rulings based on *Lemon* are no longer binding. In *Jusino v. Federation of Catholic Teachers, Inc.*, 54 F.4th 95, 102 (2d Cir. 2022), the Second Circuit held that the Supreme Court's ruling in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), "remains good law notwithstanding its reliance . . . on *Lemon*[.]" Noting that *Kennedy* "indisputably did not . . . overrule—or even mention—*Catholic Bishop*," the court held that "unless and until the Supreme Court sees fit to overrule *Catholic Bishop* directly, it remains binding on this Court." *Jusino*, 54 F.4th at 102.

But even if *Stone* were not binding law, Ms. Castro's religious display would still violate two core Establishment Clause principles that have unquestionably survived *Kennedy*: the prohibitions against religious coercion and religious favoritism.

### B. Ms. Castro's religious display was unconstitutionally coercive.

Ms. Castro's religious display before a "a captive audience" of public-school students was "problematically coercive" under the Establishment Clause. *See Kennedy*, 597 U.S. at 541–42 (first citing *Lee v. Weisman*, 505 U.S. at 580, 598; and then citing *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294, 311 (2000)). The Supreme Court has repeatedly "recognized the potentially coercive nature of classroom instruction" in public schools. *Mahmoud v. Taylor*, 606 U.S. 522, 555 (2025). In addition, "mandatory

18

attendance requirements" (*Edwards*, 482 U.S. at 584) create a legal "obligation" for parents "to send their children to public school unless they find an adequate substitute." *Mahmoud*, 606 U.S. at 561; Conn. Gen. Stat. § 10-184 (Connecticut compulsory-education law).

Thus, "[t]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Mahmoud*, 606 U.S. at 555 (quoting *Lee v. Weisman*, 505 U.S. at 592). Indeed, a religious practice may be deemed unconstitutional in the "special context of the public elementary and secondary school system" (*Edwards*, 482 U.S. at 583) but deemed constitutional elsewhere. *Cf. Van Orden*, 545 U.S. at 691 (plurality opinion) ("The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day.").

Viewed through the lens of this special concern for the captive audience of public-school students, Ms. Castro's display was religiously coercive. The crucifix "confronted . . . students every day." *Id.* Those students—many of whom were non-Christians—had no choice but to receive Ms. Castro's overtly Christian message. Duve Decl. ¶¶ 6, 8, JA186; Conn. Gen. Stat. § 10-184. Ms. Castro misreads *Kennedy* to mean that "[u]nwanted, and even unavoidable, exposure to another's religion in school is not coercion within

19

the Establishment Clause's original public meaning." Appellant's Br. 41. But *Kennedy* specifically distinguished "captive audience" settings where "attendance [is] required." 597 U.S. at 525, 541–42. Understandably so: The Supreme Court has consistently "rejected this *Clockwork Orange* view of the establishment clause—one that allows government to pry open the eyes of its citizens and deploy the techniques of religious proselytization so long as it stops short of compelling formal religious exercise." Michael A. Helfand, *Why the Ten Commandments Don't Belong in Public Schools*, The Dispatch (May 26, 2026), https://bit.ly/4vix4pq [https://perma.cc/6FU8-6RSA].

Ms. Castro's own description of her crucifix belies the notion that it was a passive, personal object meant only for her own religious exercise. Ms. Castro refused to place the crucifix in a concealed location, because displaying it prominently was an act of "letting [her] light shine as Jesus told [her] to do." Castro Decl. ¶ 46, JA64. In other words, the crucifix was a means of "bear[ing] witness to Jesus and his message." Commentary to Matthew 5:13–14, *The Ignatius Catholic Study Bible* (Rev. Standard Version Second Catholic Ed. 2001) (explaining meaning of Jesus's biblical teaching to be the "light of the world"), https://bit.ly/4aj2hjI [https://perma.cc/NA9C-BSUC]. When a public official engages in a practice that is "exploited to proselytize," they violate the Establishment Clause and our nation's "tradition." *Town of Greece v. Galloway*, 572 U.S. 565, 583

(2014) (quoting *Marsh v. Chambers*, 463 U.S. 783, 794–95 (1983)); *see also Washegesic*, 33 F.3d at 684 (holding that a Christ portrait on a public-school wall was an impermissible form of "proselytizing"). And that is precisely what Ms. Castro did here: She exploited her position as a teacher and authority figure to publicly bear witness to Jesus before a captive audience of students.

This is further demonstrated by record evidence. In 2024, the Assistant Principal at DiLoretto Elementary & Middle School received complaints from students in Ms. Castro's class. Mazzei Decl. ¶¶ 9, 11, JA162–63. Students (and staff) raised concerns about the Ms. Castro's "classroom environment," in part due to the visible display of the crucifix on the classroom wall near her desk. Manning Decl. ¶¶ 13, 20, JA142, 144. Students also complained about Ms. Castro chastising students with religious language, including by calling them "sinners" or telling them "[y]ou need Jesus," "God doesn't like liars," and that "God is probably disappointed in you." Mazzei Decl. ¶ 11, JA163. Context matters. The coercive nature of the crucifix—which presents an Establishment Clause violation on its own—was heightened by the religious atmosphere Ms. Castro created in the classroom generally. *See Roberts v. Madigan*, 921 F.2d 1047, 1049 (10th Cir. 1990).

21

### C. Ms. Castro's religious display officially favors one religion over others.

Just as government proselytization falls outside our nation's "tradition" and violates the Establishment Clause, so too does a public official's practice that "advance[s] any one, or . . . disparage[s] any other, faith or belief." *Town of Greece*, 572 U.S. at 583 (quoting *Marsh*, 463 U.S. at 794–95). The Supreme Court unanimously affirmed this principle last year, holding that the "First Amendment mandates government neutrality between religions." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 241 (2025). The Court explained: "'The clearest command of the Establishment Clause' is that the government may not 'officially prefer' one religious denomination over another.'" *Id.* at 247 (citation modified) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)); *accord Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("The First Amendment mandates governmental neutrality between religion and religion.").

Public-school teachers thus have a duty to ensure that their students' classroom environment is religiously neutral. *See, e.g.*, *Roberts*, 921 F.2d at 1054. Teachers are prohibited from singling out one set of beliefs about religion for special treatment. *See, e.g.*, *Epperson*, 393 U.S. at 104. Ms. Castro plainly violated these principles by favoring Christianity through her display of the crucifix.

### D. Ms. Castro's religious display does not fit within any historical tradition.

In *Kennedy*, the Supreme Court emphasized that "the Establishment Clause must be interpreted 'by reference to historical practices and understandings,'" and that the "'line . . . between the permissible and the impermissible' has to 'accord with history and faithfully reflect the understanding of the Founding Fathers.'" *Kennedy*, 597 U.S. at 535–36 (citation modified) (quoting *Town of Greece*, 572 U.S. at 577). Thus, if a governmental practice has an "unambiguous and unbroken history" extending back to the adoption of the First Amendment, that strongly suggests that it does not violate the Establishment Clause. *See Town of Greece*, 572 U.S. at 577 (quoting *Marsh*, 463 U.S. at 792). Ms. Castro has failed to identify such an unambiguous, unbroken history of religious displays in public-school classrooms. By contrast, the anti-coercion and religious-neutrality principles at the heart of the Establishment Clause can be clearly traced to the Founding.

In the early days of the Republic, schools were generally "a product of private action" and were "not open to all, free, or a part of some formal system of schools." Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 Minn. L. Rev. 1415, 1450 (2023). It is therefore unsurprising that Ms. Castro points to no Founding Era examples of

23

religious displays in public schools. Instead, she cites a few examples of largely ceremonial religious invocations (Appellant's Br. 38) that have nothing to do with schools, children, permanent displays, or anything else relevant to this case. Ms. Castro's analogies are particularly strained given the "special context of the public elementary and secondary school system." *Edwards*, 482 U.S. at 583.

Far from supporting Ms. Castro's claims, the historical record makes clear that anti-coercion and religious-neutrality principles have always been core to the Establishment Clause's meaning. This is evident from an examination of the historical abuses the Clause was meant to prevent. Many American colonists left Europe to escape religious establishment and persecution—including official established churches, taxation to support the churches, required attendance at church, and punishment of dissenters. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8–9 (1947). Yet subsequently, in many colonies, the same abuses were repeated. *See id.* at 9–11.

Eventually, the colonists and our nation's Founders "reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions." *Id.* at 11. The Establishment Clause was therefore intended in part to prevent even "indirect coercive pressure upon religious minorities to conform." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

24

And the "first and most immediate purpose" of the Clause "rested on the belief that a union of government and religion tends to destroy government and to degrade religion." *Id.* "The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Id.* at 431–32 (quoting James Madison, *Memorial and Remonstrance against Religious Assessments* (1785), https://bit.ly/2YwACub [https://perma.cc/S6C5-VDQJ]).

When interpreting the Establishment Clause, the Supreme Court has paid particular attention to "the views of Madison and Jefferson," which "came to be incorporated not only in the Federal Constitution but likewise in those of most of our States." *Sch. Dist. v. Schempp*, 374 U.S. 203, 214 (1963). Madison, Jefferson, and related thinkers had a broad view of what constitutes impermissible religious coercion and favoritism by government.

Jefferson was concerned not only about religious coercion sanctioned by "fine & imprisonment" but also about governmental action that could result in "some degree of proscription perhaps in public opinion." Letter from Thomas Jefferson to Samuel Miller (Jan. 23, 1808), https://bit.ly/31BeShI [https://perma.cc/49CR-AGTM]. He explained that official action amounting to "recommendation" of prayer, even without the backing of legal force, was no "less a *law* of conduct for those to whom it is directed." *Id.* And Jefferson

25

shunned governmental religious favoritism. In the famed Virginia Statute for Religious Freedom—which Jefferson wrote and Madison guided to passage (*see* David S. Bogen, *The Origins of Freedom of Speech and Press*, 42 Md. L. Rev. 429, 455 (1983))—Jefferson omitted any reference to Jesus Christ in order "to comprehend, within the mantle of [the law's] protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and Infidel of every denomination." 1 *The Writings of Thomas Jefferson* 62 (Paul Leicester Ford ed., 1892).

Similarly, Madison wrote that even a practice of governmental "recommendation[] only" concerning religion "naturally terminates in a conformity to the creed of the majority and of a single sect, if amounting to a majority." James Madison, *Detached Memoranda* (1820), https://bit.ly/3HGs2e7 [https://perma.cc/33ND-4UGX]. And the Baptist minister John Leland, who "may have been" "the most important proponent of the Establishment Clause" (Andrew Koppelman, *Phony Originalism and the Establishment Clause*, 103 Nw. U. L. Rev. 727, 741 n.67 (2009)), stated that

> the minds of men are biassed to embrace that religion which is favored and pampered by law (and thereby hypocrisy is nourished) while those who cannot stretch their consciences to believe any thing and every thing in the established creed are treated with contempt and opprobrious names; and by such means some are pampered to death by largesses and others confined from doing what good they otherwise could by penury.

26

John Leland, *The Rights of Conscience Inalienable* (1791), https://bit.ly/3HDcEyO [https://perma.cc/63ER-J7FW].

Ms. Castro would reduce this Court's historical analysis to six "hallmarks of religious establishment" she claims now govern the Establishment Clause analysis under *Kennedy*. *See* Appellant's Br. 36–37 (first quoting *Hilsenrath v. Sch. Dist.*, 136 F.4th 484, 491 & n.54 (3d Cir. 2025), *cert. denied*, 146 S. Ct. 885; then quoting *Kennedy*, 597 U.S. at 537; and then citing *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring)). And she further argues that, under this "hallmarks" analysis, her religious display did not violate the Establishment Clause. *Id.* But Ms. Castro's crabbed view of what the Establishment Clause prohibits is contrary to the Supreme Court's recent decisions. No Supreme Court opinion adopts the six hallmarks as the exclusive Establishment Clause test. Indeed, *Kennedy* expressly affirmed that it remains "problematically coercive" under the Establishment Clause for public schools to impose religious messages on a "captive audience" of students. 507 U.S. at 541–42 (citing *Lee*, 505 U.S. at 580, 598, and *Santa Fe*, 530 U.S. at 294, 311 (2000)). *Catholic Charities* then reaffirmed that the Establishment Clause prohibits governmental favoritism of one religion over another. *See* 605 U.S. at 241, 247. If the six hallmarks are interpreted as not encompassing these principles, the

27

hallmarks plainly cannot be viewed as anything more than examples of Establishment Clause violations. Binding case law and the historical record agree: Ms. Castro's religious display violated the Establishment Clause.

### III. Ms. Castro's religious display violated her students' free-exercise rights.

The district's interest in protecting the free-exercise rights of its students meets any level of scrutiny that may apply under the First Amendment. Even if Ms. Castro could assert a free-exercise claim of her own, conduct is not "immunized" by First Amendment guarantees when it "involves . . . invasion of the rights of others." *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). And Ms. Castro's behavior, including through the display of the crucifix on her wall, violated her students' free-exercise rights.

The right to free exercise guarantees that individuals and families, not the government, can make their own decisions about what—if any— religious beliefs and traditions to hold and practice. That necessarily includes the right *not* to be pressured into a government-sponsored religious observance that violates one's conscience, as well as the right to exercise one's own religion without being coerced by the government to suppress one's beliefs. *See Mahmoud,* 606 U.S. at 558 (rejecting the notion that the Free Exercise Clause provides "nothing more than protection against

28

compulsion or coercion to renounce or abandon one's religion"). The Free Exercise Clause protects against governmental burdens on one's sincerely held religious beliefs, including through (1) "indirect coercion or penalties on the free exercise of religion" (*Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022) (citation modified)), or (2) usurpation of parents' prerogative "to guide the religious future . . . of their children" (*Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).

In *Mahmoud*, the Supreme Court noted that the "state exerts great authority and coercive power through public schools because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." 606 U.S. at 554–55 (citation modified); *see also Lee v. Weisman*, 505 U.S. at 592. *Mahmoud* stands squarely for the principle that actions in the classroom can violate students' and parents' free-exercise rights. Like the Establishment Clause, the Free Exercise Clause shields public-school students from improper religious coercion. *See Mahmoud*, 606 U.S. at 554–55 (citation modified). Whether a government official's actions coercively interfere with a child's "religious development" depends on the "context in which" the "material[] at issue [is] presented." *Mahmoud*, 606 U.S. at 550. Specifically, the Supreme Court looked to whether the content was presented in a "neutral" manner and whether it "impose[d] upon students a 'pressure to conform.'" *Id*. (quoting *Yoder*, 406 U.S. at 211). And in *Mirabelli*

29

*v. Bonta*, the Court confirmed that a school's actions do not need to be curricular in order to present a free-exercise burden. *See* 607 U.S. 492, 496 (2026).

Ms. Castro's actions burden her students in exactly the way *Mahmoud* and *Mirabelli* prohibit. Ms. Castro's crucifix is inherently not presented in a religiously "neutral" manner—it is a religious item being used for religious worship and expression. Plus, per *Mirabelli*, the fact that the religious display was not mandated by the curriculum had no bearing on whether it was religiously coercive. *See id.* Ms. Castro acknowledges that religious education became part of her conversations with students. CBN News, *Teacher on Leave for Refusing to Remove Crucifix Speaks Out*, *supra*, at 02:43. Ms. Castro's additional actions—for example, referencing God to chastise her students (Mazzei Decl. ¶ 11, JA163)—only heightened the "pressure to conform" the students must have felt (*Mahmoud*, 606 U.S. at 554). Surely, if the presence of LGBTQ+ characters in a storybook "interfere[s] with" a parent's ability to direct their student's "religious upbringing in a public school setting," this does too. *See Mahmoud*, 606 U.S. at 547, 554–55.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Jess Zalph

LUKE ANDERSON
JESS ZALPH
Americans United for Separation of
  Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(771) 244-2404
*anderson@au.org*
*zalph@au.org*

*Counsel for* Amici Curiae

June 24, 2026

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and Circuit Rule 32.1(a)(4) because it contains 6539 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

Dated: June 24, 2026

/s/ Jess Zalph
Jess Zalph

## CERTIFICATE OF SERVICE

I certify that on June 24, 2026 this brief was filed using the Court's ACMS system. All participants in the case are registered ACMS users and will be served electronically via that system.

Dated: June 24, 2026

/s/ Jess Zalph
Jess Zalph

33